B1 (Official Form) 1 (4/10)

| United States Bankruptcy Court<br>District of Delaware | Voluntary Petition |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Graceway Pharmaceuticals, LLC** | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): Graceway Pharmaceuticals, Inc.,<br>Aldara, Atopiclair, Zyclara, Maxair, Minitran, Tambocor, MetroGel Vaginal, Estrasorb,<br>Norflex, Calcium Disodium Versenate, Duromine, Theolair, Norgesic, Norgesic Forte, and<br>Benziq | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete EIN<br>(if more than one, state all):<br>14-1965385 | Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete<br>EIN (if more than one, state all): |
| Street Address of Debtor (No. and Street, City, and State):<br>**340 Martin Luther King Jr. Blvd., Suite 500**<br>**Bristol, TN**<br>ZIP CODE 37620 | Street Address of Joint Debtor (No. and Street, City, and State):<br>ZIP CODE |
| County of Residence or of the Principal Place of Business:<br>Sullivan | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br>**N/A**<br>ZIP CODE | Mailing Address of Joint Debtor (if different from street address):<br>ZIP CODE |
| Location of Principal Assets of Business Debtor (if different from street address above).<br>N/A | |
| | ZIP CODE |

| Type of Debtor<br>(Form of Organization)<br>(Check **one** box) | Nature of Business<br>(Check one box.) | Chapter of Bankruptcy Code Under Which the<br>Petition is Filed (Check one box.) |
|---|---|---|
| ☐ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*<br>☒ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above<br>entities, check this box and state type of entity<br>below.) | ☐ Health Care Business<br>☐ Single Asset Real Estate as defined in<br>11 U.S.C. § 101(51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☒ Other | ☐ Chapter 7    ☐ Chapter 15 Petition for<br>☐ Chapter 9        Recognition of a Foreign<br>☒ Chapter 11        Main Proceeding<br>☐ Chapter 12    ☐ Chapter 15 Petition for<br>☐ Chapter 13        Recognition of a Foreign<br>                        Nonmain Proceeding |

| | Tax-Exempt Entity<br>(Check box, if applicable)<br>☐ Debtor is a tax-exempt organization under<br>Title 26 of the United States Code (the<br>Internal Revenue Code) | Nature of Debts<br>(Check one box.)<br>☐ Debts are primarily consumer debts, defined<br>in 11 U.S.C. § 101(8) as "incurred by an<br>individual primarily for a personal, family, or<br>household purpose.<br>☒ Debts are primarily business debts. |
|---|---|---|

| Filing Fee (Check one box.) | Chapter 11 Debtors |
|---|---|
| ☒ Full Filing Fee attached<br><br>☐ Filing Fee to be paid in installments (applicable to individuals only). Must<br>attach signed application for the court's consideration certifying that the debtor<br>is unable to pay fee except in installments. Rule 1006(b). See Official Form<br>3A.<br><br>☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must<br>attach signed application for the court's consideration. See Official Form 3B. | **Check one box:**<br>☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D)<br><br>☒ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D)<br><br>**Check if:**<br>☐ Debtor's aggregate noncontingent liquidated debts (excluding debts<br>owed to insiders or affiliates) are less than $2,343,300 *(amount subject to<br>adjustment on 4/01/13 and every three years thereafter).*<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>**Check all applicable boxes**<br>☐ A plan is being filed with this petition.<br>☐ Acceptances of the plan were solicited prepetition from one or more<br>classes of creditors, in accordance with 11 U.S.C. a small business<br>debtor as defined in 11 U.S.C. § 1126(b) |

| Statistical/Administrative Information | THIS SPACE IS FOR<br>COURT USE ONLY |
|---|---|
| ☒ Debtor estimates that funds will be available for distribution to unsecured creditors.<br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds<br>available for distribution to unsecured creditors. | |

Estimated Number of Creditors on a Consolidated Basis

| ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| 1-49 | 50-99 | 100-199 | 200-999 | 1,000-<br>5,000 | 5,001-<br>10,000 | 10,001-<br>25,000 | 25,001-<br>50,000 | 50,001-<br>100,000 | Over<br>100,000 |

Estimated Assets on a Consolidated Basis

| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001<br>to $1 million | $1,000,001<br>to $10 million | $10,000,001<br>to $50 million | $50,000,001<br>to $100 million | $100,000,001<br>to $500 million | $500,000,001<br>to $1 billion | More than<br>$1 billion |

Estimated Liabilities on a Consolidated Basis

| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001<br>to $1 million | $1,000,001<br>to $10 million | $10,000,001<br>to $50 million | $50,000,001<br>to $100 million | $100,000,001<br>to $500 million | $500,000,001<br>to $1 billion | More than<br>$1 billion |

| **Voluntary Petition**<br>*(This page must be completed and filed in every case.)* | **Name of Debtor(s):**<br>Graceway Pharmaceuticals, LLC | |
|---|---|---|
| **All Prior Bankruptcy Cases Filed Within Last 8 Years** (If more than two, attach additional sheet.) | | |
| Location<br>Where Filed: N/A | Case Number: | Date Filed: |
| Location<br>Where Filed: N/A | Case Number: | Date Filed: |
| **Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor** (If more than one, attach additional sheet.) | | |
| Name of Debtor:<br>    See Addendum. | Case Number: | Date Filed: |
| District:<br>    District of Delaware | Relationship: | Judge: |

| **Exhibit A** | **Exhibit B** |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐   Exhibit A is attached and made a part of this petition. | (To be completed if debtor is an individual whose debts are primarily consumer debts.)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I have delivered to the debtor the notice required by 11 U.S.C. § 342(b).<br><br>X _____<br>    Signature of Attorney for Debtor(s)      (Date) |

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐   Yes, and Exhibit C is attached and made a part of this petition.

☒   No.

**Exhibit D**

(To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

    ☐   Exhibit D completed and signed by the debtor is attached and made a part of this petition.

If this is a joint petition:

    ☐   Exhibit D also completed and signed by the joint debtor is attached and made a part of this petition.

**Information Regarding the Debtor – Venue**
(Check any applicable box.)

☒   Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐   There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐   Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

**Certification by a Debtor Who Resides as a Tenant of Residential Property**
(Check all applicable boxes.)

☐   Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

            _____
            (Name of landlord that obtained judgment)

            _____
            (Address of landlord)

☐   Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐   Debtor has included with this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

☐   Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(1)).

| Voluntary Petition<br>*(This page must be completed and filed in every case.)* | Name of Debtor(s):<br>Graceway Pharmaceuticals, LLC |
|---|---|

### Signatures

| Signature(s) of Debtor(s) (Individual/Joint) | Signature of a Foreign Representative |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct.<br>[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.<br>[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. § 342(b).<br><br>I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _____<br>    Signature of Debtor<br><br>X _____<br>    Signature of Joint Debtor<br><br>    _____<br>    Telephone Number (if not represented by attorney)<br><br>    _____<br>    Date | I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.<br><br>☐  I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U.S.C. § 1515 are attached.<br><br>☐  Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.<br><br>X _____<br>    (Signature of Foreign Representative)<br><br>X _____<br>    (Printed Name of Foreign Representative)<br><br>    _____<br>    Date |
| **Signature of Attorney\***<br><br>X _____<br>    Signature of Attorney for Debtor(s)<br><br>Michael R. Nestor (No. 3526)<br>YOUNG CONAWAY STARGATT & TAYLOR LLP<br>1000 West Street, 17th Floor<br>Wilmington, Delaware 19801<br>Telephone: (302) 571-6600<br>Facsimile: (302) 571-1253<br><br>    and<br><br>David S. Heller<br>Josef S. Athanas<br>LATHAM & WATKINS LLP<br>233 S. Wacker Drive, Suite 5800<br>Chicago, IL 60606<br>Telephone: (312) 876-7700<br>Facsimile: (312) 993-9767<br><br>Date 9/29 , 2011<br><br>*In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect. | **Signature of Non-Attorney Bankruptcy Petition Preparer**<br><br>I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19 is attached.<br><br>    _____<br>    Printed Name and title, if any, of Bankruptcy Preparer<br><br>    _____<br>    Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social-Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.)<br><br>    Address<br><br>X _____<br><br>    Date |
| **Signature of Debtor (Corporation/Partnership)**<br><br>I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.<br><br>The debtor requests the relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X *Brian G. Shrader*<br>    Signature of Authorized Individual<br><br>    Brian G. Shrader<br>    Chief Financial Officer<br><br>    *September 29, 2011*<br>    Date | Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose Social-Security number is provided above.<br><br>Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual.<br><br>If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.<br><br>*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.* |

## Addendum to the Voluntary Petition

Pending Bankruptcy Cases Filed by Any Spouse, Partner or Affiliate of this Debtor:

On the date hereof, each of the affiliated entities listed below (including the Debtor in this chapter 11 case) filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware.

**Graceway Holdings, LLC**
340 Martin Luther King Jr. Blvd., Suite 500
Bristol, TN 37620

**Graceway Pharmaceuticals, LLC**
340 Martin Luther King Jr. Blvd., Suite 500
Bristol, TN 37620

**Chester Valley Holdings, LLC**
340 Martin Luther King Jr. Blvd., Suite 500
Bristol, TN 37620

**Chester Valley Pharmaceuticals, LLC**
340 Martin Luther King Jr. Blvd., Suite 500
Bristol, TN 37620

**Graceway Canada Holdings, Inc.**
340 Martin Luther King Jr. Blvd., Suite 500
Bristol, TN 37620

**Graceway International, Inc.**
340 Martin Luther King Jr. Blvd., Suite 500
Bristol, TN 37620

**Graceway Pharma Holding Corp.**
340 Martin Luther King Jr. Blvd., Suite 500
Bristol, TN 37620

# SECRETARY'S CERTIFICATE
## OF GRACEWAY PHARMACEUTICALS, LLC

### September 27, 2011

The undersigned, the duly authorized officer of Graceway Pharmaceuticals, LLC, a Delaware limited liability company (the "Company") (solely in his capacity as an authorized officer of the Company and not in any individual capacity), hereby certifies on behalf of the Company that the attached is a true and correct copy of the resolutions duly adopted by the Board of Managers of the Company at a meeting held on September 27, 2011, and that such resolutions have been entered in the corporate records of the Company and have not been amended or revoked and are in full force and effect on the date hereof.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned, the duly authorized officer of the Company (solely in his capacity as an authorized officer of the Company and not in any individual capacity), has executed and delivered this certificate for and on behalf of the Company (and not any other person) as of the date first set forth above.

GRACEWAY PHARMACEUTICALS, LLC

By: _____

Name: John A. A. Bellamy

Title: Secretary, General Counsel

# RESOLUTIONS OF
# THE BOARD OF MANAGERS OF
# GRACEWAY PHARMACEUTICALS, LLC

## September 27, 2011

**WHEREAS**, the Board of Managers (the "Board") of Graceway Pharmaceuticals, LLC, a Delaware limited liability company (the "Company"), has reviewed and analyzed the materials presented by management and the outside financial and legal advisors of the Company regarding the financial condition, capital structure, liquidity position, business model and projections, short term and long term prospects of the Company and the restructuring and other strategic alternatives available to it, and the impact of the foregoing on the Company's businesses; and

**WHEREAS**, the Board has determined that it is desirable and in the best interests of the Company and its unitholders generally that the Company file a petition for relief under the provisions of Chapter 11 of the Bankruptcy Code (the "Bankruptcy Code").

## Voluntary Petition Under the Provisions of Chapter 11 of the Bankruptcy Code

BE IT RESOLVED, that the Company and its domestic affiliates are hereby authorized and directed to file or cause to be filed voluntary petitions for relief under the provisions of Chapter 11 of the Bankruptcy Code (the cases commenced thereby, the "Chapter 11 Cases");

BE IT FURTHER RESOLVED, that the Chief Executive Officer, Chief Financial Officer, President, General Counsel, and Executive Vice President of the Company or such other officers of the Company as the Board may designate (each, an "Authorized Officer" and collectively, the "Authorized Officers") be, and each of them hereby is, authorized and directed to execute and verify said petition of the Company in the name of the Company under Chapter 11 of the Bankruptcy Code and to cause the same to be filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), in such form and at such time as the Authorized Officer executing said petition shall determine;

BE IT FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized and directed to execute and verify the petitions of the Company's direct and indirect wholly-owned subsidiaries, including Chester Valley Holdings, LLC, a Delaware limited liability company ("Chester Holdings"); Chester Valley Pharmaceuticals, LLC, a Delaware limited liability company ("Chester Valley"); Graceway Canada Holdings, Inc., a Delaware corporation ("Canada Holdings"); and Graceway International, Inc., a Delaware corporation ("Graceway International"), under Chapter 11 of the Bankruptcy Code and to cause the same to be filed with the Bankruptcy Court, in such form and at such time as the Authorized Officer executing said petitions shall determine; and

BE IT FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized and directed to execute and file, or cause to be filed (or direct others to do so on their behalf as provided herein) with the Bankruptcy Court, on behalf of the Company, and on behalf of the Company's direct and indirect wholly-owned subsidiaries, including Chester

Holdings, Chester Valley, Canada Holdings and Graceway International, all petitions, affidavits, schedules, motions, lists, applications, pleadings and other necessary papers or documents, including any amendments thereto, and, in connection therewith, to employ and retain all assistance by legal counsel, accountants or other professionals and to take any and all action that they deem necessary or proper to obtain such Chapter 11 bankruptcy relief, and to take any necessary steps to coordinate each Chapter 11 case contemplated by the Company and its domestic subsidiaries under the Bankruptcy Code.

## Sale Support Agreement

BE IT RESOLVED, that the Board has reviewed a draft of the Sale Support Agreement, substantially in the form attached hereto as <u>Annex I</u> (the "<u>Sale Support Agreement</u>"), that is proposed to be entered into among the Company, Graceway Pharma Holding Corp., Graceway Holdings, LLC, Canada Holdings, Graceway International, Chester Holdings, Chester Valley, Graceway Canada Company and the Consenting First Lien Lenders (as defined in the Sale Support Agreement);

BE IT FURTHER RESOLVED, that the Board has determined it to be advisable and fair to, and in the best interests of, the Company, its affiliates, creditors, unitholders and other interested parties to execute and deliver the Sale Support Agreement and to consummate the other transactions contemplated thereby;

BE IT FURTHER RESOLVED, that the execution, delivery and performance by the Company of the Sale Support Agreement, in substantially the form attached hereto as <u>Annex I</u>, and the consummation of the other transactions contemplated thereby shall be, and they hereby are, authorized, adopted and approved for all purposes and in all respects;

BE IT FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized and directed to execute and verify said Sale Support Agreement, in such form and at such time as the Authorized Officer executing said Sale Support Agreement shall determine; and

BE IT FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized and directed, on behalf of and in the name of the Company or any of its affiliates, to take or cause to be taken any and all such further actions and to execute and deliver or cause to be executed or delivered all such further agreements, documents, certificates and undertakings (together with the Sale Support Agreement, collectively, the "<u>Transaction Documents</u>"), as in their judgment, shall be necessary, appropriate or advisable to effect the transactions contemplated by the Transaction Documents, in each case together with such changes thereto as the Authorized Officers, after consultation with counsel, shall deem necessary, appropriate or advisable, consistent with the purpose and intent of the foregoing resolution.

## Postpetition Financing

BE IT RESOLVED, that the obtaining of senior secured postpetition financing by the Company, and the unconditional guaranteeing, jointly and severally, of the Company's obligations in respect of such senior secured postpetition financing by the other debtors and

debtors in possession (other than the Company), consisting of a $6,000,000 intercompany term loan (the "Intercompany Loan") from Graceway Canada Company (the "Postpetition Lender") to the Company, be, and it hereby is, authorized and approved for all purposes and in all respects;

BE IT FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized and directed, with full power of delegation, in the name and on behalf of the Company (including in the Company's capacity as a stockholder, interest holder and/or member of each of its affiliates), to negotiate, document, execute, deliver and otherwise take any and all actions necessary or appropriate for the Company to obtain senior secured postpetition financing from the Postpetition Lender consisting of the Intercompany Loan, and to effectuate the foregoing, to enter into such loan agreements, documents, notes, guaranties, security agreements, pledge agreements and all other documents, agreements or instruments (collectively, the "Credit Documents") as may be deemed necessary or appropriate by such Authorized Officers; and

BE IT FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized and directed, with full power of delegation, in the name and on behalf of the Company (including in the Company's capacity as a stockholder, interest holder and/or member of each of its affiliates) to execute, verify and/or file, or cause to be filed and/or executed or verified (or direct others to do so on their behalf as provided herein) all necessary documents, including, without limitation, all Credit Documents, petitions, affidavits, schedules, motions, lists, applications, pleadings and other papers, and in connection therewith, to employ and retain all assistance by legal counsel, accountants, financial advisors, investment bankers or other professionals and to take any and all actions that such Authorized Officers deem necessary or proper in connection with the Chapter 11 Cases or with the Intercompany Loan contemplated hereby.

## Retention of Professionals

BE IT RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized and directed, on behalf of and in the name of the Company, to employ the law firm of Latham & Watkins LLP, as co-general bankruptcy counsel, to represent and advise the Company and its affiliates in carrying out their duties under the Bankruptcy Code, and to take any and all actions to advance the Company's and its affiliates' rights and obligations, including filing any pleadings, in connection with the Chapter 11 Cases, the Authorized Officers are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon filing of the Chapter 11 Cases, and cause to be filed an appropriate application with the Bankruptcy Court for authority to retain the services of Latham & Watkins LLP;

BE IT FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized and directed, on behalf of and in the name of the Company, to employ the firm of Young Conaway Stargatt & Taylor, LLP, as co-general bankruptcy counsel, to represent and advise the Company and its affiliates in carrying out their duties under the Bankruptcy Code, and to take any and all actions to advance the Company's and its affiliates' rights and obligations in connection with the Chapter 11 Cases, the Authorized Officers are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and

immediately upon the filing of the Chapter 11 Cases, and cause to be filed an appropriate application with the Bankruptcy Court for authority to retain the services of Young Conaway Stargatt & Taylor, LLP;

BE IT FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized and directed, on behalf of and in the name of the Company, to employ the firm of Alvarez and Marsal North America, LLC, as financial advisor, to represent and assist the Company and its affiliates in carrying out their duties under the Bankruptcy Code, and to take any and all actions to advance the Company's and its affiliates' rights and obligations in connection with the Chapter 11 Cases, the Authorized Officers are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Chapter 11 Cases, and cause to be filed an appropriate application with the Bankruptcy Court for authority to retain the services of Alvarez and Marsal North America, LLC;

BE IT FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized and directed, on behalf of and in the name of the Company, to employ the firm of Lazard Freres & Co. LLC, as investment banker, to represent and assist the Company and its affiliates in carrying out their duties under the Bankruptcy Code, and to take any and all actions to advance the Company's and its affiliates' rights and obligations in connection with the Chapter 11 Cases, the Authorized Officers are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Chapter 11 Cases, and cause to be filed an appropriate application with the Bankruptcy Court for authority to retain the services of Lazard Freres & Co. LLC;

BE IT FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized and directed, on behalf of and in the name of the Company, to employ the firm of PricewaterhouseCoopers LLP, as tax consultant, to represent and assist the Company and its affiliates in carrying out their duties under the Bankruptcy Code, and to take any and all actions to advance the Company's and its affiliates' rights and obligations in connection with the Chapter 11 Cases, the Authorized Officers are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Chapter 11 Cases, and cause to be filed an appropriate application with the Bankruptcy Court for authority to retain the services of PricewaterhouseCoopers LLP;

BE IT FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized and directed, on behalf of and in the name of the Company, to employ the firm of BMC Group, Inc., as claims, noticing, soliciting and balloting agent, to assist the Company and its affiliates in carrying out their duties under the Bankruptcy Code, and to take any and all actions to advance the Company's and its affiliates' rights and obligations in connection with the Chapter 11 Cases, the Authorized Officers are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Chapter 11 Cases, and cause to be filed an appropriate application with the Bankruptcy Court for authority to retain the services of BMC Group, Inc.; and

4

BE IT FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized and directed, on behalf of and in the name of the Company, to employ any other professionals necessary to assist the Company and its affiliates in carrying out their duties under the Bankruptcy Code; and in connection therewith, the Authorized Officers are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to or immediately upon the filing of the Chapter 11 Cases and cause to be filed appropriate applications with the Bankruptcy Court for authority to retain the services of any other professionals, as necessary.

## Consent Regarding Other Bankruptcies

BE IT RESOLVED, that out of an abundance of caution, the Board hereby agrees and consents that the filing of Graceway Holdings, LLC's petition for bankruptcy (to be filed contemporaneously with that of the Company) shall not constitute a cessation of Graceway Holdings, LLC's interest in the Company under Section 18-304 of the Delaware Limited Liability Company Act and Graceway Holdings, LLC, shall remain the sole unitholder of the Company; and

BE IT FURTHER RESOLVED, that out of an abundance of caution, the Board hereby agrees and consents that the filing of a petition for bankruptcy by the Company, as the sole unitholder of Chester Holdings (to be filed contemporaneously with that of Chester Holdings), shall not constitute a cessation of the Company's interest in Chester Holdings under Section 18-304 of the Delaware Limited Liability Company Act and the Company shall remain the sole unitholder of Chester Holdings.

## General

BE IT RESOLVED, that all acts lawfully done or actions lawfully taken by any Authorized Officer of the Company or any of the professionals to seek relief on behalf of the Company under Chapter 11 of the Bankruptcy Code or in connection with the Chapter 11 Cases in connection with such proceedings, or any matter related thereof, by, and hereby are, adopted, ratified, confirmed and approved in all respects as the acts and deeds of the Company;

BE IT FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to cause the Company and its affiliates to enter into, execute, deliver, certify, file and/or record and perform such agreements, instruments, motions, affidavits, applications for approvals or ruling of governmental or regulatory authorities, certificates or other documents, to incur all such fees and expenses and to take such other action, as in the judgment of such Authorized Officer shall be or become necessary, proper and desirable to prosecute to a successful completion of the Chapter 11 Cases, to effectuate the restructuring of debt, other obligations, organizational form and structure and ownership of the Company and to carry out and put into effect the purposes of the foregoing resolutions and the transactions contemplated by these resolutions;

BE IT FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized and empowered, with full power of delegation, for and in the name and on behalf of the Company to amend, supplement or otherwise modify from time to time the terms of

any documents, certificates, instruments, agreements or other writings referred to in the foregoing resolutions; and

BE IT FURTHER RESOLVED, that all acts, actions and transactions that are consistent with the foregoing resolutions done in the name of and on behalf of the Company, which acts would have been approved by the foregoing resolutions except that such acts were taken before these resolutions were certified, are hereby adopted, ratified, confirmed and approved in all respects as the acts and deeds of the Company.

YCST01: 11468508.1

070649.1001

## **Annex 1**

Sale Support Agreement

## SALE SUPPORT AGREEMENT

This SALE SUPPORT AGREEMENT (as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof, this "*Agreement*"), dated as of September 28, 2011, is entered into by and among Graceway Pharmaceuticals, LLC ("*Graceway*"), Graceway Pharma Holding Corp., Graceway Holdings, LLC ("*Holdings*"), Chester Valley Holdings, LLC, Chester Valley Pharmaceuticals, LLC, Graceway Canada Holdings, Inc. and Graceway International, Inc. (such entities collectively, the "*Graceway Entities*" or the "*Company*"), Graceway Canada Company, a Nova Scotia unlimited liability corporation ("*Graceway Canada*") and each of the first lien lenders party hereto in its capacity as such (each, a "*Consenting First Lien Lender*", and collectively, the "*Consenting First Lien Lenders*"). Each of the Graceway Entities, Graceway Canada and each of the Consenting First Lien Lenders are referred to herein individually as a "*Party*", and collectively as the "*Parties*".

## RECITALS

WHEREAS, certain Graceway Entities are party to that certain $680,000,000 First Lien Credit Agreement, dated as of May 3, 2007 (as amended, modified, supplemented or waived from time to time, the "*First Lien Credit Agreement*"), by and among Graceway, as borrower, Holdings, the Lenders (as defined in the First Lien Credit Agreement and hereinafter referred to as the "*First Lien Lenders*") and Bank of America, N.A. ("*BofA*"), as first lien collateral agent (together with any successor collateral agent appointed, the "*First Lien Collateral Agent*") and administrative agent (together with any successor administrative agent appointed, the "*First Lien Administrative Agent*") for the First Lien Claimholders (as defined in the Intercreditor Agreement, dated as of May 3, 2007 (the "*Intercreditor Agreement*"), among Graceway, Holdings, the First Lien Collateral Agent and Deutsche Bank Trust Company Americas, as second lien collateral agent, without giving effect to any cap provided for therein), providing for a credit facility of $680,000,000 (the "*First Lien Credit Facility*");

WHEREAS, certain Graceway Entities are party to that certain Guaranty, dated as of May 3, 2007 (the "*Guaranty*"), among Holdings, the Subsidiary Guarantors (as defined in the First Lien Credit Agreement) and the First Lien Administrative Agent;

WHEREAS, as of September 29, 2011, Graceway, Holdings and the Subsidiary Guarantors are obligated pursuant to the First Lien Credit Agreement and Guaranty for an aggregate outstanding principal amount of First Lien Loan Claims (as defined below) equal to $430,698,397.57;

WHEREAS, each Party desires that the Graceway Entities sell substantially all of their assets (the "*U.S. Assets*") pursuant to Section 363 of the Bankruptcy Code and that Graceway Canada sell substantially all of its assets (the "*Canadian Assets*" and together with the U.S. Assets, the "*Assets*"), in each case subject to the terms and conditions of this Agreement;

WHEREAS, subject to the terms and conditions of this Agreement, the Parties have agreed to support the Sale (as defined below); and

WHEREAS, the Graceway Entities intend to commence voluntary reorganization cases (the "*Chapter 11 Cases*") under chapter 11 of title 11 of the United States Code (as amended from time to time, the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") to effect the Sale; and

WHEREAS, Graceway Canada intends to make an application to Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada (the "*Canadian Court*") and, if so reasonably requested by the Prevailing Purchaser (as defined herein), to any other courts of any other provinces in which Canadian Seller has Canadian Assets material to the Business as conducted by Canadian Seller (together with the Canadian Court, the "*Requested Canadian Courts*"), for the appointment of a receiver (the "*Receiver*"), and, if so reasonably requested by the Prevailing Purchaser, for recognition in any other provinces in which Graceway Canada has Canadian Assets material to the Business as conducted by Graceway Canada and such recognition is necessary for the transfer of such Canadian Assets, to oversee the Sale of the Canadian Assets under the Asset Purchase Agreement (as defined below) in concert with the process before the Bankruptcy Court.

NOW, THEREFORE, in consideration of the premises and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      Incorporation of Defined Terms.  Capitalized terms used and not defined in this Agreement shall have the meaning ascribed to them in the Asset Purchase Agreement or First Lien Credit Agreement, as applicable.

2.      Definitions.  The following terms shall have the following definitions:

"*1.0% Holdback Account*" has the meaning set forth in section 4(b)(iii).

"*Agreement*" has the meaning set forth in the preamble hereof.

"*Affiliate*" means, with respect to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

-2-

"*Agreement Effective Date*" has the meaning set forth in section 6 hereto.

"*Alternative Transaction*" has the meaning set forth in section 5(b) hereto.

"*Assets*" has the meaning set forth in the recitals hereto.

"*Asset Purchase Agreement*" means the asset purchase agreement, dated as of September 27, 2011, attached hereto as Exhibit A.

"*Bankruptcy Code*" has the meaning set forth in the recitals hereto.

"*Bankruptcy Court*" has the meaning set forth in the recitals hereto.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court, each as amended from time to time.

"*Bidding Procedures*" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"*Bidding Procedures Order*" means an order of the Bankruptcy Court, approving, among other things, the Bidding Procedures and the Break-Up Fee.

"*Board of Directors*" has the meaning set forth in section 5(b) hereto.

"*BofA*" has the meaning set forth in the recitals hereto.

"*Business*" has the meaning set forth in the Asset Purchase Agreement.

"*Business Day*" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"*Canadian Assets*" has the meaning set forth in the recitals hereto.

"*Canadian Cash Consideration*" means that portion of the Cash Consideration allocated to the Canadian Assets as approved by the Bankruptcy Court and the Canadian Court prior to, or at the same time as, entry of the Sale Order, after notice and opportunity to appear and be heard by the Required Supporting Lenders, less any Cure Costs required to be paid by Graceway Canada in accordance with the Asset Purchase Agreement.

"*Canadian Court*" has the meaning set forth in the recitals hereto.

"*Carve-Out*" has the meaning set forth in Interim Cash Collateral Order.

-3-

"**Carve-Out Trigger Notice**" means a written notice delivered by the First Lien Administrative Agent to the Graceway Entities' lead counsel, the U.S. Trustee, counsel to the Second Lien Administrative Agent and counsel to any Creditors' Committee appointed in these Chapter 11 Cases, which notice may be delivered at any time following the occurrence and during the continuation of any event of default under the Cash Collateral Order, expressly stating that the Carve-Out is invoked.

"**Cash Collateral**" means "cash collateral," as defined in Section 363 of the Bankruptcy Code, in which the First Lien Administrative Agent, the First Lien Collateral Agent and/or the First Lien Claimholders, as applicable, have a lien, security interest or other interest (including, without limitation, any adequate protection liens or security interests), in each case whether existing on the Petition Date, arising pursuant to the Cash Collateral Order or otherwise.

"**Cash Collateral Order**" means the Interim Cash Collateral Order or Final Cash Collateral Order, as applicable.

"**Cash Consideration**" means cash in U.S. dollars equal to the Purchase Price net of any Break-Up Fee required to be paid by the Company and Graceway Canada to the Stalking Horse Bidder pursuant to the terms of the Asset Purchase Agreement.

"**CCR Account**" has the meaning set forth in Section 4(b)(v) hereto.

"**Chapter 11 Cases**" has the meaning set forth in the recitals hereto.

"**CJA**" means the Court of Justice Act (Ontario).

"**claims**" has the meaning assigned to such term in the Bankruptcy Code.

"**Closing Date**" has the meaning assigned to such term in the Asset Purchase Agreement.

"**COBRA**" means the provisions of the Consolidated Omnibus Budget Reconciliation Act, as set forth in Section 4980B of the Code, or any similar state law.

"**Committee Professionals Carve-Out Cap**" has the meaning set forth in Interim Cash Collateral Order.

"**Company**" has the meaning set forth in the preamble hereof.

"**Consenting First Lien Lender(s)**" has the meaning set forth in the preamble hereof.

"**Consenting First Lien Lender Claims**" has the meaning set forth in section 9(a) hereto.

-4-

"*Creditors' Committee*" means the official committee of unsecured creditors appointed by the Office of the United States Trustee in the Chapter 11 Cases, if any.

"*Debtors' Professionals Carve-Out Cap*" has the meaning set forth in Interim Cash Collateral Order.

"*Definitive Documents*" has the meaning set forth in section 3(a) hereto.

"*Designated Account*" has the meaning set forth in section 4(b)(ii) hereto.

"*Employee Account*" has the meaning set forth in section 4(b)(iv) hereto.

"*Final Cash Collateral Order*" has the meaning set forth in section 4(a) hereto.

"*First Lien Administrative Agent*" has the meaning set forth in the recitals hereto.

"*First Lien Collateral Agent*" has the meaning set forth in the recitals hereto.

"*First Lien Credit Agreement*" has the meaning set forth in the recitals hereto.

"*First Lien Credit Facility*" has the meaning set forth in the recitals hereto.

"*First Lien Lenders*" has the meaning set forth in the recitals hereto.

"*First Lien Loan Claims*" means all claims of any kind whatsoever arising under the First Lien Credit Agreement and the other Loan Documents.

"*First Lien Obligations*" shall have the meaning assigned to such term in the Intercreditor Agreement without giving effect to any cap provided for therein.

"*Final Order*" means (a) an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, (b) an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which any appeal, petition for certiorari, reargument, or rehearing shall have been waived in writing in form and substance reasonably satisfactory to the Graceway Entities and the Required Supporting Lenders, (c) in the event that an appeal or writ of certiorari, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been upheld by the highest court to which such order was appealed, or certiorari, reargument or rehearing shall have been denied or resulted in no modification of such

-5-

order or judgment or (d) an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which an appeal, petition for certiorari, reargument or rehearing is pending but as to which no stay request is pending or has been granted; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.

"*Graceway*" has the meaning set forth in the preamble hereof.

"*Graceway Canada*" has the meaning set forth in the preamble hereof.

"*Graceway Entities*" has the meaning set forth in the preamble hereof.

"*GTCR*" means GTCR Partners VIII, L.P., GTCR Golder Rauner II, L.L.C., GTCR Fund VIII, L.P., Fund VIII/B Graceway Splitter, L.P., GTCR Co-Invest II, L.P., GTCR Fund IX/A, L.P., Fund IX/B Graceway Splitter, L.P., GTCR Co-Invest III, L.P., and any affiliates of the foregoing.

"*Guaranty*" has the meaning set forth in the recitals hereto.

"*Holdings*" has the meaning set forth in the preamble hereof.

"*HSR Act*" has the meaning set forth in section 8(d) hereto.

"*Intercompany Loan*" means the $6,000,000 postpetition intercompany term loans from Graceway Canada to Graceway.

"*Intercompany Loan Balance*" means the sum of the outstanding principal amount under the Intercompany Loan and all capitalized or accrued interest thereon, in each case, due on the Closing Date.

"*Intercreditor Agreement*" has the meaning set forth in the recitals hereto.

"*Interim Cash Collateral Order*" has the meaning set forth in section 4(a) hereto.

"*Latham*" has the meaning set forth in section 11 hereto.

"*Lazard*" has the meaning set forth in section 4(b)(i) hereto.

"*Lazard Account*" has the meaning set forth in section 4(b)(i) hereto.

"*Marketing Process*" means the marketing process that the Company and its retained professionals have commenced to solicit third party bids for the purchase of any or all of the Assets, which shall be consummated in a court-approved auction process and Sale.

"*Party*" or "*Parties*" has the meaning set forth in the preamble hereof.

-6-

"*Person*" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any other legal entity or association.

"*Petition Date*" means the date the Chapter 11 Cases are commenced, which date shall be no later than September 30, 2011, unless such date is extended by written agreement of the Required Supporting Lenders.

"*Prepetition Claims Motions*" means those certain documents, motions and pleadings, filed by the Debtors with the Bankruptcy Court on the Petition Date, pursuant to which the Debtors sought authorization to pay the prepetition obligations specifically described therein, and any motions filed by the Debtors after the Petition Date consented to by the Required Supporting Lenders that seek authorization to pay the prepetition obligations specifically described therein.

"*Prevailing Purchaser*" means the Person or entity that submits the highest or otherwise best bid for the Assets at the conclusion of the Marketing Process.

"*Purchase Price*" means the aggregate amount of cash actually paid by the Prevailing Bidder to the Company, Graceway Canada or the First Lien Administrative Agent, in each case, on the Closing Date.

"*Receiver*" has the meaning set forth in the recitals hereto.

"*Required Supporting Lenders*" means at least two Consenting First Lien Lenders holding in aggregate a majority of the then outstanding First Lien Loan Claims held by the Consenting First Lien Lenders.

"*Sale*" means the sale of substantially all of the Assets free and clear of all liens, claims, encumbrances and other interests pursuant to, *inter alia,* Sections 105, 363 and 365 of the Bankruptcy Code to the Prevailing Purchaser in accordance with terms and conditions that are no worse when considered in the aggregate with respect to the First Lien Administrative Agent, the First Lien Collateral Agent and the First Lien Claimholders and treatment of all Consenting First Lien Lender Claims than those set forth in the Asset Purchase Agreement.

"*Sale Motion*" means the motion of the Graceway Entities before the Bankruptcy Court seeking entry of the Bidding Procedures Order and Sale Order.

"*Sale Order*" means an order of the Bankruptcy Court which, among other things, (i) approves the Sale of the Assets to the Prevailing Purchaser free and clear of all liens, claims and encumbrances in accordance with terms and conditions that are no worse when considered in the aggregate with respect to the First Lien Administrative Agent, the First Lien Collateral Agent and the First Lien Claimholders and treatment of all Consenting First Lien Lender Claims than those set forth in the Asset Purchase Agreement, (ii) approves the assumption by the Graceway Entities (and, if applicable, assignment to the Prevailing Purchaser) of any contracts pursuant to Section 365 of the Bankruptcy Code, (iii) contains findings of fact and conclusions of law that the Prevailing

Purchaser is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code and (iv) provides that (A) U.S. Cash Consideration, net of the portion of the amounts specified in section 4(b) hereof that may be paid from the U.S. Cash Consideration, and (B) any contingent payments under the Asset Purchase Agreement not yet due and payable on the Closing Date shall be paid by the Prevailing Purchaser as and when they become due and payable following the Closing Date directly to the First Lien Administrative Agent for distribution to the First Lien Lenders.

"*Second Lien Credit Agreement*" means the $330,000,000 Second Lien Credit Agreement, dated as of May 3, 2007, by and among Graceway, as borrower, Holdings, the lenders party thereto and Deutsche Bank Trust Company Americas, as second lien administrative agent and collateral agent.

"*Success Fee*" has the meaning set forth in section 4(b)(i) hereto.

"*Termination Date*" has the meaning set forth in section 7(d) hereto.

"*Termination Event*" has the meaning set forth in section 7(a) hereto.

"*Total Amount*" has the meaning set forth in section 4(b)(ii) hereto.

"*Transfer*" has the meaning set forth in section 11 hereto.

"*U.S. Assets*" has the meaning set forth in the recitals hereto.

"*U.S. Cash Consideration*" means that portion of the Cash Consideration allocated to the U.S. Assets as approved by the Bankruptcy Court and the Canadian Court prior to, or at the same time as, entry of the Sale Order, after notice and opportunity to appear and be heard by the Required Supporting Lenders, less an amount equal to the Intercompany Loan Balance (which amount shall be used by Graceway to repay the Intercompany Loan Balance on the Closing Date), less any Cure Costs required to be paid by the Graceway Entities in accordance with the Asset Purchase Agreement.

"*Wachtell Lipton*" means Wachtell, Lipton, Rosen & Katz, in its capacity as special restructuring and bankruptcy counsel to the First Lien Administrative Agent and First Lien Collateral Agent.

3.      Obligations of the Parties.  Subject to the terms and conditions of this Agreement, each of the Parties agree as follows:

a.      to promptly negotiate, in good faith, the definitive documents relating to the implementation and effectuation of the Sale, including, but not limited to, (i) the Interim Cash Collateral Order, (ii) the Final Cash Collateral Order and (iii) all other agreements, documents, exhibits, annexes, schedules and orders of the Bankruptcy Court that are necessary or appropriate for the prompt consummation of the Sale (all of the foregoing, collectively with this Agreement and the Asset Purchase Agreement, and in each case as amended, modified or supplemented from time to time in accordance with the terms hereof or thereof, the "*Definitive Documents*"); provided that, in each case,

-8-

such Definitive Documents shall contain terms and conditions that are no worse when considered in the aggregate with respect to the First Lien Administrative Agent, the First Lien Collateral Agent and the First Lien Claimholders and treatment of all Consenting First Lien Lender Claims than those set forth in the Asset Purchase Agreement and shall otherwise be in form and substance reasonably acceptable to the Graceway Entities, the Receiver and the Required Supporting Lenders; and

        b.    to promptly execute and deliver (to the extent a party thereto), and otherwise support the prompt consummation of the transactions contemplated by, the Definitive Documents.

    4.    <u>Obligations of the Consenting First Lien Lenders</u>.

        a.    <u>Consenting First Lien Lenders' Consent to Use of Cash Collateral to Fund the Chapter 11 Cases</u>. The Consenting First Lien Lenders hereby consent to (i) the Graceway Entities' use of Collateral (including, without limitation, Cash Collateral) and (ii) the Intercompany Loan, in each case, solely pursuant to the terms and conditions of the interim order attached hereto as <u>Exhibit B</u> (the "*Interim Cash Collateral Order*"), as such order may be superseded by a final and/or supplemental order(s) in form and substance substantially similar to the Interim Cash Collateral Order and reasonably acceptable to the Required Supporting Lenders (the "*Final Cash Collateral Order*").

        b.    <u>Consenting First Lien Lenders Consent to Use of Cash Collateral to Fund Liquidating Plan</u>. In furtherance of the confirmation of a plan of reorganization or liquidation, on the Closing Date, the Consenting First Lien Lenders hereby consent to the distribution and the use of a portion of the U.S. Cash Consideration to fund and, if applicable, pay the amounts specified below:

        (i)    Solely to pay the Sale Transaction Fee due and owing to Lazard Frères & Co. LLC ("*Lazard*") as defined in and pursuant to the terms of that certain engagement letter, dated March 12, 2010, between Lazard and Graceway (the "*Success Fee*"), an amount equal to the Success Fee shall be paid directly by the Prevailing Bidder to Lazard on the Closing Date if permitted by the Bankruptcy Court or, if not so permitted on the Closing Date deposited into a segregated interest bearing account (the "*Lazard Account*") to be maintained at, and at all times under the control of, the First Lien Collateral Agent pending approval by the Bankruptcy Court of the Success Fee for distribution to Lazard; provided, that (1) the liens of the First Lien Collateral Agent, for the benefit of the First Lien Lenders and other secured creditors, if any, shall attach in the same priority and to the same extent as existed on the Assets prior to the consummation of the Sale to the Lazard Account and the funds contained therein (provided, that distributions, if any, of the funds in such account in accordance with this section 4(b)(i) shall be distributed free and clear of any liens, claims, interests or encumbrances of the First Lien Collateral Agent or any liens, claims, interests or encumbrances junior in priority thereto) and (2) to the extent any such funds (and any interest accruing thereon) remain in such segregated interest bearing account after

payment in full of the Success Fee, any such excess funds shall be paid to the First Lien Administrative Agent for prompt distribution to the First Lien Lenders;

(ii)     Only after the Intercompany Loan Balance has been paid to Graceway Canada, an amount equal to (A) $11,234,000 *plus* (B) any unpaid amounts incurred and earned prior to the Closing Date under each of the Debtors' Professionals Carve-Out Cap and the Committee Professionals Carve-Out Cap (including, without limitation, any unbilled amounts) *plus* (C) the lesser of $10,500,000 and any unpaid amounts incurred and accrued prior to the Closing Date on account of allowed priority claims, administrative claims and allowed prepetition claims authorized to be paid by the Bankruptcy Court pursuant to the orders approving the Prepetition Claims Motions, excluding amounts described in clause (B) above, liabilities on account of chargebacks, channel management agreements, product returns and consumer rebates and liabilities for which funds have been deposited pursuant to paragraphs (i) and (iv) of this section 4(b), *plus* (D) any unpaid amounts incurred and accrued prior to the Closing Date on account of claims arising under Section 503(b)(9) of the Bankruptcy Code (the aggregate of such amounts in subclauses (A), (B), (C) and (D), the "***Total Amount***") *minus* (E) the sum of (1) any Cash Collateral, (2) the amount of all retainers, if any, held by professionals retained by the Graceway Entities and/or Graceway Canada and not applied prior to the Closing Date and (3) $2,616,007 (or $0 if the amount of Cash Collateral on hand immediately prior to the Closing Date, *plus* the amount of all such retainers, plus $2,616,007 is greater than or equal to the Total Amount) shall be deposited into a separate interest bearing account (the "***Designated Account***") to be maintained at, and all times under the control of, the First Lien Collateral Agent for purposes of funding any shortfall with respect to (X) the Carve-Out (less the amount of the Success Fee) and (Y) solely to the extent a Carve-Out Trigger Notice has not been delivered or a plan of reorganization or liquidation in the Chapter 11 Cases is confirmed, distributions on account of (I) allowed priority claims and allowed administrative claims (including, without limitation, claims arising under Section 503(b)(9) of the Bankruptcy Code, but excluding liabilities on account of chargebacks, channel management agreements, product returns and consumer rebates) not to exceed in the aggregate $15,852,000 (excluding any amounts approved under Section 330 of the Bankruptcy Code to the extent of the Carve-Out) and (II) allowed prepetition claims (excluding liabilities on account of chargebacks, channel management agreements, product returns and consumer rebates) authorized to be paid by the Bankruptcy Court pursuant to the orders approving the Prepetition Claims Motions and not paid as of the Closing Date, not to exceed in the aggregate $250,000; provided, however, that nothing contained herein shall be construed as prohibiting the Graceway Entities from paying any allowed prepetition claims authorized to be paid by the Bankruptcy Court pursuant to the orders approving the Prepetition Claims Motions, allowed priority claims and allowed administrative claims, in each case, incurred in the ordinary course of business prior to delivery of a Carve-Out Trigger Notice; provided, further, that (1) the liens of the First Lien Collateral Agent, for the benefit of the First Lien Lenders and other secured creditors, if any, shall attach in the same priority and to the same extent as existed on the Assets prior to the consummation of the Sale to the Designated Account and the funds contained therein (provided, that distributions, if any, of the funds in such account in accordance with this section 4(b)(ii) shall be distributed free and clear of any liens,

-10-

claims, interests or encumbrances of the First Lien Collateral Agent or any liens, claims, interests or encumbrances junior in priority thereto) and (2) to the extent any such funds (and any interest accruing thereon) remain in such segregated interest bearing account after payment in full of the professionals covered by the Carve-Out and such allowed prepetition claims, allowed priority claims and allowed administrative claims, any such excess funds shall be paid to the First Lien Administrative Agent for prompt distribution to the First Lien Lenders.

(iii)    An amount equal to one percent (1.0%) of the U.S. Cash Consideration shall be deposited into a separate interest bearing account (the "*1.0% Holdback Account*") to be maintained at, and at all times under the control of, the First Lien Collateral Agent; provided, that (1) the liens of the First Lien Collateral Agent, for the benefit of the First Lien Lenders and other secured creditors, if any, shall attach in the same priority and to the same extent as existed on the Assets prior to the consummation of the Sale to the 1.0% Holdback Account and the funds contained therein and (2) such funds shall be paid to the First Lien Administrative Agent for prompt distribution to the First Lien Lenders upon the earlier of the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases and July 31, 2012;

(iv)    An amount equal to $2,616,007 less (A) the amount of all severance and COBRA liabilities paid by the Company during the period from and including the Petition Date to and including the Closing Date and (B) any amounts paid during the period from and including the Petition Date to and including the Closing Date to the Graceway Entities' employees on account of vacation, personal and sick days, holidays and permitted time off for service on a jury, service in the military or bereavement, in each case, under the Graceway Entities' paid time off plans existing during the period from and including the Petition Date to and including the Closing Date (it being understood that the amounts described in subclauses (A) and (B) of this clause (iv) shall not in the aggregate exceed $2,616,007) shall be deposited into a separate interest bearing account (the "*Employee Account*") to be maintained at, and all times under the control of, the First Lien Collateral Agent for purposes of funding the Graceway Entities' severance and COBRA liabilities budgeted for under the Cash Collateral Order; provided, that (1) the liens of the First Lien Collateral Agent, for the benefit of the First Lien Lenders and other secured creditors, if any, shall attach in the same priority and to the same extent as existed on the Assets prior to the consummation of the Sale to the Employee Account and the funds contained therein (provided, that distributions, if any, of the funds in such account in accordance with this section 4(b)(iv) shall be distributed free and clear of any liens, claims, interests or encumbrances of the First Lien Collateral Agent or any liens, claims, interests or encumbrances junior in priority thereto) and (2) to the extent any such funds (and any interest accruing thereon) remain in such segregated interest bearing account after payment in full of such budgeted severance and COBRA liabilities, any such excess funds shall be paid to the First Lien Administrative Agent for prompt distribution to the First Lien Lenders; and

(v)    An amount equal to $17,684,000 shall be deposited into a separate interest bearing account (the "*CCR Account*") to be maintained at, and all times under the control of, the First Lien Collateral Agent for purposes of paying liabilities on

-11-

account of chargebacks, channel management agreements, product returns and consumer rebates constituting allowed (A) prepetition claims authorized to be paid by the Bankruptcy Court pursuant to the orders approving the Prepetition Claims Motions or (B) administrative claims, in each case, unpaid as of the Closing Date or arising thereafter; provided, that (1) the liens of the First Lien Collateral Agent, for the benefit of the First Lien Lenders and other secured creditors, if any, shall attach in the same priority and to the same extent as existed on the Assets prior to the consummation of the Sale to the CCR Account and the funds contained therein (provided, that distributions, if any, of the funds in such account in accordance with this section 4(b)(v) shall be distributed free and clear of any liens, claims, interests or encumbrances of the First Lien Collateral Agent or any liens, claims, interests or encumbrances junior in priority thereto) and (2) to the extent any such funds (and any interest accruing thereon) remain in such segregated interest bearing account after payment in full of such allowed claims, any such excess funds shall be paid to the First Lien Administrative Agent for prompt distribution to the First Lien Lenders

       c.    <u>Support of Sale</u>. Subject to the terms and conditions of this Agreement and the Asset Purchase Agreement, each of the Consenting First Lien Lenders, to the extent applicable, agrees that, until this Agreement has been terminated in accordance with section 7 hereof, it shall (severally and not jointly):

       (1)    not object to, or support any action or proceeding or take any other action (including, without limitation, credit bidding) that would, or would reasonably be expected to, impede or delay, the consummation of the Sale;

       (2)    not commence or support any action or proceeding to appoint a trustee, conservator, receiver or examiner for any of the Graceway Entities (or any of their respective Affiliates or subsidiaries), to dismiss any of the Chapter 11 Cases or to convert any of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code; and

       (3)    not direct or instruct the First Lien Administrative Agent to take any action that is inconsistent with the terms and conditions of this Agreement, and, if the First Lien Administrative Agent or the counsel or advisors to the First Lien Administrative Agent takes or threatens to take any such action, to promptly take all commercially reasonable efforts to direct the First Lien Administrative Agent, or to cause the First Lien Administrative Agent or the counsel or advisors to the First Lien Administrative Agent to be directed, not to take such action; it being understood that no Party shall be required to give any such direction if doing so would require such Party to provide an indemnity to the First Lien Administrative Agent in connection therewith.

CH\1294419.25

d.     <u>Limited Release</u>. Each of the Consenting First Lien Lenders, to the extent applicable, agrees that, unless this Agreement has been terminated in accordance with section 7 hereof, it shall (severally and not jointly) support, as part of the Graceway Entities' plan of reorganization or liquidation, limited releases of each of the Graceway Entities' equity holders, officers, directors and employees, in each case, other than GTCR, in connection with any salary or bonus payments, equity distributions or tax distributions received by such equity holder, officer, director or employee from the Graceway Entities prior to December 31, 2010; provided, however, that no Consenting First Lien Lender shall be obligated pursuant to this section 4(d) to support any such release if (i) the Graceway Entities' plan of reorganization or liquidation becomes effective after July 31, 2012 or (ii) the Graceway Entities' plan of reorganization or liquidation is not in form and substance acceptable to such Consenting First Lien Lender in its sole and absolute discretion.

e.     <u>Canada</u>. On the Closing Date (I) the Canadian Cash Consideration shall be paid directly to the Receiver for Graceway Canada's payment of its creditors and equity holders in accordance with applicable law and (II) the Intercompany Loan Balance shall be paid from that portion of the Cash Consideration allocated to the U.S. Assets as approved by the Bankruptcy Court and the Canadian Court prior to, or at the same time as, entry of the Sale Order, after notice and opportunity to appear and be heard by the Required Supporting Lenders.

*provided, however*, that the foregoing provisions will not (a) prohibit any Consenting First Lien Lender from taking, or directing the First Lien Collateral Agent to take, any action relating to the maintenance, protection and preservation of the Collateral; (b) prohibit any Consenting First Lien Lender from objecting, or directing the First Lien Collateral Agent or First Lien Administrative Agent to object, to any motion or pleading filed with the Bankruptcy Court seeking approval to use Cash Collateral (other than any motion or pleading filed in respect of the consensual Cash Collateral use arrangement described in the Cash Collateral Order) or to obtain debtor-in-possession financing (other than any motion or pleading filed in respect of the Intercompany Loan); or (c) limit any Consenting First Lien Lender's rights under the First Lien Credit Agreement, any other Loan Document and/or applicable law to appear and participate as a party in interest in any matter to be adjudicated in any case or proceeding under the Bankruptcy Code, the CJA or other applicable law, in each case, concerning the Company and/or Graceway Canada, so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and do not hinder, delay or prevent consummation of the Sale.

5.     <u>Company and Graceway Canada Obligations to Support the Sale</u>.

a.     <u>Generally</u>.

(1)     <u>Graceway Entities</u>. Subject to the provisions of section 5(b) of this Agreement, each Graceway Entity shall (i) use its commercially reasonable efforts to support and promptly consummate the Sale on or before January 27, 2012; (ii) do all things commercially reasonable, necessary and appropriate in furtherance of the Sale and all transactions set forth in this Agreement, including, without limitation, (1) using its commercially

reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order on or before January 2, 2012, (2) on or within three (3) Business Days after the Petition Date, filing the Sale Motion in the Bankruptcy Court, and (3) using its commercially reasonable efforts to have the Bankruptcy Court enter the Bidding Procedures Order within forty-five (45) days after the Petition Date; (iii) use its commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Sale; and (iv) not take any action that is materially inconsistent with, or is intended or is reasonably likely to interfere with or impede or delay consummation of, the Sale.

(2)     Graceway Canada.  Subject to the provisions of section 5(b) of this Agreement, Graceway Canada shall (i) use its commercially reasonable efforts to support and promptly consummate the Sale on or before January 27, 2012; (ii) do all things commercially reasonable, necessary and appropriate in furtherance of the Sale and all transactions set forth in this Agreement; (iii) use its commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Sale; and (iv) not take any action that is materially inconsistent with, or is intended or is reasonably likely to interfere with or impede or delay consummation of, the Sale.

b.     Right to Consider Alternative Transactions.  Notwithstanding anything in this Agreement to the contrary but subject to any limitations contained in the Asset Purchase Agreement, the Graceway Entities and/or Graceway Canada (in the case of Graceway Canada, in consultation with the Receiver) shall be entitled to consider any offer or proposal received as a result of the Marketing Process or otherwise from a Person concerning any proposed transaction involving any or all of (i) a plan of reorganization or other financial and/or corporate restructuring of any or all of the Graceway Entities and/or Graceway Canada, (ii) the sale or disposition by the Graceway Entities and/or Graceway Canada of greater than fifty percent (50%) of the outstanding equity interests of any Graceway Entity and/or Graceway Canada, as applicable, or the sale or disposition of assets constituting greater than fifty percent (50%) of the fair market value of all of the assets held by all of the Graceway Entities and/or Graceway Canada, (iii) a merger, consolidation, business combination, liquidation or recapitalization of any or all of the Graceway Entities and/or Graceway Canada or (iv) any similar transaction involving any or all of the Graceway Entities and/or Graceway Canada (each or any combination thereof, an "*Alternative Transaction*").  If the Graceway Entities and/or Graceway Canada receives an Alternative Transaction proposal, the Graceway Entities, Graceway Canada and/or the Receiver may engage in discussions or negotiations with, or provide information (upon entry into an acceptable confidentiality agreement) to, such Person proposing the Alternative Transaction, but only to the extent the board of directors of the applicable Graceway Entity and/or Graceway Canada (the "*Board of Directors*"), in consultation with the Receiver in the case of an Alternative Transaction with respect to Graceway Canada, determines in good faith that such Alternative Transaction may better maximize value for such Graceway Entity and/or Graceway Canada and its applicable stakeholders.  The Graceway Entities and/or Graceway Canada shall promptly deliver to Wachtell Lipton all written communications delivered to or received by the Graceway Entities and/or Graceway Canada or its advisors proposing any Alternative Transaction, including, without limitation, copies of all expressions of interest, term sheets, letters of interest, offers, and proposed agreements and shall notify Wachtell Lipton of all discussions and/or negotiations being had with other Persons concerning such Alternative Transactions (it being understood that, notwithstanding anything contained herein or otherwise, the Graceway Entities' and/or Graceway Canada's obligations

-14-

pursuant to this last sentence of section 5(b) shall survive any termination of this Agreement pursuant to section 7 (other than a termination pursuant to section 7(b)(2) hereof)).

        c.     From and after the Closing Date to an including the effective date of its plan of reorganization or liquidation, each Graceway Entity shall deposit with the First Lien Collateral Agent on a bi-weekly basis all collections in respect of accounts receivable received by such Graceway Entity during each such two-week period. Each Graceway Entity shall make such deposits on every second Friday, commencing with Friday, February 10, 2012 and on the effective date of its plan of reorganization or liquidation. All amounts so deposited shall be applied by the First Lien Collateral Agent to reduce the amount of First Lien Loan Claims outstanding under, and in accordance with the terms of, the First Lien Credit Agreement.

      6.    <u>Agreement Effective Date</u>. This Agreement, and the rights and obligations of the Parties hereunder, shall be effective on the date on which the following conditions have been satisfied (the "***Agreement Effective Date***"):

        a.     The Graceway Entities and Graceway Canada shall have executed and delivered to Wachtell Lipton counterpart signature pages to this Agreement;

        b.     First Lien Lenders that hold, in the aggregate, at least forty percent (40%) of the then outstanding principal amount of the First Lien Loan Claims under the First Lien Credit Agreement shall have executed and delivered to the Graceway Entities and Graceway Canada counterpart signature pages to this Agreement;

        c.     all representations and warranties of the Parties contained herein shall be true and correct in all material respects as of the Agreement Effective Date;

        d.     a copy of the Register (as defined in the First Lien Credit Agreement) dated as of the Agreement Effective Date shall have been furnished to the Graceway Entities (the "***Register Notice***"); and

        e.     the Graceway Entities shall have paid any and all reasonable accrued and unpaid fees and expenses incurred by the First Lien Administrative Agent and First Lien Collateral Agent as of the Agreement Effective Date (including, without limitation, all reasonable fees and expenses of the First Lien Administrative Agent's and First Lien Collateral Agent's legal and financial advisors).

      7.    <u>Termination of Obligations</u>.

        a.     This Agreement shall terminate, and all of the rights and obligations of the Parties hereunder shall be of no further force or effect, in the event that (i) the Parties mutually agree to such termination in writing or (ii) this Agreement is terminated pursuant to the remaining paragraphs of this section 7 (the occurrence of any such event shall be deemed a "***Termination Event***").

        b.     The Graceway Entities or Graceway Canada may terminate this Agreement as to all Parties upon three (3) Business Days written notice to the other Parties upon the occurrence of any of the following events:

CH\1294419.25

(1)     the Board of Directors reasonably determines that proceeding with the Sale, or the consummation of the Sale, would be inconsistent with the exercise of their respective fiduciary duties;

(2)     a material breach by any Consenting First Lien Lender of its respective obligations hereunder that would have a material adverse effect on the Graceway Entities or Graceway Canada or the prompt consummation of the Sale, which material breach is not cured on or within five (5) Business Days after the giving of written notice of such breach to the applicable breaching Consenting First Lien Lender; or

(3)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Sale.

c.     This Agreement shall terminate automatically without any further required action or notice upon the occurrence of any of the following events unless the occurrence of such Termination Event is waived in writing at any time by the Required Supporting Lenders:

(1)     the failure of the Graceway Entities to commence their Chapter 11 Cases with the Bankruptcy Court on or before September 30, 2011;

(2)     the Graceway Entities fails to obtain entry by the Bankruptcy Court of the (i) Interim Cash Collateral order on or within five (5) Business Days following the Petition Date or (ii) Final Cash Collateral Order on or within thirty-five (35) days after the Petition Date;

(3)     the Graceway Entities fail to file the Sale Motion on or within three (3) Business Days following the Petition Date seeking approval of the Bidding Procedures and Sale in the Bankruptcy Court;

(4)     the Graceway Entities fail to obtain entry by the Bankruptcy Court of (i) the Bidding Procedures Order within forty-five (45) days after the Petition Date or (ii) the Sale Order by January 2, 2012;

(5)     (i) the termination of the Asset Purchase Agreement other than in connection with acceptance of an Alternative Transaction that is acceptable to the Postpetition Lender (as defined in the Interim Cash Collateral Order) and the Required Supporting Lenders in their respective sole discretion, (ii) the amendment or modification of, or filing of a pleading by the Graceway Entities seeking to amend or modify, the Asset Purchase Agreement, or any documents related thereto (including, without limitation, the Bidding Procedures, Bidding Procedures Order or Sale Order), in a manner not acceptable to the Postpetition Lender and Required Supporting Lenders in their respective sole discretion or (iii) execution of definitive documents in respect of an Alternative Transaction that are not acceptable to the Postpetition Lender and the Required Supporting Lenders in their respective sole discretion;

-16-

(6)     the failure to consummate the Sale on or before January 27, 2012;

(7)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Sale;

(8)     (A) the entry by the Bankruptcy Court of an order, or the filing by any Graceway Entity of a motion with the Bankruptcy Court which seeks the entry of an order, accomplishing (i) the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or (ii) the dismissal, termination, stay or modification of one or more of the Chapter 11 Cases or (B) with respect to any of the foregoing, any Graceway Entity's application for, consent to, or acquiescence in, any such relief;

(9)     the entry by the Bankruptcy Court of an order, or the filing by any Graceway Entity of a motion with the Bankruptcy Court which seeks the entry of an order, accomplishing the appointment of an interim or permanent trustee, receiver or examiner with expanded powers to operate or manage the financial affairs, business or reorganization of any Graceway Entity in one or more of the Chapter 11 Cases;

(10)     (A) the entry of an order by any court invalidating, disallowing or limiting in any respect, as applicable, either (i) the enforceability, priority, or validity of any liens (including any adequate protection replacement liens) securing the First Lien Obligations or (ii) any of the First Lien Obligations or Adequate Protection Super-Priority Claims (as defined in the Interim Cash Collateral Order) granted to the First Lien Claimholders or (B) with respect to any of the foregoing, any Graceway Entity's application for, consent to, or acquiescence in, any such relief;

(11)     on or prior to January 27, 2012, with respect to each of the following line items in the Pre-Sale Approved Budget, the payment by the Graceway Entities of any disbursements in excess of the cumulative amount budgeted for each such line item in the Pre-Sale Approved Budget plus fifteen percent (15%) of the cumulative amount of disbursements with respect to such line item: (i) "Payroll & Benefits", (ii) "R&D, Licensing & Regulatory", (iii) "Advertising & Promotions and Sales Expenses", (iv) "Corporate, Occupancy, Utilities & Other Expenses", (v) "Ropes & Gray", (vi) "Edwards Angell Palmer & Dodge", (vii) "Hogan Lovells US LLP", (viii) "Other Non-Restructuring Professionals" and (ix) "CapEx";

(12)     after January 27, 2012, with respect to the "Total Corporate, Employee and Other Wind Down Expenses" line item in the Wind-Down Approved Budget (as defined in the Interim Cash Collateral Order), the payment by the Graceway Entities of any disbursements in excess of the cumulative amount budgeted for such line item in the Wind-Down Approved

Budget plus ten percent (10%) of the cumulative amount of disbursements with respect to such line item;

(13) any violation of the Budget Covenants (as defined in the Interim Cash Collateral Order);

(14) the incurrence by the Graceway Entities after the Petition Date of indebtedness that is (A) secured by a security interest, mortgage or other lien on all or any portion of the Collateral which is equal or senior to any security interest, mortgage or other lien of the First Lien Collateral Agent and the First Lien Claimholders, as applicable, or (B) entitled to priority administrative status which is equal or senior to that granted to the First Lien Administrative Agent and First Lien Claimholders, as applicable, herein, except, in each case, (x) any such indebtedness used to refinance the First Lien Obligations in full and (y) the Intercompany Loan;

(15) the entry of a final order by the Bankruptcy Court (other than the Cash Collateral Order) granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral with a value in excess of $250,000 or (B) with respect to any lien on or the granting of any lien on any Prepetition Collateral to any state or local environmental or regulatory agency (in each case with a value in excess of $250,000);

(16) reversal, vacatur, stay or modification (without the express prior written consent of the Postpetition Lender, First Lien Administrative Agent and the Required Supporting Lenders, in their respective sole discretion) of the Cash Collateral Order;

(17) the failure to make adequate protection payments or pay professional fees, costs and expenses of the First Lien Administrative Agent and First Lien Collateral Agent, in each case, when and as provided for under the Cash Collateral Order;

(18) any material breach by the Graceway Entities of any of their obligations, representations, warranties or covenants set forth in (i) this Agreement, (ii) the Cash Collateral Order or (iii) the Asset Purchase Agreement, as applicable, which material breach is not cured on or within five (5) Business Days after the giving of written notice of such breach to the Graceway Entities;

(19) any material breach by Graceway Canada of any of its obligations, representations, warranties or covenants set forth in (i) this Agreement or (ii) the Asset Purchase Agreement, as applicable, which material breach is not cured on or within five (5) Business Days after the giving of written notice of such breach to the Graceway Entities;

(20) the filing by any Graceway Entity of any stand-alone plan of reorganization or liquidation (or the announcement by any Graceway Entity of

-18-

its support of any such plan filed by any other party) prior to consummation of the Sale; and

(21)    the entry by the Bankruptcy Court of an order, or the filing by the Graceway Entities of a motion with the Bankruptcy Court which seeks the entry of an order, authorizing the use of Cash Collateral for any purpose other than to pay the First Lien Loan Claims in full or as permitted in the Cash Collateral Order.

d.    The date on which this Agreement is terminated in accordance with the foregoing provisions shall be referred to as the "*Termination Date*".

e.    Subject to the last sentence of section 5(b), if this Agreement is terminated pursuant to this section 7, then all further obligations of the Parties hereunder shall be terminated without further liability. Notwithstanding any provision in this Agreement to the contrary, the right to terminate this Agreement under this section 7 shall not be available to any Party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the occurrence of the applicable Termination Event.

8.    <u>Representations of the Company and Graceway Canada</u>.    (A) Each Graceway Entity hereby jointly and severally represents and warrants and (B) Graceway Canada hereby represents and warrants, in each case, to each Consenting First Lien Lender as follows as of the date hereof:

a.    <u>Corporate Power and Authority</u>. It has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement.

b.    <u>Authorization</u>. The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part.

c.    <u>No Conflicts</u>. The execution, delivery and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party, other than as a result of the commencement of the Chapter 11 Cases.

d.    <u>Governmental Consents</u>. The execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, other than any required filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "*HSR Act*") and the expiration or

termination of the applicable waiting period (and any extension thereof) under the HSR Act.

e. <u>Binding Obligation</u>. This Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights, and by general limitations in the availability of equitable remedies.

9. <u>Representations of Each Consenting First Lien Lender</u>. Each of the Consenting First Lien Lenders party hereto severally (but not jointly) represents and warrants to the other Parties as follows with respect to itself only and as of the date hereof:

a. <u>Holdings by Consenting First Lien Lenders</u>. Each Consenting First Lien Lender (i) either (A) is the sole legal and beneficial owner of the amount of First Lien Loan Claims appearing on the date hereof opposite its name on the Register Notice and all related claims, rights and causes of action arising out of or in connection with or otherwise relating thereto (for each such Consenting First Lien Lender, the "***Consenting First Lien Lender Claims***"), in each case free and clear (other than pursuant to this Agreement), of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrances of any kind, that would, or would reasonably be expected to, in each case, adversely affect in any material way such Party's performance of its obligations contained in this Agreement at the time such obligations are required to be performed, or (B) has investment or voting discretion with respect to such Consenting First Lien Lender Claims and has the power and authority to bind the beneficial owner(s) of such Consenting First Lien Lender Claims to the terms of this Agreement, and (ii) has full power and authority to consent to matters concerning such Consenting First Lien Lender Claims with respect to the Sale.

b. <u>Sufficiency of Information Received</u>. Each Consenting First Lien Lender has reviewed, or has had the opportunity to review, with the assistance of professional and legal advisors of its choosing, all information it deems necessary and appropriate for such Consenting First Lien Lender to evaluate the financial risks inherent in the Sale.

c. <u>Corporate Power and Authority</u>. It has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement.

d. <u>Authorization</u>. The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part.

e. <u>No Conflicts</u>. The execution, delivery and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule or regulation

-20-

applicable to it or any of its subsidiaries or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

        f.     <u>Governmental Consents</u>. The execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body.

        g.     <u>Binding Obligation</u>. This Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights, and by general limitations in the availability of equitable remedies.

        10.     <u>Claims and Interests</u>. This Agreement shall in no way be construed to preclude any Consenting First Lien Lender from acquiring or holding claims against, or interests in, any of the Graceway Entities or Graceway Canada (or any of its respective Affiliates or subsidiaries). However, in the event any Consenting First Lien Lender shall acquire or hold any such claims and interests, then such claims and interests shall, without further action of or notice to any Person, automatically be deemed to be subject to the terms and conditions of this Agreement.

        11.     <u>Transfer of Loans</u>. Prior to the consummation of the Sale, and with the exception of the permitted Transfers enumerated in subsections (a) through (c) below, no Consenting First Lien Lender will, directly or indirectly, sell, contract to sell, give, assign, hypothecate, pledge, encumber, grant a security interest in, sell a participation in, offer, sell any option or contract to purchase, purchase any option or contract to sell, grant any proxy, option, right or warrant to purchase, or otherwise transfer or dispose of, any economic, voting or other rights in or to, by operation of law or otherwise (collectively, "*Transfer*"), all or any portion of its First Lien Loan Claims, and no such Transfer will be effective, unless: (i) the transferee furnishes to the Graceway Entities, Latham & Watkins LLP, legal counsel to the Company ("*Latham*"), the other Consenting First Lien Lenders and the First Lien Administrative Agent a joinder, substantially consistent with the joinder attached hereto as <u>Exhibit C</u>, pursuant to which such transferee agrees to be bound by all of the terms and conditions of this Agreement, and (ii) the Consenting First Lien Lender effecting such Transfer provides written notice of such Transfer to Wachtell Lipton, in each case, no later than one (1) Business Day after the execution of an agreement (or trade confirmation) in respect of such Transfer. Any proposed Transfer that does not comply with the foregoing provisions of this paragraph shall be deemed void *ab initio* and be of no force or effect. Upon consummation of any such Transfer, the Consenting First Lien Lender effecting such Transfer shall, with respect to any partial transfer, be released of its obligations hereunder in connection with that portion of its First Lien Loan Claims so transferred and, with respect to the transfer of all of its First Lien Loan Claims, be released of all of its obligations hereunder; provided, however, that any such Consenting First Lien Lender shall continue to comply with section 4(c) above until after the earlier of closing of the Sale or

termination of this Agreement pursuant to section 7 above. In addition to the foregoing Transfer, the following Transfers shall be permitted:

a) any Transfer by one Consenting First Lien Lender to an Affiliate of such Consenting First Lien Lender or to one or more affiliated funds or affiliated entity or entities with a common investment advisor (in each case, other than portfolio companies) so long as such Affiliate, affiliated funds or affiliated entity, as applicable, agrees in writing to be bound by the terms hereof in the same manner as the transferor and furnishes to the other Parties to this Agreement, Latham, Wachtell Lipton and the First Lien Administrative Agent a joinder, substantially consistent with the joinder attached hereto as Exhibit C;

b) any Transfer by one Consenting First Lien Lender to another Consenting First Lien Lender, provided, that the transferor provides written notice of such Transfer to Wachtell Lipton no later than one (1) Business Day after the execution of an agreement (or trade confirmation) in respect of such Transfer; and

c) any other Transfer that is approved in writing in advance of such Transfer by the Consenting First Lien Lenders and the Graceway Entities, in their respective sole discretion.

12. Entire Agreement; Prior Negotiations. This Agreement and the Asset Purchase Agreement, including any exhibits, set forth in full the terms of agreement between and among the Parties with respect to the transactions contemplated herein and are intended as the full, complete and exclusive contract governing the relationship between and among the Parties with respect to the transactions contemplated herein, superseding all other discussions, promises, representations, warranties, agreements and understandings, whether written or oral, between or among the Parties with respect to the subject matter hereof; provided, that any confidentiality agreement between or among any of the Parties shall remain in full force and effect in accordance with its terms. No representations, oral or written, other than those set forth herein, may be relied on by any Party in connection with the subject matter hereof.

13. Amendment or Waiver. No waiver, modification or amendment of any term or provision of this Agreement or the Asset Purchase Agreement shall be valid unless such waiver, modification or amendment is in writing and has been signed by the Graceway Entities, Graceway Canada and each Consenting First Lien Lender; provided, however, that any modification or amendment of the definition of "Petition Date" set forth in section 2 hereof or waiver, modification or amendment of section 7(c) hereof shall be valid if such waiver, modification or amendment is in writing and has been signed by the Graceway Entities, Graceway Canada and the Required Supporting Lenders. No waiver of any of the provisions of this Agreement or the Asset Purchase Agreement shall be deemed or constitute a waiver of any other provision of this Agreement or the Asset Purchase Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver. Any modification of this section 13 shall require the written consent of all Parties.

14. Miscellaneous.

a.    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States District Court for the Southern District of New York, and by execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing, but subject to the limitations of *Stern v. Marshall*, 131 S. Ct. 2594 (U.S. 2011), upon any commencement of the Chapter 11 Cases and until the effective date of a plan of reorganization or liquidation, each of the Parties agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

b.    <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (excluding monetary remedies) as its sole and exclusive remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

c.    <u>Reservation of Rights</u>.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner, waive, limit, impair or restrict the ability of each Consenting First Lien Lender to protect and preserve its rights, remedies and interests, including its claims, against the Graceway Entities and/or Graceway Canada. If the Sale contemplated herein and in the Asset Purchase Agreement is not consummated, or if this Agreement is terminated for any reason, the Parties hereto fully reserve any and all of their respective rights and remedies. Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms and provisions of this Agreement.

d.    <u>Headings</u>.  The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

e.    <u>Notice</u>.  All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by facsimile or electronic transmission or mailed (first class postage prepaid) to the Parties at the following addresses, email addresses, or facsimile numbers, as applicable:

If to the First Lien Administrative Agent:

Bank of America, N.A.

-23-

111 Westminster Street
Providence, RI 02903
Fax: (401) 278-6002
Email: daniel.d.butler@bankofamerica.com
Attn: Daniel D. Butler

*with a copy (which shall not constitute notice) to*:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Fax: (212) 403-2158
Email: MSBenn@wlrk.com
Attn: Scott K. Charles and Michael S. Benn

If to any other Consenting First Lien Lender:

To the address, facsimile number or electronic mail address specified on its respective signature page to this Agreement.

If to the Graceway Entities:

Graceway Pharmaceuticals, LLC
340 Martin Luther King Jr. Blvd., Suite 500
Bristol, TN 37620
Fax: (519) 432-8097
Email: john.bellamy@gracewaypharma.com
Attn: John A. Bellamy

*with a copy (which shall not constitute notice) to*:

Latham & Watkins LLP
233 South Wacker Drive, Suite 5800
Chicago, IL 60606
Fax: (312) 993-9767
Email: josef.athanas@lw.com
Attn: Josef S. Athanas, Caroline A. Reckler and Matthew Warren

If to Graceway Canada:

Graceway Canada Company
252 Pall Mall Street, Suite 302
London, ON, N6A 5P6
Fax: (519) 432-8097
Email: erin.craven@gracewaypharma.ca
Attn: Erin Craven

*With a copy (which shall not constitute notice) to:*

Goodmans LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto ON, M5H 2S7
Canada
Fax: (416) 979-1234
Email: jlatham@goodmans.ca
Attn: Joe Latham

f.   <u>Successors and Assigns, No Third-Party Beneficiaries</u>.   This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives.   Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other Person or entity shall, or shall be deemed to, be a third party beneficiary hereof.

g.   <u>Severability</u>.   Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

h.   <u>Several Obligations</u>.   The agreements, representations and obligations of each Consenting First Lien Lender under this Agreement are several, and not joint, in all respects.   Any breach of this Agreement by a Party shall not result in liability for any other non-breaching Party (it being acknowledged and agreed by all parties that their sole and exclusive remedy for any breach of this Agreement shall be specific performance and injunctive or other equitable relief (excluding monetary remedies) as provided in section 14(b) above).   It is understood and agreed that any Consenting First Lien Lender may trade in the First Lien Loan Claims or other debt or equity securities of the Graceway Entities or Graceway Canada without the consent of the Graceway Entities, Graceway Canada or any other Consenting First Lien Lender, subject to applicable laws, if any, sections 10 and 11 herein and the First Lien Credit Agreement (as applicable).   No Consenting First Lien Lender shall have any responsibility for any such trading by any other entity by virtue of this Agreement.

i.   <u>Counterparts</u>.   This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.   Execution copies of this Agreement may be

delivered by facsimile or electronic mail which shall be deemed to be an original for the purposes of this Agreement.

j.     Consideration.  It is hereby acknowledged and agreed by the Parties that no consideration shall be due or paid to any Consenting First Lien Lender in exchange for their support of the Sale in accordance with the terms and conditions of this Agreement, other than the obligations imposed upon the Parties pursuant to the terms of this Agreement.

k.     Public Disclosure.  At least two (2) Business Days prior to release or filing thereof, the Company will submit to Wachtell Lipton any press release and/or public filing relating to this Agreement, the Asset Purchase Agreement, or the transactions contemplated hereby and thereby and any amendments thereof.

l.     No Strict Construction.  This Agreement and all other agreements and documents executed and/or delivered in connection herewith have been prepared through the joint efforts of all of the Parties hereto or thereto.  Neither the provisions of this Agreement or any such other agreements and documents nor any alleged ambiguity therein shall be interpreted or resolved against any Party on the ground that such Party or such Party's counsel drafted this Agreement or such other agreements and documents, or based on any other rule of strict construction.

m.     Survival of Agreement.  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible sale of substantially all of the Assets of the Graceway Entities and Graceway Canada and in contemplation of possible Chapter 11 filings by the Graceway Entities, and (a) subject to section 8(e) and 9(g) of this Agreement, the rights granted in this Agreement are enforceable by each signatory hereto without approval of the Bankruptcy Court and (b) the Graceway Entities and Graceway Canada waive any right to assert that the exercise of the termination rights herein violates the automatic stay provisions of the Bankruptcy Code or any comparable provisions under the CJA or other applicable law; provided, however, that the Parties reserve their respective rights to argue before the Bankruptcy Court regarding the applicability of the automatic stay to all other rights provided herein.

n.     WAIVER OF JURY TRIAL.  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

o.     Time Periods.  If any time period or other deadline provided in this Agreement expires on a day that is not a Business Day, then such time period or other deadline, as applicable, shall be deemed extended to the next succeeding Business Day.

p.     No Solicitation.  This Agreement is not intended to be, and each signatory to this Agreement acknowledges that this Agreement is not, whether for the purposes of Sections 1125 and 1126 of the Bankruptcy Code or otherwise, a solicitation for the acceptance

or rejection of a plan of liquidation or plan of reorganization for any of the Graceway Entities. The Graceway Entities will not solicit acceptances of a plan of liquidation or a plan of reorganization from any Consenting First Lien Lender until the Consenting First Lien Lenders have been sent copies of a disclosure statement approved by the Bankruptcy Court.

*[Remainder of page intentionally left blank; signature pages follow]*

CH\1294419.25

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered by their respective duly authorized officers, all as of the date and year first above written.

GRACEWAY PHARMACEUTICALS, LLC

By: _____

Name: Gregory C. Jones
Title: EVP, Strategic Development

GRACEWAY PHARMA HOLDING CORP.

By: _____

Name: Gregory C. Jones
Title: EVP, Strategic Development

GRACEWAY HOLDINGS, LLC

By: _____

Name: Gregory C. Jones
Title: EVP, Strategic Development

CHESTER VALLEY HOLDINGS, LLC

By: _____

Name: Gregory C. Jones
Title: EVP, Strategic Development

CHESTER VALLEY PHARMACEUTICALS, LLC

By: _____

Name: Gregory C. Jones
Title: EVP, Strategic Development

*[Signature Page to Sale Support Agreement]*

GRACEWAY CANADA HOLDINGS, INC.

By: _____

Name: Gregory C. Jones

Title: EVP, Strategic Development

GRACEWAY CANADA COMPANY

By: _____

Name: John Belly

Title: EVP and General Counsel

GRACEWAY INTERNATIONAL, INC.

By: _____

Name: Gregory C. Jones

Title: EVP, Strategic Development

*[Signature Page to Sale Support Agreement]*

**First Lien Lenders**

Aberdeen Loan Funding, Ltd.
Armstrong Loan Funding, Ltd.
Brentwood CLO, Ltd.
Loan Funding IV LLC
Eastland CLO, Ltd.
Gleneagles CLO, Ltd.
Grayson CLO, Ltd.
Greenbriar CLO, Ltd.
Highland Loan Funding V Ltd.
Jasper CLO, Ltd.
Liberty CLO, Ltd.
Red River CLO, Ltd.
Rockwall CDO, Ltd.
Rockwall CDO II, Ltd.
Southfork CLO, Ltd.
Stratford CLO, Ltd.
Loan Funding VII LLC
Westchester CLO, Ltd.

Signed on behalf of the First Lien Lenders listed
above by:

HIGHLAND CAPITAL MANAGEMENT, L.P.,
as Collateral Manager

By:      Strand Advisors, Inc., its general partner

By:
Name:   MARK OKADA
Title:   EXECUTIVE VICE PRESIDENT

**QUANTUM PARTNERS LP**

By: QP GP LLC, its General Partner

By: _____

Name:

Title: THOMAS L. O'GRADY
Attorney-in-Fact


Attn:  Thomas L. O'Grady

Tel:    212-320-5626

Fax:   646-731-5626

Email: thomas.ogrady@soros.com

Address:

c/o Soros Fund Management LLC
888 Seventh Avenue
New York, NY 10106

**QP SFM CAPITAL HOLDINGS LIMITED**

By: _____

Name:

Title:

THOMAS L. O'GRADY
Attorney-in-Fact

Attn:  Thomas L. O'Grady

Tel:   212-320-5626

Fax:  646-731-5626

Email:  thomas.ogrady@soros.com

Address:

c/o Soros Fund Management LLC
888 Seventh Avenue
New York, NY 10106

**Exhibit A**

Asset Purchase Agreement

ASSET PURCHASE AGREEMENT

DATED AS OF SEPTEMBER 27, 2011

BY AND BETWEEN

GALDERMA S.A.

AND

GRACEWAY PHARMACEUTICALS, LLC

AND

THE OTHER PARTIES SIGNATORY HERETO

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ...........................................................................................2

    Section 1.1    Definitions..................................................................................2
    Section 1.2    Other Definitions and Interpretive Matters ...............................12

ARTICLE II PURCHASE AND SALE ........................................................................14

    Section 2.1    Purchase and Sale of the Acquired Assets .................................14
    Section 2.2    Excluded Assets........................................................................15
    Section 2.3    Assumed Liabilities ..................................................................16
    Section 2.4    Excluded Liabilities ..................................................................16
    Section 2.5    Assignments; Cure Costs ..........................................................16
    Section 2.6    Further Assurances ...................................................................17

ARTICLE III PURCHASE PRICE ..............................................................................18

    Section 3.1    Purchase Price...........................................................................18
    Section 3.2    Deposit .....................................................................................18
    Section 3.3    Closing Date Payment...............................................................18
    Section 3.4    Discharge of Assumed Liabilities After Closing ........................18
    Section 3.5    Allocation of Purchase Price......................................................18
    Section 3.6    Withholding .............................................................................19

ARTICLE IV CLOSING ..............................................................................................19

    Section 4.1    Closing Date .............................................................................19
    Section 4.2    Buyer's Deliveries ....................................................................19
    Section 4.3    Sellers' Deliveries....................................................................20

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS..............21

    Section 5.1    Organization and Good Standing................................................21
    Section 5.2    Authority; Validity; Consents....................................................21
    Section 5.3    No Conflict...............................................................................21
    Section 5.4    Environmental and Health and Safety Matters ...........................22
    Section 5.5    Title to Acquired Assets ...........................................................22
    Section 5.6    Taxes .......................................................................................22
    Section 5.7    Legal Proceedings ....................................................................22
    Section 5.8    Compliance with Laws; Permits................................................23
    Section 5.9    Sellers' Intellectual Property.....................................................23
    Section 5.10   Assigned Agreements................................................................24
    Section 5.11   Regulatory Matters ...................................................................24
    Section 5.12   Brokers or Finders ....................................................................26
    Section 5.13   Affiliate Transactions ...............................................................26
    Section 5.14   Insurance .................................................................................26

i

| | | |
|---|---|---|
| Section 5.15 | 3M | 26 |
| Section 5.16 | Inventory; Products | 27 |
| Section 5.17 | Canadian Competition Act | 27 |
| Section 5.18 | Financial Statements | 27 |
| Section 5.19 | No Other Representations or Warranties | 27 |

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER ............................... 28

| | | |
|---|---|---|
| Section 6.1 | Organization and Good Standing | 28 |
| Section 6.2 | Authority; Validity; Consents | 28 |
| Section 6.3 | No Conflict | 29 |
| Section 6.4 | Availability of Funds; Solvency | 29 |
| Section 6.5 | Litigation | 29 |
| Section 6.6 | Brokers or Finders | 29 |

ARTICLE VII ACTION PRIOR TO THE CLOSING DATE ....................................... 29

| | | |
|---|---|---|
| Section 7.1 | Investigation of the Business by Buyer | 29 |
| Section 7.2 | Operations Prior to the Closing Date | 30 |
| Section 7.3 | HSR Act; Reasonable Best Efforts | 31 |
| Section 7.4 | Bankruptcy Court Filings and Approval | 34 |
| Section 7.5 | Bidding Procedures | 35 |
| Section 7.6 | Break-Up Fee; Expense Reimbursement Amount | 36 |
| Section 7.7 | Communications with Customers and Suppliers | 36 |
| Section 7.8 | Financing | 37 |
| Section 7.9 | Notification of Certain Matters | 37 |

ARTICLE VIII ADDITIONAL AGREEMENTS ..................................................... 37

| | | |
|---|---|---|
| Section 8.1 | Taxes | 37 |
| Section 8.2 | Payments Received | 38 |
| Section 8.3 | Assigned Agreements; Adequate Assurance of Future Performance | 38 |
| Section 8.4 | Rebates, Chargebacks and Returns | 39 |
| Section 8.5 | Transfer of Regulatory Matters | 40 |
| Section 8.6 | Adverse Event Reporting | 40 |
| Section 8.7 | Use of Sellers' Brand. | 41 |
| Section 8.8 | Post-Closing Books and Records and Personnel | 41 |
| Section 8.9 | Confidentiality | 42 |
| Section 8.10 | Nycomed Litigation | 42 |
| Section 8.11 | Acquired Assets "AS IS"; Buyer's Acknowledgment Regarding Same | 43 |

ARTICLE IX CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE .... 44

| | | |
|---|---|---|
| Section 9.1 | Accuracy of Representations | 44 |
| Section 9.2 | Sellers' Performance | 44 |
| Section 9.3 | No Order | 44 |
| Section 9.4 | Governmental Authorizations | 45 |

CH\1296825.17

| | | |
|---|---|---|
| Section 9.5 | Sellers' Deliveries | 45 |
| Section 9.6 | Sale Order | 45 |
| Section 9.7 | Canadian Sale and Vesting Order | 45 |

ARTICLE X CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE ............................................................................................................ 45

| | | |
|---|---|---|
| Section 10.1 | Accuracy of Representations | 45 |
| Section 10.2 | Sale Order in Effect | 45 |
| Section 10.3 | Canadian Sale and Vesting Order | 45 |
| Section 10.4 | Buyer's Performance | 45 |
| Section 10.5 | No Order | 46 |
| Section 10.6 | Governmental Authorizations | 46 |
| Section 10.7 | Buyer's Deliveries | 46 |

ARTICLE XI TERMINATION ............................................................................ 46

| | | |
|---|---|---|
| Section 11.1 | Termination Events | 46 |
| Section 11.2 | Effect of Termination | 48 |

ARTICLE XII GENERAL PROVISIONS ......................................................... 49

| | | |
|---|---|---|
| Section 12.1 | Public Announcements | 49 |
| Section 12.2 | Notices | 49 |
| Section 12.3 | Waiver | 50 |
| Section 12.4 | Entire Agreement; Amendment | 51 |
| Section 12.5 | Assignment | 51 |
| Section 12.6 | Severability | 51 |
| Section 12.7 | Expenses | 51 |
| Section 12.8 | Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver | 51 |
| Section 12.9 | Counterparts | 52 |
| Section 12.10 | Parties in Interest; No Third Party Beneficiaries | 52 |
| Section 12.11 | Non-Recourse | 52 |
| Section 12.12 | Schedules; Materiality | 52 |
| Section 12.13 | Specific Performance | 53 |
| Section 12.14 | Survival | 53 |
| Section 12.15 | Prepetition Claims and Liabilities | 53 |
| Section 12.16 | Receiver | 53 |

CH\1296825.17

# SCHEDULES

Schedule 1.1(a)        Assigned Agreements
Schedule 1.1(b)        Excluded Intellectual Property
Schedule 1.1(c)        Products, Product Registrations and Territory
Schedule 2.2(d)        Excluded Agreements
Schedule 2.2(o)        Non-Business Assets
Schedule 2.3(d)        Required Contracts
Schedule 5.1           Jurisdictions
Schedule 5.4           Environmental and Health and Safety Matters
Schedule 5.5           Title to Acquired Assets
Schedule 5.6           Taxes
Schedule 5.7           Legal Proceedings
Schedule 5.8           Compliance with Laws; Permits
Schedule 5.9(a)(i)     Material Business Intellectual Property
Schedule 5.9(a)(ii)    Unregistered Trademarks
Schedule 5.9(a)(iii)   Title to Material Business Intellectual Property
Schedule 5.9(b)        Intellectual Property Matters
Schedule 5.9(c)        Intellectual Property Proceedings
Schedule 5.9(d)        Claims Relating to Intellectual Property Rights
Schedule 5.10          Enforceability of Assigned Agreements
Schedule 5.11(a)       Regulatory Compliance Matters
Schedule 5.11(b)       Regulatory Correspondence
Schedule 5.11(c)       Regulatory Filings
Schedule 5.11(d)       Safety Notices
Schedule 5.11(e)       Regulatory Matters
Schedule 5.12          Brokers and Finders
Schedule 5.13          Affiliate Transactions
Schedule 5.14          Insurance
Schedule 5.15          Agreements with 3M
Schedule 5.18          Financial Statements
Schedule 7.2           Operations Prior to the Closing Date

# EXHIBITS

Exhibit A     Form of Bidding Procedures Order
Exhibit B     Form of Bill of Sale
Exhibit C     Form of Canadian Bill of Sale
Exhibit D     Form of Sale Order
Exhibit E     Form of Escrow Agreement
Exhibit F     Form of Assignment and Assumption Agreement
Exhibit G     Form of Canadian Sale and Vesting Order
Exhibit H     Form of US Trademark Assignment
Exhibit I     Form of US Patent Assignment

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is made as of September 27, 2011 (the "Effective Date"), by and between **GALDERMA S.A.**, a Switzerland corporation ("Buyer"), and **GRACEWAY PHARMACEUTICALS, LLC**, a Delaware limited liability company, and its Subsidiaries set forth on Annex A hereto (collectively, "US Sellers" and each individually a "US Seller"), and **GRACEWAY CANADA COMPANY**, a Nova Scotia unlimited liability company ("Canadian Seller" and collectively with US Sellers, "Sellers" and each individually a "Seller"). Capitalized terms used herein and not otherwise defined herein have the meanings set forth in Article I.

### RECITALS

**WHEREAS**, Sellers are engaged in the business of developing, licensing and selling the Products in the Territory (such business, as conducted by Sellers as of the date hereof, the "Business");

**WHEREAS**, (i) US Sellers intend to file a voluntary petition for relief (the "Filing") commencing a case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and (ii) Canadian Seller intends to make an application to the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada and, if so reasonably requested by Buyer, to any other courts of any other provinces in which Canadian Seller has Acquired Assets material to the Business as conducted by Canadian Seller (collectively, the "Canadian Court"), for the appointment of a receiver, and, if so reasonably requested by Buyer, for recognition in any other provinces in which Canadian Seller has Acquired Assets material to the Business as conducted by Canadian Seller and such recognition is necessary for the transfer of such Acquired Assets (the "Canadian Proceedings") to oversee the sale of the assets of Canadian Seller;

**WHEREAS**, Sellers desire to sell to Buyer all of the Acquired Assets and transfer to Buyer the Assumed Liabilities and Buyer desires to purchase from Sellers all of the Acquired Assets and assume all of the Assumed Liabilities, upon the terms and conditions hereinafter set forth;

**WHEREAS**, the execution and delivery of this Agreement and Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, *inter alia*, Sections 363 and 365 of the Bankruptcy Code, and the issuance of the Canadian Sale and Vesting Order in the Canadian Proceedings; and

**WHEREAS**, the Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order and the Canadian Court issues the Canadian Sale and Vesting Order.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged and intending to be legally bound hereby, the Parties agree as follows:

# ARTICLE I
## DEFINITIONS

Section 1.1    Definitions.  For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"Accounts Receivable" means, with respect to Sellers, all trade accounts receivable and other rights to payment from customers of Sellers to the extent arising out of the Business.

"Acquired Assets" shall have the meaning set forth in Section 2.1.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person.  For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.  For purposes of this Agreement, Affiliates of Buyer shall not include Nestlé S.A. or L'Oréal S.A., and their Affiliates (other than Galderma Pharma, S.A. and its Subsidiaries).

"Agreement" shall have the meaning set forth in the Preamble.

"Allocation Schedule(s)" shall have the meaning set forth in Section 3.5.

"Alternative Transaction" means a transaction or series of related transactions pursuant to which Sellers accept a bid for all or a substantial portion of the Acquired Assets or any group of assets that includes all or a substantial portion of the Acquired Assets, from a Person other than Buyer, as the highest or best offer, in accordance with the Bidding Procedures Order or otherwise, but does not mean the sale of Products by Sellers conducted in the Ordinary Course of Business.

"Assigned Agreements" means the Contracts listed or described in Schedule 1.1(a) (as may be amended pursuant to Section 7.9).

"Assignment and Assumption Agreement" shall have the meaning set forth in Section 4.2(d).

"Assumed Liabilities" shall have the meaning set forth in Section 2.3.

"Auction" shall have the meaning set forth in the Bidding Procedures.

"Audited Financial Statements"  shall have the meaning set forth in Section 5.18.

"Avoidance Actions" means any and all claims for relief of Sellers under chapter 5 of the Bankruptcy Code, or state fraudulent conveyances, fraudulent transfer or other similar state laws, or under Sections 95 to 101.1 of the *Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3*, as amended.

CH\1296825.17

"Bankruptcy Case" means the bankruptcy case to be commenced by Sellers under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code, Sections 101 *et seq.*

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Benefit Plan" means any plan, program, policy or arrangement of Seller or any of its Affiliates by which compensation or employee benefits are provided to any Seller Employee.

"Bidding Procedures" means the bidding procedures substantially in the form attached as Exhibit 1 to the Bidding Procedures Order, to be approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"Bidding Procedures Order" means the Order of the Bankruptcy Court, pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code: (a) authorizing and scheduling the Auction; (b) approving procedures for the submission of Qualified Bids; (c) in the case of any subsequent Qualified Bids, approving the initial overbid of at least $10,750,000 and further incremental overbids of at least $2,500,000; (d) approving the Break-Up Fee and the Expense Reimbursement Amount; (e) scheduling a hearing to consider approval of such sale; and (f) approving the form and manner of notice of the Auction procedures and Sale Hearing, which Order shall be substantially in the form attached hereto as Exhibit A with such changes as Buyer and Sellers find reasonably acceptable.

"Bill of Sale" means the bill of sale substantially in the form attached hereto as Exhibit B.

"Break-Up Fee" shall have the meaning set forth in Section 7.6(a).

"Business" shall have the meaning set forth in the Recitals.

"Business Day" means any day of the year on which national banking institutions in New York, New York or Toronto, Ontario are open to the public for conducting business and are not required or authorized by Law to close.

"Business Intellectual Property" means all Intellectual Property owned by Sellers or any of their Subsidiaries, other than the Excluded Intellectual Property.

"Buyer" shall have the meaning set forth in the Preamble.

"Buyer Default Termination" shall have the meaning set forth in Section 3.2.

"Buyer Required Code" shall have the meaning set forth in Section 8.4(a).

"Buyer Termination Notice" shall have the meaning set forth in Section 11.1(b)(i).

"Buyer's Interim Access Manager" shall have the meaning set forth in Section 7.1.

"Canadian Assets" shall have the meaning set forth in Section 3.5.

"Canadian Bidding Procedures Order" shall have the meaning set forth in Section 7.4(b).

"Canadian Bill of Sale" means the bill of sale substantially in the form attached hereto as Exhibit C.

"Canadian Court" shall have the meaning set forth in the Recitals.

"Canadian Orders" means the Canadian Receivership Order, the Canadian Bidding Procedures Order, the Canadian Sale and Vesting Order and all other Orders sought by Canadian Seller in the Canadian Proceedings relating to this Agreement and the transactions contemplated therein.

"Canadian Proceedings" shall have the meaning set out in the Recitals.

"Canadian Receivership Order" shall have the meaning set forth in Section 7.4(b).

"Canadian Sale and Vesting Order" shall have the meaning set forth in Section 7.4(c).

"Canadian Seller" shall have the meaning set forth in the Preamble.

"Cash Consideration" means cash in U.S. dollars in the amount of Two Hundred Seventy-Five Million United States Dollars (USD $275,000,000.00).

"Chargebacks" means all chargebacks, credits, reimbursements and related adjustments, in each case other than Rebates, that are charged by wholesalers, group purchasing organizations, managed care entities and distributors.

"CJA" means *Courts of Justice Act*, R.S.O. 1990, c. C.43.

"Claims" means all claims, causes of action, choses in action, rights of recovery and rights of set-off of whatever kind or description against any Person arising out of or relating to any Product or Acquired Asset.

"Closing" shall have the meaning set forth in Section 4.1.

"Closing Date" shall have the meaning set forth in Section 4.1.

"Closing Date Payment" shall have the meaning set forth in Section 3.3.

"Closing Legal Impediment" shall have the meaning set forth in Section 9.3.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, agreement, lease, sublease, license, sublicense, sales order, purchase order, instrument or other commitment, whether written or oral, that is binding on any Person or any part of its property under applicable Law.

4

"Cure Costs" means amounts that must be paid and obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assigned Agreements.

"Deposit" shall have the meaning set forth in Section 3.2.

"DESI" means the Drug Efficacy Study Implementation program implemented and administered by the FDA, and all applicable regulations, notices and guidances issued by the FDA in connection therewith, including without limitation the FDA's "Guidance for FDA Staff and Industry, Marketed Unapproved Drugs—Compliance Policy Guide Section 440.100 (June 2006)."

"DIN" means the Drug Identification Number assigned to a party for a drug product authorized for sale in Canada, that uniquely identifies that drug product sold in a specific dosage form in Canada.

"Documents" means (a) all books, records, files, invoices, inventory records, product specifications, customer lists, cost and pricing information, physician lists, supplier lists, business plans, catalogs, customer literature, quality control records and manuals and credit records of customers, (b) research, design and development files, records and laboratory books (including raw data, technical data, pharmacology data, pharmacovigilance data, chemistry and pharmaceutical data relating to drug substance and drug product (including analytical and product characterization data) and toxicology data) and stability and clinical studies; (c) all data relevant to the manufacturing of a Product, (d) Regulatory Documentation and (e) Marketing Materials , in each case relating to any Product or Acquired Asset (including all data and other information stored on discs, tapes or other media).

"Effective Date" shall have the meaning set forth in the Preamble.

"Encumbrance" means any charge, lien, claim, mortgage, lease, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

"Environmental, Health and Safety Laws" shall have the meaning set forth in Section 5.4(a).

"Equipment" means all furniture, trade fixtures, equipment, computers, servers, telephones, laptop computers, machinery, apparatus, appliances, implements, signage, office supplies and all other tangible personal property of every kind and description owned by Sellers and used or held for use primarily in the Business.

"Escrow Agent" shall have the meaning set forth in Section 3.2.

"Escrow Agreement" shall have the meaning set forth in Section 3.2.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Excluded Intellectual Property" means the Seller Brand and the Intellectual Property set forth on Schedule 1.1(b).

"Excluded Liabilities" shall have the meaning set forth in Section 2.4.

"Expense Reimbursement Amount" shall have the meaning set forth in Section 7.6(b).

"FD&C Act" means the United States Federal Food, Drug, and Cosmetic Act.

"FDA" means the United States Food and Drug Administration, or any successor entity.

"Filing" shall have the meaning set forth in the Recitals.

"Final Order" means an action taken or order issued by the applicable Governmental Authority as to which no stay of the action or order is in effect.

"Financial Statements" shall have the meaning set forth in Section 5.18.

"Governmental Authority" means any United States or Canadian federal, provincial, state, municipal or local or any foreign government, governmental agency or authority, or regulatory or administrative authority, or any court, tribunal or judicial body having jurisdiction, including the Bankruptcy Court and the Canadian Court.

"Governmental Authorization" means any approval, consent, license, permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"Hazardous Substance" means any "toxic substance," "hazardous pollutant," "hazardous waste," "hazardous material" or "hazardous substance" under any Environmental, Health and Safety Laws.

"Health Canada" means the Canadian Federal department called Health Canada, or any successor entity.

"Health Care Laws" shall have the meaning set forth in Section 5.11(a).

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the relevant rules and regulations thereunder.

"IND" shall have the meaning given in the definition of "Regulatory Documentation."

"Intellectual Property" means all right, title and interest in, to or under intellectual property, including: (i) all patents, patent applications, patent disclosures and invention disclosure statements, together with all provisionals, reissuances, continuations, continuations-in-part, divisions, revisions, extensions and reexaminations thereof; (ii) all trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, slogans, internet domain names and other source identifiers, together with all goodwill of the business connected with the use thereof and symbolized thereby, and all applications, registrations, and renewals in

6

connection therewith; (iii) all copyrights and all applications, registrations, renewals and extensions in connection therewith; (iv) all trade secrets and confidential and proprietary information, including confidential technology, know-how, inventions, processes, formulae, specifications, models and methodologies (collectively, the "Trade Secrets"); (v) computer software, including websites and computer programs, any and all software implementations of algorithms, models and methodologies whether in source code or object code form, and all documentation, including user manuals and training materials, related to the foregoing; and (vi) all copies and tangible embodiments of the foregoing (in whatever form or medium).

"Intercompany Loan" means the debtor-in-possession financing provided by the Canadian Seller to the US Sellers and all proceeds thereof.

"Inventory" means all raw materials, work-in-process, finished goods, supplies (including clinical drug supplies), samples (including samples held by sales representatives), components, packaging materials, and other inventories to which Sellers have title that are in the possession of Sellers or any Third Party and used or held for use in connection with any Product or Acquired Asset.

"IRS" means the Internal Revenue Service.

"Knowledge" means, with respect to any matter in question, in the case of Sellers, the knowledge, after reasonable inquiry, of Jefferson J. Gregory, Robert J. Moccia, Brian G. Shrader, John A. A. Bellamy, Tariq Zaidi, John Bowles, Michael T. Nordsiek, Chris Curtin, Gregory C. Jones, Sean T. Brennan and Erin Craven, with respect to such matter.

"Labeling" shall be as defined in Section 201(m) of the FD&C Act (21 U.S.C. § 321(m)) and other comparable foreign Law relating to the subject matter thereof, including the applicable Product's label, packaging and package inserts accompanying such Product, and any other written, printed, or graphic materials accompanying such Product, including patient instructions or patient indication guides.

"Law" means any foreign or domestic law, statute, code, ordinance, rule, regulation, order, judgment, writ, stipulation, award, injunction or decree by any Governmental Authority as in effect from time to time.

"Liability" means any debt, losses, claim, damage, demand, fine, judgment, penalty, liability or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"Marketing Materials" means all marketing materials, marketing research data, customer and sales information, product literature, promotional materials and data, advertising and display materials (including all underlying designs, samples, charts, diagrams, photos and electronic files related to the foregoing) and all training materials, in each case in whatever form or medium (e.g., audio, visual, digital or print) held in any Seller's name and primarily related to any Product or Acquired Asset as of the Closing Date.

"Material Adverse Effect" means any effect, change, condition, circumstance, development or event that, individually or in the aggregate with all other effects, changes,

conditions, circumstances, developments and events has had, or would reasonably be expected to have, a material adverse effect on the Business (excluding the Excluded Assets and the Excluded Liabilities), taken as a whole, or would reasonably be expected to prevent or materially impair the ability of Sellers to consummate the transactions contemplated by this Agreement, excluding, in each case, (a) any effect, change, condition, circumstance, development or event that results from or arises out of: (i) the Bankruptcy Case and/or the Canadian Proceedings; (ii) the execution and delivery of this Agreement or the announcement thereof or the pendency or consummation of the transactions contemplated hereby; (iii) geopolitical conditions or any outbreak or escalation of hostilities or acts of terrorism or war; (iv) any hurricane, tornado, flood, earthquake or other natural disaster; (v) changes in (or proposals to change) Laws or accounting regulations or principles; (vi) any action expressly contemplated by this Agreement or taken at the written request of Buyer; (vii) failure of any Seller, or part thereof, to meet any internal or published projections, forecasts, estimates or predictions in respect of financial or operating metrics (it being understood that the facts or circumstances giving rise or contributing to such failure to meet any internal or published projections, forecasts, estimates or predictions in respect of financial or operating metrics may be deemed to constitute, or be taken into account in determining whether there has been, a Material Adverse Effect); (viii) the failure to pay or otherwise honor (A) Rebates, Chargebacks and return obligations relating to sales of Products sold by Sellers prior to the Filing or (B) any patient coupon program; or (ix) any reasonably anticipated motion, application, pleading or Order filed under or in connection with the Bankruptcy Case; and (b) any effect, change or event generally applicable to: (i) the industries and markets in which Sellers operate, or (ii) economic or political conditions or the debt, securities or financial markets in any country or region, *provided, however*, that in the case of clauses (a)(iii), (a)(v), (b)(i) and (b)(ii) of this paragraph, such effects, changes or events shall be taken into account in determining whether any material adverse effect has occurred to the extent that any such effects, changes or events have, or would reasonably be expected to have, a disproportionate effect on the Business (excluding the Excluded Assets and the Excluded Liabilities) as compared to other similarly situated businesses engaged in the business of selling dermatology pharmaceutical products.

"Material Business Intellectual Property" shall have the meaning set forth in Section 5.9(a).

"Material Unregistered Trademarks" shall have the meaning set forth in Section 5.9(a).

"NDA" means any new drug application filed pursuant to the requirements of the FDA, as more fully defined in 21 C.F.R. Part 314 *et seq.*, and any foreign equivalent application filed with any Governmental Authority.

"NDC Number" means the unique, identifying number assigned to a drug product, including the labeler code, product code and package code, in connection with the drug listing requirements of Section 510(j) of the FD&C Act and applicable FDA rules and regulations or other comparable foreign Law relating to the subject matter thereof.

"NDS" means any new drug submission filed pursuant to the requirements of Health Canada as more fully defined under the *Food and Drugs Act*, RSC 1985, c F-27 and includes all related documentation accompanying the submission.

"NOC" means the regulatory approval for a drug product by Health Canada, namely a Notice of Compliance.

"Non-Serious Adverse Event" shall have the meaning set forth in Section 8.6(b).

"Nycomed Award Amount" shall have the meaning set forth in Section 8.10.

"Nycomed Litigation" means Graceway Pharmaceuticals, LLC and 3M Innovative Properties Company v. Perrigo Company, Perrigo Israel Pharmaceuticals, Ltd. and Nycomed U.S. Inc., Civil Action No. 10-937 (WJM)(MF) in the United States District Court for the District of New Jersey.

"Order" means any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority.

"Ordinary Course of Business" means the operation of the Business in the ordinary and usual course consistent with past practice and custom of Sellers, including taking any action in accordance with any Contract to which Sellers is a party.

"Outside Date" shall have the meaning set forth in Section 11.1(a)(iii).

"Party" or "Parties" means, individually or collectively, Buyer and Sellers.

"Permits" means all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals, clearances, Product Registrations and Orders that are necessary for Sellers to own, lease and operate their properties and assets or to carry on the Business as it is now being conducted.

"Permitted Encumbrances" means (a) as to US Sellers only, Encumbrances for utilities and current Taxes not yet due and payable or being contested in good faith; (b) non-exclusive licenses to the Business Intellectual Property granted in the Ordinary Course of Business; and (c) as to US Sellers only, immaterial materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"Pre-Paid Expenses" means all deposits and prepaid charges and expenses of Sellers as of the Closing Date to the extent related to an Assigned Agreement and after applying any such deposits, prepaid charges and expenses against any Cure Costs payable to the third party to whom such deposits, prepaid charges and expenses were paid.

"Proceeding" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority, other than an Avoidance Action.

"Product Registrations" means the approvals, licenses, registrations, listings, franchises, permits, certificates, consents, clearances, or other authorizations (including, but not limited to, NDAs and NDSs) and comparable regulatory filings required by any Governmental Authority for the Products held in Sellers' name as set forth in Schedule 1.1(c).

"Products" or "Product" means, collectively or individually, all products, formulations and compounds owned by Sellers or any of their Subsidiaries, or to which Sellers or any of their Subsidiaries have rights, including the products, formulations, compounds and other assets set forth on Schedule 1.1(c), together with all potential new strengths, indications, modes of administration and line extensions related to such products, formulations, compounds and other assets.

"Property Taxes" shall have the meaning set forth in Section 8.1(b).

"Purchase Price" shall have the meaning set forth in Section 3.1.

"Qualified Bid" shall have the meaning set forth in the Bidding Procedures.

"Real Property" means all real property owned by Sellers and all unexpired leases or other occupancy agreements for real property under which Sellers are a lessee (or the equivalent).

"Rebates" means rebates, price reductions, administrative fees and related adjustments charged by state Medicaid and other federal, state and local governmental programs (including any Canadian programs) and their participants, and by health plans, insurance companies, mail service pharmacies and health care providers based upon the utilization and sales of the Product, and service, administrative and inventory management fees due to wholesalers, distributors and group purchasing organizations based on sales of the Product.

"Receiver" means the Receiver appointed by the Canadian Court in the Canadian Proceedings.

"Regulatory Documentation" means (a) all regulatory filings and supporting documents, chemistry, manufacturing and controls data and documentation, preclinical and clinical studies and tests, (b) the NDA and all regulatory files and foreign equivalents related thereto, including the NDS, (c) all records maintained under record keeping or reporting Laws of the FDA or any other Governmental Authority including all investigational new drug ("IND") applications, IND annual and safety reports, drug master files, FDA warning letters, FDA Notices of Adverse Finding Letters, FDA audit reports (including any responses to such reports), any correspondence with the Department of Drug Marketing, Advertising and Communications, periodic safety update reports, complaint files, annual product quality reviews and clinical trial applications in Canada, (d) the complete complaint, adverse event and medical inquiry filings with respect to the Products, in each case held by Sellers as required by applicable Laws and as related to any Product or Acquired Asset, including the Product Registrations and (e) all regulatory approvals, including the NOC, the DIN and any other market authorization issued by Health Canada.

"Release" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the environment.

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Retained Subsidiaries" means all direct and indirect Subsidiaries of Sellers.

"Review Documents" shall have the meaning set forth in Section 5.19(a).

"Safety Notice" shall have the meaning set forth in Section 5.11(d).

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, which Order shall be substantially in the form attached hereto as Exhibit D with such changes as Buyer and Sellers find reasonably acceptable.

"Seller Employee" means any employee of any Seller or any Affiliates of any Seller.

"Sellers" and "Seller" shall have the meaning set forth in the Preamble.

"Sellers Termination Notice" shall have the meaning set forth in Section 11.1(c)(i).

"Sellers' Brand" shall have the meaning set forth in Section 8.7.

"Sellers' Interim Access Manager" shall have the meaning set forth in Section 7.1.

"Serious Adverse Event" shall have the meaning set forth in Section 8.6(b).

"Stalking Horse Bidder" shall have the meaning set forth in the Bidding Procedures.

"Subsidiary" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body.

"Successful Bidder" shall have the meaning set forth in the Bidding Procedures.

"Tax" or "Taxes" means any federal, state, provincial, local, municipal, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care,

11

withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto), in each case imposed by any Governmental Authority.

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed with or required to be filed with any Governmental Authority in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Territory" means the countries and territories set forth directly above each Product indicated on Schedule 1.1(c).

"Third Party" means a Person who or which is neither a party hereto nor an Affiliate of a Party hereto.

"Trade Secrets" shall have the meaning set forth in subsection (iv) of the definition of Intellectual Property.

"Transaction Documents" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

"Transfer Taxes" shall have the meaning set forth in Section 8.1(a).

"Treasury Regulations" means the regulations promulgated by the U.S. Treasury Department pursuant to the Code.

"Unaudited Financial Statements" shall have the meaning set forth in Section 5.18.

"US Sellers" and "US Seller" shall have the meaning set forth in the Preamble.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, any similar Law, and the rules and regulations thereunder.

Section 1.2    Other Definitions and Interpretive Matters.

(a)    Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

(i)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Any reference in this Agreement to $ means U.S. dollars.

12

(iii)    Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement. No reference to or disclosure of any item or other matter in the Exhibits and Schedules shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in the Exhibits and Schedules. No disclosure in the Exhibits and Schedules relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. Any information, item or other disclosure set forth in any Schedule shall be deemed to have been set forth in all other applicable Schedules if the relevance of such disclosure to such other Schedule is reasonably apparent from the facts specified in such disclosure. All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(iv)    Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(v)    The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(vi)    Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(vii)    The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    No Strict Construction. Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

CH\1296825.17

# ARTICLE II

## PURCHASE AND SALE

Section 2.1    Purchase and Sale of the Acquired Assets.  Upon the terms and subject to the conditions of this Agreement, on the Closing Date, US Sellers and Canadian Seller, or the Receiver on behalf of the Canadian Seller, shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase, all right, title and interest of Sellers in, to or under all of the properties and assets (including Intellectual Property) of Sellers of every kind and description, wherever located, real, personal or mixed, tangible or intangible, to the extent owned, leased, licensed, used or held for use in or relating to the Business, as the same shall exist on the Closing Date (but, for the avoidance of doubt, excluding any Excluded Assets) (collectively, the "Acquired Assets"), including all right, title and interest of Sellers in, to or under:

(a)    all Inventory;

(b)    the Assigned Agreements;

(c)    all Permits and pending applications therefor;

(d)    all Business Intellectual Property;

(e)    all Pre-Paid Expenses;

(f)    all goodwill associated with the Acquired Assets;

(g)    all Documents (other than those described in Section 2.2(c)) to the extent available and permitted by applicable Laws, *provided* that Sellers may retain copies of such Documents;

(h)    all Claims and Proceedings (including, for the avoidance of doubt, the Nycomed Litigation and all claims for past infringement or misappropriation of Business Intellectual Property) of Sellers as of the Closing other than Claims and Proceedings (i) primarily related to or constituting any Excluded Asset or Excluded Liability or (ii) against Sellers (regardless of whether or not such claims and causes of action have been asserted by Sellers) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds (other than Tax refunds), rights of reimbursement and other rights of recovery, including insurance proceeds, possessed by Sellers as of the Closing (regardless of whether such rights are currently exercisable) to the extent related to any Product or other Acquired Asset or any of the Assumed Liabilities; and

(i)    all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements relating to any Product or Acquired Asset (or any portion thereof).

14

Section 2.2    Excluded Assets.  Notwithstanding anything herein to the contrary, the Acquired Assets shall not include any of the following (collectively, the "Excluded Assets"):

(a)    each Seller's rights under this Agreement (including the right to receive the Purchase Price delivered to Sellers pursuant to this Agreement);

(b)    all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits, securities, securities entitlements, instruments and other investments of Sellers and all bank accounts and securities accounts, including any cash collateral that is collateralizing any letters of credit;

(c)    all Documents prepared in connection with this Agreement or the transactions contemplated hereby or relating to the Bankruptcy Case or the Canadian Proceedings, all minute books, corporate records (such as stock registers) and organizational documents of Sellers and the Retained Subsidiaries, Tax Returns, other Tax work papers, and all other Documents not related to the Products or the Acquired Assets;

(d)    any Contract that is not an Assigned Agreement, including the Contracts listed or described on Schedule 2.2(d), which Schedule may be modified from the Effective Date through one (1) Business Day prior to the Sale Hearing in accordance with Section 7.9;

(e)    any Tax refunds, rebates or credits of Sellers;

(f)    all Claims and Proceedings of Sellers (other than those described in Section 2.1(h));

(g)    all Seller Employees and all of the funding vehicles and assets of any Benefit Plan;

(h)    the Avoidance Actions or similar Proceedings, including but not limited to Proceedings under Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code;

(i)    any security deposits or pre-paid expenses not associated with the Acquired Assets;

(j)    all insurance policies and binders, all claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders and all rights to proceeds thereof (other than as described in Section 2.1(h));

(k)    all shares of capital stock or other equity interests of any Seller or Retained Subsidiary or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller or Retained Subsidiary;

(l)    the Equipment;

(m)    all Accounts Receivable;

(n)    all Real Property;

(o)     any assets, properties and rights of any Sellers other than the Acquired Assets, including those set forth on  Schedule 2.2(o);

(p)     the Excluded Intellectual Property;

(q)     any Inventory that is part of a split lot of  and in the possession of Sellers as of the Filing; and

(r)     the Intercompany Loan and all interest thereon.

Section 2.3     Assumed Liabilities.  Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer shall assume and agree to perform and discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), the following Liabilities (collectively, the "Assumed Liabilities"):

(a)     all Liabilities arising from the ownership of the Acquired Assets or the sale of Products by Buyer, in each case after the Closing Date, it being understood that Liabilities arising from the ownership of the Acquired Assets or the operation of the Business prior to the Closing Date (including the sale of Products by Sellers and their Affiliates prior to the Closing Date) shall not constitute Assumed Liabilities regardless of when the obligation to pay such Liabilities arises, other than as set forth in Section 2.3(e) and Section 8.1;

(b)     all Liabilities under the Assigned Agreements arising after the Closing;

(c)     the Cure Costs associated with any Contracts (i) added by Buyer to Schedule 1.1(a) after the Effective Date, *provided* that such Contract (A) is listed on Schedule 2.2(d) to this Agreement as of the Effective Date or (B) arose in the Ordinary Course of Business after the Effective Date and was approved by Buyer in writing as an "Assigned Agreement" or (ii) added by Buyer to Schedule 1.1(a) after the Auction;

(d)     all Liabilities of Sellers for any claims entitled to administrative expense priority in the Bankruptcy Case in accordance with the applicable provisions of the Bankruptcy Code arising out of any Contract removed by Buyer from Schedule 1.1(a) in accordance with Section 7.9 that is listed on Schedule 2.3(d); and

(e)     all Liabilities for Transfer Taxes, as provided in Section 8.1.

Section 2.4     Excluded Liabilities.  Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge, and Sellers shall be solely and exclusively liable with respect to, any Liability of Sellers that is not an Assumed Liability, including, without limitation, Liability incurred by Sellers for returns, government Rebates, commercial Rebates and obligations arising under any patient coupon program, in each case, with respect to Product sold by Sellers prior to Closing and whether such Liabilities arise prior to, on or after the Closing Date (such Liabilities, collectively, the "Excluded Liabilities").

Section 2.5     Assignments; Cure Costs.  Sellers shall transfer and assign all Assigned Agreements and Permits to Buyer, and Buyer shall assume all Assigned Agreements and Permits

from Sellers, as of the Closing Date pursuant to, *inter alia*, Section 365 of the Bankruptcy Code and the Sale Order. In connection with such assumption and assignment of the Assigned Agreements in accordance with Section 2.1(b), Sellers shall pay and discharge all Cure Costs, except for those assumed by Buyer pursuant to Section 2.3(c), which Buyer shall pay and discharge; *provided, however*, that, notwithstanding the foregoing, Canadian Seller shall not be liable for Cure Costs for Assigned Agreements and Permits to which Canadian Seller is not a party. To the maximum extent permitted by the Bankruptcy Code or other applicable Law, the Assigned Agreements and Permits shall be assumed by Sellers and assigned to Buyer as of the Closing Date. Notwithstanding anything to the contrary in this Agreement, to the extent that the assignment to Buyer of any Assigned Agreement or Permit is not permitted by Law or is not permitted without the consent of another Person and, in the case of the Assigned Agreements and Permits that are the subject of Section 365 of the Bankruptcy Code and the Sale Order, as applicable, such restriction cannot be effectively overridden or canceled by the Sale Order, or other related order of the Bankruptcy Court, then this Agreement will not be deemed to constitute an assignment or an undertaking or attempt to assign the same or any right or interest therein if such consent is not given and the Closing shall proceed with respect to the remaining Assigned Agreements and Permits without any reduction in the Purchase Price, *provided, however*, that Sellers will use their commercially reasonable efforts to obtain any such consents to assign such Assigned Agreements and Permits to Buyer, *provided, further*, that Sellers shall not be required to incur any Liabilities or provide any financial accommodation in order to obtain any such consents.

Section 2.6    Further Assurances. At the Closing, Sellers shall execute and deliver to Buyer such other instruments of transfer as shall be reasonably necessary or appropriate to vest in Buyer good and indefeasible title to the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances) and to comply with the purposes and intent of this Agreement and such other instruments as shall be reasonably necessary or appropriate to evidence the assignment by Sellers and assumption by Buyer of the Assigned Agreements, and each of Sellers, on the one hand, and Buyer, on the other hand, shall use its commercially reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable Law, and execute and deliver such documents and other papers, as may be required to consummate the transactions contemplated by this Agreement at or after the Closing, including, subject to Section 2.5, assistance by Sellers with the transfer of the Inventory, Permits, Documents, Business Intellectual Property (including with respect to making all appropriate filings and submissions with the United States Patent and Trademark Office and the Canadian Intellectual Property Office promptly after Closing, and in any event within thirty (30) days of Closing) and Product Registrations (which in the case of the shipping and delivery of the Inventory, Documents and Product Registrations shall be arranged by Buyer at its sole cost and expense); *provided* that (i) nothing in this Section 2.6 shall prohibit Sellers from ceasing operations or winding up their affairs following the Closing and (ii) Buyer shall reimburse Sellers for any reasonable and documented out-of-pocket expenditure or obligation incurred by Sellers after the Closing directly related to assistance provided to Buyer pursuant to this Section 2.6. In furtherance and not in limitation of the foregoing, in the event that any of the assets, properties, rights, titles and interests (tangible or intangible) used in connection with the Products and the Acquired Assets shall not have been conveyed at Closing, Sellers shall use commercially reasonable efforts to convey such assets, properties, rights, titles and interests to Buyer as promptly as practicable after the Closing, and pending such conveyance

17

shall provide the applicable benefits thereof to Buyer in a manner consistent in all material respects with past practice, *provided, however*, that Sellers shall not be required to incur any Liabilities or provide any financial accommodation in connection with any action required to be taken pursuant to this <u>Section 2.6</u>. Prior to the Closing, the parties shall cooperate in good faith to identify any assets, properties, rights, titles or interests that may not be able to be conveyed at Closing.

**ARTICLE III**
**PURCHASE PRICE**

Section 3.1 <u>Purchase Price</u>. The purchase price (the "<u>Purchase Price</u>") for the purchase, sale, assignment and conveyance of Sellers' right, title and interest in, to and under the Acquired Assets shall consist of:

      (a)    cash in the amount of the Cash Consideration; plus

      (b)    the assumption of the Assumed Liabilities.

Section 3.2 <u>Deposit</u>. Upon the execution of an escrow agreement substantially in the form attached hereto as <u>Exhibit E</u> (the "<u>Escrow Agreement</u>"), with such changes thereto as may be reasonably acceptable to Sellers and Buyer, with an escrow agent reasonably acceptable to Sellers and Buyer (the "<u>Escrow Agent</u>"), Buyer shall deposit into escrow with the Escrow Agent an amount equal to 10% of the Cash Consideration (such amount, together with all interest and other earnings accrued thereon, the "<u>Deposit</u>") by wire transfer of immediately available funds pursuant to the terms of the Escrow Agreement. The Deposit shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any Sellers or Buyer. The Deposit shall become payable to Sellers upon the Closing or in the event of the termination of this Agreement pursuant to <u>Section 11.1(c)(i)</u>, in accordance with <u>Section 11.2</u> (a "<u>Buyer Default Termination</u>"). At the Closing, the Parties shall instruct the Escrow Agent to deliver the Deposit to an account designated by Sellers by wire transfer of immediately available funds as payment of a portion of the Purchase Price.

Section 3.3 <u>Closing Date Payment</u>. At the Closing, Buyer shall pay to Sellers and the Receiver in accordance with the Allocation Schedule(s) in cash by wire transfer of immediately available funds an amount equal to the Cash Consideration, *less* the amount of the Deposit (such amount to be paid to Sellers at the Closing, the "<u>Closing Date Payment</u>").

Section 3.4 <u>Discharge of Assumed Liabilities After Closing</u>. Buyer shall pay, perform or satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

Section 3.5 <u>Allocation of Purchase Price</u>. No later than twenty (20) Business Days prior to the Closing, Buyer shall deliver to Sellers allocation schedule(s) allocating the Purchase Price (as may be adjusted pursuant to the terms of this Agreement), including the Assumed Liabilities to the extent such Liabilities are required to be treated as part of the purchase price for Tax purposes, (i) between the Acquired Assets of Canadian Seller (the "<u>Canadian Assets</u>"), on the one hand, and the Acquired Assets other than the Canadian Assets, on the other hand, (ii) for

18

the Canadian Assets, among the province(s) in which the Canadian Assets are located, and (iii) among the Acquired Assets (the "Allocation Schedule(s)") in accordance with Section 1060 of the Code and the regulations thereunder. In administering any Proceeding, the Bankruptcy Court shall not be required to apply the Allocation Schedule(s) in determining the manner in which the Purchase Price should be allocated as between any of the US Sellers and their respective estates or between the US Sellers and their estates and the Canadian Seller and its estate. In administering the Canadian Proceedings, the Canadian Court shall not be required to apply the Allocation Schedule(s) in determining the manner in which the Purchase Price should be allocated as between the US Sellers and their estates and the Canadian Seller and its estate. The Buyer and Sellers will each file all Tax Returns (including, but not limited to, IRS Forms 8594) consistent with the Allocation Schedule(s) established pursuant to the terms of this Section 3.5. Sellers, on the one hand, and Buyer, on the other hand, each agree to provide the other promptly with any other information required to complete IRS Forms 8594. Neither Buyer nor any Seller shall take any Tax position inconsistent with such Allocation Schedule(s) and neither Buyer nor any Seller shall agree to any proposed adjustment based upon or arising out of Allocation Schedule(s) by any Governmental Authority without first giving the other Party prior written notice; *provided, however,* that nothing contained herein shall prevent Buyer or any Seller from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the Allocation Schedule(s), and neither Buyer nor any Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of such Allocation Schedule(s). The Allocation Schedule(s) shall be revised in accordance with Section 1060 of the Code and the regulations thereunder to appropriately take into account any payments made under this Agreement.

Section 3.6    Withholding.  If Buyer is required by applicable Laws to withhold or deduct any amount of Tax from the payment of the Purchase Price hereunder, then Buyer shall withhold or deduct (and, to the extent required by applicable Laws, remit to the appropriate Governmental Authority) the amount of any such Tax and such withheld amount shall be treated for all purposes of this Agreement as having been paid to Sellers.

## ARTICLE IV
## CLOSING

Section 4.1    Closing Date.  Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the offices of Latham & Watkins LLP, 233 S. Wacker Drive, Suite 5800, Chicago, Illinois, no later than the third (3rd) Business Day following the date on which the conditions set forth in Article IX and Article X have been satisfied or (if permissible) waived (other than the conditions which by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or at such other place or time as Buyer, Sellers and the Receiver may mutually agree. The date and time at which the Closing actually occurs is referred to as the "Closing Date."

Section 4.2    Buyer's Deliveries.  At the Closing, Buyer shall deliver to Sellers:

(a)    the Closing Date Payment, in accordance with Section 3.3;

(b)      the Bill of Sale, duly executed by Buyer;

(c)      the Canadian Bill of Sale, duly executed by Buyer;

(d)      an assignment and assumption agreement with respect to the Assigned Agreements, in the form attached hereto as Exhibit F (the "Assignment and Assumption Agreement"), assigning to Buyer all of Sellers' right, title and interest in and to such Assigned Agreements, duly executed by Buyer;

(e)      each other Transaction Document to which Buyer is a party, duly executed by Buyer;

(f)      the certificates of Buyer to be received by Sellers pursuant to Sections 10.1 and 10.4; and

(g)      such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Sellers, as Sellers may reasonably request to transfer and assign the Acquired Assets and Assumed Liabilities to Buyer.

Section 4.3    Sellers' Deliveries.  At the Closing, Sellers and the Receiver, as applicable, shall deliver to Buyer:

(a)      the Bill of Sale, one or more Assignment and Assumption Agreements, and each other Transaction Document to which any Seller is a party, duly executed by each applicable Seller or the Receiver;

(b)      the Canadian Bill of Sale, duly executed by the Receiver;

(c)      a copy of the Sale Order entered by the Bankruptcy Court;

(d)      a copy of the Canadian Sale and Vesting Order as entered by the Canadian Court;

(e)      a copy of the Receiver's Certificate referred to in the Canadian Sale and Vesting Order duly executed by the Receiver and as filed with the Canadian Court;

(f)      the certificates of Sellers to be received by Buyer pursuant to Sections 9.1 and 9.2;

(g)      a certificate of non-foreign status executed by each Seller (or, if applicable, a direct or indirect owner of a Seller) that is not a disregarded entity for U.S. federal income tax purposes, prepared in accordance with Treasury Regulation Section 1.1445-2(b); and

(h)      such other bills of sale, special warranty deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all the right, title and interest of Sellers in, to or under any or all the Acquired Assets.

CH\1296825.17

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby represent and warrant to Buyer that the statements contained in this <u>Article V</u> are true and correct:

Section 5.1 <u>Organization and Good Standing</u>. Each Seller is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization. Sellers have the requisite corporate or limited liability company power and authority to own or lease and to operate and use its properties and to carry on the Business as now conducted. Except as set forth on <u>Schedule 5.1</u>, Sellers are duly qualified or licensed to do business and are in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

Section 5.2 <u>Authority; Validity; Consents</u>. Sellers have, subject to requisite Bankruptcy Court approval and Canadian Court approval, as applicable, the requisite corporate or limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which each such Seller is a party and to consummate the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by Sellers and each other Transaction Document required to be executed and delivered by Sellers at the Closing will be duly and validly executed and delivered by Sellers at the Closing. Subject to requisite Bankruptcy Court approval and Canadian Court approval, as applicable, this Agreement and the other Transaction Documents constitute, with respect to Sellers, the legal, valid and binding obligations of Sellers, enforceable against Sellers in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to requisite Bankruptcy Court approval and Canadian Court approval, as applicable, except (a) as required to comply with the HSR Act, (b) for entry of the Sale Order or the Canadian Sale and Vesting Order and (c) for notices, filings and consents required in connection with the Bankruptcy Case or the Canadian Proceedings, Sellers are not required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, except for such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, have a Material Adverse Effect.

Section 5.3 <u>No Conflict</u>. When the consents and other actions described in <u>Section 5.2</u> have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the material breach of any of the terms and provisions of, or constitute a material default under, or materially conflict with, or require consent or the giving of notice under, or cause any acceleration of any material obligation of Sellers under (a) any Order or (b) any Law.

21

Section 5.4    Environmental and Health and Safety Matters.  Except as set forth on Schedule 5.4 or as would not, individually or in the aggregate, have a Material Adverse Effect:

(a)    the current operations of the Business at the Real Property comply with all applicable Laws concerning environmental, health or safety matters ("Environmental, Health and Safety Laws"), and Sellers have not received written notice alleging that the activities of the Business are in violation of any Environmental Health and Safety Laws; and

(b)    no Seller has caused any Release of any Hazardous Substances that requires reporting under applicable Environmental, Health and Safety Laws at, on or under any of the Real Property, and, to Sellers' Knowledge, none of such properties has been used by any Person as a landfill or storage, treatment or disposal site for any type of Hazardous Substance or non-hazardous solid wastes as defined under the Resource Conservation and Recovery Act of 1976, as amended.

Section 5.5    Title to Acquired Assets.  Sellers have, and, immediately prior to Closing, will have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.3, and subject to the terms of the Sale Order and the Canadian Sale and Vesting Order, Sellers will thereby transfer to Buyer, good title to, or, in the case of personal property leased by Sellers, a valid leasehold interest in, all of the Acquired Assets material to the Business, taken as a whole, and the assets set forth on Schedule 5.5, free and clear of all Encumbrances, except (a) as set forth on Schedule 5.5, (b) for the Assumed Liabilities, (c) for Permitted Encumbrances, and (d) subject to the limitation that certain transfers, assignments, licenses, sublicenses, leases and subleases, as the case may be, of Acquired Assets, Assigned Agreements and Permits, and any claim or right or benefit arising thereunder or resulting therefrom, may require consent of a Person or Governmental Authority, which has not been obtained.

Section 5.6    Taxes.  Except as set forth on Schedule 5.6, all income and other material Tax Returns required to be filed by Sellers have been timely filed (taking into account any extension of time to file granted, or to be obtained with respect thereto), and all such Tax Returns are complete and accurate in all material respects.  Except as set forth on Schedule 5.6, on the Effective Date (a) no examination by any Governmental Authority of any such Tax Return is currently in progress; and (b) no material Tax deficiencies of Sellers are being claimed, proposed or assessed by any Governmental Authority. All material amounts of Tax due and payable by Sellers have been duly and timely paid.  There are no Liens for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

Section 5.7    Legal Proceedings.  As of the date hereof, except for the Bankruptcy Case, the Canadian Proceedings and as set forth on Schedule 5.7, there is no Proceeding or Order pending, outstanding or, to Sellers' Knowledge, threatened against any Seller that (a) seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or (b) would have, individually or in the aggregate, a Material Adverse Effect.  Since December 31, 2006, there has not been made or, to Sellers' Knowledge, threatened, any material product liability or other material product-related claims by any third party arising from the sale, distribution or manufacturing with respect to the safety of the

CH\1296825.17

Products of any Product and, to Seller's Knowledge, there are no material safety concerns with respect to any Product.

Section 5.8    Compliance with Laws; Permits.  Except as set forth in Schedule 5.8, Sellers are not, and since January 1, 2009, have not been in violation in any material respect of any Law applicable to the operation of the Business and hold all Permits required for Sellers to conduct the Business as it is currently conducted.  Except as set forth in Schedule 5.8, there are no Proceedings pending, or to Sellers' Knowledge threatened, regarding any of the Permits, except where the failure to hold the same or such Proceedings regarding the same would not reasonably be expected to materially impair the conduct of the Business as currently conducted.  Sellers are in compliance with the terms of all Permits, except for such non-compliance as would not reasonably be expected to materially impair the conduct of the Business as currently conducted.  Notwithstanding the foregoing, this Section 5.8 shall not apply to environmental and health and safety matters, Taxes or regulatory matters, which are the subject exclusively of the representations and warranties in Section 5.4, Section 5.6 and Section 5.11, respectively.

Section 5.9    Sellers' Intellectual Property.

(a)    Schedule 5.9(a)(i) sets forth a true and complete list of all U.S. and foreign (A) issued patents and pending applications for patents; (B) registered trademarks, Internet domain names and pending applications for trademarks; and (C) registered copyrights and pending applications for copyrights, in each case consisting of Business Intellectual Property and which are material to the Business as currently conducted (collectively, the "Material Business Intellectual Property").  To Sellers' Knowledge, Schedule 5.9(a)(ii) sets forth a true and complete list of all unregistered trademarks consisting of Business Intellectual Property and which are material to the Business as currently conducted (the "Material Unregistered Trademarks").  Except as set forth on Schedule 5.9(a)(iii) and for Permitted Encumbrances, Sellers have all right, title and interest in and to the Material Business Intellectual Property designated as owned by Sellers on Schedule 5.9(a)(i), free and clear of all Encumbrances.

(b)    Except as set forth on Schedule 5.9(b), to Sellers' Knowledge, each item of the Material Business Intellectual Property is in full force and effect, and has not been abandoned or passed into the public domain, and all necessary registration, maintenance and renewal documentation and fees in connection with the applicable Material Business Intellectual Property have been timely filed with the appropriate authorities and paid.  Sellers have in place commercially reasonable policies and procedures, consistent with industry standards, to maintain the secrecy of all Trade Secrets included in the Business Intellectual Property.  To Sellers' Knowledge, the Business is not using any Material Business Intellectual Property in a manner that would reasonably be expected to result in the cancellation or unenforceability of such Material Business Intellectual Property.

(c)    Except as set forth on Schedule 5.9(c), there are no claims, actions, suits or proceedings before any court, tribunal or other Governmental Authority with respect to the Material Business Intellectual Property or Material Unregistered Trademarks (other than proceedings related to usual and customary patent or trademark prosecutions in the Ordinary Course of Business, including with the United States Patent and Trademark Office or equivalent foreign or multi-national authority).

23

(d)     Except as disclosed on Schedule 5.9(d), to Sellers' Knowledge (i) the conduct of the Business by Sellers as conducted as of the date hereof does not infringe or otherwise violate any Person's Intellectual Property rights, and no claims with respect to such infringement or violation are pending or threatened in writing against Sellers, and (ii) no Person is infringing or otherwise violating any Business Intellectual Property, and no claims with respect to any such infringement or violation are pending or threatened against any Person by Sellers.

Section 5.10  Assigned Agreements.  Each Assigned Agreement listed or described in Schedule 1.1(a) is in full force and effect and is a valid and binding obligation of Sellers and, to Sellers' Knowledge, the other parties thereto, in accordance with its terms and conditions, in each case except (a) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity and (b) as set forth on Schedule 5.10.  Sellers have made available to Buyer correct and complete copies of all Assigned Agreements.  Upon entry of the Sale Order and payment of the Cure Costs and except as set forth on Schedule 5.10, (i) no Seller will be in material breach or default of its obligations under any such Assigned Agreement, (ii) no condition exists that with notice or lapse of time or both would constitute a material default by any Seller under any such Assigned Agreement and (iii) to Sellers' Knowledge, no other party to any such Assigned Agreement is in material breach or default thereunder.  Other than as disclosed in Schedule 1.1(a) (as amended from time to time in accordance with the terms of this Agreement), Schedule 2.2(d) (as amended from time to time in accordance with the terms of this Agreement), Schedule 5.13, Schedule 5.14 and Schedule 5.15, as of the Effective Date, no Seller is party to a Contract that is material to the Business.

Section 5.11  Regulatory Matters.

(a)     Except as disclosed on Schedule 5.11(a), Sellers are in compliance in all material respects with all health care laws, statutes, ordinances, codes, rules, regulations, decrees and orders of Governmental Authorities (collectively, "Health Care Laws") applicable to the conduct of the Business as currently conducted by Sellers.  Health Care Laws include, but are not limited to, the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Anti-Inducement Law (42 U.S.C. § 1320a-7a(a)(5)), the civil False Claims Act (31 U.S.C. §§ 3729 et seq.), the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)), the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. §§ 1320d et seq.) as amended by the Health Information Technology for Economic and Clinical Health Act (42 U.S.C. §§ 17921 et seq.), the exclusion laws (42 U.S.C. § 1320a-7), the FD&C Act and related FDA regulations, the DESI program, the Public Health Service Act, the Controlled Substances Act, Medicare (Title XVIII of the Social Security Act), Medicaid (Title XIX of the Social Security Act), the Food and Drugs Act, RSC 1985, cF-27, the Food and Drugs Regulations CRC, C870, the Patent Act R.S.C., 1985, c. P-4, the Patented Medicines (Notice of Compliance) Regulations SOR/93-133 and the Controlled Drugs and Substances Act, SC 1996, c 19, as well as any comparable foreign, federal or state laws, and the regulations promulgated pursuant to such laws.  Except as disclosed on Schedule 5.11(a), no Seller has received any notification of any pending or, to Sellers' Knowledge, threatened, claim, suit, proceeding, hearing, enforcement, audit, inquiry, investigation, arbitration or other action from any Governmental Authority, including, without limitation, the FDA, the Centers for Medicare & Medicaid Services, and the U.S. Department of Health and Human

24

Services Office of Inspector General, alleging potential or actual non-compliance by, or liability of, Sellers under any Health Care Laws, except as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Business as currently conducted.

(b)     Sellers hold Product Registrations required for the conduct of the Business as currently conducted by Sellers, and such Product Registrations are in full force and effect, except where the failure to hold a Product Registration would not, individually or in the aggregate, reasonably be expected to materially impair the conduct of the Business as currently conducted.  Sellers have fulfilled and performed, and are performing, all of their material obligations with respect to the Product Registrations, and no event has occurred which allows, or after notice or lapse of time would allow, revocation or termination thereof or results in any other impairment of the rights of the holder of any Product Registration, except where the failure to so perform, or the occurrence of such event would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Business as currently conducted.  Except as disclosed on Schedule 5.11(b), Sellers have not received any notice, letters or other correspondence from the FDA, Health Canada or any other Governmental Authority or person (i) contesting any of their Product Registrations or (ii) otherwise alleging any violation of Health Care Laws by Sellers.

(c)     Except as disclosed on Schedule 5.11(c), all material reports, documents, claims and notices required to be filed, maintained, or furnished to the FDA or Health Canada by Sellers (including, but not limited to, drug registration and listing submissions to the FDA or Health Canada) have been so filed, maintained or furnished and, to Sellers' Knowledge, were complete and correct in all material respects on the date filed (or were corrected in or supplemented by a subsequent filing).

(d)     Except as set forth on Schedule 5.11(d), during the one (1) year period prior to the Effective Date, no Seller has voluntarily or involuntarily initiated, conducted or issued, or caused to be initiated, conducted or issued, any recalls, market withdrawals, replacements, warnings, "dear doctor" letters, investigator notices, MedWatch safety alerts or other notice of material action relating to an alleged lack of safety, efficacy or regulatory compliance of the Products (each a "Safety Notice").

(e)     Except as set forth on Schedule 5.11(e), during the one (1) year prior to the Effective Date, no Seller has received any FDA Form 483, notice of adverse finding, warning letter, untitled letter, or other notice, in each case, alleging a material lack of safety from the FDA, Health Canada or any other Governmental Authority.

(f)     During the one (1) year prior to the Effective Date, no Seller has received any notification from the FDA regarding Products marketed under the DESI program (i) alleging or finding that a Product is illegally marketed; (ii) requesting that Sellers voluntarily submit an application for a Product Registration with the FDA in order to market or continue marketing a Product; (iii) providing notice of action in a *Federal Register* notice against a Product and/or (iv) initiating a seizure, injunction or other action against a Product.

(g)     To Sellers' Knowledge, the clinical and pre-clinical studies conducted or sponsored by Sellers, or in which Sellers, the Products or Sellers' product candidates have

25

participated were, and if still pending, are being conducted in accordance with standard medical and scientific research procedures and all applicable Health Care Laws, including, but not limited to, the FD&C Act and its applicable implementing regulations at 21 C.F.R. Parts 50, 54, 56, 58 and 312, except as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Business as currently conducted.

(h)     To Sellers' Knowledge, no officer, employee, or agent of Sellers has made an untrue statement of a material fact or fraudulent statement to the FDA, Health Canada or any other Governmental Authority, failed to disclose a material fact required to be disclosed to the FDA, Health Canada or any other Governmental Authority, or committed an act, made a statement, or failed to make a statement that, at the time such disclosure was made, would reasonably be expected to provide a basis for the FDA, Health Canada or any other Governmental Authority to invoke its policy respecting "Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities," set forth in 56 Fed. Reg. 46191 (Sept. 10, 1991) or any similar policy. To Sellers' Knowledge, no officer, employee, or agent of Sellers has engaged in any conduct that has resulted, or would reasonably be expected to result, in debarments under 21 U.S.C. § 335a(a) or any similar laws, rules, or regulations.

Section 5.12   Brokers or Finders.   Except as set forth on Schedule 5.12 hereof, Sellers have not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable, and Sellers shall indemnify and hold harmless Buyer from any claims with respect to any such fees or commissions.

Section 5.13   Affiliate Transactions.   Other than as set forth on Schedule 5.13 hereof or as otherwise expressly contemplated by this Agreement, there are no loans, leases or other continuing transactions between Sellers, on the one hand, and any present or former member, manager, stockholder, director or officer thereof, as applicable, on the other hand, that will not be terminated and of no further effect prior to or simultaneously with the Closing.

Section 5.14   Insurance.   The physical properties, assets, business, operations, employees, officers, directors and managers of Sellers are insured to the extent disclosed in Schedule 5.14 and (i) to Sellers' Knowledge, there is no claim by Sellers pending under any such policies as to which coverage has been questioned, denied or disputed by the insurer, (ii) such insurance policies and arrangements are in full force and effect, all premiums with respect thereto are currently paid, and Sellers are in compliance in all material respects with the terms thereof, and (iii) no notice of cancellation or termination has been received by Sellers with respect to any insurance policy described in Schedule 5.14.

Section 5.15   3M.   Schedule 5.15 lists all agreements between Sellers and/or the Business, on the one hand, and 3M Company or any of its Affiliates, on the other hand. As of the date hereof, to the Knowledge of Sellers, Sellers have not received any notice and have no reason to believe that 3M Company or any of its Affiliates has (i) terminated or intends to terminate its business dealings with the Business, (ii) materially reduced or will materially reduce its supply to the Business, or (iii) otherwise materially changed or intends to materially

26

change the pricing, terms or amount of business with the Business in a manner adverse to the Business, in each case, as a result of this Agreement, the Bankruptcy Case, or otherwise.

Section 5.16 <u>Inventory; Products</u>. Inventory that is finished goods or samples (i) with an expiration date fourteen (14) months or longer from the Closing Date and (ii) not in quarantine, is in good and marketable condition, and is saleable in the ordinary course of business, other than for normal discounts and liquidations in the Ordinary Course of Business.

Section 5.17 <u>Canadian Competition Act</u>. Neither (i) the aggregate value of the Acquired Assets in Canada of Sellers, nor (ii) the gross revenues from sales in or from Canada from such assets exceeds Cdn$73 million as determined in accordance with the Notifiable Transaction Regulations promulgated under the Competition Act (Canada).

Section 5.18 <u>Financial Statements</u>. <u>Schedule 5.18</u> sets forth the (i) audited consolidated financial statements of Sellers as at and for the years ended December 31, 2009 and December 31, 2010 (the "<u>Audited Financial Statements</u>") and (ii) unaudited consolidated financial statements of the Business as at and for the period ended July 31, 2011 (the "<u>Unaudited Financial Statements</u>"), including in each of clauses (i) and (ii) a balance sheet, statement of income and statements of cash flows and operations and for clause (i) a statement of retained earnings (the Audited Financial Statements and the Unaudited Financial Statements collectively, the "<u>Financial Statements</u>"). The Financial Statements have been prepared in accordance with United States generally accepted accounting principles and practices in effect from time to time applied on a consistent basis throughout the periods indicated and present fairly, in all material respects, the financial condition of Sellers at their respective dates, *provided, however,* that in the case of clause (ii) the unaudited financial statements were prepared on a going concern basis and do not include footnotes.

Section 5.19 <u>No Other Representations or Warranties</u>.

(a) Buyer acknowledges that, except for the representations and warranties contained in <u>Article V</u>, neither Sellers nor any other Person on behalf of Sellers makes any express or implied representation or warranty with respect to Sellers (including representations and warranties as to the condition of the Acquired Assets) or with respect to any information provided by or on behalf of Sellers to Buyer. Neither Sellers nor any other Person will have or be subject to any liability or indemnification obligation to Buyer or any other Person resulting from the distribution to Buyer, or use by Buyer, of any such information, including any information, documents, projections, forecasts or other material made available to Buyer in any "data rooms," "data sites," responses to inquiries, confidential information memoranda or management presentations in expectation of or in connection with the transactions contemplated by this Agreement or any other Transaction Document. Any documents, title information, assessments, surveys, plans, specifications, reports and studies, or other information made available to Buyer by Sellers or their Representatives, including any other material made available to Buyer in any "data rooms," "data sites," responses to inquiries, confidential information memoranda or management presentations (collectively, "<u>Review Documents</u>") are provided as information only. Buyer shall not rely upon Sellers' provision of any Review Document(s) in lieu of conducting its own due diligence. Except for the specific representations and warranties contained in this <u>Article V</u> (in each case as modified by the Disclosure Schedules

hereto), Sellers have not made, do not make, and have not authorized anyone else to make any representation as to: (i) the accuracy, reliability or completeness of any of the Review Documents; (ii) the operating condition of the Acquired Assets; (iii) the Environmental Conditions of the Real Property INCLUDING, WITHOUT LIMITATION, THE PRESENCE OR ABSENCE OF ANY HAZARDOUS SUBSTANCES; (iv) the enforceability of, or Buyer's ability to obtain the benefits of, any agreement of record affecting the Acquired Assets, (v) the transferability or assignability of any Contract or Permit or (vi) any other matter or thing affecting or relating to the Acquired Assets.

(b)     In connection with investigation by Buyer, Buyer has received or may receive from Sellers certain projections, forward-looking statements and other forecasts and certain business plan information. Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that Buyer shall have no claim against anyone with respect thereto. Accordingly, Buyer acknowledges that, without limiting any representation or warranty in this Article V or any other term of this agreement, Sellers make no representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers that the statements contained in this Article VI are true and correct:

Section 6.1   Organization and Good Standing.  Buyer is a corporation, duly organized, validly existing and in good standing under the laws of the Country of Switzerland. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

Section 6.2   Authority; Validity; Consents.  Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all requisite corporate actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a party will be duly and validly executed and delivered by Buyer at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Except as required to comply with the HSR Act and Investment Canada Act, Buyer is not and will not be required to give any notice to or obtain any

consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party or the consummation or performance of any of the transactions contemplated hereby or thereby.

Section 6.3    No Conflict.  When the consents and other actions described in Section 6.2 have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any agreement, indenture, or other instrument to which it is bound, (b) the certificate incorporation of Buyer, (c) any Order or (d) any Law.

Section 6.4    Availability of Funds; Solvency.

(a)    Buyer will have at the Closing sufficient cash in immediately available funds (without giving effect to any unfunded financing, regardless of whether any such financing is committed) to pay the Cash Consideration, and all other costs, fees and expenses required to be paid by it under this Agreement and the other Transaction Documents.

(b)    As of the Closing and immediately after consummating the transactions contemplated by this Agreement and the other transactions contemplated by the Transaction Documents, Buyer will not, assuming the accuracy of Sellers' representations and warranties under this Agreement, (i) be insolvent (either because its financial condition is such that the sum of its debts is greater than the fair value of its assets or because the present fair value of its assets will be less than the amount required to pay its probable Liability on its debts as they become absolute and matured), (ii) have unreasonably small capital with which to engage in its business or (iii) have incurred or plan to incur debts beyond its ability to repay such debts as they become absolute and matured.

Section 6.5    Litigation.  There are no Proceedings pending or, to the knowledge of Buyer, threatened, that would affect in any material respect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

Section 6.6    Brokers or Finders.  Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Sellers are or will become liable, and Buyer shall hold harmless and indemnify Sellers from any claims with respect to any such fees or commissions.

## ARTICLE VII
## ACTION PRIOR TO THE CLOSING DATE

Section 7.1    Investigation of the Business by Buyer.  After the Effective Date and prior to the Closing Date, Sellers shall, at Buyer's sole cost and expense and in accordance with reasonable procedures to be established in good faith by mutual agreement of Sellers' Interim Access Manager and Buyer's Interim Access Manager, (a) afford Buyer's authorized Representatives access during normal business hours to the offices, properties, key employees,

outside accountants, agreements and other documentation and financial records (including computer files, retrieval programs and similar documentation) with respect to the Business to the extent Buyer reasonably deems necessary, and permit Buyer and its authorized Representatives to make copies of such materials, (b) furnish to Buyer or its authorized Representatives such additional information concerning the Business as shall be reasonably requested by Buyer or its authorized Representatives and (c) use commercially reasonable efforts to cause their outside accountants and outside counsel to cooperate with Buyer in its investigation; *provided* that Buyer shall submit to Sellers requests for such access, information or cooperation, including reasonable detail regarding the requested access, information or cooperation, a reasonable period in advance of the time at which such access, information or cooperation is to be provided, and all such requests shall be submitted only to John A. A. Bellamy, as Sellers' designated representative, or to such other individuals as John A. A. Bellamy may designate from time to time to receive such requests ("Sellers' Interim Access Manager"). Such requests of Buyer shall be submitted only by Scott McCrea or another individual reasonably acceptable to Sellers' Interim Access Manager as Scott McCrea's successor, as Buyer's designated representative ("Buyer's Interim Access Manager"). Notwithstanding anything herein to the contrary, no such access, information or cooperation shall be permitted or required to the extent that it would require Sellers to disclose information subject to attorney-client privilege or would be prohibited by Law or would otherwise contravene any antitrust or competition Law.

Section 7.2   Operations Prior to the Closing Date.  Sellers covenant and agree that, except (i) as expressly contemplated by this Agreement, (ii) as disclosed in Schedule 7.2 or any other Schedule as of the date hereof, (iii) for the failure to pay or otherwise honor (A) Rebates, Chargebacks and return obligations relating to Products sold by Sellers prior to the Filing or (B) any patient coupon program, (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed), (v) as required by, arising out of, relating to or resulting from the Bankruptcy Case, the Canadian Proceedings or otherwise approved by the Bankruptcy Court or the Canadian Court and (vi) as otherwise required by Laws, after the Effective Date and prior to the Closing Date:

(a)      Sellers shall use commercially reasonable efforts, taking into account US Sellers' status as a debtor-in-possession in the Bankruptcy Case and Canadian Seller's status as a debtor in the Canadian Proceedings, to carry on in the Ordinary Course of Business (including by paying all fees due to any regulatory authority in the Ordinary Course of Business, including all fees due to the FDA or Health Canada prior to Closing), to maintain in full force and effect the Permits, to maintain and preserve the Acquired Assets in their present condition, other than reasonable wear and tear, and to keep intact the business relationships relating to the Acquired Assets; and, without limiting the generality of the forgoing,

(b)      Sellers shall not:

(i)      other than the sale of Products in accordance with Section 7.2(b)(vii) or pursuant to any debtor-in-possession financing or cash collateral agreement or order, sell, lease (as lessor), transfer or otherwise dispose of, or mortgage or pledge, or voluntarily impose or suffer to be imposed, any Encumbrance (other than Assumed Liabilities and Permitted Encumbrances) on any Acquired Asset;

30

(ii)     issue, deliver or sell or authorize the issuance, delivery or sale of, any membership or other equity interests of Sellers;

(iii)     fail to pay any maintenance or similar fees in connection with the prosecution and maintenance of applicable Material Business Intellectual Property, or otherwise fail to protect and maintain Material Business Intellectual Property consistent with past practice in all material respects;

(iv)     amend any of the Assigned Agreements or any Contract included in the Acquired Assets other than non-material amendments made in the Ordinary Course of Business;

(v)     other than in the Ordinary Course of Business, enter into any new, or amend any existing, license or other similar agreement concerning any Business Intellectual Property material to the Business, taken as a whole;

(vi)     except in the Ordinary Course of Business, cancel or compromise any material claim or waive or release any material right, in each case, that is a claim or right related to an Acquired Asset;

(vii)     sell more than 3,300 units of Zyclara Products in the aggregate (including all strengths and methods of delivery) in any given week or materially increase the sale of other Products outside of the Ordinary Course of Business; or

(viii)     enter into any agreement or commitment to take any action prohibited by this Section 7.2.

Without in any way limiting any Party's rights or obligations under this Agreement, the Parties understand and agree that (i) nothing contained in this Agreement shall give Buyer, directly or indirectly, the right to control or direct the operations of Sellers, or the Business prior to the Closing and (ii) prior to the Closing, Sellers shall exercise, consistent with, and subject to, the terms and conditions of this Agreement, complete control and supervision over the Business and their operations.  Notwithstanding anything herein to the contrary, Sellers shall be permitted to take all actions that are necessary or desirable to comply with the Worker Adjustment and Retraining Notification Act and WARN Act, including without limitation, providing any notices required under the WARN Act, and no such actions shall constitute a violation of this Section 7.2.

Section 7.3    HSR Act; Reasonable Best Efforts.

(a)     Subject to Section 7.3(c), within fifteen (15) Business Days following the Effective Date, Sellers, on the one hand, and Buyer, on the other hand, shall each prepare and file, or cause to be prepared and filed, any notifications required to be filed under the HSR Act with the United States Federal Trade Commission and the Department of Justice, and request early termination of the waiting period under the HSR Act.  Buyer, on the one hand, and Sellers, on the other hand, shall as soon as reasonably practicable respond to any requests for additional information in connection with such filings and shall take all other actions necessary to cause the

31

waiting periods under the HSR Act to terminate or expire at the earliest practicable date after the date of filing. Buyer shall be responsible for payment of the applicable filing fee under the HSR Act.

(b) In addition to the actions to be taken under Section 7.3(a), Sellers, on the one hand, and Buyer, on the other hand, shall use all best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using best efforts to accomplish the following: (i) the taking of all reasonable acts necessary to cause the conditions precedent set forth in Article IX and Article X to be satisfied, (ii) the obtaining of all necessary Governmental Authorizations and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all steps as may be necessary to avoid any Proceeding by any Governmental Authority, (iii) the defending of any Proceedings challenging this Agreement or the consummation of the transaction contemplated hereby, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed, and (iv) the execution or delivery of any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

(c) Buyer further agrees that it shall, to the extent necessary to obtain the waiver or consent from any Governmental Authority required to satisfy the conditions set forth in Article IX and Article X, as applicable, or to avoid the entry of or have lifted, vacated or terminated any Closing Legal Impediment, take the following actions: (i) propose, negotiate, offer to commit and effect (and if such offer is accepted, commit to and effect), by consent decree, hold separate order or otherwise, and in connection with the consummation of the transactions contemplated by this Agreement and the other Transaction Documents, the sale, divestiture or disposition (including by licensing any intellectual property rights) of any Acquired Assets and/or any other assets or businesses of Buyer or any of its Affiliates (or equity interests held by Buyer or any of its Affiliates in entities with assets or businesses); (ii) terminate any existing relationships and contractual rights and obligations; (iii) otherwise offer to take or offer to commit to take any action which it is capable of taking and, if the offer is accepted, take or commit to take such action, that limits its freedom of action with respect to, or its ability to retain, any of the Acquired Assets and/or any other assets or businesses of Buyer or any of its Affiliates (or equity interests held by Buyer or any of its Affiliates in entities with assets or businesses); and (iv) take promptly, in the event that any permanent or preliminary injunction or other order is entered or becomes reasonably foreseeable to be entered in any proceeding that would make consummation of the transactions contemplated by this Agreement and the other Transaction Documents unlawful or that would prevent or delay consummation of the transactions contemplated by this Agreement and the other Transaction Documents, any and all steps (including the appeal thereof, the posting of a bond or the taking of the steps contemplated by clauses (i), (ii) and (iii) of this Section 7.3(c)) necessary to vacate, modify or suspend such injunction or order. For the avoidance of doubt, Buyer's obligations under this Section 7.3 shall be absolute and not qualified by "commercially reasonable efforts." The Parties agree that Sellers' obligations under this Section 7.3 shall not include any obligation on the part of Sellers or their respective Affiliates to commit to or effect, by consent decree, hold separate orders, trust

or otherwise the sale or disposition of such of its assets or businesses (including the Acquired Assets) as may be required to be divested in order to avoid the entry of, or to effect the dissolution of, any decree, order, judgment, injunction, temporary restraining order or other order in any suit or preceding.

(d)     Sellers, on the one hand, and Buyer, on the other hand, (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto and shall discuss and attempt to reasonably account for any comments or suggestions of the other Party.  In addition, none of Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent not prohibited by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable.  Subject to any restrictions under applicable laws, rules or regulations, Buyer, on the one hand, and Sellers, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval.  In carrying out their obligations under this Section 7.3, subject to applicable Law, each of the Parties shall not submit or otherwise provide any information to such Governmental Authority without first having provided a reasonable opportunity to the other Party and its counsel to comment upon such information.  Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.  Any Party may, as it deems advisable and necessary, reasonably designate any sensitive material provided to the other Party under this Section 7.3, or otherwise pursuant to this Agreement, as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to the directors, officers or employees of the recipient, unless express written permission is obtained in advance from the source of the materials.

(e)     Neither Buyer nor Sellers shall, after the entry of the Sale Order, agree to accept any agreement that would have the effect of delaying the consummation of any action contemplated by this Agreement without the written consent of the other Party.  For the avoidance of doubt, no Party shall commit to or agree with any Governmental Authority to stay, toll or extend any applicable waiting period under the HSR Act or other applicable Laws, without the prior written consent of the other Parties.

CH\1296825.17

(f)     Neither Buyer nor any of its controlled Affiliates shall take any action or acquire any assets or securities of any other Person or agree to acquire assets or securities of any other Person if such action, acquisition or agreement would reasonably be expected to impair Buyer's ability to consummate the transactions contemplated hereby.

Section 7.4     <u>Bankruptcy Court Filings and Approval</u>.

(a)     US Sellers shall use their commercially reasonable efforts to obtain entry of the Bidding Procedures Order and the Sale Order and such other relief from the Bankruptcy Court as may be necessary or appropriate in connection with this Agreement and the consummation of the transactions contemplated by this Agreement. US Sellers shall file with the Bankruptcy Court, on or prior to the end of the third (3rd) Business Day following the later of the Filing or execution of this Agreement, the motion seeking entry of the Bidding Procedures Order and the Sale Order authorizing US Sellers to enter into this Agreement and to consummate the transactions contemplated hereunder. Buyer agrees that it will promptly take such actions as are reasonably requested by US Sellers to assist in obtaining entry of the Bidding Procedures Order and the Sale Order and, consistent with <u>Section 8.3(a)</u> below, a finding by the Bankruptcy Court of adequate assurance of future performance by Buyer.

(b)     As promptly as possible, but in no event later than five (5) Business Days following the Filing, Canadian Seller shall bring application in the Canadian Court seeking an Order under the CJA (i) appointing a receiver to oversee the sale of the assets of Canadian Seller and (ii) granting certain other relief customarily granted in receivership orders made by the Canadian Court including, without limitation, a stay of proceedings against Canadian Seller (the "<u>Canadian Receivership Order</u>"), which Order shall be in form and substance acceptable to Buyer, acting reasonably. As promptly as possible, but in no event later than two (2) Business Days following entry of the Bidding Procedures Order and on notice to Persons designated by Buyer, the Canadian Seller shall bring a motion seeking an Order in the Canadian Proceedings approving this Agreement (including the Break-Up Fee and the Expense Reimbursement Amount) and the transactions contemplated herein as a stalking horse agreement, and approving the Bidding Procedures as they relate to Canadian Seller, and granting such other relief as Canadian Seller and Buyer may deem necessary or advisable (the "<u>Canadian Bidding Procedures Order</u>"), which Order shall be in form and substance acceptable to Buyer, acting reasonably.

(c)     As promptly as possible, but in no event later than two (2) Business Days following entry of the Sale Order and on notice to Persons designated by Buyer, Canadian Seller shall bring a motion seeking an Order in the Canadian Proceeding, *inter alia*, (i) approving this Agreement and the transactions contemplated herein, (ii) exempting the transaction from the provisions of the Bulk Sales Act (Ontario), and (iii) vesting the Canadian Assets in Buyer free and clear of all claims, liens and encumbrances (other than Permitted Encumbrances) effective upon delivery to Buyer of the Receiver's Certificate confirming that the Purchase Price has been paid, the conditions to Closing have been satisfied or waived and the transactions contemplated in this Agreement have closed to the satisfaction of the Receiver (such order, the "<u>Canadian Sale and Vesting Order</u>"), which Order shall be substantially in the form attached hereto as <u>Exhibit G</u>, with such changes as Buyer may accept acting reasonably. Buyer agrees that it will take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Canadian

Receivership Order, the Canadian Bidding Procedures Order and the Canadian Sale and Vesting Order.

(d)     Prior to the filing by Sellers of the motion contemplated by the second sentence of Section 7.4(a) and the applications and motions for the Canadian Orders, Sellers will (i) provide a copy thereof (including, in each case, the related forms of order and notice and supporting materials) to Buyer and its counsel, (ii) provide Buyer and its counsel a reasonable opportunity to review and comment on such document, and any amendment or supplement thereto and (iii) incorporate any reasonable comments of Buyer and its counsel into such document and any amendment or supplement thereto.

(e)     Sellers and Buyer acknowledge that this Agreement and the sale of the Acquired Assets and the assumption and assignment of the Assigned Agreements are subject to Bankruptcy Court approval and approval of the Canadian Court.  Sellers and Buyer acknowledge that (i) to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest and otherwise best offer possible for the Acquired Assets and (ii) Buyer must provide adequate assurance of future performance under the Assigned Agreements to be assigned by US Sellers.

(f)     Sellers shall give appropriate notice, and provide appropriate opportunity for hearing, to all Persons entitled thereto, of all motions (including the motions seeking entry of the Bidding Procedures Order, the Sale Order and the Canadian Orders), orders, hearings and other proceedings relating to this Agreement and the transactions contemplated hereby and thereby and such additional notice as ordered by the Bankruptcy Court or the Canadian Court or as Buyer may reasonably request.

(g)     In the event an appeal is taken or a stay pending appeal is requested, from the Bidding Procedures Order, Sale Order or any of the Canadian Orders, Sellers shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay.  Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from or stay request in respect of either of such orders.  Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal or stay request and obtain an expedited resolution of such appeal.

(h)     After entry of the Sale Order and the Canadian Sale and Vesting Order, to the extent Buyer is the Successful Bidder at the Auction, Sellers shall not take any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order or the Canadian Sale and Vesting Order.

Section 7.5     Bidding Procedures.  The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order.  Buyer agrees and acknowledges that Sellers and their Representatives and Affiliates are and may continue soliciting inquiries, proposals or offers for the Acquired Assets in connection with any alternative transaction pursuant to the terms of the Bidding Procedures Order.

Section 7.6    Break-Up Fee; Expense Reimbursement Amount.

(a)    Subject to entry of the Bidding Procedures Order and the Canadian Bidding Procedures Order, if this Agreement is terminated pursuant to Section 11.1(a)(iv), Section 11.1(b)(iii), Section 11.1(c)(ii) or Section 11.1(c)(iii) and, in each case, Sellers consummate an Alternative Transaction, then Sellers, jointly and severally, shall pay in cash to Buyer, on the date of the consummation of the Alternative Transaction and from the proceeds of the Alternative Transaction, a break-up fee in the amount of Eight Million Two Hundred Fifty Thousand United States Dollars (USD$8,250,000) (the "Break-Up Fee") by wire transfer of immediately available funds to the account specified by Buyer to Sellers in writing.

(b)    Subject to entry of the Bidding Procedures Order and the Canadian Bidding Procedures Order, if this Agreement is terminated pursuant to Section 11.1(a)(i) (unless due to Buyer's breach of this Agreement), Section 11.1(a)(iv), Section 11.1(b)(i), Section 11.1(b)(iii), Section 11.1(c)(ii) or Section 11.1(c)(iii), then Sellers, jointly and severally, shall pay in cash to Buyer, within five (5) Business Days of such termination, an amount equal to the reasonable and documented costs, fees and expenses incurred by Buyer and its Affiliates (including fees and expenses of legal, accounting and financial advisors) in connection with this Agreement and the transactions contemplated hereby up to a maximum of One Million Five Hundred Thousand United States Dollars (USD$1,500,000) (the "Expense Reimbursement Amount") by wire transfer of immediately available funds to the account specified by Buyer to Sellers in writing.  If the Break-Up Fee is later determined to be payable, it shall be reduced by the Expense Reimbursement Amount received by Buyer from Sellers pursuant to this Section 7.6.

(c)    The obligations of Sellers to pay the Break-Up Fee and the Expense Reimbursement Amount as provided herein shall be entitled to administrative expense status with priority over any and all administrative expenses of the kind specified in Sections 503(b)(1) and 507(a) of the Bankruptcy Code in the Bankruptcy Case and senior to all other superpriority administrative expenses in the Bankruptcy Case.

(d)    Sellers agree and acknowledge that Buyer's due diligence, efforts, negotiation and execution of this Agreement have involved substantial investment of management time and have required significant commitment of financial, legal and other resources by Buyer and its Affiliates and that such due diligence, efforts, negotiation and execution have provided value to Sellers.

Section 7.7    Communications with Customers and Suppliers.  Prior to the Closing, Buyer shall not, and shall cause its Affiliates and Representatives not to, contact, or engage in any discussions or otherwise communicate with, any of Sellers' landlords, clients, suppliers and other Persons with which Sellers have material commercial dealings without obtaining the prior consent of Sellers, which consent shall not be unreasonably withheld, conditioned or delayed; provided that nothing herein shall in any way restrict or limit Buyer or its Affiliates from contacting, or engaging in discussions or otherwise communicating with, any Person in the ordinary course of the business of Buyer and its Affiliates as conducted as of the date hereof.  In no event shall Buyer request any client, customer or any other Person to return any Products sold by Seller.

36

Section 7.8    Financing.  Buyer covenants and agrees with Sellers that it will take all actions necessary to ensure that as of the Closing Date Buyer will have immediately available funds, in the aggregate, sufficient to pay the Cash Consideration, and all other costs, fees and expenses required to be paid by it under this Agreement and the other Transaction Documents.

Section 7.9    Notification of Certain Matters.  From the Effective Date through one (1) Business Day prior to the Sale Hearing, Sellers shall use commercially reasonable efforts to promptly (and in no event later than five (5) Business Days prior to the Sale Hearing, except with respect to Contracts entered into after such date) supplement or update Schedule 2.2(d) by providing Buyer written notice of any Contract to which any Seller is a party as of the Effective Time which was not set forth on Schedule 1.1(a) or Schedule 2.2(d) as of the Effective Time and any Contracts that relate to the Business and arise in the Ordinary Course of Business after the Effective Date.  From the Effective Date through one (1) Business Day prior to the Sale Hearing, Buyer may amend Schedule 2.2(d) or Schedule 1.1(a) to move any Contract from Schedule 2.2(d) to Schedule 1.1(a) or vice versa by providing Seller with written notice thereof, *provided*, *however*, that Buyer shall have no right to add any Contract rejected, in accordance with Section 365 of the Bankruptcy Code, by Sellers prior to Sellers receiving written notice from Buyer to include such Contract on Schedule 1.1(a)), *provided further*, that, following the Auction, Buyer may amend Schedule 2.2(d) or Schedule 1.1(a) to move any Contract from Schedule 2.2(d) to Schedule 1.1(a), but not vice versa, *provided further*, that Buyer may not amend Schedule 2.2(d) or Schedule 1.1(a) to move any Contract from Schedule 1.1(a) to Schedule 2.2(d) which is also listed on Schedule 5.15 without the prior written consent of Sellers.

## ARTICLE VIII
## ADDITIONAL AGREEMENTS

Section 8.1    Taxes.

(a)    Any sales, use, property transfer or gains, documentary, stamp, registration, recording or similar Tax (including, for certainty, goods and services tax, harmonized sales tax and land transfer tax) payable in connection with the sale or transfer of the Acquired Assets ("Transfer Taxes") shall be borne by Buyer and, to the extent any Seller is required by applicable Law to pay Transfer Taxes, such Transfer Taxes shall be paid by the Buyer to the appropriate Seller at Closing.  Sellers and Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes.  Buyer shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes; *provided*, *however*, that in the event any such Tax Return requires execution by Sellers, Buyer shall prepare and deliver to Sellers a copy of such Tax Return at least three (3) Business Days before the due date thereof, and Sellers shall promptly execute such Tax Return and deliver it to Buyer, which shall cause it to be filed.  Buyer shall reimburse Sellers for any Tax described in this Section 8.1(a) that is paid by Sellers to a Governmental Authority.

(b)    Buyer shall be responsible for all personal property Taxes and similar ad valorem obligations levied with respect to the Acquired Assets (the "Property Taxes"), without

regard to the taxable period such Property Taxes are attributable to, that are due and payable after the Closing Date.

(c) Buyer and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Acquired Assets (including access to Documents) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claims, suit or proceeding relating to any Tax; *provided, however*, that (other than as required pursuant to this Section 8.1(c)) neither Buyer nor any Seller shall be required to disclose the contents of its income tax returns to any Person. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(c) shall be borne by the Party requesting it.

(d) Notwithstanding any other provisions in this Agreement, Buyer and Sellers hereby waive compliance with all "bulk sales," "bulk transfer" and similar laws that may be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

(e) If requested by Sellers prior to Closing, Buyer and Canadian Seller shall jointly execute and file an election pursuant to subsection 20(24) of the *Income Tax Act* (Canada) and the corresponding provisions of any applicable provincial Tax legislation in prescribed manner and within the prescribed time limits with respect to Buyer's assumption of Canadian Seller's obligations in respect of undertakings to which paragraph 12(1)(a) of *Income Tax Act* (Canada) apply. Buyer and Canadian Seller acknowledge that Canadian Seller is transferring assets of equal value to Buyer as consideration for the assumption of such obligations. Buyer and Canadian Seller shall file all of their respective Canadian Tax Returns in a manner consistent with any elections completed under this Section 8.1(e).

Section 8.2    Payments Received. Sellers, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using their best efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which properly belongs to the other and will account to the other for all such receipts.

Section 8.3    Assigned Agreements; Adequate Assurance of Future Performance.

(a) With respect to each Assigned Agreement, Buyer shall provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer of each such Assigned Agreement. Buyer and Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Agreements, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's and Sellers' Representatives available to testify before the Bankruptcy Court.

(b) Subject to the other terms and conditions of this Agreement, Buyer shall, from and after the Closing Date, (i) assume all Liabilities of Sellers under the Assigned

CH\1296825.17

Agreements and (ii) satisfy and perform all of the Liabilities related to each of the Assigned Agreements when the same are due thereunder.

Section 8.4    Rebates, Chargebacks and Returns.

(a)    On or following the Closing, Buyer shall take all actions necessary to obtain its own NDC Numbers, DINs and any other license number, code or other similar reference required for the distribution, marketing, and sale of each Product by Buyer in each jurisdiction in the relevant Territory (collectively, "Buyer Required Code"). Such actions shall include labeling all Product inventory acquired by Buyer pursuant to this Agreement with Buyer's Buyer Required Code, as applicable, such that all sales of Product by Buyer are tracked with Buyer Required Code in each applicable jurisdiction in the relevant Territory. Buyer will not sell or otherwise transfer any Products that have a label or packaging that includes any Seller NDC Number, DIN or foreign equivalent or counterpart.

(b)    As promptly as practicable following the Closing, Sellers and Buyer will issue a joint letter to customers of the Products, advising such customers of Sellers' and Buyer's responsibilities in connection with returns and credits. Sellers shall be responsible only for returned Product that bears Sellers' NDC Number, DIN or foreign counterpart and evidenced as being sold by Sellers prior to the Closing by lot number or otherwise, *provided* that, any processing of returns of Product shall be in compliance with Sellers' return policy. Buyer shall be responsible only for returned Product that bears the Buyer's NDC Number, DIN or foreign counterpart or evidenced as being sold by Buyer on or after the Closing Date by lot number or otherwise, *provided* that, any such returns of Product shall be in compliance with Buyer's then current return policy. Neither Sellers nor Buyer shall take any action to encourage or delay return of any Product. If Sellers or Buyer receive a Product for which the other was responsible as set forth in Section 8.4(b), that party shall ship the returned Product to the responsible party at the expense of the responsible party, together with such information as is necessary to support the return. All payments due to Sellers from Buyer or due to Buyer from Sellers under this Section 8.4(b), shall be made within 30 days of submission to the responsible party of invoices that describe the requested payment in reasonable detail.

(c)    Subject to the terms and conditions of this Agreement, after the Closing Date, Buyer shall have the responsibility to process, and shall have all Liability for, all Rebates and Chargebacks for Products sold by Buyer. Sellers shall retain all Liability for Rebates and Chargebacks relating to Products sold by Sellers.

(d)    Without limiting the generality of the foregoing or Section 8.5, or being limited thereby, after the Closing, Buyer shall make all appropriate filings and submissions with the Centers for Medicare & Medicaid Services, any Canadian programs and other Government Authorities in regard to all Chargebacks and Rebates owing to such Government Authorities for Products sold by Buyer, including without limitation updates to Buyer's Medicaid Drug Rebate Agreement and any required filings. Sellers shall bear no responsibility for Buyer's failure to make such filings and submissions or any delays resulting therefrom.

(e)    Nothing in this Section 8.4 shall prohibit Sellers from ceasing operations or winding up their affairs following the Closing.

39

Section 8.5    Transfer of Regulatory Matters.

(a)    Promptly after the Closing and in any event within one (1) day after the Closing, Sellers and Buyer shall file with the FDA, Health Canada or other Governmental Authority the notices and information required pursuant to any applicable regulation or requirement, such as 21 C.F.R. § 314.72, or any successor regulation thereto, to transfer the Product Registrations from Sellers to Buyer.  The Parties also agree to use all commercially reasonable efforts, and in any event within thirty (30) days, to take any and all other actions required by the FDA, Health Canada, or other Governmental Authority, if any, to effect the transfer of the Product Registrations from Sellers to Buyer.

(b)    Promptly after the Closing and in any event within thirty (30) days after the Closing, Sellers and Buyer shall make all appropriate filings and submissions with Governmental Authorities, including but not limited to, the Centers for Medicare & Medicaid Services, the FDA and Health Canada, to register NDC Numbers and DINs and transfer all regulatory responsibilities, excluding all Excluded Liabilities, attaching thereto of each Product, from Sellers to Buyer.

(c)    Except as provided in Section 8.5(a) and Section 8.5(b), from and after the Closing, Buyer, at its cost, shall be solely responsible and liable for (i) taking all actions, paying all fees and conducting all communication with the appropriate Governmental Authority required by any Law in respect of the Product Registrations, including preparing and filing all reports (including adverse drug experience reports) with the appropriate Governmental Authority, (ii) paying all future Chargebacks and Rebates due to any Governmental Authority for Products sold by Buyer, (iii) taking all actions and conducting all communication with Third Parties in respect of Products sold by Buyer, including responding to (A) complaints in respect thereof, including complaints related to tampering or contamination, and (B) all medical information requests, (iv) investigating all complaints and adverse drug experiences in respect of such Products, *provided further* that nothing in this Section 8.5(c) shall prohibit Sellers from ceasing operations or winding up their affairs following the Closing.

(d)    Subject to Section 12.15, Sellers shall be solely responsible and liable for all Chargebacks and Rebates due to any Governmental Authority for Products bearing Seller's NDC Number.

Section 8.6    Adverse Event Reporting.  Each of Buyer and Sellers shall promptly notify the other of any significant adverse events that relate to the Products or are required in accordance with any Law, including adverse drug experiences and governmental inquiries, and each of Buyer and Sellers shall cooperate with the other in connection therewith as reasonably requested by the other Party and as follows:

(a)    Serious Adverse Events related to any Product of which Sellers become aware shall be submitted to Buyer within three (3) Business Days but no more than four (4) calendar days from the date Sellers first become aware of such Serious Adverse Event.  Non-Serious Adverse Events for any Product that are reported to Sellers shall be submitted to Buyer no more than one (1) month from the date received by Sellers; *provided, however*, that medical and scientific judgment should be exercised in deciding whether expedited reporting is

40

appropriate in other situations, such as important medical events that may not be immediately life-threatening or result in death or hospitalization but may jeopardize the patient or may require intervention to prevent a Serious Adverse Event outcome. In no event shall Sellers submit to Buyer any adverse event report or similar information that does not relate to the Products.

(b)     Until the reporting procedures referenced in Section 8.6(d) herein have been instituted by Buyer and Sellers, a "Serious Adverse Event" for any Product shall have the meaning set forth in 21 C.F.R. § 314.80(a), as amended from time to time, and a "Non-Serious Adverse Event" for any Product is defined any adverse event that is not a Serious Adverse Event.

(c)     As provided in Section 8.5(c) above, from and after the Closing, Buyer shall be solely responsible for reporting adverse events related to the Products to Governmental Authorities to the extent required by applicable Laws.

(d)     As soon as reasonably practicable after the Closing Date, Buyer and Sellers shall discuss and develop mutually acceptable guidelines and procedures for the receipt, recordation, reporting, communication (as between the Parties) and exchange of Serious Adverse Event and Non-Serious Adverse Event information, as applicable, to the other Party; *provided* that Buyer shall have exclusive responsibility for communications with Governmental Authorities concerning the Products and related Serious Adverse Event and Non-Serious Adverse Event information. The Parties shall bear their respective costs incurred in connection with receiving, recording, reviewing, reporting, communicating and exchanging with each other regarding and, as applicable, reporting and responding to Serious Adverse Events and Non-Serious Adverse Events.

Section 8.7     Use of Sellers' Brand. Other than as expressly provided in this Agreement and the Transaction Documents, Buyer will have no right, title, interest, license or any other right whatsoever in or to, and shall not use or permit any of its Affiliates to use, the name "Graceway" or any names, words, service marks, trademarks, trade names, identifying symbols, logos, emblems, signs, insignia or other business identifiers containing or comprising the foregoing, including any derivations, translations, modifications or alterations thereof, or any word, name or mark confusingly similar thereto (the "Sellers' Brand"); *provided* that Sellers hereby grant to Buyer a non-exclusive, non-transferable, non-sublicensable limited right and license to use, Sellers' Brand as it appears on existing (as of the Closing Date) Labeling and packaging for existing Inventory purchased hereunder for a period of time ending on the one hundred eightieth (180th) day after the Closing Date. Buyer and its Affiliates shall indemnify and hold harmless Sellers and any of their Affiliates for any claims (other than claims resulting from the gross negligence of Sellers or any of their Affiliates or representatives) arising from or relating to the use by Buyer or any of its Affiliates of the Sellers' Brand pursuant to this Section 8.7. The Parties agree that damages would be an inadequate remedy in the event of a breach of this Section 8.7, and that a Person seeking to enforce this Section 8.7 shall be entitled to seek specific performance and injunctive relief as remedies for any breach hereof in addition to any other remedies available at law or in equity.

Section 8.8     Post-Closing Books and Records and Personnel. For seven (7) years after the Closing Date (or such longer period as may be required by any Governmental Authority or ongoing claim), (a) neither Buyer nor any Seller shall dispose of or destroy any of the business

records and files of the Business and (b) Buyer and Sellers (including, for clarity, any trust established under a Chapter 11 plan of Sellers or any other successors of Sellers) shall allow each other and their respective Representatives reasonable access during normal business hours, and upon reasonable advance notice, to all employees, files and any books and records and other materials included in the Acquired Assets for purposes relating to the Bankruptcy Case, the Canadian Proceedings, the wind-down of the operations of Sellers, the functions of any such trusts or successors, or other reasonable business purposes, including Tax matters, governmental contracts, litigation, or potential litigation, each as it relates to any Product, the Business, the Acquired Assets or the Assumed Liabilities prior to the Closing Date (with respect to Sellers) or from and after the Closing Date (with respect to the Buyer), and Buyer and Sellers (including any such trust or successors) and such Representatives shall have the right to make copies of any such files, books, records and other materials. In addition, from and after the Closing for a period of 60 days, Sellers will permit Buyer and its Representatives access to such personnel of Sellers during normal business hours as Buyer may reasonably request to assist with the transfer of the Inventory, Permits, Documents, Business Intellectual Property and Product Registrations, *provided* that (i) nothing in this <u>Section 8.8</u> shall prohibit Sellers from ceasing operations or winding up their affairs following the Closing and (ii) Buyer shall reimburse Sellers for any reasonable and documented out-of-pocket expenditure or obligation incurred by Sellers after the Closing directly related to assistance provided pursuant to this <u>Section 8.8</u> with the transfer and integration of the Inventory, Permits, Documents, Business Intellectual Property and Product Registrations.

Section 8.9    <u>Confidentiality</u>.

(a)    Sellers agree not to, and shall use commercially reasonable efforts to cause its employees not to, divulge to any Person (other than Buyer or its Affiliates or any persons employed or designated by such entities), publish or make use of any information of any type whatsoever of a confidential nature relating to the Products or the Acquire Assets, including, without limitation, all types of trade secrets, client lists or information, information regarding product development, marketing plans, management organization information, operating policies or manuals, performance results, packaging design or other financial, commercial, business or technical information, except (i) such knowledge or information that is in the public domain through no wrongful act by any Seller without the prior written consent of Buyer or its Affiliates (as the case may be), (ii) for disclosure made pursuant to and in accordance with any Contract to which any Seller or any Affiliate of Seller is a party, (iii) for disclosures made to facilitate the Auction in accordance with the Bidding Procedures, and (iv) as required by applicable law, by an order of a court having competent jurisdiction or under subpoena from an appropriate government agency. This confidentiality provision has no temporal or geographical limitation.

(b)    Sellers and Buyer hereby agree that the Confidentiality Agreement, dated April 20, 2011, between Graceway Pharmaceuticals, LLC and Galderma Pharma S.A. shall terminate, and no party shall have any further obligations thereunder, effective concurrently with the Closing.

Section 8.10   <u>Nycomed Litigation</u>. After the Closing Date, if Buyer receives any proceeds, judgments, payments, expense reimbursements, property or rights (without regard to how any such items are characterized by a court, arbitrator, agreement or the parties to the

Nycomed Litigation and specifically including, but not limited, to rights to future royalties or revenue streams, license or cross-licensing rights, marketing rights, services, or any other rights the value of which can be reasonably ascertained or estimated) relating to or arising from the final resolution of all or any portion of the Nycomed Litigation, the value of such proceeds, judgments, payments, expense reimbursements, property or rights (the "Nycomed Award Amount"), such Nycomed Award Amount shall be distributed as follows:

(a)     first, any such proceeds up to an aggregate amount of $3 million shall be transferred to Sellers in cash by wire transfer of immediately available funds;

(b)     second, Buyer shall retain any additional proceeds up to the amount of reasonable, documented out-of-pocket costs, fees and expenses incurred by Buyer and its Affiliates in connection with the Nycomed Litigation;

(c)     third, Buyer shall transfer any additional proceeds to Sellers, in cash by wire transfer of immediately available funds, up to an amount, when taken together with the $3 million of proceeds transferred to Sellers pursuant to Section 8.10(a), that equals the amount of reasonable, documented out-of-pocket costs, fees and expenses incurred by Sellers prior to the Closing in connection with the Nycomed Litigation (which shall in no event exceed $9,000,000); and

(d)     fourth, Buyer shall (i) retain 50% of any additional proceeds and (ii) transfer the remaining 50% of such proceeds to Sellers in cash by wire transfer of immediately available funds.

Within ten (10) Business Days after indefeasible receipt by Buyer of any funds constituting Sellers' portion of the Nycomed Award Amount, Buyers shall pay to US Sellers in cash by wire transfer of immediately available funds an amount equal to the amount apportioned to Sellers above (or the applicable portion thereof). To the extent all or any portion of the Nycomed Award Amount may be payable to Buyers in future increments. Buyers and Sellers shall negotiate in good faith appropriate arrangements for the payment to Sellers of Sellers' portion of such delayed payments either (x) over time as such amounts are received by Buyers or (y) as a single lump sum of the agreed net present value of such payment streams. For the avoidance of doubt, Buyer shall have full control over the defense of the Nycomed Litigation and any decisions related thereto, including any potential settlements, and Sellers shall cooperate with Buyer in connection with such defense. On and after the Closing Date, Buyers shall keep Sellers informed of any material developments in the Nycomed Litigation including any settlement offers and acceptances. Buyer shall provide Sellers reasonably detailed information, including copies of any related settlement agreement or license agreement as well as supporting documents and materials, related to any resolution (whether or not appealable) of the matters related to the Nycomed Litigation, and Buyer shall allow Sellers reasonable access to employees and outside counsel of Buyer to resolve any questions or ambiguities related to such information.

Section 8.11 Acquired Assets "AS IS"; Buyer's Acknowledgment Regarding Same. Buyer agrees, warrants and represents that (a) Buyer is purchasing the Acquired Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on Buyer's own investigation of the Acquired Assets and (b) except as set forth in this Agreement, neither Sellers nor any

Representative of Sellers have made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Acquired Assets, any part of the Acquired Assets, the financial performance of the Acquired Assets or the Business, or the physical condition of the Acquired Assets. Buyer further acknowledges that the consideration for the Acquired Assets specified in this Agreement has been agreed upon by Sellers and Buyer after good-faith arms-length negotiation in light of Buyer's agreement to purchase the Acquired Assets "AS IS" and "WITH ALL FAULTS." Buyer agrees, warrants and represents that, except as set forth in this Agreement, Buyer has relied, and shall rely, solely upon its own investigation of all such matters, and that Buyer assumes all risks with respect thereto. EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLERS HEREBY DISCLAIM ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT, OR INFORMATION MADE, COMMUNICATED, OR FURNISHED (ORALLY OR IN WRITING) TO BUYER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION, OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER BY ANY DIRECTOR, OFFICER, MANAGER, EMPLOYEE, AGENT, CONSULTANT, OR REPRESENTATIVE OF SELLERS OR ANY OF THEIR AFFILIATES). EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES TO BUYER REGARDING THE PROBABLE SUCCESS, PROFITABILITY OR VALUE OF ANY OF THE PURCHASED ASSETS.

## ARTICLE IX
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 9.1    Accuracy of Representations. The representations and warranties of Sellers contained in Article V shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties which address matters only as of a particular date need only be true and correct as of such date); *provided*, *however*, that the condition in this Section 9.1 shall be deemed to be satisfied so long as any failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein), individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect. Buyer shall have received a certificate of Sellers, signed by a duly authorized officer of Sellers, to that effect.

Section 9.2    Sellers' Performance. Sellers shall have performed and complied with in all material respects the covenants and agreements that Sellers are required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof.

Section 9.3    No Order. No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement (a

"Closing Legal Impediment"); *provided, however*, that prior to asserting this condition Buyer shall have taken all actions required by Section 7.3, subject to the last sentence of Section 7.3(c), to prevent the occurrence or entry of any such Closing Legal Impediment and to remove or appeal as promptly as possible any such Closing Legal Impediment.

Section 9.4    Governmental Authorizations.  Any applicable waiting period under the HSR Act and any other material waiting period under any applicable antitrust or competition Law shall have expired or been terminated and any other material approval under any applicable antitrust or competition Law shall have been received.

Section 9.5    Sellers' Deliveries.  Each of the deliveries required to be made to Buyer pursuant to Section 4.3 shall have been so delivered.

Section 9.6    Sale Order.  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order.

Section 9.7    Canadian Sale and Vesting Order.  The Canadian Court shall have entered the Canadian Sale and Vesting Order and the Canadian Sale and Vesting Order shall be a Final Order.

## ARTICLE X
## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE

Sellers' obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 10.1    Accuracy of Representations.  The representations and warranties of Buyer contained in this Agreement shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties which address matters only as of a particular date need only be true and correct as of such date); *provided, however*, that the condition in this Section 10.1 shall be deemed to be satisfied so long as any failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality" or "material adverse effect" set forth therein), individually or in the aggregate, has not had and would not reasonably be expected to prevent or materially impair the ability of Buyer to consummate the transactions contemplated by this Agreement. Sellers shall have received a certificate of Buyer, signed by a duly authorized officer of Buyer, to that effect.

Section 10.2    Sale Order in Effect.  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order.

Section 10.3    Canadian Sale and Vesting Order.  The Canadian Court shall have entered the Canadian Sale and Vesting Order and the Canadian Sale and Vesting Order shall be a Final Order.

Section 10.4    Buyer's Performance.  Buyer shall have performed and complied with in all material respects the material covenants and agreements that Buyer is required to perform or

45

comply with pursuant to this Agreement at or prior to the Closing, and Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 10.5 <u>No Order</u>. No Closing Legal Impediment shall be in effect.

Section 10.6 <u>Governmental Authorizations</u>. Any applicable waiting period under the HSR Act and any other material waiting period under any applicable antitrust or competition Law shall have expired or been terminated and any other material approval under any applicable antitrust or competition Law shall have been received.

Section 10.7 <u>Buyer's Deliveries</u>. Each of the deliveries required to be made to Sellers pursuant to <u>Section 4.2</u> shall have been so delivered.

# ARTICLE XI
# TERMINATION

Section 11.1 <u>Termination Events</u>. Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing Date:

    (a)    by either Sellers or Buyer:

        (i)    if the Bankruptcy Court declines to approve this Agreement for any reason, if the Canadian Court fails to enter the Canadian Sale and Vesting Order or if a Governmental Authority issues a final, non-appealable ruling or Order permanently prohibiting the transactions contemplated hereby, *provided, however*, that the right to terminate this Agreement pursuant to this <u>Section 11.1(a)(i)</u> shall not be available to any party whose breach of any of its representations, warranties, covenants or agreements contained herein results in such ruling or Order;

        (ii)    by mutual written consent of Sellers and Buyer;

        (iii)    if the Closing shall not have occurred by the close of business on January 27, 2012 (the "<u>Outside Date</u>"); *provided, however*, that (A) Buyer shall be permitted to terminate this Agreement pursuant to this <u>Section 11.1(a)(iii)</u> only if (x) Buyer is not in breach of any of its representations, warranties, covenants or agreements contained herein in such a way that would result in the failure of a condition set forth in <u>Section 10.1</u> or <u>Section 10.4</u> to be satisfied, and (y) Buyer has provided written notice to Sellers of its intention to exercise its rights under this <u>Section 11.1(a)(iii)</u> and Sellers have not taken all actions necessary to close the transactions contemplated by this Agreement on or before the date that is five (5) Business Days after the date of such notice from Buyer, and (B) Sellers shall be permitted to terminate this Agreement pursuant to this <u>Section 11.1(a)(iii)</u> only if (x) Sellers are not themselves in breach of any of their representations, warranties, covenants or agreements contained herein in such a way that would result in the failure of a condition set forth in <u>Section 9.1</u> or <u>Section 9.2</u> to be satisfied and (y) Sellers have provided written notice to Buyer of their intention to

46

exercise their rights under this Section 11.1(a)(iii) and Buyer has not taken all actions necessary to close the transactions contemplated by this Agreement on or before the date that is five (5) Business Days after the date of such notice from Sellers; or

(iv)     if Sellers file any stand-alone plan of reorganization or liquidation (or announce support of any such plan filed by any other party) or consummate an Alternative Transaction;

(b)     by Buyer:

(i)     in the event of any breach by any Seller of any of its agreements, covenants, representations or warranties contained herein (*provided* such breach would result in the failure of a condition set forth in Section 9.1 or Section 9.2 to be satisfied), and the failure of Sellers to cure such breach by the earlier of (A) the Outside Date and (B) the date that is thirty (30) days after receipt of the Buyer Termination Notice; *provided, however*, that (1) Buyer is not in material breach of any of its representations, warranties, covenants or agreements contained herein or in the Bidding Procedures Order or the Sale Order, (2) Buyer notifies Sellers in writing (the "Buyer Termination Notice") of its intention to exercise its rights under this Section 11.1(b)(i) as a result of the breach, and (3) Buyer specifies in the Buyer Termination Notice the representation, warranty, covenant or agreement contained herein of which Sellers are allegedly in breach; or

(ii)     if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement;

(iii)     if Buyer is not the Successful Bidder at the Auction, except that if Buyer is designated as the second highest bidder, then upon the earlier of the consummation of the transaction with the Successful Bidder and 30 days after the conclusion of the Sale Hearing;

(iv)     if the Bidding Procedures Order has not been entered on or before forty-five (45) days after the date hereof (or is vacated or stayed as of such date); or

(v)     if the Sale Order has not been entered on or before January 2, 2012 (or is vacated or stayed as of such date).

(c)     by Sellers:

(i)     in the event of any breach by Buyer of any of its agreements, covenants, representations or warranties contained herein (*provided* such breach would result in the failure of a condition set forth in Section 10.1 or Section 10.4 to be satisfied), and the failure of Buyer to cure such breach by the earlier of (A) the Outside Date and (B) the date that is thirty (30) days after receipt of the Sellers Termination Notice; *provided, however*, that Sellers (1) are not themselves

47

in material breach of any of their representations, warranties, covenants or agreements contained herein or in the Bidding Procedures Order or the Sale Order, (2) with concurrence of the Receiver, notify Buyer in writing (the "Sellers Termination Notice") of their intention to exercise their rights under this Section 11.1(c) as a result of the breach, and (3) specify in the Sellers Termination Notice the representation, warranty, covenant or agreement contained herein of which Buyer is allegedly in breach;

   (ii)  if Buyer is not the Successful Bidder at the Auction; or

   (iii)  if Sellers enter into (or provide written notice to Buyer of their intent to enter into) one or more agreements to sell, transfer or otherwise dispose of any portion of the Acquired Assets in a transaction or series of transactions with one or more Persons other than Buyer in accordance with the Bidding Procedures.

For the avoidance of doubt, the Parties acknowledge and agree, that in the event that Sellers determine, in their reasonable discretion, that the last Overbid (as defined in the Bidding Procedures) submitted by Buyer is better than all other Qualified Bids (as defined in the Bidding Procedures) as such Qualified Bids may be amended by an Overbid submitted at the Auction, then within two (2) Business Days following the conclusion of the Auction, Sellers and Buyer shall enter into an amendment to this Agreement to reflect Buyer's last Overbid; it being acknowledged and agreed that this Agreement shall not be deemed to have terminated by virtue of Buyer's having submitted the winning bid at the Auction.

  Section 11.2 Effect of Termination.

   (a)  In the event of a termination of this Agreement pursuant to Section 11.1(c)(i), the Escrow Agent shall, within two (2) Business Days after receiving joint notice of the Buyer Default Termination from Sellers and Buyer, disburse the Deposit to an account designated by Sellers by wire transfer of immediately available funds to be retained by Sellers for their own account; *provided* that disbursement of the Deposit shall not constitute liquidated damages or otherwise limit Sellers' remedies against Buyer in any respect of any claim against Buyer arising under this Agreement or otherwise (except that any damages that may be awarded against Buyer by any court shall be reduced by the amount of the Deposit). Sellers acknowledge and agree that, in such event, the Deposit shall be allocated among US Sellers and Canadian Seller on the same basis as contemplated by clause (i) of Section 3.5.

   (b)  In the event of a termination of this Agreement pursuant to this Article XI (other than a termination of this Agreement pursuant to Section 11.1(c)(i)), Sellers and Buyer shall instruct the Escrow Agent to, and the Escrow Agent shall, promptly (but in any event within two (2) Business Days of such instruction) return to Buyer the Deposit by wire transfer of immediately available funds and the return thereof shall, except as specified in Section 11.2(c), below, constitute the sole and exclusive remedy of Buyer in the event of a termination hereunder.

   (c)  If the Bidding Procedures Order has been entered and this Agreement is terminated in the circumstances set forth in Section 7.6(a) or Section 7.6(b), then Sellers, jointly

and severally, shall pay to Buyer the Break-Up Fee or the Expense Reimbursement Amount in accordance with Section 7.6, as applicable. The Break-Up Fee and the Expense Reimbursement Amount are in the nature of liquidated damages and shall, except as specified in Section 11.2(b), constitute the sole and exclusive remedy of Buyer in the event of a termination hereunder.

# ARTICLE XII
# GENERAL PROVISIONS

Section 12.1 <u>Public Announcements</u>. The initial press release relating to this Agreement shall be a joint press release, the text of which shall be agreed to by Buyer, on the one hand, and Sellers, on the other hand. Buyer, on the one hand, and Sellers, on the other hand, shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld or delayed).

Section 12.2 <u>Notices</u>. All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile (with written confirmation of receipt), (c) received by the addressee, if sent by a delivery service (prepaid, receipt requested) or (d) received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses, representatives (if applicable) and facsimile numbers set forth below (or to such other addresses, representatives and facsimile numbers as a Party may designate by notice to the other Parties):

(a)    If to Sellers, then to:

        Graceway Pharmaceuticals, LLC
        340 Martin Luther King Jr. Blvd., Suite 500
        Bristol, Tennessee 37620
        Attn: John A. A. Bellamy
        Facsimile: 423-274-5520

with a copy (which shall not constitute notice) to:

        Latham & Watkins LLP
        233 South Wacker Drive, Suite 5800
        Chicago, Illinois 60606
        Attn: Josef Athanas and Zachary Judd
        Facsimile: 312-993-9767

with a copy (which shall not constitute notice) to:

        Goodmans LLP
        333 Bay St., Suite 3400
        Toronto, Ontario
        Attn: Joseph Latham and Cristina Alaimo

Facsimile: 416-979-1234

(b)     If to Buyer:

Galderma S.A.
c/o Galderma Laboratories, L.P.
14501 North Freeway
Fort Worth, TX 76177
Attn: General Counsel
Facsimile: (817) 961-0034

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Attn: Kevin Rinker and My Chi To
Facsimile: (212) 909-6836

with a copy (which shall not constitute notice) to:

Bennett Jones LLP
1 First Canadian Place, Suite 3400
P.O. Box 130
Toronto, Ontario M5X 1A4
Attn: Kevin Zych and Mark Laugesen
Facsimile: (416) 863-1716

(c)     After the appointment of the Receiver, all notices to Canadian Seller shall
also be copied to:

RSM Richter Inc.
200 King Street West, Suite 1100
Toronto, Ontario M5H 3T4
Attn: Robert Kofman
Facsimile: (416) 932-6200

with a copy (which shall not constitute notice) to:

Davies, Ward, Phillips & Vineberg LLP
1 First Canadian Place, 44th Floor
Toronto, Ontario M5X 1B1
Attn: Jay Swartz
Facsimile: (416) 863-0871

Section 12.3  Waiver.  Neither the failure nor any delay by any Party in exercising any
right, power, or privilege under this Agreement or the documents referred to in this Agreement
shall operate as a waiver of such right, power or privilege, and no single or partial exercise of

50

any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

Section 12.4  <u>Entire Agreement; Amendment</u>. This Agreement (including the Schedules and the Exhibits) and the other Transaction Documents supersede all prior agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to their subject matter. This Agreement may not be amended except by a written agreement executed by all of the Parties.

Section 12.5  <u>Assignment</u>. This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party); *provided, however*, that Buyer shall be permitted, upon prior notice to Sellers, to assign all or part of its rights or obligations hereunder to an Affiliate, but no such assignment shall relieve Buyer of its obligations under this Agreement, and Sellers shall be permitted to assign all or part of their rights or obligations hereunder pursuant to a plan of reorganization or liquidation approved by the Bankruptcy Court.

Section 12.6  <u>Severability</u>. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

Section 12.7  <u>Expenses</u>. Whether or not the transactions contemplated by this Agreement are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby (except as otherwise specified herein).

Section 12.8  <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>.

(a)     Except to the extent the mandatory provisions of the Bankruptcy Code or the provisions of the CJA or other Laws applicable in the Canadian Proceedings apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

CH\1296825.17

(b)     Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby (except for such matters as must be dealt with by the Canadian Court in the Canadian Proceedings) and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; *provided, however*, that, if the Bankruptcy Case is closed, all Proceedings arising out of or relating to this Agreement shall be heard and determined in a Delaware state court or a federal court sitting in the State of Delaware, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding. The Parties consent to service of process by mail (in accordance with Section 12.2) or any other manner permitted by law.

(c)     THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLERS OR BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

Section 12.9 <u>Counterparts</u>. This Agreement and any amendment hereto may be executed in one or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall be deemed to constitute one and the same instrument. Notwithstanding anything to the contrary in Section 12.2, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier, facsimile or email attachment shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

Section 12.10 <u>Parties in Interest; No Third Party Beneficiaries</u>. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

Section 12.11 <u>Non-Recourse</u>. No past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any Seller shall have any liability for any obligations or liabilities of Sellers under this Agreement or any other Transaction Document, for any claim based on, in respect of, or by reason of the transactions contemplated hereby and thereby, and Buyer hereby covenants, on behalf of itself and its Affiliates, not to sue any past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any Seller for any such claim.

Section 12.12 <u>Schedules; Materiality</u>. The inclusion of any matter in any Schedule shall be deemed to be an inclusion for all purposes of this Agreement, to the extent that such

disclosure is sufficient to identify the Section to which such disclosure is responsive, but inclusion therein shall not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement. The disclosure of any particular fact or item in any Schedule shall not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

Section 12.13 Specific Performance. The Parties acknowledge and agree that (a) irreparable injury, for which monetary damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this Agreement are not performed in accordance with the specific terms hereof or are otherwise breached, and (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement. If any Proceeding is brought by the non-breaching Party or Parties to enforce this Agreement, the Party in breach shall waive the defense that there is an adequate remedy at law.

Section 12.14 Survival. All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall survive the Closing in accordance with their terms. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate.

Section 12.15 Prepetition Claims and Liabilities. Notwithstanding anything contained herein to the contrary, and taking into account US Sellers' status as debtors-in-possession in the Bankruptcy Cases and the limitations set forth in the Bankruptcy Code (including, without limitation, with respect the payment of prepetition claims (including, without limitation, prepetition claims on account of Rebates, returns, Chargebacks or coupons)), US Seller shall not be required to pay or otherwise satisfy any prepetition claims or liabilities (other than (i) Sellers' obligations to pay Cure Costs to the extent required by this Agreement, (ii) Sellers' obligations to pay any fees due to any regulatory authority in the Ordinary Course of Business in accordance with Section 7.2(a), except, for the avoidance of doubt, those related to any Rebates, returns, Chargebacks or coupons, (iii) Sellers' obligations under Section 7.2(b)(iii) to pay any Governmental Authority with respect to the prosecution and maintenance of applicable Material Business Intellectual Property, and (iv) Sellers' obligations to Buyer under Sections 3.2, 11.2(b) and 11.2(c) of this Agreement) and none of Sellers' covenants or obligations hereunder shall be construed, directly or indirectly, to require such payment or satisfaction.

Section 12.16 Receiver. For greater certainty, nothing herein or in any bill of sale or similar document shall constitute an express or implied representation or warranty by the Receiver or shall create any liability or obligation for the Receiver.

*[Signature pages follow.]*

CH\1296825.17

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Effective Date.

**GRACEWAY PHARMACEUTICALS, LLC**

By: _____
Jefferson J. Gregory
Chief Executive Officer

**GRACEWAY CANADA HOLDINGS, INC.**

By: _____
Jefferson J. Gregory
Chief Executive Officer

**GRACEWAY CANADA COMPANY**

By: _____
Jefferson J. Gregory
Chief Executive Officer

**GRACEWAY INTERNATIONAL, INC.**

By: _____
Jefferson J. Gregory
Chief Executive Officer

**CHESTER VALLEY HOLDINGS, LLC**

By: _____
Jefferson J. Gregory
Chief Executive Officer

**CHESTER VALLEY
PHARMACEUTICALS, LLC**

By: _____
Jefferson J. Gregory
Chief Executive Officer

**GALDERMA S.A.**

By: _____

**Name:** Humberto C. Antunes

**Title:**  President & Chief Executive Officer

## Annex A

### Subsidiary Sellers

Graceway Canada Holdings, Inc.
Graceway International, Inc.
Chester Valley Holdings, LLC
Chester Valley Pharmaceuticals, LLC

**Disclosure Schedules**

[Intentionally omitted; available upon request]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

<table>
<tr><td>In re:<br><br>GRACEWAY PHARMACEUTICALS,<br>LLC, <i>et al.</i>,[1]<br><br>Debtors.</td><td>Chapter 11<br><br>Case No. 11-_____ (____)<br><br>Jointly Administered<br><br><b>Related Docket No. [____]</b></td></tr>
</table>

**ORDER APPROVING AND AUTHORIZING (A) BIDDING PROCEDURES IN
CONNECTION WITH THE SALE OF CERTAIN ASSETS OF THE DEBTORS,
(B) STALKING HORSE BID PROTECTIONS, (C) FORM AND
MANNER OF NOTICE OF THE SALE HEARING AND (D) RELATED RELIEF**

Upon the portion of the motion (the "**Motion**")[2] of Graceway Pharamaceuticals, LLC

and its affiliates, as debtors and debtors-in-possession (collectively, the "**Debtors**"), for entry of

an order approving and authorizing (a) bidding procedures, including stalking horse bidder

protections, in connection with the receipt and analysis of competing bids for certain assets of the

Debtors, (b) procedures for the assumption and assignment of executory contracts and unexpired

leases in connection with the Sale, (c) the form and manner of notice of the Sale and scheduling

the sale hearing and setting related dates and deadlines, and (d) other related relief, pursuant to

sections 105(a), 363, 365, 503(b), 507 and, if applicable, 1146(a) of title 11 of the United States

Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Graceway Pharma Holding Corp., a Delaware corporation (9175); Graceway Holdings, LLC, a Delaware limited liability company (2502); Graceway Pharmaceuticals, LLC, a Delaware limited liability company (5385); Chester Valley Holdings, LLC, a Delaware limited liability company (9457); Chester Valley Pharmaceuticals, LLC, a Delaware limited liability company (3713); Graceway Canada Holdings, Inc., a Delaware corporation (6663); and Graceway International, Inc., a Delaware corporation (2399). The mailing address for Graceway Pharmaceuticals, LLC is 340 Martin Luther King Jr. Blvd., Suite 500, Bristol, TN 37620 (Attn: John Bellamy).

[2]     All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1, 6004-1 and 9006-1(b) of

the Local Bankruptcy Rules of Bankruptcy Practice and Procedure for the United States

Bankruptcy Court for the District of Delaware (the "**Local Rules**"); and this Court having found

that it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found

that the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having

found that venue of this proceeding and the Motion in this District is proper pursuant to

28 U.S.C. §§ 1408 and 1409; and a hearing having been held on _____ __, 2011 (the "**Bidding**

**Procedures Hearing**"); and this Court having reviewed the Motion and the exhibits thereto and

the arguments of counsel made and the evidence proffered or adduced, as applicable, at the

Bidding Procedures Hearing; and this Court having determined that the legal and factual bases

set forth in the Motion and at the Bidding Procedures Hearing establish just cause for the relief

granted herein; and this Court having found that the relief requested in the Motion is in the best

interests of the Debtors' estates, their creditors and other parties in interest; and this Court having

found the form and manner of notice of the Bidding Procedures Hearing is good, sufficient and

appropriate under the circumstances and that no other or further notice need be provided or is

necessary; and after due deliberation and sufficient cause appearing therefor, this Court FINDS

AND DETERMINES THAT:[3]

---

[3]      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

A.    **Bidding Procedures**.  The Debtors have articulated good and sufficient reasons for authorizing and approving the Bidding Procedures attached as **Exhibit 1** hereto (the "**Bidding Procedures**"), which are fair, reasonable and appropriate under the circumstances and represent the best method for maximizing the recovery on, and realizable value of, the Acquired Assets.

B.    **Stalking Horse Bid Protections**.  The Debtors have demonstrated a compelling and sound business justification for authorizing the payment of the Break-Up Fee and the Expense Reimbursement Amount and establishing the Initial Minimum Overbid Increment (collectively, the "**Bid Protections**") to the Stalking Horse Bidder under the circumstances, including, without limitation, that:

    i.    the Bid Protections are the product of negotiations among the Debtors and the Stalking Horse Bidder conducted in good faith and at arm's-length, and the APA (including the Bid Protections) is the culmination of a process undertaken by the Debtors and their professionals to negotiate a transaction with a bidder who was prepared to pay the highest or otherwise best purchase price to date for the Acquired Assets in order to maximize the value of the Debtors' estates;

    ii.    the Break-Up Fee and the Expense Reimbursement Amount are an actual and necessary cost and expense of preserving the respective Debtors' estates, within the meaning of Sections 503(b) and 507(a)(2) of the Bankruptcy Code;

    iii.    the Bid Protections are fair, reasonable and appropriate in light of, among other things, the size and nature of the proposed Sale under the APA and comparable transactions, the substantial efforts that have been and will be expended by the Stalking Horse Bidder, notwithstanding that the proposed Sale is subject to higher or better offers, and the substantial benefits the Stalking Horse Bidder has provided to the Debtors, their estates and creditors and all parties in interest herein, including, among other things, by increasing the likelihood that the best possible price for the Acquired Assets will be received;

    iv.    the protections afforded to the Stalking Horse Bidder by way of the Bid Protections were material inducements for, and express conditions of, the Stalking Horse Bidder's willingness to enter into, and to continue to be bound by, the APA, and were necessary to ensure that the Stalking Horse

Bidder would continue to pursue the proposed acquisition on terms acceptable to the Debtors in their sound business judgment, subject to competitive bidding; and

v.    the assurance of the payment of the Break-Up Fee and/or the Expense Reimbursement Amount, as applicable, (I) has promoted more competitive bidding by inducing the Stalking Horse Bidder's bid, which otherwise would not have been made, without which competitive bidding would be limited, and which may be the highest and best available offer for the Acquired Assets, and has induced the Stalking Horse Bidder to conduct due diligence with respect to the Debtors' business, assets, operations and liabilities, and propose the Sale contemplated by the APA, including, among other things, submission of a bid that will serve as a minimum or floor bid on which all other bidders can rely and (II) increases the likelihood that the final purchase price reflects the true value of the Acquired Assets.

**C.**    **Assumption Procedures**. The Motion, this Order, and the Contract Notice are reasonably calculated to provide counterparties to the Assumed Contracts with proper notice of the intended assumption and assignment of their executory contracts or unexpired leases, any Cure Amounts relating thereto and the Assumption and Assignment Procedures.

**D.**    **Sale Notice**. The Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including, without limitation: (i) the date, time and place of the Auction (if one is held); (ii) the Bidding Procedures and the dates and deadlines related thereto; (iii) the objection deadline for the sale motion and the date, time and place of the Sale Hearing; (iv) reasonably specific identification of the Acquired Assets; (v) instructions for promptly obtaining a copy of the APA; (vi) representations describing the Sale as being free and clear of liens, claims, interests and other encumbrances, with all such liens, claims, interests and other encumbrances attaching with the same validity and priority to the sale proceeds; (vi) the commitment by the Stalking Horse Bidder to assume certain liabilities of the Debtors; and (vii) notice of the proposed assumption and assignment of contracts and leases to the Stalking Horse Bidder pursuant to the APA (or to another Successful Bidder arising

from the Auction, if any), the proposed cure amounts relating thereto and the right, procedures and deadlines for objecting thereto, and no other or further notice of the Sale shall be required.

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:

1.     The Motion is granted to the extent set forth herein.

2.     All objections to the relief requested in the Motion that have not been withdrawn, waived or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

**I.     Important Dates and Deadlines**

3.     **Sale Hearing**. _____ __, 2011, at _:00 _.m. prevailing Eastern Time, is the date and time the sale hearing (the "**Sale Hearing**") will be held before the Honorable Judge [_____], United States Bankruptcy Judge for the Bankruptcy Court for the District of Delaware, at: 824 North Market Street, [__] Floor, Wilmington, Delaware 19801.  At the Sale Hearing, the Debtors will seek the entry of an order of this Court approving and authorizing the Sale to the Stalking Horse Bidder or the Successful Bidder (if other than the Stalking Horse Bidder), as applicable.  Any obligations of the Debtors set forth in the APA that are intended to be performed prior to the Sale Hearing and/or entry of the Sale Order pursuant to the APA are authorized as set forth herein and are fully enforceable as of the date of entry of this Order. **Please take notice that:** the Sale Hearing (or any portion thereof) may be adjourned by this Court or the Debtors from time to time without further notice other than by announcement in open court, on this Court's calendar or through the filing of a notice or other document on this Court's docket.

4.     **Sale Objection Deadline**. _____ __, 2011 at 4:00 p.m. prevailing Eastern Time, is the deadline to object to the relief requested in the Motion, including entry of the proposed Sale Order (the "**Sale Objection Deadline**").  Objections, if any, **must**:  (i) be in writing;

5

(ii) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (iv) be filed with this Court and served so *actually received* no later than the Sale Objection Deadline by (A) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002 and (B) the following parties (the "**Notice Parties**"):

| Debtors | Counsel to Debtors |
|---|---|
| Graceway Pharmaceuticals, LLC<br>340 Martin Luther King Jr. Blvd.<br>Suite 500<br>Bristol, Tennessee 37620<br>Attn: John Bellamy | Latham & Watkins LLP<br>233 South Wacker Drive<br>Chicago, IL 60606<br>Attn: Josef S. Athanas, Esq. and<br>Matthew L. Warren, Esq.<br><br>Young Conaway Stargatt & Taylor, LLP<br>1000 West Street, 17th Floor<br>Wilmington, Delaware 19801<br>Attn: Michael R. Nestor, Esq. and<br>Kara Hammond Coyle, Esq. |
| **Special Bankruptcy and Restructuring Counsel to the Agent for the First Lien Lenders** | **United States Trustee** |
| Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, NY 10019<br>Attn: Scott K. Charles, Esq. and<br>Michael S. Benn, Esq.<br><br>DLA Piper LLP<br>919 North Market Street, 15th Floor<br>Suite 1500<br>Wilmington, DE 19801<br>Attn: Stuart M. Brown, Esq. | Office of the United States Trustee<br>for the District of Delaware<br>844 King Street<br>J. Caleb Boggs Federal Building<br>Room 2207, Lockbox 35<br>Wilmington, DE 19801<br>Attn: [_____] |
| **Financing Counsel to the Agent for the First Lien Lenders** | **Counsel to the Creditors' Committee** |
| Morgan Lewis<br>225 Franklin Street, 16th Floor<br>Boston, Massachusetts 02110<br>Attn: Sula Fiszman, Esq. | |
| **Counsel to the Agent for the Second Lien Lenders** | **Counsel to the Stalking Horse Bidder** |
| Sidley Austin LLP<br>One South Dearborn,<br>Chicago, IL 60603<br>Attn: Larry Nyhan, Esq. | Debevoise & Plimpton LLP<br>919 Third Avenue<br>New York, NY 10022<br>Attn: My Chi To, Esq. and Kevin A. Rinker, Esq.<br><br>Morris, Nichols, Arsht & Tunnell LLP<br>1201 North Market Street, 18th Floor<br>Wilmington, DE 19801<br>Attn: Gregory W. Werkheiser, Esq. |

6

Notwithstanding anything to the contrary in this paragraph 4, the Sale Objection Deadline may be extended by the Debtors in consultation with the Stalking Horse Bidder.

5. **The failure to timely file an objection in accordance with this Order shall forever bar the assertion of any objection to the Motion, entry of the Sale Order and/or consummation of the Sale, including the assumption and assignment of contracts and leases to the Successful Bidder pursuant to the APA, and shall be deemed to constitute any such party's consent to entry of the Sale Order and consummation of the Sale and all transactions related thereto.**

6. **Reply Deadline.** ____ __, 2011 at 4:00 p.m. prevailing Eastern Time, is the deadline for the Debtors, the Stalking Horse Bidder and other parties in interest to file replies to any timely-filed objection to entry of the Sale Order with this Court; *provided*, that such deadline may be extended by agreement of the Debtors and the affected objecting party.

7. **Competitive Bidding**. The following dates and deadlines regarding competitive bidding are hereby established (subject to modification as needed):

    a. **Bid Deadline:** ____ __, 2011 at _:00 _.m. prevailing Eastern Time, is the deadline by which all "Qualified Bids" (as defined in the Bidding Procedures) must be *actually received* by the parties specified in the Bidding Procedures (the "**Bid Deadline**"); and

    b. **Auction:** ____ __, 2011 at _:00 _.m. prevailing Eastern Time, is the date and time of the Auction, if one is needed, will be held at the offices of counsel to the Debtors: Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022-4834.

**II.**    **Bidding Procedures and Related Relief**

    **A.**    **Bidding Procedures**

8. The Bidding Procedures, substantially in the form annexed hereto as **Exhibit 1** and incorporated by reference as though fully set forth herein, are hereby approved in their

7

entirety. The Bidding Procedures shall govern the submission, receipt and analysis of all bids relating to the proposed Sale, and any party desiring to submit a higher or better offer for the Acquired Assets shall do so strictly in accordance with the terms of the Bidding Procedures and this Order. The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

9.     The Bid Protections described in the Motion are hereby approved. The Debtors are authorized to pay any and all amounts owing to the Stalking Horse Bidder in accordance with the terms of the APA, including the Break-Up Fee and the Expense Reimbursement Amount, without further order of this Court, except as otherwise provided herein. The Debtors' obligation to pay the Bid Protections to the Stalking Horse Bidder shall constitute an administrative expense claim in accordance with Sections 105(a), 503 and 507 of the Bankruptcy Code, senior to all other superpriority administrative expense claims in the Debtors' Bankruptcy Cases.

10.     No person or entity other than the Stalking Horse Bidder shall, pursuant to the Bidding Procedures or otherwise, be entitled to any expense reimbursement, break-up fees, "topping," termination or other similar fee or payment in connection with the sale of the Acquired Assets pursuant to the terms of this Order.

11.     As described in the Bidding Procedures, if the Debtors do not receive any Qualified Bids other than from the Stalking Horse Bidder or if no Qualified Bidder other than the Stalking Horse Bidder indicates its intent to participate in the Auction, the Debtors will not hold the Auction, the Stalking Horse Bidder will be named the Successful Bidder and the Debtors will seek approval of the APA at the Sale Hearing. If one or more Qualified Bids is timely received from a Qualified Bidder (other than the Stalking Horse Bidder) in accordance with the Bidding Procedures, the Debtors shall conduct the Auction as set forth herein.

12.     If the Auction is conducted, each Qualified Bidder participating in the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding process or the Sale, the Auction will be conducted openly and the Auction shall be transcribed or videotaped.

## III.     **Assumption Procedures**

13.     The following procedures regarding the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale are hereby approved to the extent set forth herein, and shall govern the assumption and assignment of all executory contracts and unexpired leases proposed to be assumed by the Debtors pursuant to Section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (or other Successful Bidder following the Auction, if any) pursuant to Section 365(f) of the Bankruptcy Code under the APA:

    c.    **Designation Deadline**.  On or before one day prior to the Sale Hearing, the Stalking Horse Bidder or other Successful Bidder shall have the right to (a) designate any Contract to be an Assigned Agreement by amending Schedule 1.1(a) to the APA (Assigned Agreements) to add such Contract and (b) designate any Contract to not be an Assigned Agreement by amending Schedule 1.1(a) to the APA (Assigned Agreements) to remove such Contract; provided that, following the conclusion of the Auction, the Stalking Horse Bidder or such other Successful Bidder (i) may designate any Contract to be an Assigned Agreement by amending Schedule 1.1(a) to add such Contract to Schedule 1.1(a) and (ii) may not remove any Contract that was on Schedule 1.1(a) as of the conclusion of the Auction from Schedule 1.1(a).

    d.    **Notices for Assigned Agreements**.  As soon as practicable, the Debtors shall serve on all non-Debtor counterparties to any Contract (the "**Contract Notice Parties**") that may be assumed by the Debtors and assigned to the Successful Bidder, a "**Contract Notice**" in the form attached hereto as **Exhibit 3** that identifies, to the extent applicable (a) the Contract that may be an Assigned Agreement, (b) the name of the counterparty to such Contract, (c) any applicable cure amount for such Contract if it becomes an Assigned Agreement, and (d) the deadline by which any such Contract counterparty must file a "**Contract Objection**" to the proposed assumption and assignment; provided, however, that the

presence of a Contract on a Contract Notice does not constitute an admission that such Contract is an executory contract. As soon as practicable after the conclusion of the Auction, the Debtors shall file with the Court and serve on the Contract Notice Parties party to an Assigned Agreement identified by the Successful Bidder a further notice in the form attached hereto as **Exhibit 4** (the "**Assumption Notice**") identifying the Successful Bidder and stating which Contracts will be Assigned Agreements, and no other or further notice will be required with respect to the Assigned Agreements. If the Successful Bidder designates any additional Contracts during the period between the Auction and the day prior to the Sale Hearing pursuant to subsection (a) above, the Debtors shall file with the Court and serve on such additionally affected Contract Notice Parties a revised Assumption Notice. The Contract Notice, substantially in the form attached hereto as Exhibit 3, is hereby approved. The Assumption Notice, substantially in the form attached hereto as Exhibit 4, is hereby approved.

e. **Objections to Assumption of Contracts**. For all non-Debtor counterparties to an Assigned Agreement served a Contract Notice in accordance with this Order more than 14 days prior to the Sale Hearing, to which no Contract Objection was timely filed within 14 days after mailing of the Contract Notice, the counterparty to such Assigned Agreement shall be deemed to have waived and released any right to assert an objection to the assignment and assumption of such Assigned Agreement and to have otherwise consented to such assumption and assignment and cure amount, and the assignment will be deemed effective in accordance with the Sale Order. For all non-Debtor counterparties to an Assigned Agreement served with a Contract Notice 14 days or less prior to the Sale Hearing, if a timely filed Contract Objection is not received at or prior to the Sale Hearing, the counterparty to such Assigned Agreement shall be deemed to have waived and released any right to assert an objection to the assignment and assumption of such Assigned Agreement and to have otherwise consented to such assumption and assignment and cure amount, and the assignment will be deemed effective in accordance with the Sale Order. If any counterparty timely files a Contract Objection that cannot be resolved by the Debtors and the counterparty, the Court shall resolve such Contract Objection prior to assumption and assignment of such designated Contract, and upon entry of an order by the Court resolving such Contract Objection, the assignment shall be deemed effective in accordance with the Sale Order.

14. Any party failing to timely file a Contract Objection shall be forever barred and estopped from objecting thereto, including asserting against the Debtors or any of the Debtors' estates, the Stalking Horse Bidder or other Successful Bidder that any additional cure or default

amounts are due or conditions to assumption and assignment must be satisfied under such executory contract(s) or unexpired lease(s) and shall be deemed to consent to the Sale and the assumption and assignment of such executory contract(s) or unexpired lease(s) effectuated in connection therewith.

15.     A properly filed and served Contract Objection will reserve such objecting party's rights against the Debtors with respect to the relevant cure objection, but will not constitute an objection to the remaining relief requested in the Motion.

### A.     Sale Hearing Notice and Related Relief

16.     The Sale Notice, substantially in the form annexed hereto as **Exhibit 2**, is hereby approved.  Within three (3) business days of the entry of this Order or as soon thereafter as practicable, the Debtors shall cause the Sale Notice to be served upon, without limitation, (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) financing counsel to the agent for the First Lien Lenders; (iv) special bankruptcy and restructuring counsel to the agent for the First Lien Lenders; (v) local counsel to the agent for the First Lien Lenders, (vi) counsel to the agent for the Second Lien Lenders, (vii) the attorneys general for each of the States in which the Debtors conduct operations; (viii) all taxing authorities having jurisdiction over any of the Acquired Assets, including the Internal Revenue Service; (ix) the Environmental Protection Agency; (x) the Tennessee Environmental Protection Agency, (xi) the Pension Benefit Guaranty Corporation; (xii) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002; (xiii) all parties that are known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Acquired Assets; (xiv) all parties that are known or reasonably believed to have asserted any lien, encumbrance, claim or other interest in the Acquired Assets; (xv) all governmental agencies that are an interested party with respect to

the Sale and transactions proposed thereunder; (xvi) all non-Debtor parties to the Assigned Agreements and (xvii) all other known creditors of the Debtors.

17. Within five (5) business days of the entry of this Order or as soon as practicable thereafter, the Debtors shall publish the Sale Notice once in *The Wall Street Journal*, and such publication notice shall be deemed proper notice to any other interested parties whose identities are unknown to the Debtors.

18. Compliance with the foregoing notice provisions shall constitute sufficient notice to all parties in interest, including those whose identities are unknown to the Debtors, of the Sale of the Acquired Assets, the contemplated assumption and assignment of the Assigned Agreements and the cure amounts, and no additional notice of such contemplated transactions need be given.

19. The Debtors are authorized to execute and deliver all instruments and documents, and take such other action as may be necessary or appropriate to implement and effectuate the transactions contemplated by this Order.

20. The Court finds that the requirements set forth in Local Rules 6004-1 and 9013-1 are hereby satisfied or waived.

21. Notwithstanding any applicability of Bankruptcy Rule 6004(h), 6006(d), 7062 or 9014, the terms and conditions of this Order shall be immediately effective and enforceable upon entry of this Order. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

22.    This Court shall retain jurisdiction with respect to any matters, claims, rights or

disputes arising from, based upon or related to this Order.


Date:    _____ ___, 2011                    _____
         Wilmington, Delaware                    United States Bankruptcy Judge

# EXHIBIT 1

## Bidding Procedures

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the potential sale (the "Sale") of certain assets (the "Assets") of Graceway Pharmaceuticals, LLC, and certain of its subsidiaries, as debtors and debtors-in-possession (collectively, the "Debtors"), in jointly administered case no. [_____] under chapter 11 of the Bankruptcy Code pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Pursuant to the Bidding Procedures Order (defined below), the Bankruptcy Court has approved Galderma S.A. or its assignee(s) or designee(s) as the stalking horse bidder (the "Stalking Horse Bidder") for the Assets as set forth more fully in that certain Asset Purchase Agreement among Galderma S.A., the Debtors and Graceway Canada Company, dated as of September [__], 2011 (the "APA").

On September [__], 2011, the Debtors filed a motion pursuant to 11 U.S.C. §§ 105(A), 363, 365, 503, and 507 and Federal Bankruptcy Rules 2002, 6004, 6006, and 9014: (a) approving and authorizing (i) bidding procedures in connection with the sale of certain assets of the Debtors; (ii) stalking horse bid protections; (iii) form and manner of notice of the sale hearing and (iv) related relief; and (b) authorizing (i) the sale of such assets free and clear of all claims, liens, liabilities, rights, interests and encumbrances; (ii) the Debtors to enter into and perform their obligations under the APA; (iii) the Debtors to assume and assign certain executory contracts; and (iv) related relief. On [_____] [__], 2011 the Bankruptcy Court entered an order approving the Bidding Procedures set forth herein (the "Bidding Procedures Order"). The Bidding Procedures Order also set [_____], 2011 as the date the Bankruptcy Court will conduct the Sale Hearing (as defined below). At the Sale Hearing, the Debtors may seek entry of an order from the Bankruptcy Court authorizing and approving the Sale of the Assets to the Stalking Horse Bidder or another Qualified Bidder (as defined below) that the Debtors determine to have made the highest or best offer for the Assets.

## Assets to be Sold

The Debtors are offering to sell in one or more transactions the Assets and Qualified Bidders may submit bids for all or substantially all of the Assets. The Debtors shall retain all rights to the Assets that are not subject to a bid accepted by the Debtors and approved by the Bankruptcy Court at the Sale Hearing.

## Bid Deadline

All offers, solicitations, or proposals (each, a "Bid") must be submitted in writing so that they are actually **received** no later than 4:00 p.m. (Eastern Time) on [____], **2011** (the "Bid Deadline"). Prior to the Bid Deadline, a Qualified Bidder that wants to make a Bid shall deliver written copies of its Bid to investment bankers for the Debtors, Lazard Freres & Co., LLC ("Lazard"), 190 South LaSalle Street, 31st Floor, Chicago, Illinois 60603, Attn: Daniel Aronson, Daniel.aronson@lazard.com and Sachin Lulla, sachin.lulla@lazard.com, and Lazard will promptly (and in no event later than twenty-four (24) hours of receipt) deliver such Bid to: (a) the Debtors, c/o Graceway Holdings, LLC, 340 Martin Luther King Jr. Blvd., Suite 500, Bristol, Tennessee 37620, Attn: John Bellamy, john.bellamy@gracewaypharma.com; (b) co-counsel to the Debtors, (i) Latham & Watkins LLP, 233 South Wacker Drive, Suite 5800,

Chicago, Illinois 60606, Attn: David Heller, Josef Athanas, and Zak Judd, david.heller@lw.com, josef.athanas@lw.com, zachary.judd@lw.com; and (ii) Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, Attn: Michael R. Nestor and Kara Hammond Coyle, mnestor@ycst.com and kcoyle@ycst.com; (c) co-counsel to the Stalking Horse Bidder, (i) Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York 10022, Attn: Kevin Rinker and My Chi To, karinker@debevoise.com and mcto@debevoise.com and (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 18th Floor, Wilmington, DE 19801, Attn: Gregory W. Werkheiser, gwerkheiser@mnat.com; (d) financing counsel to the agent (the "First Lien Agent") to the lenders party to the Debtors' prepetition first lien credit agreement (the "First Lien Lenders"), Morgan Lewis, 225 Franklin Street, 16th Floor, Boston, Massachusetts 02110, Attn: Sula Fiszman, sfiszman@morganlewis.com; (e) special bankruptcy and restructuring counsel to the First Lien Agent, Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York 10019, Attn: Scott K. Charles and Michael S. Benn, SKCharles@wlrk.com and MSBenn@wlrk.com; (f) counsel to the agent (the "Second Lien Agent") to the lenders party to the Debtors' prepetition second lien credit agreement (the "Second Lien Lenders"), Sidley Austin LLP, One South Dearborn, Chicago, IL 60603, Attn: Larry Nyhan, lnyhan@sidley.com; (g) local counsel to the First Lien Agent, DLA Piper LLP, 919 North Market Street, 15th Floor, Suite 1500, Wilmington, Delaware 19801, Attn: Stuart M. Brown, stuart.brown@dlapiper.com; and (h) counsel to the Official Committee of Unsecured Creditors, [_____], Attn: [_____] (collectively, the "Notice Parties"), by the Bid Deadline. A Bid received after the Bid Deadline shall not constitute a Qualified Bid (as defined below). A Bid shall be delivered to all Notice Parties at the same time. Interested bidders requesting information about the qualification process, including a form asset purchase agreement, and information in connection with their due diligence, should contact Sachin Lulla, Lazard Freres & Co., LLC, 190 South LaSalle Street, 31st Floor, Chicago, Illinois 60603, (312) 407-6626, Sachin.Lulla@lazard.com.

## Participant Requirements

To participate in the process detailed by the Bidding Procedures and to otherwise be considered for any purpose hereunder, each Bid and each bidder submitting a Bid (a "Potential Bidder") must be determined by the Debtors to have satisfactorily provided the Debtors with each of the following (unless such requirement other than the "Confidentiality Agreement requirement set forth in clause (c) below is waived by the Debtors) on or before the Bid Deadline (the "Participant Requirements"):

(a) Identification of Potential Bidder. Identification of the Potential Bidder and any Principals (defined below), and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

(b) Corporate Authority. Written evidence of the Potential Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction and acceptance of the terms set forth in the Bidding Procedures; provided, however, that, if the Potential Bidder is an entity specially formed for the purpose of effectuating the contemplated transaction (an "Acquisition Entity"), then the Potential Bidder must

2

furnish written evidence reasonably acceptable to the Debtors of the approval of the contemplated transaction by the equity holder(s) of such Potential Bidder (the "<u>Principals</u>");

(c)    <u>Confidentiality Agreement</u>. An executed confidentiality agreement (the "<u>Confidentiality Agreement</u>") in form and substance acceptable to the Debtors and their counsel;

(d)    <u>Proof of Financial Ability to Perform</u>. Written evidence upon which the Debtors may reasonably conclude that the Potential Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance of all obligations to be assumed in such contemplated transaction. Such information should include, among other things, the following:

(i)    the Potential Bidder's or, in the case of an Acquisition Entity, the Principals', current financial statements (audited if they exist);

(ii)    contact names and numbers for verification of financing sources;

(iii)    evidence of the Potential Bidder's or Principals' internal resources and written evidence of a commitment for debt or equity funding that is needed to close the contemplated transaction; and

(iv)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Potential Bidder has the ability to close the contemplated transaction; provided, however, that the Debtors shall determine, in their reasonable discretion, in consultation with their advisors, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Potential Bidder's financial qualifications.

### Designation as Qualified Bidder

A "<u>Qualified Bidder</u>" is a Potential Bidder (or combination of Potential Bidders whose Bids for the Assets do not overlap and who agreed to have their Bids combined for purposes of the determination of whether such Potential Bidders together constitute a Qualified Bidder, and who shall also be referred to herein as a single Qualified Bidder) that delivers the documents described in paragraphs (a) through (d) above, and that the Debtors in their reasonable determination and with assistance from their advisors (after consultation with special bankruptcy and restructuring counsel to the First Lien Agent and counsel to the Official Committee of Unsecured Creditors) determine is reasonably likely to submit a bona fide offer that would result in greater cash value being received for the benefit of the Debtors' creditors than under the APA and to be able to consummate a sale if selected as a Successful Bidder (defined below) within the approximate overall time frame contemplated by the APA.

CH\1298988.12

Upon the receipt from a Potential Bidder of the information required under paragraphs (a) through (d) above, as soon as is practicable, the Debtors shall, in consultation with special bankruptcy and restructuring counsel to the First Lien Agent and counsel to the Official Committee of Unsecured Creditors, determine and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder.

The Stalking Horse Bidder is a Qualified Bidder.

## Access to Due Diligence Materials

Only Potential Bidders that execute the Confidentiality Agreement are eligible to receive due-diligence access or additional non-public information; provided, however, if the Debtors determine in their reasonable discretion that a Potential Bidder who has satisfied the Participant Requirements does not constitute a Qualified Bidder, then such Potential Bidder's right to receive due-diligence access or additional non-public information shall terminate. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due-diligence access from such Qualified Bidders. The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline. The Debtors are not responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders in connection with the sale of the Assets. If the Debtors furnish any material information related to the Debtors not theretofore given to the Stalking Horse Bidder, then the Debtors shall place such information in one of the data rooms.

## Due Diligence From Bidders

Each Potential Bidder and Qualified Bidder (collectively, a "Bidder") shall comply with all reasonable requests for additional information and due-diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction. Failure by a Potential Bidder to comply with requests for additional information and due-diligence access will be a basis for the Debtors to determine that the Potential Bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with requests for additional information and due-diligence access will be a basis for the Debtors to determine that a Bid made by a Qualified Bidder is not a Qualified Bid.

## Bidding Process

The Debtors and their advisors shall: (a) determine whether a Potential Bidder is a Qualified Bidder; (b) coordinate the efforts of Bidders in conducting their due-diligence investigations, as permitted by the provisions herein; (c) receive offers from Qualified Bidders; and (d) negotiate any offers made to purchase the Assets. Subject to the Bidding Procedures Order, the Debtors shall have the right to adopt such other rules for the Bidding Process (including rules that may depart from those set forth herein), that, in the Debtors' reasonable discretion, will better promote the goals of the Bidding Process.

## Bid Requirements

To participate in the Auction (as defined below), each Bid (including any credit bid by the First Lien Agent (other than with respect to clause (h) below) or the Second Lien

Agent) and Qualified Bidder submitting such a Bid must be determined by the Debtors to satisfy each of the following conditions:

(a)      <u>Written Submission of APA and Commitment to Close</u>. Qualified Bidders must submit by the Bid Deadline a blackline of the APA reflecting their proposed changes, and a written commitment that they intend to close on the terms and conditions set forth therein;

(b)      <u>Identification of Executory Contracts and Leases to be Assumed</u>. Qualified Bidders must submit by the Bid Deadline a comprehensive list of all executory contracts and leases that they will assume and the corresponding cure amounts associated with the assumption and assignment of such leases and contracts;

(c)      <u>Irrevocable</u>. A Bid must be irrevocable until five (5) business days after the Assets have been sold pursuant to the closing of the sale or sales approved by the Bankruptcy Court in a final, non-appealable order (the "<u>Termination Date</u>") unless such Bid is designated as the Back-Up Bid (defined below);

(d)      <u>Contingencies</u>. A Bid may not be conditioned on obtaining financing, regulatory contingencies (other than on the condition that any applicable waiting period under The Hart–Scott–Rodino Antitrust Improvements Act of 1976 (Public Law 94-435) be satisfied, which may occur subsequent to the date of the Bid Deadline), any internal approval or on the outcome or review of due diligence. Any other contingencies or conditions associated with a Bid may not be more burdensome taken as a whole than those set forth in the APA taken as a whole;

(e)      <u>Financing Sources</u>. A Bid must contain written evidence of a firm commitment for financing or other evidence of the financial wherewithal and ability to consummate the sale and which the Debtors reasonably believe to be sufficient to satisfy the standards to provide adequate assurance of future performance under Bankruptcy Code Section 365, with appropriate contact information for such financing sources;

(f)      <u>No Fees Payable to Qualified Bidder</u>. A Bid may not request or entitle the Qualified Bidder to any break-up fee, expense reimbursement fee or similar type of payment. Further, by submitting a Bid, a Bidder shall be deemed to waive its right to pursue a substantial contribution claim under Section 503 of the Bankruptcy Code or in any way related to the submission of its Bid or the Bidding Procedures;

(g)      <u>Good-Faith Deposit</u>. Each Bid must be accompanied by a deposit (the "<u>Good Faith Deposit</u>") in the form of a certified check or cash payable to the order of Graceway Pharmaceuticals, LLC in the amount of not less

CH\1298988.12

than $27,500,000 to be held in escrow by the Debtors until the Termination Date;

(h) <u>Minimum Overbid</u>. The consideration proposed by the Bid may include only cash and assumed liabilities. The aggregate consideration must equal or exceed the sum of the cash "Purchase Price" and assumed liabilities provided for under the APA, in the aggregate, plus the cash amount of the Break-Up Fee ($8,250,000) (defined below), *plus* the cash amount of $2,500,000 (the "<u>Initial Minimum Overbid Increment</u>");

(i) <u>Terms</u>. A Bid must be on terms that, taken as a whole, are determined by the Debtors not to be materially more burdensome or conditional than the terms of the APA taken as a whole; and

(j) <u>Purchase of Assets and Assumption of Liabilities</u>. A Bid must provide for the purchase of all or a substantial portion of the Assets and payment or assumption of all or a substantial portion of the liabilities to be paid or assumed under the APA.

A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements, and that satisfies the Bid Deadline requirement above, shall constitute a "Qualified Bid," if the Debtors believe, in their reasonable discretion (after consultation with special bankruptcy and restructuring counsel to the First Lien Agent and counsel to the Official Committee of Unsecured Creditors), that such Bid would be consummated if selected as the Successful Bid (as defined below). For purposes herein, the APA shall constitute a Qualified Bid. A Qualified Bid shall be considered such Qualified Bidder's "Baseline Bid."

If any Bid is determined by the Debtors not to be a Qualified Bid, the Bidder shall be refunded its Good Faith Deposit and all accumulated interest thereon within three (3) business days after that determination.

Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors.

### Auction

Only if a Qualified Bid (other than that of the Stalking Horse Bidder) is received by the Bid Deadline shall the Debtors conduct an auction (the "<u>Auction</u>") to determine the highest and/or best bid with respect to the Assets. The Auction shall commence on [_____], 2011, at 10:00 a.m. (Eastern Time), at the offices of Latham & Watkins, LLP, 885 Third Avenue, Suite 1000, New York, New York 10022-4834.

If no such Qualified Bid is received by the Bid Deadline, then (i) the Auction will not be held, (ii) the Stalking Horse Bidder will be deemed the Successful Bidder, (iii) the APA will be the Successful Bid, and (iv) at the Sale Hearing on [_____, 2011 at _:00 _.m.] (Eastern Time), the Debtors will seek approval of and authority to consummate the proposed sale to the Stalking Horse Bidder as contemplated by the APA.

The Auction shall be conducted according to the following procedures:

6

### (a) Participation At The Auction

Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. Only the authorized representatives of each of the Qualified Bidders, the Debtors, the official committee of unsecured creditors and the First Lien Agent shall be permitted to attend. During the Auction, bidding shall begin initially with the highest Qualified Bid (the "Opening Bid") and subsequently continue in minimum increments of at least $2,500,000 (or such other amount the Debtors determine to facilitate the Auction). At least two (2) business days prior to the Auction, each Qualified Bidder that has submitted a Qualified Bid must inform the Debtors whether it intends to participate at the Auction. The Debtors shall provide copies of the Opening Bid to the Stalking Horse Bidder and all Qualified Bidders that have indicated their intent to participate at the Auction at least one (1) business day prior to the Auction.

### (b) The Debtors Shall Conduct The Auction

The Debtors and their professionals shall direct and preside over the Auction. The determination of which Qualified Bid constitutes the Opening Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estate, including, among other things, the following: (i) the amount and nature of the consideration; (ii) the proposed assumption of any liabilities; (iii) the ability of the Qualified Bidder to close the proposed transaction; (iv) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (v) any purchase-price adjustments; (vi) the impact of the contemplated transaction on any actual or potential litigation; (vii) the net economic effect of any changes from the APA, if any, contemplated by the contemplated transaction documents (the "Contemplated Transaction Documents"); (viii) the net after-tax consideration to be received by the Debtors' estates; and (ix) such other considerations the Debtors deem relevant in their reasonable discretion (collectively, the "Bid Assessment Criteria"). All Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Debtors shall arrange for the actual bidding at the Auction to be transcribed or videotaped. Each Qualified Bidder participating in the Auction will be required to confirm that it has not engaged in any collusion regarding the Bidding Procedures, the Auction or the proposed transaction.

### (c) Terms of Overbids

An "Overbid" is any Bid made at the Auction subsequent to the Debtors' announcement of the Opening Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

#### (i) Minimum Overbid Increment

Any Overbid after the Opening Bid shall be made in increments of at least $2,500,000 (or such other amount the Debtors determine to facilitate the Auction).

#### (ii) Remaining Terms are the same as for Qualified Bids

CH\1298988.12

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, *provided, however,* that the Bid Deadline and the Initial Minimum Overbid Increment shall not apply. Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (A) the Debtors accept a higher Qualified Bid as an Overbid and (B) such Overbid is not selected as the Back-up Bid (as defined below).

To the extent not previously provided (which shall be determined by the Debtors), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor) demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid.

### (iii)    Consideration of Overbids

The Debtors reserve the right, in their reasonable business judgment, to make one or more adjournments in the Auction to, among other things: (A) facilitate discussions between the Debtors and individual Qualified Bidders; (B) allow individual Qualified Bidders to consider how they wish to proceed; (C) consider and determine the current highest and best Overbid at any given time during the Auction; and (D) give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require that the Qualified Bidder (other than Stalking Horse Bidder) has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount. The Break-Up Fee will be taken into account in each round of bidding. For the avoidance of doubt, during the Auction, any bid by the Stalking Horse Bidder shall be deemed to be increased by the amount of the Break-Up Fee, *provided* that in the event that the Stalking Horse Bidder is the Successful Bidder and its Successful Bid includes the Break-Up Fee, the Stalking Horse Bidder shall be entitled to credit the amount of the Break-Up Fee against the purchase price.

### (d)    Additional Procedures

The Debtors, in their reasonable discretion, may adopt rules for the Auction at or prior to the Auction that will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bidding Procedures, the Bidding Procedures Order or the Bankruptcy Code.

### (e)    Closing the Auction

Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall (i) immediately review the final Overbid of each Qualified Bidder on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the proposed sale, and (ii) identify the highest, best, and/or otherwise financially superior offer for the Assets (the "Successful Bid" and the entity submitting such Successful Bid, the "Successful Bidder"), which highest, best and/or otherwise financially superior offer will provide the greatest amount of net cash value to the Debtor, and the next highest or otherwise best offer after the Successful Bid (the "Back-up Bid"), and advise the Qualified Bidders and Notice Parties of such determination. No additional bids may be

8