considered following the closing of the Auction. If the Stalking Horse Bidder's final Bid is deemed to be highest and best at the conclusion of the Auction, the Stalking Horse Bidder will be the Successful Bidder, and such Bid, the Successful Bid.

Within one (1) day after the closing of the Auction, the Debtors shall file with the Bankruptcy Court and serve upon all Qualified Bidders and entities that have requested notice in the Bankruptcy Cases a notice identifying the Successful Bidder.

### (f) *Consent to Jurisdiction as Condition to Bid.*

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Bidder's Contemplated Transaction Documents, as applicable.

### (g) *Terms of Break-Up Fee*

If the APA terminates because the Debtors have accepted or selected, and the Bankruptcy Court has approved, the Bid or Bids (including a credit bid) of any Qualified Bidder(s) other than Stalking Horse Bidder to purchase all or a substantial portion of the Debtors' Assets, and such transaction or transactions contemplated by any such Bid or Bids has been consummated, the Debtors shall pay the Stalking Horse Bidder out of the proceeds of such transaction or transactions at the closing the "Break-Up Fee".

### Acceptance of Successful Bid

The Debtors shall sell the Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court. The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the Bid. The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Bankruptcy Court.

### Credit Bidding by First Lien Lenders

In the event the Bankruptcy Court permits the First Lien Lenders to credit bid, in addition to the requirements set forth in the section titled "Bid Requirements" above (other than with respect to clause (h) of such section), in order to be a Qualified Bid, a credit bid must provide for (a) the payment in cash at the closing of the Break-Up Fee, (b) the payment in cash at closing and/or the assumption of the unpaid administrative expense claims of the Debtors owning such collateral (other than the Break-Up Fee and the Lazard Success Fee (as defined in the Interim Cash Collateral Order)) incurred from the Petition Date through and including the date on which the closing of the sale occurs, (c) the payment in cash at closing of all claims that are senior to the claims of the First Lien Lenders pursuant to the DIP Financing Order or otherwise, (d) a description of all assets to be purchased that are not subject to a valid and perfected security interest held by the agent for the First Lien Lenders, (e) payment in cash in an amount equal to the fair value of such unencumbered assets and (f) payment in cash of the Lazard Success Fee. In the event the agent for the First Lien Lenders submits a credit bid for all of its collateral pursuant to these Bidding Procedures at the Auction, the Debtors reserve their

rights to not consult with the agent for the First Lien Lenders as to whether a Potential Bidder is a Qualified Bidder with respect to such Assets.

## Credit Bidding by Second Lien Lenders

In the event that the Bankruptcy Court permits the Second Lien Lenders to credit bid, in addition to the requirements set forth in the section titled "Bid Requirements" above, in order to be a Qualified Bid, a credit bid by the Second Lien Lenders must provide for (a) the payment in cash at closing of the Break-Up Fee, (b) the payment in full in cash of all obligations owed to the First Lien Lenders and to other the holders of claims with claims senior to those of the Second Lien Lenders pursuant to the Interim Cash Collateral Order or otherwise, (c) the payment in cash at closing and/or the assumption of the unpaid administrative expense claims of the Debtors owning such collateral incurred from the Petition Date through and including the date on which the closing of the sale occurs, (d) a description of all assets to be purchased that are not subject to a valid and perfected first priority security interest held by the agent for the Second Lien Lenders, (d) payment in cash in an amount equal to the fair value of such unencumbered assets and (e) payment in cash of the Lazard Success Fee. In the event the agent for the Second Lien Lenders submits a credit bid for all of its collateral pursuant to these Bidding Procedures at the Auction, the Debtors reserve their rights to not consult with the agent for the Second Lien Lenders as to whether a Potential Bidder is a Qualified Bidder with respect to such Assets. Notwithstanding the right to credit bid afforded them in the Bidding Procedures, the Second Lien Agent and the Second Lien Lenders shall be deemed to have consented and waived any and all applicable rights under Bankruptcy Code Section 363(f).

## "As Is, Where Is"

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates except to the extent set forth in the APA or the purchase agreement of another Successful Bidder. The Stalking Horse Bidder and each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely on its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid, and that it did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures and (a) as to the Stalking Horse Bidder, the terms of the sale of the Assets set forth in the APA, or (b) as to another Successful Bidder, the terms of the sale of the Assets set forth in the applicable purchase agreement.

## Free Of Any And All Encumbrances

Except as otherwise provided in the APA or another Successful Bidder's purchase agreement, all of the Debtors' right, title, and interest in and to the Assets subject thereto shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Encumbrances") in accordance with 11 U.S.C. § 363, with such Encumbrances to attach to the net proceeds of the sale of the Assets.

10

## Sale Hearing

A hearing to approve the sale of the Assets to the Successful Bidder shall be conducted by the Bankruptcy Court on [_____,2011, at _:00 _.m.] (Eastern Time), located at 824 North Market Street, [_]th Floor, Courtroom No. [_] Wilmington, Delaware (the "Sale Hearing"). Following the approval of the sale of the Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale within fourteen (14) days after entry of order by the Bankruptcy Court approving the sale of the Assets (except where the sole cause of any delay in closing is as a result of default by the Debtors), the Debtors shall be authorized, but not required, to deem the Back-up Bid, as disclosed at the Sale Hearing, the Successful Bid and the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such Back-up Bid without further notice or orders of the Bankruptcy Court. The Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing. If the Stalking Horse Bidder is not the Successful Bidder at the Auction but is designated as the bidder that has submitted the Back-Up Bid, then such Back-Up Bid must remain open until the earlier of the consummation of the transaction with the Successful Bidder and 30 days after the conclusion of the Sale Hearing. If any other bidder submits the Back-Up Bid, such Back-Up Bid must remain open until the consummation of the Sale to the Successful Bidder.

## Return of Good Faith Deposit

The Good Faith Deposit of the Successful Bidder shall be applied to the purchase price of such transaction at closing. Good Faith Deposits of all other Qualified Bidders shall be held by the Debtors until five (5) business days after closing of the transactions contemplated by the Successful Bid, and thereafter returned to the respective Qualified Bidders. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Good Faith Deposit as part of their damages resulting from the breach or failure to perform by the Successful Bidder. Notwithstanding anything herein to the contrary, the terms under which the Stalking Horse Bidder provided a Good Faith Deposit and the terms of its use, release and return to the Stalking Horse Bidder shall be governed by the APA.

## Modifications and Reservations

The Debtors may (a) determine which Qualified Bid, if any, is the highest, best, and/or otherwise financially superior offer; and (b) reject at any time before entry of orders of the Bankruptcy Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors, their estates and creditors.

At or before the Sale Hearing, the Debtors may impose such other terms and conditions as the Debtors may determine to be in the best interests of their estate and creditors and other parties in interest thereof that are not inconsistent with the Bidding Procedures Order, the Bidding Procedures or the Bankruptcy Code.

11

The Bidding Procedures may be materially modified only upon the express written consent of the Debtors and the Stalking Horse Bidder (such consent not to be unreasonably withheld), or by order of the Bankruptcy Court.

## Reservation of Rights

Subject to the Bidding Procedures Order, the Debtors reserve the right as they may determine to be in the best interests of their estates to: (a) determine which Potential Bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures Order or the requirements of the Bankruptcy Code or any other orders entered by the Bankruptcy Court, or (iii) contrary to the best interests of the Debtors and their estates or stakeholders, as applicable; (e) impose additional terms and conditions with respect to any or all Potential Bidders other than the Stalking Horse Bidder; (f) adjourn the Auction and/or Sale Hearing in open court without further notice; and (h) with the consent of the Stalking Horse Bidder, remove a portion of the Assets from the Auction. Without limiting the foregoing, the Debtors may determine to distribute or not distribute copies of other Qualified Bids to other Qualified Bidders prior to or during the Auction other than with respect to the distribution of the Opening Bid as set forth above.

CH\1298988.12

**EXHIBIT 2**

**Sale Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GRACEWAY PHARMACEUTICALS, LLC, *et al.*,[1] | Case No. 11-_____ (____) |
| Debtors. | Jointly Administered |

## NOTICE OF PUBLIC AUCTION AND SALE HEARING

### ("**Sale Notice**")

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), have entered into an asset purchase agreement, dated [_____], 2011 (the "**APA**")[2], with [_____], a [_____], formed by [_____] (the "**Stalking Horse Bidder**") to sell certain assets of the Debtors free and clear of all liens, claims, encumbrances and other interests to the Stalking Horse Bidder, subject to the submission of higher or better offers in an auction process (the "**Auction**").

**PLEASE TAKE FURTHER NOTICE** that in connection with the proposed sale (the "**Sale**") to the Stalking Horse Bidder, on [_____], 2011, the Debtors filed a motion [Docket No. [___]] (the "**Motion**") seeking a court order for approval and authorization of, among other things, (a) bidding procedures governing the Sale, (b) payment of a break-up fee and reimbursable expenses to the Stalking Horse Bidder in certain instances under the terms and conditions set forth in the APA, including if the Stalking Horse Bidder is not the successful bidder at the Auction, (c) the form and manner of notices related to the Sale, and (d) procedures related to the assumption and assignment of executory contracts and unexpired leases in connection with the Sale.

**PLEASE TAKE FURTHER NOTICE** that, on [_____], 2011, the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") entered an order [Docket No. [___]] (the "**Bidding Procedures Order**") approving the bidding procedures (the "**Bidding Procedures**"), which set the key dates and times related to the Sale. All interested bidders should carefully read the Bidding Procedures. The summary of the Bidding Procedures contained in this Sale Notice is provided for convenience only. To the extent that there are any

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Graceway Pharma Holding Corp., a Delaware corporation (9175); Graceway Holdings, LLC, a Delaware limited liability company (2502); Graceway Pharmaceuticals, LLC, a Delaware limited liability company (5385); Chester Valley Holdings, LLC, a Delaware limited liability company (9457); Chester Valley Pharmaceuticals, LLC, a Delaware limited liability company (3713); Graceway Canada Holdings, Inc., a Delaware corporation (6663); and Graceway International, Inc., a Delaware corporation (2399). The mailing address for Graceway Pharmaceuticals, LLC is 340 Martin Luther King Jr. Blvd., Suite 500, Bristol, TN 37620 (Attn: John Bellamy).

[2] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the APA.

inconsistencies between the Bidding Procedures and the summary description in this Sale Notice, the terms of the Bidding Procedures shall control.

PLEASE TAKE FURTHER NOTICE that copies of the Motion, Bidding Procedures and Bidding Procedures Order, as well as all related exhibits including the APA, are available on the website of the Court-appointed claims, noticing soliciting and balloting agent for the Debtors' chapter 11 cases, BMC Group, Inc., at www.bmcgroup.com/graceway, or can be requested by calling (888) 909-0100 from within the United States or +1 310 321 5555 from outside the United States.

PLEASE TAKE FURTHER NOTICE that, if the Debtors receive one or more qualified competing bids that satisfy the requirements and time frame specified by the Bidding Procedures, the Debtors will conduct the Auction to determine the highest or otherwise best bid for the purchased assets on [_____], 2011 at 10:00 a.m. prevailing Eastern Time at the offices of Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022, or at any such other location as the Debtors may hereafter designate (with notice of such alternate location given to all qualified bidders under the Bidding Procedures).

PLEASE TAKE FURTHER NOTICE that the Debtors will seek approval of the Sale before the Honorable [_____], United States Bankruptcy Judge for the Bankruptcy Court for the District of Delaware, at: 824 North Market Street, [\_\_]th Floor, Wilmington, Delaware 19801, on [\_\_\_\_\_], 2011 at [\_\_\_\_\_] [].m. prevailing Eastern Time.

PLEASE TAKE FURTHER NOTICE that objections to the Motion if any, **must**: (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the District of Delaware; (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (iv) be filed with the Court and served so *actually received* no later than [\_\_\_\_\_], 2011 at 4:00 p.m. prevailing Eastern Time by all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002 and the following parties:

| Debtors | Counsel to Debtors |
|---|---|
| Graceway Pharmaceuticals, LLC<br>340 Martin Luther King Jr. Blvd.<br>Suite 500<br>Bristol, Tennessee 37620<br>Attn: John Bellamy | Latham & Watkins LLP<br>233 South Wacker Drive<br>Chicago, IL 60606<br>Attn: Josef S. Athanas, Esq. and<br>Matthew L. Warren, Esq.<br><br>Young Conaway Stargatt & Taylor, LLP<br>1000 West Street, 17th Floor<br>Wilmington, Delaware 19801<br>Attn: Michael R. Nestor, Esq. and<br>Kara Hammond Coyle, Esq. |

CH\1299993.5

| Special Bankruptcy and Restructuring Counsel to the Agent for the First Lien Lenders | United States Trustee |
|---|---|
| Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, NY 10019<br>Attn: Scott K. Charles, Esq. and<br>Michael S. Benn, Esq.<br><br>DLA Piper LLP<br>919 North Market Street, 15th Floor<br>Suite 1500<br>Wilmington, DE 19801<br>Attn: Stuart M. Brown, Esq. | Office of the United States Trustee<br>for the District of Delaware<br>844 King Street<br>J. Caleb Boggs Federal Building<br>Room 2207, Lockbox 35<br>Wilmington, DE 19801<br>Attn: [_____], Esq. |
| **Financing Counsel to the Agent for the First Lien Lenders** | **Counsel to the Creditors' Committee** |
| Morgan Lewis<br>225 Franklin Street, 16th Floor<br>Boston, Massachusetts 02110<br>Attn: Sula Fiszman, Esq. | [to come] |
| **Counsel to the Agent for the Second Lien Lenders** | **Counsel to the Stalking Horse Bidder** |
| Sidley Austin LLP<br>One South Dearborn,<br>Chicago, IL 60603<br>Attn: Larry Nyhan, Esq. | Debevoise & Plimpton LLP<br>919 Third Avenue<br>New York, NY 10022<br>Attn: My Chi To, Esq. and Kevin A. Rinker, Esq.<br><br>Morris, Nichols, Arsht & Tunnell LLP<br>1201 North Market Street, 18th Floor<br>Wilmington, DE 19801<br>Attn: Gregory W. Werkheiser, Esq. |

## CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS AFFECTED THEREUNDER.**

## NO SUCCESSOR OR TRANSFEREE LIABILITY

The proposed Sale Order provides that the purchaser in the Sale (the "**Purchaser**") will have no responsibility for, and the assets will be sold free and clear of, any successor liability, including the following:

The Purchaser shall not be deemed, as a result of any action taken in connection with the APA, the consummation of the Transactions (as defined in the Sale Order) contemplated by the APA, or the transfer or operation of the Acquired Assets, to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for the Purchaser, with respect to any obligations as an assignee under the Assigned Agreements arising after the Closing); (b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be an alter ego or mere continuation or substantial continuation of the Debtors including, without limitation, within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101 et seq., the Comprehensive Environmental Response Compensation and Liability Act ("**CERCLA**"), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act, 29 U.S.C. § 151, et seq., environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, any liabilities, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine. Other than as expressly set forth in the APA with respect to Assumed Liabilities, the Purchaser shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the Acquired Assets or (b) any remaining Claims (as defined in the Sale Order) against the Debtors or any of their predecessors or affiliates. The Purchaser shall have no liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, *de facto* merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing.

---

**IF YOU HAVE ANY QUESTIONS REGARDING THIS SALE NOTICE, PLEASE CONTACT THE RESTRUCTURING HOTLINE ESTABLISHED IN CONNECTION WITH THE DEBTORS' CHAPTER 11 CASES AT (888) 909-0100 FROM WITHIN THE UNITED STATES OR +1 310 321 5555 FROM OUTSIDE THE UNITED STATES**

CH\1299993.5

**EXHIBIT 3**


**Contract Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GRACEWAY PHARMACEUTICALS, LLC, *et al.,*[1] | Case No. 11-_____ (____) |
| Debtors. | Jointly Administered |
| | Sale Hearing: [_____] 2011 at [____] [].m. (ET)<br>Objection Deadline: [_____] 2011 at [____] [].m. (ET |

## NOTICE OF (I) CURE AMOUNT WITH RESPECT TO EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED AND (II) POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

PLEASE TAKE NOTICE OF THE FOLLOWING:

1.     Pursuant to the *Order Approving and Authorizing (A) Bidding Procedures in Connection with the Sale of Certain Assets of the Debtors, (B) Stalking Horse Bid Protections, (C) Form and Manner of Notice of the Sale Hearing and (D) Related Relief* [Docket No. ____] (the "**Bidding Procedures Order**") entered by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on [_____], 2011, the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby provide notice that they are a party to various executory contracts and unexpired leases as set forth on Exhibit 1 attached hereto (individually, a "**Contract**", collectively the "**Contracts**") and they intend to seek to assume and assign some or all of the Contracts (individually, a "**Potentially Assumed**

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Graceway Pharma Holding Corp., a Delaware corporation (9175); Graceway Holdings, LLC, a Delaware limited liability company (2502); Graceway Pharmaceuticals, LLC, a Delaware limited liability company (5385); Chester Valley Holdings, LLC, a Delaware limited liability company (9457); Chester Valley Pharmaceuticals, LLC, a Delaware limited liability company (3713); Graceway Canada Holdings, Inc., a Delaware corporation (6663); and Graceway International, Inc., a Delaware corporation (2399). The mailing address for Graceway Pharmaceuticals, LLC is 340 Martin Luther King Jr. Blvd., Suite 500, Bristol, TN 37620 (Attn: John Bellamy).

Contract", collectively, the "**Potentially Assumed Contracts**") to the Successful Bidder[2] in connection with the proposed sale of certain of the Debtors' assets.

2.     You have been identified as a party to a Potentially Assumed Contract.  If your Contract is **actually** to be assumed or assigned, a separate notice of such assumption and assignment will be provided.

3.     The Potentially Assumed Contract with respect to which you have been identified as a non-Debtor counterparty, and the corresponding proposed amount the Debtors' records reflect is owing to cure any and all defaults under such Potentially Assumed Contract so as to permit the assumption and assignment of such Potentially Assumed Contract (if designated for assumption and assignment by the Successful Bidder) pursuant to 11 U.S.C. § 365 (the "**Cure Amount**"), have been set forth on Exhibit 1, as attached hereto.  The Debtors' records reflect, as of the date hereof, that all postpetition amounts owing under your Potentially Assumed Contract have been paid and will continue to be paid and that there are no other defaults under the Potentially Assumed Contract.  Amounts due and owing under the Contracts with respect to the period after the petition date and after the closing date of the Sale are not included in the calculation of the Cure Amounts.

4.     Objections, if any, to the proposed Cure Amount, or to the possible assumption and assignment of any Potentially Assumed Contract, must be made in writing, filed with the United States Bankruptcy Court for the District of Delaware, at: 824 North Market Street, [__]th

---

[2]     Capitalized terms not otherwise defined in this notice shall have the meanings set forth in the Bidding Procedures approved as part of the Bidding Procedures Order.  All documents filed with the Bankruptcy Court in connection with these Chapter 11 Cases, including orders of the Bankruptcy Court, are available for free on the website of the Court-appointed claims, noticing, soliciting and balloting agent in these Chapter 11 Cases, BMC Group, Inc., at www.bmcgroup.com/graceway, or can be requested by calling (888) 909-0100 from within the United States or +1 310 321 5555 if calling from outside the United States.

Floor, Wilmington, Delaware 19801, and served so as to be received on or before [_____] [_].m. on [_____], 2011 (the "**Objection Deadline**"). Service should be made by mail to:

| Debtors | Counsel to Debtors |
|---|---|
| Graceway Pharmaceuticals, LLC<br>340 Martin Luther King Jr. Blvd.<br>Suite 500<br>Bristol, Tennessee 37620<br>Attn: John Bellamy | Latham & Watkins LLP<br>233 South Wacker Drive<br>Chicago, IL 60606<br>Attn: Josef S. Athanas, Esq. and<br>Matthew L. Warren, Esq.<br><br>Young Conaway Stargatt & Taylor, LLP<br>1000 West Street, 17th Floor<br>Wilmington, Delaware 19801<br>Attn: Michael R. Nestor, Esq. and<br>Kara Hammond Coyle, Esq. |
| **Special Bankruptcy and Restructuring Counsel to the Agent for the First Lien Lenders** | **United States Trustee** |
| Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, NY 10019<br>Attn: Scott K. Charles, Esq. and<br>Michael S. Benn, Esq.<br><br>DLA Piper LLP<br>919 North Market Street, 15th Floor<br>Suite 1500<br>Wilmington, DE 19801<br>Attn: Stuart M. Brown, Esq. | Office of the United States Trustee<br>for the District of Delaware<br>844 King Street<br>J. Caleb Boggs Federal Building<br>Room 2207, Lockbox 35<br>Wilmington, DE 19801<br>Attn: [_____], Esq. |
| **Financing Counsel to the Agent for the First Lien Lenders** | **Counsel to the Creditors' Committee** |
| Morgan Lewis<br>225 Franklin Street, 16th Floor<br>Boston, Massachusetts 02110<br>Attn: Sula Fiszman, Esq. | [to come] |
| **Counsel to the Agent for the Second Lien Lenders** | **Counsel to the Stalking Horse Bidder** |
| Sidley Austin LLP<br>One South Dearborn,<br>Chicago, IL 60603<br>Attn: Larry Nyhan, Esq. | Debevoise & Plimpton LLP<br>919 Third Avenue<br>New York, NY 10022<br>Attn: My Chi To, Esq. and Kevin A. Rinker, Esq.<br><br>Morris, Nichols, Arsht & Tunnell LLP<br>1201 North Market Street, 18th Floor<br>Wilmington, DE 19801<br>Attn: Gregory W. Werkheiser, Esq. |

5.       An objection to any Cure Amount must (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the District of Delaware; and (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor.

CH\1299982.4

6.      If an objection to the Cure Amount, or the possible assumption and assignment, is timely filed and cannot be resolved by the Debtors and the counterparty to the Potentially Assumed Contract, a hearing with respect to the objection will be held before the Honorable [_____], United States Bankruptcy Judge for the Bankruptcy Court for the District of Delaware, at: 824 North Market Street, [__]th Floor, Wilmington, Delaware 19801, on [_____], 2011 at [_____] [].m. prevailing Eastern Time or at a later hearing, as determined by the Debtors. A hearing regarding objections to a Cure Amount, if any, may be continued at the sole discretion of the Debtors.

7.      Regardless of whether a Potentially Assumed Contract will be assumed and assigned at the closing of the Sale as provided for in the APA, unless a non-debtor party to any Potentially Assumed Contract files an objection to the Cure Amount by the Objection Deadline, then such counterparty shall be (i) forever barred from objecting to the Cure Amount or the assumption and assignment of such Potentially Assumed Contract; and (ii) forever barred and estopped from asserting or claiming any amounts under the Contracts outstanding as of the effective date of assumption and assignment to the Successful Bidder, other than the Cure Amount on Exhibit 1, against the Debtors, any Successful Bidder or any other assignee of the relevant contract.

8.      The Debtors will file and serve a further notice that identifies any Successful Bidder and provides notice of the particular Potentially Assumed Contracts that the Debtors will seek to assume and assign at the Sale Hearing (the "**Assumption Notice**").

9.      At the Sale Hearing, the Debtors shall present evidence necessary to demonstrate adequate assurance of future performance by the Successful Bidder. At the Sale Hearing, you

4

will have the opportunity to evaluate and, if necessary, challenge, the ability of the Successful Bidder to provide adequate assurance of future performance under the Assumed Contracts.

10.     The presence of a contract, lease or other agreement on Exhibit 1, as attached hereto, does not constitute an admission that such contract, lease or other agreement is an executory contract or unexpired lease or that such contract or lease will be assumed by the Debtors and assigned to any Successful Bidder. The Debtors reserve all of their rights, claims and causes of action with respect to the contracts, leases and other agreements listed on Exhibit 1, as attached hereto.

Dated: _____, 2011
Wilmington, Delaware

Respectfully Submitted,

_____
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

David S. Heller
Josef S. Athanas
Matthew L. Warren
LATHAM & WATKINS LLP
Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS-IN-POSSESSION

CH\1299982.4

# EXHIBIT 4

## Assumption Notice

| In re: | Chapter 11 |
|---|---|
| GRACEWAY PHARMACEUTICALS, LLC, *et al.*,[1] | Case No. 11-_____ (____) |
| | Jointly Administered |
| Debtors. | **Hearing Date:** [_____], 2011 at [__] [].m. (ET) |

## NOTICE OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

PLEASE TAKE NOTICE OF THE FOLLOWING:

1. On [_____], 2011, the United States Bankruptcy Court for the District of Delaware (this "**Court**") entered the *Order Approving and Authorizing (A) Bidding Procedures in Connection with the Sale of Certain Assets of the Debtors, (B) Stalking Horse Bid Protections, (C) Form and Manner of Notice of the Sale Hearing and (D) Related Relief* [Docket No. _____] (the "**Bidding Procedures Order**").

2. Pursuant to the Bidding Procedures Order, the Debtors have accepted the bid of [_____] (the "**Successful Bidder**") for the purchase of certain of the assets (the "**Assets**") related to the Debtors' business (the "**Sale**"). The terms of the bid are set forth in that certain asset purchase agreement (the "**APA**"), dated as of [_____], 2011 among the Debtors and the Successful Bidder, as filed with the Court [Docket No. _____].

3. The Bidding Procedures Order, among other things, authorized procedures for the Debtors to assume and assign certain executory contracts and unexpired leases (the "**Assumed**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Graceway Pharma Holding Corp., a Delaware corporation (9175); Graceway Holdings, LLC, a Delaware limited liability company (2502); Graceway Pharmaceuticals, LLC, a Delaware limited liability company (5385); Chester Valley Holdings, LLC, a Delaware limited liability company (9457); Chester Valley Pharmaceuticals, LLC, a Delaware limited liability company (3713); Graceway Canada Holdings, Inc., a Delaware corporation (6663); and Graceway International, Inc., a Delaware corporation (2399). The mailing address for Graceway Pharmaceuticals, LLC is 340 Martin Luther King Jr. Blvd., Suite 500, Bristol, TN 37620 (Attn: John Bellamy).

**Contracts**") to the Successful Bidder.  Attached hereto as <u>Exhibit 1</u> is a list of the Assumed Contracts that the Debtors will assign to the Successful Bidder in connection with the closing of the Sale and the cure amount, if any, with respect to each Assumed Contract.

4.    As set forth in the Bidding Procedures Order, the hearing to approve the Sale will be held on [        ], 2011, at [        ] [].m. prevailing Eastern Time before the Honorable [                ], United States Bankruptcy Judge for the Bankruptcy Court for the District of Delaware, at: 824 North Market Street, [    ]th Floor, Wilmington, Delaware 19801.

5.    All documents filed with this Court in connection with these Chapter 11 Cases, including orders of this Court, are available for free on the website of the Court-appointed claims, noticing, soliciting and balloting agent in these Chapter 11 Cases, BMC Group, Inc., at www.bmcgroup.com/graceway, or can be requested by calling (888) 909-0100 from within the United States or +1 310 321 5555 from outside the United States.

CH\1299949.4

Dated: _____, 2011          Respectfully Submitted,
Wilmington, Delaware

_____
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

David S. Heller
Josef S. Athanas
Matthew L. Warren
LATHAM & WATKINS LLP
Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS-IN-POSSESSION

CH\1299949.4

# EXHIBIT 1

## ASSUMED CONTRACTS

## BILL OF SALE

This **BILL OF SALE** (this "Bill of Sale") is made as of [●], 2011, by and among **GALDERMA S.A.**, a Switzerland corporation ("Buyer"), and **GRACEWAY PHARMACEUTICALS, LLC**, a Delaware limited liability company, and its Subsidiaries set forth on Annex A to the Asset Purchase Agreement (as defined below) (collectively, "Sellers" and each individually a "Seller").

**WHEREAS**, Buyer and Sellers entered into that certain Asset Purchase Agreement, dated as of September [●], 2011 (the "Asset Purchase Agreement"); and

**WHEREAS**, pursuant to the Asset Purchase Agreement, Sellers have agreed to sell, convey, transfer, assign and deliver to Buyer all of the Acquired Assets, and Buyer has agreed to purchase the Acquired Assets from Sellers.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, it is hereby agreed that:

1.     Definitions.  Unless otherwise defined herein, all capitalized terms used in this Bill of Sale shall have the meanings set forth in the Asset Purchase Agreement.

2.     Transfer of Assets.  Effective as of the Closing Date, Sellers hereby sell, convey, transfer, assign and deliver to Buyer all of Sellers' right, title and interest in, to and under the tangible Acquired Assets, and Buyer hereby purchases such tangible Acquired Assets and accepts such conveyance, transfer, assignment and delivery; *provided, however,* that any Acquired Assets that are specifically assigned or transferred pursuant to any other Transaction Document shall not be assigned or transferred pursuant to this Section 2.

3.     Subject to the Asset Purchase Agreement.  This Bill of Sale is subject in all respects to the terms and conditions of the Asset Purchase Agreement, and all of the representations, warranties, covenants and agreements of Sellers and Buyer contained therein, all of which shall survive the execution and delivery of this Bill of Sale in accordance with the terms of the Asset Purchase Agreement.  The Acquired Assets are being delivered for good and valuable consideration, pursuant to the terms and conditions contained in the Asset Purchase Agreement.  Nothing contained herein shall supersede, amend, alter or modify (nor shall it be deemed or construed to supersede, amend, alter or modify) any of the terms or conditions of the Asset Purchase Agreement in any manner whatsoever.  In the event of any conflict between the provisions of this Bill of Sale and the provisions of the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall control and prevail.

4.     Representations and Warranties.  Except as set forth in the Asset Purchase Agreement, Sellers make no representations or warranties, express or implied, with respect to the Acquired Assets, and Sellers expressly disclaim any implied warranties.

5.     Assignment.  This Bill of Sale, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent may be granted or withheld in the sole discretion of

such other Party); provided, however, that Buyer shall be permitted, upon prior notice to Sellers, to assign all or part of its rights or obligations hereunder to an Affiliate, but no such assignment shall relieve Buyer of its obligations under this Bill of Sale, and Sellers shall be permitted to assign all or part of their rights or obligations hereunder pursuant to a plan of reorganization or liquidation approved by the Bankruptcy Court.

6. Parties in Interest; No Third Party Beneficiaries. This Bill of Sale shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This Bill of Sale is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

7. Counterparts. This Bill of Sale and any amendment hereto may be executed in one or more counterparts, each of which shall be deemed to be an original of this Bill of Sale or such amendment and all of which, when taken together, shall be deemed to constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Bill of Sale or any amendment hereto by telecopier, facsimile or email attachment shall be effective as delivery of a manually executed counterpart of this Bill of Sale or such amendment, as applicable.

8. Waiver. Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Bill of Sale or the documents referred to in this Bill of Sale shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

9. Entire Agreement; Amendment. This Bill of Sale and the other Transaction Documents supersede all prior agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to their subject matter. This Bill of Sale may not be amended except by a written agreement executed by all of the Parties.

10. Severability. The provisions of this Bill of Sale shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Bill of Sale, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Bill of Sale and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

2

11.    Governing Law; Jurisdiction.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Bill of Sale shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Bill of Sale and to decide any claims or disputes which may arise or result from, or be connected with, this Bill of Sale, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; *provided, however,* that, if the Bankruptcy Case is closed, all Proceedings arising out of or relating to this Bill of Sale shall be heard and determined in a Delaware state court or a federal court sitting in the State of Delaware, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding. The Parties consent to service of process by mail (in accordance with Section 12.2 of the Asset Purchase Agreement) or any other manner permitted by law.

(c)    THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS BILL OF SALE OR THE ACTIONS OF SELLERS OR BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

*SIGNATURE PAGES FOLLOW*

CH\1298392.3

**IN WITNESS WHEREOF**, the parties hereto have caused this Bill of Sale to be executed by their respective officers thereunto duly authorized as of the date first above written.

**GRACEWAY PHARMACEUTICALS, LLC**

By: _____
Name:
Title:

**GRACEWAY CANADA HOLDINGS, INC.**

By: _____
Name:
Title:

**GRACEWAY INTERNATIONAL, INC.**

By: _____
Name:
Title:

**CHESTER VALLEY HOLDINGS, LLC**

By: _____
Name:
Title:

**CHESTER VALLEY PHARMACEUTICALS, LLC**

By: _____
Name:
Title:

**GALDERMA S.A.**

By: _____
Name:
Title:

EXHIBIT C

## BILL OF SALE

This **BILL OF SALE** (this "Bill of Sale") is made as of [●], 2011, by and among **GALDERMA S.A.**, a Switzerland corporation ("Buyer"), **GRACEWAY CANADA COMPANY**, a Nova Scotia unlimited liability company ("Canadian Seller"), and **RSM RICHTER INC.**, in its capacity as the Receiver of the Canadian Seller (the "Receiver") appointed in the Canadian Proceedings pursuant to the Receivership Order in order to carry out the terms of the Canadian Sale and Vesting Order and all other Orders received by the Canadian Seller in the Canadian Proceedings relating to the Asset Purchase Agreement (as defined below) and the transactions contemplated therein.

**WHEREAS**, Graceway Pharmaceuticals, LLC, its Subsidiaries set forth on Annex A to the Asset Purchase Agreement, Graceway Canada and Buyer entered into that certain Asset Purchase Agreement dated as of September [●], 2011 (the "Asset Purchase Agreement");

**WHEREAS**, pursuant to the Asset Purchase Agreement, Canadian Seller has agreed to sell, convey, transfer, assign and deliver to Buyer all of the Canadian Assets, and Buyer has agreed to purchase the Canadian Assets from Canadian Seller; and

**WHEREAS**, pursuant to the Canadian Sale and Vesting Order, the Receiver is authorized to conclude the transactions contemplated by the Asset Purchase Agreement on behalf of the Debtor, and the Receiver and the Debtor are thereby authorized to take such additional steps and to execute such additional documents as may be necessary or desirable for the conveyance of the Canadian Assets to the Buyer;

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, it is hereby agreed that:

1. <u>Definitions</u>. Unless otherwise defined herein, all capitalized terms used in this Bill of Sale shall have the meanings set forth in the Asset Purchase Agreement.

2. <u>Transfer of Assets</u>. Effective as of the Closing Date, pursuant to the authority and powers granted in the Canadian Sale and Vesting Order, the Receiver hereby sells, conveys, transfers, assigns and delivers to Buyer all right, title and interest of Canadian Seller and Receiver in, to and under the Canadian Assets, including, without limitation, all Intellectual Property (as defined in the Asset Purchase Agreement) of the Canadian Seller, and Buyer hereby purchases such Canadian Assets and accepts such sale, conveyance, transfer, assignment and delivery; *provided, however*, that any Canadian Assets that are specifically assigned or transferred pursuant to any other Transaction Document shall not be assigned or transferred pursuant to this <u>Section 2</u>.

3. <u>Subject to the Asset Purchase Agreement</u>. This Bill of Sale is subject in all respects to the terms and conditions of the Asset Purchase Agreement, and all of the representations, warranties, covenants and agreements of Canadian Seller and Buyer contained therein, all of which shall survive the execution and delivery of this Bill of Sale in accordance with the terms of the Asset Purchase Agreement. The Canadian Assets are being delivered for

good and valuable consideration, pursuant to the terms and conditions contained in the Asset Purchase Agreement and pursuant to the powers granted to the Receiver pursuant to the Canadian Orders. Nothing contained herein shall supersede, amend, alter or modify (nor shall it be deemed or construed to supersede, amend, alter or modify) any of the terms or conditions of the Asset Purchase Agreement in any manner whatsoever. In the event of any conflict between the provisions of this Bill of Sale and the provisions of the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall control and prevail.

4. <u>Representations and Warranties</u>. Except as set forth in the Asset Purchase Agreement and this Bill of Sale, in respect of Canadian Seller, neither of Canadian Seller nor the Receiver makes any representations or warranties, express or implied, with respect to the Acquired Assets, and each of Canadian Seller and the Receiver expressly disclaims any implied warranties. For greater certainty, nothing in this Bill of Sale or in the Asset Purchase Agreement or similar document shall create any liability for the Receiver. The Receiver represents and warrants to the Buyer that (a) the Receiver is a court-appointed receiver of the Canadian Seller and, pursuant to the Canadian Sale and Vesting Order, has the power, authority and capacity to enter into this Bill of Sale and to complete the Transaction related to the Canadian Assets as contemplated by the Asset Purchase Agreement; (b) the Receiver has not created any encumbrance on the Canadian Assets, other than the Receiver's Charge as contemplated in the Receivership Order; and (c) the Receiver is not a non-resident of Canada for purposes of the *Income Tax Act* (Canada).

5. <u>Parties in Interest; No Third Party Beneficiaries</u>. This Bill of Sale shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This Bill of Sale is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

6. <u>Counterparts</u>. This Bill of Sale and any amendment hereto may be executed in one or more counterparts, each of which shall be deemed to be an original of this Bill of Sale or such amendment and all of which, when taken together, shall be deemed to constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Bill of Sale or any amendment hereto by telecopier, facsimile or email attachment shall be effective as delivery of a manually executed counterpart of this Bill of Sale or such amendment, as applicable.

7. <u>Waiver</u>. Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Bill of Sale or the documents referred to in this Bill of Sale shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

8.     Entire Agreement; Amendment.  Subject to Section 3 of this Bill of Sale, this Bill of Sale and the other Transaction Documents supersede all prior agreements between Buyer, on the one hand, and Canadian Seller, on the other hand, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and Canadian Seller, on the other hand, with respect to their subject matter.  This Bill of Sale may not be amended except by a written agreement executed by all of the Parties.

9.     Severability.  The provisions of this Bill of Sale shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Bill of Sale, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Bill of Sale and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

10.     Governing Law; Jurisdiction.

(a)     This Bill of Sale is to be construed and enforced in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.

(b)     Without limitation of any Party's right to appeal any Canadian Order of the Canadian Court, (i) the Canadian Court shall retain exclusive jurisdiction to enforce the terms of this Bill of Sale and to decide any claims or disputes which may arise or result from, or be connected with, this Bill of Sale, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Canadian Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Canadian Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding. The Parties consent to service of process (in accordance with Section 12.2 of the Asset Purchase Agreement) or any other manner permitted by law.

*SIGNATURE PAGE FOLLOWS*

**IN WITNESS WHEREOF**, the parties hereto have caused this Bill of Sale to be executed by their respective officers thereunto duly authorized as of the date first above written.

**GRACEWAY CANADA COMPANY**

By: _____
Name:
Title:


**RSM RICHTER INC., in its capacity as the Receiver of Graceway Canada Company, and not in its personal capacity**

By: _____
Name:
Title:


**GALDERMA S.A.**

By: _____
Name:
Title:

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| GRACEWAY PHARMACEUTICALS, LLC, *et al.*,[1] | Case No. 11-_____ (____) |
| | Joint Administration Requested |
| Debtors. | Related Docket No. [__] |

**ORDER AUTHORIZING (A) THE SALE OF CERTAIN ASSETS OF THE DEBTORS FREE AND CLEAR OF ALL CLAIMS, LIENS, LIABILITIES, RIGHTS, INTERESTS AND ENCUMBRANCES; (B) THE DEBTORS TO ENTER INTO AND PERFORM THEIR OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT; (C) THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) GRANTING RELATED RELIEF**

Upon the portion of the motion (the "**Motion**")[2] of Graceway Holdings, LLC and the other above-captioned debtors, as debtors and debtors-in-possession (collectively, the "**Debtors**") for entry of orders, pursuant to sections 105(a), 363, 365, 503 and 507 of the United States Bankruptcy Code (the "**Bankruptcy Code**"), and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") authorizing and approving the following:

(i)     the sale of certain assets of the Debtors;

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Graceway Pharma Holding Corp., a Delaware corporation (9175); Graceway Holdings, LLC, a Delaware limited liability company (2502); Graceway Pharmaceuticals, LLC, a Delaware limited liability company (5385); Chester Valley Holdings, LLC, a Delaware limited liability company (9457); Chester Valley Pharmaceuticals, LLC, a Delaware limited liability company (3713); Graceway Canada Holdings, Inc., a Delaware corporation (6663); and Graceway International, Inc., a Delaware corporation (2399). The mailing address for Graceway Pharmaceuticals, LLC is 340 Martin Luther King Jr. Blvd., Suite 500, Bristol, TN 37620 (Attn: John Bellamy).

[2]     Unless indicated otherwise, capitalized terms used but not defined herein have the meanings ascribed to them in the APA (as defined below).

(ii)     the entry into, performance under and terms and conditions of the Asset Purchase Agreement dated as of September [___], 2011 (collectively with all related agreements, amendments, documents or instruments and all exhibits, schedules and addenda to any of the foregoing, the "**APA**"), substantially in the form attached hereto as **Exhibit A**, whereby the Debtors have agreed to sell, and Galderma S.A. ("**Buyer**") has agreed to buy, certain of the Debtors' assets (specifically as set forth and defined in the APA, the "**Acquired Assets**"), free and clear of all Claims (as defined below), Liens (defined below), liabilities, rights, interests, setoff rights and encumbrances except where the Debtors have agreed to transfer and Buyer has expressly agreed to assume certain of the Debtors' liabilities (specifically as set forth and defined in the APA, the "**Assumed Liabilities**") (collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the APA, the "**Transactions**");

(iii)    the assumption and assignment to Buyer or an Affiliate (as defined in the APA) of Buyer of certain executory contracts and unexpired leases of the Debtors designated for assumption and assignment as Assigned Agreements in accordance with this Order, the Bidding Procedures Order (defined below) and the APA (collectively the "**Assigned Agreements**"); and

(iv)     other related relief;

and the Court having entered an order approving the bidding procedures and granting certain related relief on [_____], 2011 [Docket No. _____] (the "**Bidding Procedures Order**"); an auction having been conducted in accordance with the Bidding Procedures Order (the "**Auction**") and Buyer having submitted the highest and best offer; and the Court having conducted a hearing on the Motion commencing on [_____], 2011 (the "**Sale Hearing**") at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered the Motion, the APA, the Bidding Procedures Order, the record of the hearing before the Court on [_____] (the "**Bidding Procedures Hearing**") at which the Bidding Procedures Order was approved, and all objections to the Transactions and the APA filed in accordance with the Bidding Procedures Order; and the appearance of all interested parties and all responses and objections to the Sale Motion having been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing, and

having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Sale Hearing; and upon all of the proceedings had before the Court, and all objections and responses to the relief requested in the Motion having been heard and overruled, continued or resolved on the terms set forth in this Order, and it appearing that due notice of the Motion, the APA, the Bidding Procedures Order and the Auction having been provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their stakeholders and all other parties-in-interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT EXPRESSLY FINDS AS FOLLOWS:[3]**

<u>**Jurisdiction, Venue and Final Order**</u>

A.     This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h), 6006(d) and 7062, and to the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of this Order as set forth herein.

---

[3]     All findings of fact and conclusions of law announced by the Bankruptcy Court at the Sale Hearing in relation to the Sale Motion are hereby incorporated to the extent not inconsistent herewith.

## Notice of the Transactions, APA, Sale Hearing, Auction and the Cure Costs

C.     As evidenced by the affidavits of service and publication previously filed with this Court, proper, timely, adequate and sufficient notice of the Motion, the Auction, the Sale Hearing, the APA and the Transactions has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014. The Debtors have complied with all obligations to provide notice of the Motion, the Auction, the Sale Hearing, the APA and the Transactions as required by the Bidding Procedures Order. The aforementioned notices are good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, the Auction, the Sale Hearing, the APA or the Transactions is required for the entry of this Order.

D.     A reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

E.     In accordance with the Bidding Procedures Order, the Debtors have served a notice (as amended, modified or otherwise supplemented from time to time, the "**Contract Notice**") of the potential assumption and assignment of the Assigned Agreements and of the Cure Costs upon each non-Debtor counterparty to an Assigned Agreement. The service and provision of the Contract Notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of assumption and assignment of the Assigned Agreements or establishing a Cure Cost for the respective Assigned Agreements. Non-Debtor counterparties to the Assigned Agreements have had an adequate opportunity to object to assumption and assignment of the applicable Assigned Agreements and the Cure Cost set forth in the Contract Notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the non-Debtor counterparty from accepting performance by, or rendering performance to, Buyer for purposes of section 365(c)(1)

of the Bankruptcy Code). The deadline to file an objection to the assumption and assignment to Buyer of any Assigned Agreement (a "**Contract Objection**") has expired and to the extent any such party timely filed a Contract Objection, all such Contract Objections have been resolved, withdrawn, overruled, or continued to a later hearing by agreement of the parties. To the extent that any such party did not timely file a Contract Objection by the Contract Objection deadline, such party shall be deemed to have consented to (i) the assumption and assignment of the Assigned Agreement, and (ii) the proposed Cure Cost set forth on the Contract Notice.

## Highest or Otherwise Best Offer

F.       As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors have otherwise complied in all respects with, the Bidding Procedures Order. The Auction was duly noticed and conducted in a noncollusive, fair and good faith manner and the Auction process set forth in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase all of the Acquired Assets and assume all of the Assumed Liabilities.

G.       The Acquired Assets were adequately marketed by the Debtors, and the consideration provided by Buyer under the APA constitutes the highest and best offer and provides fair and reasonable consideration to the Debtors for the sale of all Acquired Assets and the assumption of all Assumed Liabilities. The consideration provided by Buyer under the APA will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination that the consideration provided by Buyer under the APA constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

H.     Approval of the Motion and the APA and the consummation of the Transactions contemplated thereby are in the best interests of the Debtors, their respective creditors, estates and other parties in interest. The Debtors have demonstrated good, sufficient and sound business reasons and justifications for entering into the Transactions and the performance of their obligations under the APA.

I.     Entry of an order approving the APA and all the provisions thereof is a necessary condition precedent to Buyer's consummation of the Transactions.

J.     The APA was not entered into, and none of the Debtors or Buyer has entered into the APA or propose to consummate the Transactions, for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors. None of the Debtors or Buyer is entering into the APA, or proposing to consummate the Transactions, fraudulently, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

K.     The offer of Buyer, upon the terms and conditions set forth in the APA, including the form and total consideration to be realized by the Debtors pursuant to the APA: (i) is the highest and best offer received by the Debtors; (ii) is fair and reasonable; (iii) is in the best interests of the Debtors' creditors and estates and (iv) constitutes fair value, fair, full and adequate consideration, reasonably equivalent value and reasonable market value for the Acquired Assets.

L.     Buyer is the Successful Bidder for the Acquired Assets in accordance with the Bidding Procedures Order. Buyer has complied in all respects with the Bidding Procedures

Order and any other applicable order of this Court in negotiating and entering into the APA, and the sale and the APA likewise comply with the Bidding Procedures Order and any other applicable order of this Court.

### Good Faith of Debtors and Buyer

M.     The sales process conducted by the Debtors, including without limitation, the Bidding Procedures set forth in the Bidding Procedures Order, was at arms' length, non-collusive, in good faith, and substantively and procedurally fair to all parties.

N.     The Debtors, Buyer and their respective professionals have complied, in good faith, in all respects with the Bidding Procedures Order. As demonstrated by (i) any testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, substantial marketing efforts and a competitive sale process were conducted in accordance with the Bidding Procedures Order, the Debtors (a) afforded all creditors and other parties in interest and all potential purchasers a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase the Acquired Assets, (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Acquired Assets, and (c) considered any bids submitted on or before the Bid Deadline (as defined in the Bidding Procedures).

O.     The APA and the Transactions contemplated thereunder were proposed, negotiated and entered into by and among the Debtors and Buyer without collusion, in good faith and at arms' length. None of the Debtors or Buyer has engaged in any conduct that would cause or permit the APA or the Transactions to be avoided under section 363(n) of the Bankruptcy Code.

P.      Neither Buyer nor any of its affiliates, present or contemplated members, officers, directors, shareholders or any of their respective successors and assigns is an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code. Buyer is entering into the Transactions in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding. Neither the Debtors nor Buyer have engaged in any action or inaction that would cause or permit the APA to be avoided or impose any costs or damages under section 363(n) of the Bankruptcy Code.

## Section 363 Is Satisfied

Q.      The Debtors have demonstrated a sufficient basis and compelling circumstances requiring them to (i) enter into the APA, and (ii) sell the Acquired Assets and assume and assign the Assigned Agreements and such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their estates and their creditors. Such business reasons include, but are not limited to, the fact that (i) the APA constitutes the highest and best offer for the Acquired Assets; (ii) the APA presents the best opportunity to realize the value of the Debtors; and (iii) unless the sale is concluded expeditiously as provided for in the Motion and pursuant to the APA, recoveries of creditors may be diminished.

R.      The Debtors have, to the extent necessary, satisfied the requirements of Bankruptcy Code section 363(b)(1). Accordingly, appointment of a consumer privacy ombudsman pursuant to Bankruptcy Code sections 363(b)(1) or 332 is not required with respect to the relief requested in the Motion.

S.      The Acquired Assets constitute property of the Debtors' estates and title thereto is presently vested in the Debtors' estates within the meaning of Bankruptcy Code section 541(a).

T.     The sale of all Acquired Assets to Buyer under the terms of the APA meets the applicable provisions of section 363(f) of the Bankruptcy Code such that the sale of the Acquired Assets will be free and clear of any and all Claims, and except as expressly provided in the APA with respect to the Assumed Liabilities, the (i) transfer of the Acquired Assets to Buyer and (ii) assumption and/or assignment to Buyer or an Affiliate of Buyer of the Assigned Agreements and Assumed Liabilities will be free and clear of all Claims and will not subject Buyer or any of Buyer's assets to any liability for any Claims whatsoever (including, without limitation, under any theory of equitable law, antitrust, setoff, or successor or transferee liability).  All holders of Claims who did not object, or withdrew their objections to the Transactions, are deemed to have consented to the Transactions pursuant to section 363(f)(2) of the Bankruptcy Code, and all holders of Claims are adequately protected — thus satisfying section 363(e) of the Bankruptcy Code — by having their Claims, if any, attach to the proceeds of the Transactions ultimately attributable to the property against or in which they assert a Claim or other specifically dedicated funds, in the same order of priority and with the same validity, force and effect that such Claim holder had prior to the Transactions, subject to any rights, claims and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein; provided, however, that setoff rights will be extinguished to the extent there is no longer mutuality after the consummation of the Transactions.

U.     Buyer would not have entered into the APA and would not consummate the sale of all Acquired Assets, thus adversely affecting the Debtors, their estates, creditors, employees and other parties in interest, if the sale of the Acquired Assets was not free and clear of all Claims or if Buyer would, or in the future could, be liable for any Claims, including, without limitation and as applicable, certain liabilities that expressly are not assumed by Buyer as set

forth in the APA or in this Order. Buyer asserts that it will not consummate the Transactions unless the APA specifically provides, and this Court specifically orders, that none of Buyer, its assets or the Acquired Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any (i) Claim or (ii) any successor or transferee liability for any of the Debtors other than the Assumed Liabilities.

V. The transfer of the Acquired Assets to Buyer under the APA will be a legal, valid and effective transfer of all of the legal, equitable and beneficial right, title and interest in and to the Acquired Assets free and clear of all Claims. The Debtors may sell their interests in the Acquired Assets free and clear of all Claims because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied. The transfer of the Acquired Assets to Buyer will vest Buyer with good and marketable title to the Acquired Assets.

W. Buyer is not a successor to the Debtors or their respective estates by reason of any theory of law or equity and Buyer shall not assume or in any way be responsible for any liability or obligation of any of the Debtors or their respective estates, except as otherwise expressly provided in the APA or this Sale Order. Buyer is not a continuation of the Debtors or their respective estates and there is no continuity between Buyer and the Debtors. Buyer is not holding itself out to the public as a continuation of the Debtors or their respective estates and the Transactions do not amount to a consolidation, merger or *de facto* merger of Buyer and the Debtors.

X. There is no legal or equitable reason to delay the Transactions. The Transactions must be approved and consummated promptly in order to preserve the value of the Debtors' assets.

Y.     The Debtors have demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the Transactions pursuant to section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization in that, among other things, absent the immediate consummation of the Transactions, the value of the Debtors' assets will be harmed. To maximize the value of the Purchased Assets, it is essential that the Transactions occur within the timeframe set forth in the APA. Time is of the essence in consummating the Transactions.

Z.     The sale and assignment of the Acquired Assets outside of a plan of reorganization pursuant to the APA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan for the Debtors. Neither the APA nor the transactions contemplated thereby constitute a sub rosa chapter 11 plan.

## Assumption and Assignment of the Assigned Agreements

AA.     The assumption and assignment of the Assigned Agreements (as such Assigned Agreements may be amended, supplemented or otherwise modified prior to assumption and assignment without further order of the Court with the consent of the Debtors, the contract counterparty and Buyer) that are designated for assumption and assignment pursuant to the terms of this Order and the APA are integral to the APA, are in the best interests of the Debtors and their respective estates, creditors and other parties in interest, and represent the reasonable exercise of sound and prudent business judgment by the Debtors.

BB.     No section of any Assigned Agreement which purports to prohibit, restrict, or condition the use, consideration or assignment of any such Assigned Agreement in connection with the Transactions shall have any force or effect.

CC.     The Debtors have met all requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Agreements.  The Debtors (and, in certain cases, Buyer, as applicable under the APA) have (a) cured and/or provided adequate assurance of cure of any default existing prior to the Closing under all of the Assigned Agreements, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (b) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default prior to the Closing under any of the Assigned Agreements, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  Each of the Assigned Agreements is free and clear of all Claims against Buyer.

DD.     Buyer has demonstrated adequate assurance of its future performance under the relevant Assigned Agreements within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  Pursuant to section 365(f) of the Bankruptcy Code, the Assigned Agreements to be assumed and assigned under the APA shall be assigned and transferred to, and remain in full force and effect for the benefit of, Buyer notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer.

EE.     No defaults exist in the Debtors' performance under the Assigned Agreements as of the date of this Sale Order other than the failure to pay amounts equal to the Cure Costs or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

<u>**General Provisions**</u>

2.     The Motion is granted in its entirety and approved in all respects.

3.     All objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation

filed with the Court or as resolved in this Order, and all reservations of rights included therein, are hereby overruled on the merits with prejudice. All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein including without limitation all non-Debtor parties to the Assigned Agreements.

4. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

### Approval of the APA

5. The APA, all of the terms and conditions thereof, and all of the Transactions contemplated therein are approved in all respects. The failure specifically to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety. The transfer of the Acquired Assets by the Debtors to Buyer shall be a legal, valid and effective transfer of the Acquired Assets. The consummation of the Transactions is hereby approved and authorized under section 363(b) of the Bankruptcy Code.

6. The Debtors are authorized to (a) take any and all actions necessary or appropriate to perform, consummate, implement and close the Transactions, including the sale to Buyer of all Acquired Assets, in accordance with the terms and conditions set forth in the APA and this Order, including without limitation executing, acknowledging and delivering such deeds, assignments, conveyances and other assurance, documents and instruments of transfer and taking any action for purposes of assigning, transferring, granting, conveying, and confirming to Buyer, or reducing to possession, any or all of the Acquired Assets and (b) to assume and assign any and

all Assigned Agreements. The Debtors are further authorized to pay, without further order of this Court, whether before, at or after the Closing, any expenses or costs that are required to be paid in order to consummate the Transactions or perform their obligations under the APA. [Except for the Break Up Fee (as defined in the APA), which is only payable out of the proceeds of an Alternative Transaction (as defined in the APA), any amounts, including the Expense Reimbursement Amount, that become payable by the Debtors to Buyer pursuant to the APA, (and related agreements executed in connection therewith) shall constitute administrative expenses of the Debtors' estates under sections 503(b) and 507(a)(l) of the Bankruptcy Code (to the extent set forth in the Bidding Procedures Order, the APA and such related agreements) and shall be treated with such priority if the above-captioned bankruptcy cases convert to cases under chapter 7 of the Bankruptcy Code.][4]

7.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer the Acquired Assets to Buyer in accordance with the APA and this Order.

<u>**Sale and Transfer Free and Clear of Claims**</u>

8.     Except as otherwise expressly provided in the APA and the terms of this Order with respect to Assumed Liabilities, the Acquired Assets shall be sold free and clear of all claims, Liens, liabilities, interests, rights and encumbrances, including, without limitation, the following: all mortgages, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses,

---

[4] Note to draft: to be revised after determination of Successful Bidder.

options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, offsets, contract rights, rights of setoff, recoupment rights, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any governmental entity, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guaranties, option rights or claims, rights, contractual or other commitment rights and claims, rights of licensees or sublicensees under section 365(n) of the Bankruptcy Code or any similar statute, and all other matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of this Bankruptcy Case (but, for the avoidance of doubt, in each case arising from the ownership of the Acquired Assets or the operation of the Business prior to the Closing Date), and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under any theory, law or doctrine of successor liability or related theories (all of the foregoing collectively being referred to in this Order as "**Claims**", and, as used in this Order, the term Claims includes, without limitation, any and all "claims" as that term is defined and used in the Bankruptcy Code, including section 101(5) thereof), with all such Claims to attach to the proceeds of the

Transactions to be received by the Debtors with the same validity, force, priority and effect which they now have as against the Acquired Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto; provided, however, that setoff rights will be extinguished to the extent there is no longer mutuality after the consummation of the Transactions. As used in this Order, the term "**Liens**" includes, without limitation, any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code, including section 101(37) thereof.

9. At Closing, all of the Debtors' right, title and interest in and to, and possession of, the Acquired Assets shall be immediately vested in Buyer pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code free and clear of any and all Claims except for Assumed Liabilities. Such transfer shall constitute a legal, valid, binding and effective transfer of such Acquired Assets. All person or entities, presently or on or after the Closing, in possession of some or all of the Acquired Assets are directed to surrender possession of the Acquired Assets to Buyer or its designees on the Closing or at such time thereafter as Buyer may request.

10. This Order (a) shall be effective as a determination that, as of the Closing, (i) no Claims (other than Assumed Liabilities) will be capable of being asserted against Buyer or any of its assets (including the Acquired Assets), (ii) the Acquired Assets shall have been transferred to Buyer free and clear of all Claims and (iii) the conveyances described herein have been effected; and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of

law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA. The Acquired Assets are sold free and clear of any reclamation rights.

11. Except as otherwise expressly provided in the APA with respect to the Assumed Liabilities, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors holding Claims arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets, the ownership, sale or operation of the Acquired Assets and the Business prior to Closing or the transfer of the Acquired Assets to Buyer, are hereby forever barred, estopped and permanently enjoined from asserting such Claims against Buyer, its successors or assigns, their property or the Acquired Assets. Following the Closing, no holder of any Claim shall interfere with Buyer's title to or use and enjoyment of the Acquired Assets based on or related to any such Claim, or based on any action the Debtors may take in their Chapter 11 cases.

12. If any person or entity that has filed financing statements, mortgages, mechanic's Claims, *lis pendens* or other documents or agreements evidencing Claims against or in the Acquired Assets shall not have delivered to the Debtors prior to the Closing of the Transactions, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Claims that the person or entity has with respect to the Acquired Assets or otherwise, then only with regard to the Acquired Assets that are purchased by

Buyer pursuant to the APA and this Order (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets and (b) Buyer is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against Buyer and the applicable Acquired Assets; and (c) Buyer may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction, and releases of all Claims with respect to the Acquired Assets other than Assumed Liabilities. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office. Notwithstanding the foregoing, the provisions of this Order authorizing the sale and assignment of the Acquired Assets free and clear of Claims shall be self-executing, and none of the Debtors nor Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

13. To the maximum extent permitted under applicable law, Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Acquired Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to Buyer as of the Closing Date.

14. To the extent permitted by Bankruptcy Code section 525, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets

sold, transferred, assigned or conveyed to Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Transactions.

## No Successor or Transferee Liability

15.     Buyer shall not be deemed, as a result of any action taken in connection with the APA, the consummation of the Transactions contemplated by the APA, or the transfer or operation of the Acquired Assets to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for Buyer, with respect to any obligations as an assignee under the Assigned Agreements arising after the Closing); (b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors including, without limitation, within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**"), WARN (defined below), CERCLA (defined below), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act, 29 U.S.C. § 151, *et seq.* (the "**NLRA**"), environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, any liabilities, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

16.     Other than as expressly set forth in the APA with respect to Assumed Liabilities, Buyer shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the Acquired Assets or (b) any remaining Claims against the Debtors or any of their predecessors or affiliates.  Buyer shall have no liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as described herein, "**Successor or Transferee Liability**") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, *de facto* merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing.  Buyer shall have no liability or obligation under the WARN Act (29 U.S.C. §§ 2101 et seq.) ("**WARN**") or the Comprehensive Environmental Response Compensation and Liability Act ("**CERCLA**"), or any foreign, federal, state or local labor, employment, or environmental law whether of similar import or otherwise by virtue of Buyer's purchase of the Acquired Assets or assumption of the Assumed Liabilities by Buyer or an Affiliate of Buyer.

17.     Nothing in this Order or the APA shall require Buyer to (a) continue or maintain in effect, or assume any liability in respect of any employee, collective bargaining agreement, pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreements to which the Debtors are a party or have any responsibility therefor including, without limitation, medical, welfare and pension benefits payable after retirement or other termination of

employment; or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

18. Effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against Buyer, or its assets (including the Acquired Assets), with respect to any (a) Claim or (b) Successor or Transferee Liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien, claim, interest or encumbrance; (iv) asserting any setoff, right of subrogation or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with such assets.

## Good Faith of Buyer

19. The Transactions contemplated by the APA are undertaken by Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the Transactions (including the assumption and assignment of the Assigned Agreements), unless such authorization and consummation of

the sale are duly and properly stayed pending such appeal. Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

20. ·  Neither the Debtors nor Buyer have engaged in any action or inaction that would cause or permit the Transactions to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code. The consideration provided by Buyer for the Acquired Assets under the APA is fair and reasonable and the Transactions may not be avoided under section 363(n) of the Bankruptcy Code.

21. Buyer is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code.

### Assumption and Assignment of Assigned Agreements

22. The Debtors are authorized and directed at to assume and assign each of the Assigned Agreements upon the Closing of the Transactions, free and clear of all Claims. The payment of the applicable Cure Costs by the Debtors (or, in certain cases, Buyer, as applicable under the APA) shall (a) effect a cure of all defaults existing thereunder as of the Closing Date, (b) compensate for any actual pecuniary loss to such non-Debtor counterparty resulting from such default, and (c) together with the assumption of the Assigned Agreements by the Debtors and the assignment of the Assigned Agreements to Buyer or an Affiliate of Buyer, constitute adequate assurance of future performance thereof.

23. Any provisions in any Assigned Agreement that prohibit or condition the assignment of such Assigned Agreement or allow the counterparty to such Assigned Agreement to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assigned Agreement, constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and

conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to Buyer or an Affiliate of Buyer of the Assigned Agreements have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assigned Agreements, and such Assigned Agreements shall remain in full force and effect for the benefit of Buyer. Each non-Debtor counterparty to the Assigned Agreements shall be forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors or Buyer or their respective property any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing Date or arising by reason of the Closing, including any breach related to or arising out of change-in-control in such Assigned Agreements, or any purported written or oral modification to the Assigned Agreements and (b) asserting against Buyer (or its property, including the Acquired Assets) any claim, counterclaim, defense, breach, condition, setoff asserted or capable of being asserted against the Debtors existing as of the Closing Date or arising by reason of the Closing except for the Assumed Liabilities.

24.     Upon the Closing and the payment of the relevant Cure Costs, Buyer shall be deemed to be substituted for the Debtors as a party to the applicable Assigned Agreements and the Debtors shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assigned Agreements. There shall be no assignment fees, increases or any other fees charged to Buyer or the Debtors as a result of the assumption and assignment of the Assigned Agreements.

25.     Each non-Debtor party to an Assigned Agreement is forever barred, estopped and permanently enjoined from asserting against Buyer, or its property (including without limitation

the Acquired Assets), any default existing as of the date of the Sale Hearing, or any counterclaim, defense, setoff or other claim asserted or capable of being asserted against the Debtors. Other than the Assigned Agreements, Buyer assumed none of the Debtors' other contracts or leases and shall have no liability whatsoever thereunder.

26.     The assignments of each of the Assigned Agreements are made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

### Other Provisions

27.     In connection with the Closing of the Transactions, the Cash Consideration from the Sale[, less the Break Up Fee paid to Buyer pursuant to the terms of the APA (the "**Net Cash Consideration**")][5], shall be paid directly by the Successful Bidder to the First Lien Agent (as defined in the *Interim Order (I) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; (III) Authorizing Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. § 364 and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(B)* [Docket No. ____], entered on _____, 2011, and the *Final Order (I) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 and (III) Authorizing Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. § 364* [Docket No. ____], entered on ____, 2011, and any amendments to each of the foregoing (collectively, the "**DIP Order**")) on the Closing Date for distribution to the First Lien Claimholders (as defined in the DIP Order), except that:

---

[5] NTD: This provision will be included/excluded after the Successful Bidder is determined.

(i)     $[•] shall be funded into a segregated escrow account to pay the applicable Debtors' Cure Costs in accordance with the APA (the "**Cure Account**");

(ii)    $[•] (the "**Canadian Cash Consideration**"), constituting the portion of the [Net][6] Cash Consideration allocated by the Bankruptcy Court to the Acquired Assets of Graceway Canada Company ("**Graceway Canada**") less any Cure Costs required to be paid by Graceway Canada in accordance with the APA, shall be paid directly to the Receiver from Graceway Canada's payment of its creditors and equity holders in accordance with applicable law;

(iii)   the sum of the outstanding principal amount and all capitalized or accrued interest thereon under the $6,000,000 postpetition intercompany term loans authorized pursuant to the DIP Order from Graceway Canada to Graceway Pharmaceuticals, LLC (the "**Intercompany Loan Balance**") shall be paid to Graceway Canada;

(iv)    solely to pay the Sale Transaction Fee due and owing to Lazard Freres & Co. LLC ("**Lazard**") as defined in and pursuant to the terms of that certain engagement letter, dated March 12, 2010, between Lazard and Graceway Pharmaceuticals, LLC (the "**Success Fee**"), an amount equal to the Success Fee shall be paid directly by the Successful Bidder to Lazard on the Closing Date if permitted by the Bankruptcy Court or, if not so permitted on the Closing Date deposited into a segregated interest bearing account (the "**Lazard Account**") to be maintained at, and at all times under the control of, the First Lien Agent pending approval by the Bankruptcy Court of the Success Fee for distribution to Lazard;

(v)     only after the Intercompany Loan Balance shall be paid to Graceway Canada in accordance with sub-clause (iii) above, an amount equal to(A) $[•] *plus* (B) any unpaid amounts incurred and earned prior to the Closing Date under each of the Debtors' Professionals Carve-Out Cap and the Committee Professionals Carve-Out Cap (each as defined in the DIP Order) (including, without limitation, any unbilled amounts) *minus* (C) the sum of (1) any Cash Collateral (as defined in the DIP Order), (2) the amount of all retainers, if any, held by professionals retained by the Debtors and/or Graceway Canada and not applied prior to the closing of the sale and (3) $2,616,007 (or $0 if the amount of Cash Collateral on hand immediately prior to the closing of the sale, *plus* the amount of all such retainers, *plus* $2,616,007 is greater than or equal to $[•] *plus* any unpaid amounts incurred and earned prior to the Closing Date under each of the Debtors' Professionals Carve-Out Cap and the Committee Professionals Carve-Out Cap (including, without limitation, any unbilled amounts)) shall be deposited into a separate interest bearing account (the "**Designated Account**") to be maintained at, and all times under the control of, the First Lien Agent for purposes of funding any shortfall with respect to (X) the Carve-Out (as defined in the DIP Order) (less the

---

[6] NTD: This word will be included/excluded after the Successful Bidder is determined.

amount of the Success Fee) and (Y) solely to the extent a Carve-Out Trigger Notice (as defined in the DIP Order) has not been delivered or a plan of reorganization or liquidation in the Bankruptcy Case is confirmed, distributions on account of (I) allowed priority claims and allowed administrative claims (including, without limitation, claims arising under Section 503(b)(9) of the Bankruptcy Code) not to exceed in the aggregate $[•] (excluding any amounts approved under Section 330 of the Bankruptcy Code to the extent of the Carve-Out) and (II) allowed prepetition claims authorized to be paid by the Bankruptcy Court pursuant to the orders approving those certain documents, motions and pleadings, filed by the Debtors with the Bankruptcy Court on the Petition Date (as defined in the DIP Order), pursuant to which the Debtors sought authorization to pay the prepetition obligations specifically described therein or any motions filed by the Debtors after the Petition Date consented to by the Approving Majority First Lien Lenders (as defined in the DIP Order) that seek authorization to pay the prepetition obligations specifically described therein (the "**Prepetition Claims Motions**") and not paid as of the Closing Date, not to exceed in the aggregate $[•]; provided, however, that nothing contained herein shall be construed as prohibiting the Debtors from paying any allowed prepetition claims authorized to be paid by the Bankruptcy Court pursuant to the orders approving the Prepetition Claims Motions, allowed priority claims and allowed administrative claims, in each case, incurred in the ordinary course of business prior to delivery of a Carve-Out Trigger Notice;

(vi)    an amount equal to one percent (1.0%) of the portion of the [Net] Cash Consideration allocated to the Acquired Assets of the Debtors in accordance with the procedures set forth in the Sale Motion net of the sum of (A) the amount equal to the Intercompany Loan Balance, (B) any Cure Costs required to be paid in accordance with the APA and (C) the Canadian Cash Consideration, shall be deposited into a separate interest bearing account (the "**1.0% Holdback Account**") to be maintained at, and at all times under the control of, the First Lien Agent; and

(vii)    an amount equal to $2,616,007 less (A) the amount of all severance and liabilities under the provisions of the Consolidated Omnibus Budget Reconciliation Act, as set forth in Section 4980B of the Code, or any other similar state law ("**COBRA**") paid by the Debtors during the period from and including the Petition Date to and including the Closing Date and (B) any amounts paid during the period from and including the Petition Date to and including the Closing Date to the Debtors' employees on account of vacation, personal and sick days, holidays and permitted time off for service on a jury, service in the military or bereavement, in each case, under the Debtors' paid time off plans existing during the period from and including the Petition Date to and including the Closing Date (it being understood that the amounts described in subclauses (A) and (B) of this clause shall not in the aggregate exceed $2,616,007) shall be deposited into a separate interest bearing account (the "**Employee Account**" and, together with the Cure Account, Lazard Account, Designated Account and 1.0% Holdback Account, the "**Reserve Accounts**") to be maintained at, and all times under the control of, the First Lien

Agent for purposes of funding the Debtors' severance and COBRA liabilities budgeted for under the DIP Order.

Any contingent payments under the APA not yet due and payable on the Closing Date shall be paid by the Successful Bidder as and when they become due and payable following the Closing Date directly to the First Lien Agent for distribution to the First Lien Claimholders

28.     Without limiting any provision hereunder, it is hereby acknowledged and agreed that (i) the liens of the First Lien Agent, for the benefit of the First Lien Claimholders and other secured creditors, if any, shall attach in the same priority and to the same extent as existed on the Acquired Assets prior to the consummation of the transactions contemplated by the APA to each of the Reserve Accounts (provided, that distributions, if any, of the funds in such Reserve Accounts in accordance with paragraph 26 shall be distributed free and clear of any liens, claims, interests or encumbrances of the First Lien Agent or any liens, claims, interests or encumbrances junior in priority thereto), and (ii) to the extent any such funds (and any interest accruing thereon) remain in such segregated interest bearing Reserve Accounts (other than the 1% Holdback Account) after the final payment of all amounts for which such funds are designed (as specified herein), any such excess funds shall be paid to the First Lien Agent for prompt distribution to the First Lien Claimholders.  Notwithstanding anything to the contrary in this Order, the funds in the 1.0% Holdback Account shall be distributed to the First Lien Administrative Agent for prompt distribution to the First Lien Lenders upon the earlier of the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases and [July 31, 2012].

29.     The requirements set forth in Bankruptcy Rules 6003(b), 6004 and 6006 and Local Bankruptcy Rules 6004-1 and 9013-1 have been satisfied or otherwise deemed waived.

30. Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence, provided however that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

31. Notwithstanding anything to the contrary contained in the APA, the Acquired Assets shall not include any causes of action concerning directors' and officers' liability. In addition to the foregoing, neither the APA, nor this Order shall transfer to Buyer any avoidance claims or causes of action under the Bankruptcy Code or applicable law, including all such rights and avoidance actions of the Debtors' estates arising under chapter 5 of the Bankruptcy Code.

32. This Order is binding upon and inures to the benefit of any successors and assigns of the Debtors or Buyer, including any trustee appointed in any subsequent case of the Debtors under chapter 7 of the Bankruptcy Code.

33. The provisions of this Order and the APA are non-severable and mutually dependent.

34. The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

35. The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors

to Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Transactions. This Court retains jurisdiction to compel delivery of the Acquired Assets, to protect Buyer and its assets, including the Acquired Assets, against any Claims and Successor and Transferee Liability and to enter orders, as appropriate, pursuant to sections 105, 363 or 365 (or other applicable provisions) of the Bankruptcy Code necessary to transfer the Acquired Assets and the Assigned Agreements to Buyer.

36.     As provided by Bankruptcy Rules 7062 and 9014, the terms and conditions of this Order shall be effective immediately upon entry and shall not be subject to the stay provisions contained in Bankruptcy Rules 6004(h) and 6006(d). Time is of the essence in closing the sale and the Debtors and Buyer intend to close the sale as soon as possible. Therefore, any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay or risk their appeal being foreclosed as moot.

37.     This Order and the APA shall be binding in all respects upon all creditors of (whether known or unknown), and holders of equity interests in, any Debtor, any holders of Claims in, against or on all or any portion of the Acquired Assets, all non-Debtor counterparties to the Assigned Agreements, all successors and assigns of Buyer, the Debtors and their affiliates and subsidiaries and any subsequent trustees appointed in these chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code, and shall not be subject to rejection. Nothing contained in any chapter 11 plan confirmed in these chapter 11 cases, any order confirming any such chapter 11 plan or any order approving wind-down or dismissal of these chapter 11 cases or any subsequent chapter 7 cases shall conflict with or derogate from the provisions of the APA or this Order, and to the extent of any conflict or derogation between this

Order or the APA and such future plan or order, the terms of this Order and the APA shall control.

38.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

39.    To the extent any provisions of this Order conflict with, or are otherwise inconsistent with, the terms and conditions of the APA or the Bidding Procedures Order, this Order shall govern and control.

Dated: [_____] [•], 2011
      Wilmington, Delaware

 

_____

UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

## APA

**Exhibit E: Form of Escrow Agreement**

[Intentionally omitted; available upon request]

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This **ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Assignment Agreement") is made as of [●], 2011, by and among **GALDERMA S.A.**, a Switzerland corporation ("Buyer"), and **GRACEWAY PHARMACEUTICALS, LLC**, a Delaware limited liability company, and its Subsidiaries set forth on Annex A to the Asset Purchase Agreement (as defined below) (collectively, "US Sellers" and each individually a "US Seller"), and **GRACEWAY CANADA COMPANY**, a Nova Scotia unlimited liability company ("Canadian Seller" and collectively with US Sellers, "Sellers" and each individually a "Seller").

**WHEREAS**, Buyer and Sellers entered into that certain Asset Purchase Agreement, dated as of September [●], 2011 (the "Asset Purchase Agreement"); and

**WHEREAS**, pursuant to the Asset Purchase Agreement, Sellers have agreed to sell, convey, transfer, assign and deliver to Buyer all of Sellers' right, title and interest in, to and under the Acquired Assets, and Buyer has agreed to assume, timely perform and discharge in accordance with their respective terms, the Assumed Liabilities.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, it is hereby agreed that:

1.      Definitions.  Unless otherwise defined herein, all capitalized terms used in this Assignment Agreement shall have the meanings set forth in the Asset Purchase Agreement.

2.      Assignment of Acquired Assets.  Effective as of the Closing Date, Sellers hereby sell, convey, transfer, assign and deliver to Buyer all of Sellers' right, title and interest in, to and under the Acquired Assets, and Buyer hereby accepts such sale, conveyance, transfer, assignment and delivery from Sellers; *provided, however*, that the tangible Acquired Assets are being specifically assigned and transferred pursuant to the Bill of Sale and any other Acquired Assets that are specifically assigned or transferred pursuant to any other Transaction Document are being specifically assigned and transferred pursuant to such other Transaction Documents and, in each case, shall not be assigned or transferred pursuant to this Section 2.

3.      Assumption of Assumed Liabilities.  Effective as of the Closing Date, Buyer hereby assumes, accepts and agrees to timely perform and discharge in accordance with their respective terms any and all of the Assumed Liabilities; *provided, however*, that any Assumed Liabilities that are specifically assumed by Buyer pursuant to any other Transaction Document shall not be assumed pursuant to this Section 3.

4.      Subject to the Asset Purchase Agreement.  This Assignment Agreement is subject in all respects to the terms and conditions of the Asset Purchase Agreement, and all of the representations, warranties, covenants and agreements of Sellers and Buyer contained therein, all of which shall survive the execution and delivery of this Assignment Agreement in accordance with the terms of the Asset Purchase Agreement.  Nothing in this Assignment Agreement shall supersede, amend, alter or modify (nor shall it be deemed or construed to supersede, amend, alter

or modify) any of the terms or conditions of the Asset Purchase Agreement in any manner whatsoever. In the event of any conflict between the provisions of this Assignment Agreement and the provisions of the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall control and prevail.

     5.    <u>Representations and Warranties</u>. Except as set forth in the Asset Purchase Agreement, Sellers make no representations or warranties, express or implied, with respect to the Acquired Assets or the Assumed Liabilities, and Sellers expressly disclaim any implied warranties.

     6.    <u>Assignment</u>. This Assignment Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party); provided, however, that Buyer shall be permitted, upon prior notice to Sellers, to assign all or part of its rights or obligations hereunder to an Affiliate, but no such assignment shall relieve Buyer of its obligations under this Assignment Agreement, and Sellers shall be permitted to assign all or part of their rights or obligations hereunder pursuant to a plan of reorganization or liquidation approved by the Bankruptcy Court.

     7.    <u>Parties in Interest; No Third Party Beneficiaries</u>. This Assignment Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This Assignment Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

     8.    <u>Counterparts</u>. This Assignment Agreement and any amendment hereto may be executed in one or more counterparts, each of which shall be deemed to be an original of this Assignment Agreement or such amendment and all of which, when taken together, shall be deemed to constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Assignment Agreement or any amendment hereto by telecopier, facsimile or email attachment shall be effective as delivery of a manually executed counterpart of this Assignment Agreement or such amendment, as applicable.

     9.    <u>Waiver</u>. Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Assignment Agreement or the documents referred to in this Assignment Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

     10.    <u>Entire Agreement; Amendment</u>. This Assignment Agreement and the other Transaction Documents supersede all prior agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to its subject matter and constitute a complete and

exclusive statement of the terms of the agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to their subject matter. This Assignment Agreement may not be amended except by a written agreement executed by all of the Parties.

11.    Severability. The provisions of this Assignment Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Assignment Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Assignment Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

12.    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code or the provisions of the CJA or other Laws applicable in the Canadian Proceedings apply, this Assignment Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Assignment Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Assignment Agreement, any breach or default hereunder, or the transactions contemplated hereby (except for such matters as must be dealt with by the Canadian Court in the Canadian Proceedings) and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; provided, however, that, if the Bankruptcy Case is closed, all Proceedings arising out of or relating to this Assignment Agreement shall be heard and determined in a Delaware state court or a federal court sitting in the State of Delaware, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding. The Parties consent to service of process by mail (in accordance with Section 12.2 of the Asset Purchase Agreement) or any other manner permitted by law.

(c)    THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS ASSIGNMENT AGREEMENT OR THE ACTIONS OF SELLERS OR BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

*SIGNATURE PAGES FOLLOW*

**IN WITNESS WHEREOF**, the parties hereto have caused this Assignment Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**GRACEWAY PHARMACEUTICALS, LLC**

By: _____
Name:
Title:

**GRACEWAY CANADA HOLDINGS, INC.**

By: _____
Name:
Title:

**GRACEWAY CANADA COMPANY**

By: _____
Name:
Title:

**GRACEWAY INTERNATIONAL, INC.**

By: _____
Name:
Title:

**CHESTER VALLEY HOLDINGS, LLC**

By: _____
Name:
Title:

**CHESTER VALLEY PHARMACEUTICALS, LLC**

By: _____
Name:
Title:

**GALDERMA S.A.**

By: _____
Name:
Title:

Court File No. ●

# ONTARIO
## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

| THE HONOURABLE ● | ) | ●, THE ● |
| | ) | |
| JUSTICE ● | ) | DAY OF ●, 2011 |

## IN THE MATTER OF THE RECEIVERSHIP OF GRACEWAY CANADA COMPANY

Applicant

## AND IN THE MATTER OF
## THE *COURTS OF JUSTICE ACT*, AS AMENDED

## SALE AND VESTING ORDER

THIS MOTION, made by RSM Richter Inc. in its capacity as the Court-appointed receiver (the "**Receiver**") of Graceway Canada Company (the "**Debtor**") appointed by Order of the Court dated ●, 2011 (the "**Receivership Order**"), for an order approving the sale transaction (the "**Transaction**") contemplated by an asset purchase agreement (the "**Asset Purchase Agreement**") among Galderma S.A., as the purchaser, the Debtor, Graceway Pharmaceuticals, LLC and its U.S. affiliates signatory thereto (collectively with Graceway Pharmaceuticals, LLC, the "**U.S. Sellers**") dated September ●, 2011, and vesting in the Purchaser the Debtor's right, title and interest in and to the Canadian Assets (as defined in the Asset Purchase Agreement), was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the ● Report of the Receiver dated ●, 2011 (the "**Report**"), **[and the affidavit of ● sworn on ●,]** and on hearing the submissions of counsel for the Receiver, the Debtor, the Purchaser and ●, no one appearing for any other person on the service list, although properly served as appears from the affidavit of ● sworn ●, 2011 filed:

\6005957

1.    THIS COURT ORDERS AND DECLARES that the Transaction (including the allocation of the Purchase Price (as defined in the Asset Purchase Agreement) as between the Debtor's estate and the estates of the U.S. Sellers) is hereby approved, the Receiver is hereby authorized and directed to conclude the Transaction on behalf of the Debtor, and the Receiver and the Debtor are hereby authorized and directed to take such additional steps and to execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Canadian Assets to ● (the "**Purchaser**").

2.    THIS COURT ORDERS AND DECLARES that upon the delivery of a Receiver's certificate to the Purchaser substantially in the form attached as Schedule A hereto (the "**Receiver's Certificate**"), all of the Debtor's right, title and interest in and to the Canadian Assets described in the Asset Purchase Agreement shall vest absolutely in the Purchaser, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "**Claims**") including, without limiting the generality of the foregoing:  (i) any encumbrances or charges created by the Receivership Order **[or the Bidding Procedures Order of this Court dated ●, 2011]**; and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system, but excluding the Permitted Encumbrances (as defined in the Asset Purchase Agreement) (all of which are collectively referred to as the "**Encumbrances**") and, for greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Canadian Assets are hereby expunged and discharged as against the Canadian Assets.

3.    THIS COURT ORDERS that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Canadian Assets shall stand in the place and stead of the Canadian Assets, and that from and after the delivery of the Receiver's Certificate all Claims and Encumbrances shall attach to the net proceeds from the sale of the Canadian Assets with the same priority as they had with respect to the Canadian Assets immediately prior to the sale, as if the Canadian Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

4.     THIS COURT ORDERS AND DIRECTS the Receiver to file with the Court a copy of the Receiver's Certificate, forthwith after delivery thereof.

5.     THIS COURT ORDERS that, notwithstanding:

    (a)     the pendency of these proceedings;

    (b)     any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of the Debtor and any bankruptcy order issued pursuant to any such applications; and

    (c)     any assignment in bankruptcy made in respect of the Debtor;

the vesting of the Canadian Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of the Debtor and shall not be void or voidable by creditors of the Debtor, nor shall it constitute nor be deemed to be a settlement, fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue, or other reviewable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

6.     THIS COURT ORDERS AND DECLARES that the Transaction is exempt from the application of the *Bulk Sales Act* (Ontario).

7.     THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States to give effect to this Order and to assist the Receiver and its agents in carrying out the terms of this Order.   All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Receiver, as an officer of this Court, as may be necessary or desirable to give effect to this Order or to assist the Receiver and its agents in carrying out the terms of this Order.

Court File No. ◉

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

**IN THE MATTER OF THE RECEIVERSHIP OF
GRACEWAY CANADA COMPANY**

Applicant

**AND IN THE MATTER OF
THE *COURTS OF JUSTICE ACT*, AS AMENDED**

**RECEIVER'S CERTIFICATE**

**RECITALS**

A.    Pursuant to an Order of the Honourable ◉ of the Ontario Superior Court of Justice (the "**Court**") dated ◉, 2011, RSM Richter Inc. was appointed as the receiver (the "**Receiver**") of Graceway Canada Company (the "**Debtor**").

B.    Pursuant to an Order of the Court dated ◉, 2011, the Court approved the asset purchase agreement made as of ◉, 2011 (the "**Asset Purchase Agreement**") among Galderma S.A., as the purchaser, the Debtor, Graceway Pharmaceuticals, LLC and its U.S. affiliates signatory thereto and provided for the vesting in ◉ (the "**Purchaser**") of the Debtor's right, title and interest in and to the Canadian Assets, which vesting is to be effective with respect to the Canadian Assets upon the delivery by the Receiver to the Purchaser of a certificate confirming (i) the payment by the Purchaser of the Purchase Price for the Canadian Assets; (ii) that the conditions to Closing as set out in section ◉ of the Asset Purchase Agreement have been satisfied or waived by the Receiver and the Purchaser; and (iii) the Transaction has been completed to the satisfaction of the Receiver.

C.    Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Asset Purchase Agreement.

THE RECEIVER CERTIFIES the following:

1.      The Purchaser has paid and the Receiver has received the Purchase Price for the Canadian Assets payable on the Closing Date pursuant to the Asset Purchase Agreement;

2.      The conditions to Closing as set out in section ⬤ of the Asset Purchase Agreement have been satisfied or waived by the Receiver and the Purchaser; and

3.      The Transaction has been completed to the satisfaction of the Receiver.

4.      This Certificate was delivered by the Receiver at ⬤ on ⬤, 2011.

**RSM Richter Inc., in its capacity as Receiver of Graceway Canada Company, and not in its personal capacity**

Per: _____

     Name:

     Title:

## U.S. TRADEMARK ASSIGNMENT

This U.S. TRADEMARK ASSIGNMENT, dated as of _____, 2011 (the "Assignment"), is made by and between Graceway Pharmaceuticals, LLC, a Delaware limited liability company ("Assignor"), and Galderma S.A., a Switzerland corporation ("Assignee").

WHEREAS, Assignee, Assignor, Graceway Canada Company and certain Subsidiaries of Assignor are parties to the Asset Purchase Agreement, dated as of September __, 2011 ("Purchase Agreement"), providing for the execution and delivery of this Assignment (capitalized terms used herein without definition shall have the meanings set forth in the Purchase Agreement);

WHEREAS, Assignor is the sole and exclusive owner of the marks set forth on Exhibit A and incorporated by reference herein, which are registered, or for which application for registration has been filed, in the United States Patent and Trademark Office (collectively, the "Assigned Marks"); and

WHEREAS, Assignee desires to purchase and acquire all of Assignor's right, title and interest in and to the Assigned Marks together with the goodwill of the Business symbolized by the Assigned Marks, which is ongoing.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

1.      Assignment.  Assignor does hereby sell, transfer, assign, convey and deliver to Assignee all of Assignor's right, title and interest in and to the Assigned Marks together with the goodwill of the Business symbolized by the Assigned Marks, including without limitation all of the rights in damages for past, present and future infringements of the Assigned Marks.

2.      Recordation.  Assignor authorizes and requests the Commissioner of Patents and Trademarks of the United States to record ownership of the Assigned Marks as the property of Assignee.

3.      Governing Law.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

4.      Further Action.  From time to time after the date hereof, and for no further consideration, Assignor and Assignee shall execute, acknowledge and deliver such

assignments, transfers, consents, assumptions and other documents and instruments and take such other actions as may reasonably be necessary to consummate the transactions contemplated hereby.

5. <u>Counterparts</u>. This Assignment may be executed simultaneously in one or more counterparts (including by facsimile or electronic .pdf submission), and by the different parties in separate counterparts, each of which when executed shall be deemed to be an original, but all of which shall constitute one and the same agreement.

*[Signature Page Follows.]*

2

IN WITNESS WHEREOF, the parties hereof have caused this Assignment to be executed as of the date first written above by their respective officers thereunto duly authorized.

ASSIGNOR:

GRACEWAY PHARMACEUTICALS, LLC

By: _____
Name: _____
Title: _____


## ACKNOWLEDGMENT

STATE OF NEW YORK        )
                                        :SS:
COUNTY OF                      )

    On _____ , 2011        before me, the undersigned, personally appeared
_____
personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


                                               _____
                                             (signature and office of individual taking acknowledgment)

ASSIGNEE:

GALDERMA S.A.

By: _____
Name: _____
Title: _____

## ACKNOWLEDGMENT

STATE OF NEW YORK    )
                           :SS:
COUNTY OF              )

On     , 2011    before me, the undersigned, personally appeared

_____

personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
(signature and office of individual
taking acknowledgment)

EXHIBIT A

Assigned Marks

[TO COME]

**EXHIBIT I**

## U.S. PATENT ASSIGNMENT

This U.S. PATENT ASSIGNMENT, dated as of _____, 2011 (the "Assignment"), is made by and between Graceway Pharmaceuticals, LLC, a Delaware limited liability company ("Assignor"), and Galderma S.A., a Switzerland corporation ("Assignee").

WHEREAS, Assignee, Assignor, Graceway Canada Company and certain Subsidiaries of Assignor are parties to the Asset Purchase Agreement, dated as of September __, 2011 ("Purchase Agreement"), providing for the execution and delivery of this Assignment (capitalized terms used herein without definition shall have the meanings set forth in the Purchase Agreement);

WHEREAS, Assignor is the sole and exclusive owner of the patents and patent applications set forth on Exhibit A and incorporated by reference herein, which have been issued, or for which application has been filed, in the United States Patent and Trademark Office (collectively, the "Assigned Patents"); and

WHEREAS, Assignee desires to purchase and acquire all of Assignor's right, title and interest in and to the Assigned Patents.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

1.    Assignment.  Assignor does hereby sell, transfer, assign, convey and deliver to Assignee all of Assignor's right, title and interest in and to the Assigned Patents, including without limitation all of the rights in damages for past, present and future infringements of the Assigned Patents.

2.    Recordation.  Assignor authorizes and requests the Commissioner of Patents and Trademarks of the United States to record ownership of the Assigned Patents as the property of Assignee.

3.    Governing Law.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

4.    Further Action.  From time to time after the date hereof, and for no further consideration, Assignor and Assignee shall execute, acknowledge and deliver such assignments, transfers, consents, assumptions and other documents and instruments and

take such other actions as may reasonably be necessary to consummate the transactions contemplated hereby.

5. <u>Counterparts</u>. This Assignment may be executed simultaneously in one or more counterparts (including by facsimile or electronic .pdf submission), and by the different parties in separate counterparts, each of which when executed shall be deemed to be an original, but all of which shall constitute one and the same agreement.

*[Signature Page Follows.]*

2

IN WITNESS WHEREOF, the parties hereof have caused this Assignment to be executed as of the date first written above by their respective officers thereunto duly authorized.

ASSIGNOR:

GRACEWAY PHARMACEUTICALS, LLC

By: _____
Name: _____
Title: _____

## ACKNOWLEDGMENT

STATE OF NEW YORK     )
                      :SS:
COUNTY OF            )

     On       , 2011     before me, the undersigned, personally appeared
_____
personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
(signature and office of individual
taking acknowledgment)

ASSIGNEE:

GALDERMA S.A.

By: _____

Name: _____

Title: _____

## ACKNOWLEDGMENT

STATE OF NEW YORK    )

                            :SS:

COUNTY OF          )

     On      , 2011    before me, the undersigned, personally appeared

_____

personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____

(signature and office of individual taking acknowledgment)

EXHIBIT A

Assigned Patents

[TO COME]

**Exhibit B**

Interim Cash Collateral Order

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>GRACEWAY PHARMACEUTICALS, LLC, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 11-_____ (____)<br><br>Joint Administration Requested<br><br>Related Docket No. |

## INTERIM ORDER (I) AUTHORIZING DEBTORS TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364; (III) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. § 364 AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

### ("*Interim DIP Order*")

Upon the motion, dated September 29, 2011, (the "*DIP Motion*"), of Graceway Pharma

Holding Corp. ("*Parent*"), Graceway Holdings, LLC ("*Holdings*"), Graceway Pharmaceuticals,

LLC (the "*Borrower*"), and the other debtors in possession (collectively, the "*Debtors*") in the

above-referenced Chapter 11 cases (the "*Chapter 11 Cases*" and each of the Chapter 11 Cases

upon either appointment of any trustee or any other estate representative or conversion to a case

under Chapter 7 of the Bankruptcy Code (as defined below) and any other proceedings related to

the Chapter 11 Cases, a "*Successor Case*"), seeking entry of an interim order (this "*Interim

Order*") pursuant to Sections 105, 361, 362, 363, 364(c)(1), 364(c)(3), 364(d)(1), 364(e), 507

and 552 of Chapter 11 of title 11 of the United States Code (as amended, the "*Bankruptcy

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Graceway Pharma Holding Corp., a Delaware corporation (9175); Graceway Holdings, LLC, a Delaware limited liability company (2502); Graceway Pharmaceuticals, LLC, a Delaware limited liability company (5385); Chester Valley Holdings, LLC, a Delaware limited liability company (9457); Chester Valley Pharmaceuticals, LLC, a Delaware limited liability company (3713); Graceway Canada Holdings, Inc., a Delaware corporation (6663); and Graceway International, Inc., a Delaware corporation (2399). The mailing address for Graceway Pharmaceuticals, LLC is 340 Martin Luther King Jr. Blvd., Suite 500, Bristol, TN 37620.

*Code*"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*) and Rules 2002-1 and 4001-2 of the Local Bankruptcy Rules for the District of Delaware (the *"Local Rules"*), that, among other things:

       (i)     authorizes the Debtors to use Prepetition Collateral (as defined below), including, without limitation, "cash collateral," as such term is defined in Section 363 of the Bankruptcy Code (the *"Cash Collateral"*), in which the Prepetition Secured Parties (as defined below) have a Lien or other interest, whether existing on the Petition Date (as defined below), arising pursuant to this Interim Order or otherwise;

       (ii)    authorizes the Borrower to obtain, and authorizes each of the other Debtors (other than Parent) unconditionally to guarantee, jointly and severally, the Borrower's obligations in respect of, senior secured postpetition financing, which if approved would consist of $6,000,000 in aggregate principal amount of intercompany term loans (the *"Intercompany Loan"*) from Graceway Canada Company (*"Graceway Canada"* and in its capacity as lender under the Intercompany Loan, the *"Postpetition Lender"*) to the Borrower;

       (iii)   grants, as of the Petition Date and in accordance with the relative priorities set forth herein, the Prepetition Secured Parties' Adequate Protection (as defined below);

       (iv)   authorizes the Borrower and each of the other Debtors to grant to the Postpetition Lender the DIP Protections (as defined below);

       (v)    modifies the automatic stay imposed by Section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and subject in all respects to the Debtors' rights under paragraph 14 herein;

       (vi)   schedules a final hearing on the DIP Motion to be held within thirty-five (35) days after the Petition Date (the *"Final Hearing"*) to consider entry of a final order

2

acceptable in form and substance to the First Lien Agent (as defined below) and Majority First Lien Lenders (as defined below), which grants all of the relief requested in the DIP Motion on a final basis (the "*Final Order*"); and

(vii)    waives any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of this Interim Order.

Having considered the DIP Motion, the *Declaration of Gregory C. Jones in Support of Chapter 11 Petitions and First Day Motions* (the "*First Day Declaration*") and the evidence submitted or proffered at the hearing to consider the entry of this Interim Order (the "*Interim Hearing*"); and in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d) and 9014 and Local Rules 4001-2 and 2002-1, notice of the DIP Motion and the Interim Hearing having been provided in a sufficient manner; an Interim Hearing having been held and concluded on September 30, 2011; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and all parties in interest, and is essential for the continued operation of the Debtors' business; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED[2], that:**

A.    **Petition Date**.  On September 29, 2011, (the "*Petition Date*"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (this "*Court*").  The Debtors have continued in the management and operation of their business and properties as debtors-in-

---

[2]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

CH\1291774.22

possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No statutory committee of unsecured creditors (to the extent such committee is appointed, the "*Committee*"), trustee, or examiner has been appointed in the Chapter 11 Cases.

B. **Jurisdiction and Venue**. This Court has core jurisdiction over the Chapter 11 Cases, the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are Sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Rules 2002-1 and 4001-2.

C. **Notice**. The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001 and Local Rule 4001-2(b). Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, on September 29, 2011, to certain parties in interest, including: (i) the Office of the United States Trustee for the District of Delaware, (ii) the Internal Revenue Service, (iii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis, (iv) the First Lien Agent (as defined below), (v) financial counsel and special restructuring and bankruptcy counsel to the First Lien Agent, (vi) the Second Lien Agent (as defined below), (vii) counsel to the Second Lien Agent, (viii) counsel to the administrative agent for the lenders under the Debtors' prepetition unsecured mezzanine credit facility, (ix) the United States Food and Drug Administration, (x) any entity with an interest in the Adequate Protection Collateral (as defined below) known to the Debtors and (xi) all parties requesting notice pursuant to Bankruptcy Rule 2002. The aforementioned notices are appropriate under the circumstances, and no other or further notice of

4

the DIP Motion, the relief requested therein and the Interim Hearing is required for entry of this Interim Order.

**D.** **Debtors' Stipulations Regarding the Prepetition Secured Credit Facilities.** Without prejudice to the rights of parties in interest to the extent set forth in paragraph 7 below, the Debtors admit, stipulate, acknowledge and agree (paragraphs D(i) through D(ix) hereof shall be referred to herein collectively as the "***Debtors' Stipulations***") as follows:

(i) <u>First Lien Credit Facility</u>. Pursuant to that certain First Lien Credit Agreement dated as of May 3, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "***First Lien Credit Agreement***"), among, *inter alia*, Holdings, the Borrower, the lenders party thereto (collectively, the "***First Lien Lenders***"), and Bank of America, N.A. ("***BofA***"), as administrative agent for the First Lien Lenders and collateral agent for the First Lien Claimholders (as defined in the Intercreditor Agreement (as defined below), without giving effect to any cap provided for therein) (BofA, in such capacity, the "***First Lien Agent***"), Swing Line Lender and L/C Issuer, the First Lien Agent, the First Lien Lenders, the Swing Line Lender and the L/C Issuer agreed to extend certain loans to, and issue letters of credit for the account of, the Borrower. The First Lien Credit Agreement, along with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the First Lien Credit Documents (as defined in the Intercreditor Agreement), are collectively referred to herein as the "***First Lien Documents***" (as the same may be amended, restated, supplemented or otherwise modified from time to time). All obligations of the Debtors arising under the First Lien Credit Agreement, together with any other First Lien Obligations (as defined in the Intercreditor Agreement without giving effect to any cap provided for therein), shall collectively be referred to herein as the "***First Lien Obligations***."

5

(ii)     Second Lien Credit Facility.  Pursuant to that certain Second Lien Credit Agreement dated as of May 3, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "*Second Lien Credit Agreement*"), among, *inter alia*, Holdings, the Borrower, the lenders party thereto (collectively, the "*Second Lien Lenders*") and Deutsche Bank Trust Company Americas ("*DB*"), as administrative agent for the Second Lien Lenders and collateral agent for the Second Lien Claimholders (as defined in the Intercreditor Agreement) (the Second Lien Claimholders and First Lien Claimholders collectively, the "*Prepetition Secured Parties*") (DB, in such capacity, the "*Second Lien Agent*"), the Second Lien Agent and the Second Lien Lenders agreed to extend certain loans to the Borrower.  The Second Lien Credit Agreement, along with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the Second Lien Credit Documents (as defined in the Intercreditor Agreement), are collectively referred to herein as the "*Second Lien Documents*" (as the same may be amended, restated, supplemented or otherwise modified from time to time).  All obligations of the Debtors arising under the Second Lien Credit Agreement, together with any other Second Lien Obligations (as defined in the Intercreditor Agreement), shall collectively be referred to herein as the "*Second Lien Obligations*" and, together with the First Lien Obligations, the "*Prepetition Obligations*."

(iii)     First Priority Liens and First Lien Collateral.  Pursuant to the Collateral Documents (as such documents are amended, restated, supplemented or otherwise modified from time to time, the "*First Lien Collateral Documents*"), by and between each of the Debtors (other than Parent) and the First Lien Agent, each Debtor (other than Parent) granted to the First Lien Agent, for the benefit of the First Lien Claimholders, to secure the First Lien Obligations, a valid, binding, enforceable and perfected first priority continuing security interest in substantially

6

all of such Debtor's assets and property (which for the avoidance of doubt includes Cash Collateral) and all proceeds thereof, collateral therefor, income, royalties and other payments due and payable with respect thereto and supporting obligations relating thereto, in each case whether then owned or existing or thereafter acquired or arising (the "*First Priority Liens*"). All collateral granted or pledged by the Debtors (other than Parent) pursuant to any First Lien Collateral Document or any other First Lien Document, including, without limitation, the Collateral (as defined in the First Liens Credit Agreement), and all prepetition and postpetition proceeds thereof shall collectively be referred to herein as the "*First Lien Collateral*."

   (iv) <u>Second Priority Liens and Second Lien Collateral</u>. Pursuant to the Collateral Documents (as defined in the Second Lien Credit Agreement) (as such documents are amended, restated, supplemented or otherwise modified from time to time, the "*Second Lien Collateral Documents*"), by and between each of the Debtors (other than Parent) and the Second Lien Agent, each Debtor (other than Parent) granted to the Second Lien Agent, for the benefit of the Second Lien Claimholders, to secure the Second Lien Obligations, a valid, binding, enforceable and perfected second priority continuing security interest in substantially all of such Debtor's assets and property (which for the avoidance of doubt includes Cash Collateral) and all proceeds thereof, collateral therefor, income, royalties and other payments due and payable with respect thereto and supporting obligations relating thereto, in each case whether then owned or existing or thereafter acquired or arising (the "*Second Priority Liens*" and, together with the First Priority Liens, the "*Prepetition Liens*"). All collateral granted or pledged by the Debtors (other than Parent) pursuant to any Second Lien Collateral Document or any other Second Lien Document, including, without limitation, the Collateral (as defined in the Second Lien Credit Agreement), and all prepetition and postpetition proceeds thereof shall collectively be referred to

herein as the "*Second Lien Collateral*" and, together with the First Lien Collateral, the "*Prepetition Collateral*."

      (v)   <u>Intercreditor Agreement</u>.  Pursuant to the Intercreditor Agreement, dated as of May 3, 2007 (the "*Intercreditor Agreement*" and, together with the First Lien Documents and the Second Lien Documents, the "*Prepetition Documents*"), among Holdings, the Borrower, the First Lien Agent, the Second Lien Agent and BofA as Control Agent, the Second Priority Liens are subject and subordinate on the terms contained in the Intercreditor Agreement to the First Priority Liens.

      (vi)   <u>First Priority Liens and First Lien Obligations</u>.  (I) The First Priority Liens (a) are valid, binding, enforceable, and perfected Liens that have attached to the First Lien Collateral, (b) were granted to, or for the benefit of, the First Lien Claimholders, as applicable, for fair consideration and reasonably equivalent value, (c) are not subject to avoidance, recharacterization, or subordination or other legal or equitable relief adversely affecting the First Priority Liens, in each case, pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein) and (d) are subject and subordinate in all respects only to (A) the DIP Liens (as defined below), (B) the Carve-Out (as defined below) and (C) the Prepetition Prior Liens (as defined below) and (II) (w) the First Lien Obligations constitute legal, valid and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable First Lien Documents (other than in respect of the stay of enforcement arising from Section 362 of the Bankruptcy Code), (x) no setoffs, recoupments, offsets, defenses or counterclaims to any of the First Lien Obligations exist, (y) no portion of the First Lien Obligations or any payments made to any or all of the First Lien Claimholders is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or

any other "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law and (z) the Guaranty of each Guarantor continues in full force and effect notwithstanding any use of the Prepetition Collateral, including, without limitation the Cash Collateral, permitted hereunder, or the Intercompany Loan.

(vii) <u>Second Priority Liens and Second Lien Obligations</u>. (I) The Second Priority Liens (a) are valid, binding, enforceable, and perfected Liens that have attached to the Second Lien Collateral, (b) were granted to, or for the benefit of, the Second Lien Claimholders, as applicable, for fair consideration and reasonably equivalent value, (c) are not subject to avoidance, recharacterization, or subordination or other legal or equitable relief adversely affecting the First Priority Liens, in each case, pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein) and (d) are subject and subordinate in all respects only to (A) the DIP Liens, (B) the Carve-Out, (C) the Prepetition Prior Liens (as defined below) and (D) the First Priority Liens (pursuant to the terms of the Intercreditor Agreement), and (II) (w) the Second Lien Obligations constitute legal, valid and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Second Lien Documents (other than in respect of the stay of enforcement arising from Section 362 of the Bankruptcy Code), (x) no setoffs, recoupments, offsets, defenses or counterclaims to any of the Second Lien Obligations exist, (y) no portion of the Second Lien Obligations or any payments made to any or all of the Second Lien Claimholders is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or any other "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law and (z) the Guaranty (as defined in the Second Lien Credit Agreement) of each Guarantor (as defined in the Second Lien Credit Agreement)

9

continues in full force and effect notwithstanding any use of the Prepetition Collateral, including, without limitation the Cash Collateral, permitted hereunder, or the Intercompany Loan.

(viii)    <u>Amounts Owed under Prepetition Documents</u>.  As of the Petition Date, the Debtors were truly and justly indebted (i) to the First Lien Claimholders pursuant to the First Lien Documents, without defense, counterclaim or offset of any kind, in respect of loans made and letters of credit issued by the First Lien Agent, the First Lien Lenders, the L/C Issuer and the Swing Line Lender in the aggregate principal amount of not less than $430,698,397.58, including, without limitation, an undrawn letter of credit in the amount of $350,000, *plus* all accrued or, subject to Section 506(b) of the Bankruptcy Code, hereafter accruing, and unpaid interest thereon, and any additional fees and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the First Lien Documents) now or hereafter due under the First Lien Credit Agreement and the other First Lien Documents and (ii) to the Second Lien Claimholders pursuant to the Second Lien Documents, without defense, counterclaim or offset of any kind, in respect of loans made by the Second Lien Agent and Second Lien Lenders in the aggregate principal amount of not less than $330,000,000, *plus* all accrued and unpaid interest thereon and any additional fees and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the Second Lien Documents), in each case, due under the Second Lien Credit Agreement and the other Second Lien Documents as of the Petition Date.

(ix)    <u>Release of Claims</u>.  Each Debtor and its estate shall be deemed to have forever waived, discharged, and released the First Lien Agent, First Lien Claimholders, the Second Lien Agent and the Second Lien Claimholders, together with their respective affiliates,

10

agents, attorneys, financial advisors, consultants, officers, directors, and employees (all of the foregoing, collectively, the "*Secured Party Releasees*") of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, setoff, recoupment, or other offset rights against any and all of the Secured Party Releasees, whether arising at law or in equity, with respect to the First Lien Obligations, First Priority Liens, Second Lien Obligations and Second Priority Liens, as applicable, including, without limitation, (I) any recharacterization, subordination, avoidance, or other claim arising under or pursuant to Section 105 or Chapter 5 of the Bankruptcy Code, or under any other similar provisions of applicable state or federal law, and (II) any right or basis to challenge or object to the amount, validity, or enforceability of the First Lien Obligations or Second Lien Obligations, as applicable, or the validity, enforceability, priority, perfection or non-avoidability of the First Priority Liens or Second Priority Liens, as applicable, securing the First Lien Obligations or Second Lien Obligations, as applicable.

E. **Need to Use the Prepetition Collateral (including, without limitation, the Cash Collateral) and to Obtain Intercompany Loan.**

(i) The Debtors have an immediate need to use the Prepetition Collateral, including, without limitation, the Cash Collateral, and obtain the Intercompany Loans, to, among other things, permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs. The Debtors' access to sufficient working capital and liquidity through the use of the Cash Collateral and borrowing the Intercompany Loan is of vital importance and in the best interest of the Debtors' estates.

(ii) As set forth in the DIP Motion and in the First Day Declaration in support thereof, the Debtors are unable to obtain financing on more favorable terms from a source other

11

than the Postpetition Lender. The Debtors are unable to obtain adequate unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under Sections 364(c) and (d) of the Bankruptcy Code without (i) granting to the Postpetition Lender the rights, remedies, privileges, benefits and protections provided herein, including, without limitation, the DIP Liens and the DIP Super-Priority Claims (as defined below, and together with the DIP Liens, the "*DIP Protections*") and (ii) providing the Prepetition Secured Parties the adequate protection more fully described in paragraph F below.

F. **Adequate Protection for Prepetition Secured Parties**. The First Lien Agent and certain First Lien Lenders holding a majority of the First Lien Obligations and that have consented to the use of the Prepetition Collateral, including, without limitation, the Cash Collateral (the "*Majority First Lien Lenders*"), have negotiated in good faith regarding the Debtors' use of the Prepetition Collateral, including, without limitation, the Cash Collateral, to fund the administration of the Debtors' estates and maintain the continued operation of their businesses. The First Lien Agent and Majority First Lien Lenders have agreed to permit the Debtors to use the Prepetition Collateral, including, without limitation, the Cash Collateral, for the period through the Cash Collateral Termination Date (as defined below), subject to the terms and conditions set forth herein. In addition, the Intercompany Loan contemplated hereby provides for a priming of the Prepetition Liens pursuant to Section 364(d) of the Bankruptcy Code. The Prepetition Secured Parties are entitled to the adequate protection set forth herein pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code for the Diminution in Value (as defined below) of the Prepetition Collateral. Based on the DIP Motion and on the record presented to this Court at the Interim Hearing, the terms of the proposed adequate protection

12

arrangements, the use of the Prepetition Collateral, including, without limitation, the Cash Collateral and the Intercompany Loan, in each case, contemplated hereby are fair and reasonable and reflect the Debtors' prudent exercise of business judgment.

G. **Limited Consent**. The consent of the First Lien Agent and Majority First Lien Lenders to (i) the priming of the First Priority Liens by the DIP Liens is limited to the financing presently before this Court, with Graceway Canada as lender, and shall not, and shall not be deemed to, extend to any other postpetition financing or to any modified version of the Intercompany Loan and (ii) the Debtors' use of the Prepetition Collateral, including, without limitation, the Cash Collateral, is limited to use of the Prepetition Collateral, including, without limitation, the Cash Collateral, pursuant to the terms of this Interim Order and shall not, and shall not be deemed to, extend to any other use of the Prepetition Collateral, including, without limitation, the Cash Collateral. Nothing in this Interim Order, including, without limitation, any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of the First Lien Agent or any First Lien Claimholder are or will be adequately protected with respect to any non-consensual postpetition financing or use of Prepetition Collateral, including, without limitation, the Cash Collateral.

H. **Section 552(b).** In light of the subordination of the Prepetition Liens to (i) in the case of the First Lien Claimholders, the Carve-Out and DIP Liens, and (ii) in the case of the Second Lien Claimholders, the Carve-Out, DIP Liens and Adequate Protection Replacement Liens (as defined below) granted to the First Lien Agent for the benefit of the First Lien Claimholders, each of the First Lien Claimholders and Second Lien Claimholders is entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply.

I.     **Business Judgment and Good Faith Pursuant to Section 364(e)**.  Based on the record presented to this Court by the Debtors, it appears that:

(i)     Graceway Canada has indicated a willingness to provide postpetition secured financing via the Intercompany Loan to the Borrower in accordance with this Interim Order.

(ii)    The terms and conditions of the Intercompany Loan pursuant to this Interim Order are fair, reasonable and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and consideration.

(iii)   The Intercompany Loan was negotiated in good faith among the Debtors and the Postpetition Lender and shall be deemed to have been extended by the Postpetition Lender for valid business purposes and uses and in good faith, as that term is used in Section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, and the DIP Liens and the DIP Super-Priority Claims shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event this Interim Order or any other order or any provision hereof or thereof is vacated, reversed, amended or modified, on appeal or otherwise.

J.     **Relief Essential; Best Interest**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001-2(b).  Absent granting the relief set forth in this Interim Order, the Debtors' estates and their ability successfully to operate their businesses will be immediately and irreparably harmed. Consummation of the Intercompany Loan and authorization of the use of Prepetition Collateral, including, without limitation, the Cash Collateral, in accordance with

14

this Interim Order is therefore in the best interests of the Debtors' estates and consistent with their fiduciary duties.

NOW, THEREFORE, on the DIP Motion and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the First Lien Agent, the Majority First Lien Lenders and the Postpetition Lender to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

IT IS ORDERED that:

1. **Motion Granted**. The DIP Motion is hereby granted in accordance with the terms and conditions set forth in this Interim Order. Any objections to the DIP Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

2. **Use of the Prepetition Collateral (including, without limitation, the Cash Collateral) and Authorization to Incur Intercompany Loan**. To enable the Debtors to continue to operate their business, during the period from the entry of this Interim Order through and including the date of entry of the Final Order (the "*Interim Period*"), the Debtors are hereby authorized to use the Prepetition Collateral, including, without limitation, the Cash Collateral, and the Borrower is hereby authorized to borrow and use the proceeds of the Intercompany Loan, in each case, only in accordance with the terms and conditions of this Interim Order, including, without limitation, the Approved Budget and Budget Covenants (in each case, as defined below). Following the expiration of the Interim Period, the Debtors' authority to use the Prepetition Collateral, including, without limitation, the Cash Collateral, and the Borrower's authority to use the proceeds of the Intercompany Loan will, in each case, be governed by the terms and

conditions of the Final Order, including, without limitation, the Approved Budget and Budget Covenants. Any amount repaid under the Intercompany Loan may not be reborrowed.

3.    **Approved Budget; Budget Covenants; Events of Default**.

(a)    Approved Budget. Attached hereto as Exhibit A is (i) a rolling weekly cash flow budget from and including the Petition Date through and including January 27, 2012 (the "***Pre-Sale Approved Budget***") and (ii) a rolling monthly cash flow budget from and including January 28, 2012 through and including June 30, 2012 (the "***Wind-Down Approved Budget***" and together with the Pre-Sale Approved Budget, the "***Approved Budget***"), in each case, (A) as may be amended or modified from time to time with the consent of the First Lien Agent and the Approving Majority First Lien Lenders (as defined below) and (B) reflecting on a line-item basis the Debtors' projected (1) aggregate cash receipts, (2) disbursements (including, without limitation, professional fees and capital expenditures) and (3) cash on hand (collectively, "***Aggregate Liquidity***"), in each case, on a weekly or monthly basis, as applicable; provided, that if (x) the Debtors shall have filed plans of reorganization or liquidation in the Chapter 11 Cases that are reasonably acceptable to the First Lien Agent and Approving Majority First Lien Lenders and the Court shall have entered an order approving the Debtors' disclosure statement in connection with such plans of reorganization or liquidation, in each case, on or before June 30, 2012 and (y) the Debtors are using reasonable best efforts to confirm such plans of reorganization or liquidation, the Wind-Down Approved Budget shall automatically be extended to include the period from and including June 30, 2012 to and including July 31, 2012; provided, however, that the Debtors shall be prohibited from using Prepetition Collateral, including, without limitation, Cash Collateral, pursuant to such extended Wind-Down Approved Budget in

16

excess of the amounts provided under the Wind-Down Approved Budget through and including June 30, 2012.

     (b)    <u>Budget Covenants</u>.

     (i)    From and including the Petition Date to and including January 27, 2012, for each 8-week period set forth in the Pre-Sale Approved Budget, tested weekly on a rolling basis by reference to the Pre-Sale Variance Report (as defined below), commencing with the 8-week period ending November 25, 2011, the aggregate disbursements (including, without limitation, professional fees (but excluding the First Lien Professional Fees (as defined below) and, if any, the Committee's professional fees permitted under the Pre-Sale Approved Budget and the amount budgeted therefor) and capital expenditures) by the Debtors shall not exceed one hundred fifteen percent (115%) of the aggregate amount of disbursements budgeted for each such 8-week period pursuant to the Pre-Sale Approved Budget. The Debtors shall provide to the Postpetition Lender, a duly appointed representative of Graceway Canada (the "*Canadian Representative*"), the First Lien Agent, the Second Lien Agent and the Committee, so as actually to be received on or prior to the Thursday following the end of each week, commencing with the Thursday following the fourth week after the Petition Date, a variance report (a "*Pre-Sale Variance Report*") certified by the chief executive officer, chief financial officer, treasurer, controller or general counsel of the Borrower (each an "*Authorized Officer*"), in form acceptable to the Postpetition Lender, the First Lien Agent and the Approving Majority First Lien Lenders, each, in their respective sole discretion, setting forth (A) the actual cash receipts and aggregate disbursements (including, without limitation, professional fees (including, without limitation, the First Lien Professional Fees and, if any, the Committee's professional fees permitted under the Pre-Sale Approved Budget) and capital expenditures) for such immediately preceding calendar

17

week and the Aggregate Liquidity as of the end of such calendar week (provided, however, that the initial Pre-Sale Variance Report provided by the Debtors in accordance with the terms of this Interim Order shall set forth actual cash receipts and aggregate disbursements (including, without limitation, professional fees (including, without limitation, the First Lien Professional Fees and, if any, the Committee's professional fees permitted under the Pre-Sale Approved Budget) and capital expenditures) for each immediately preceding calendar week since the Petition Date and the Aggregate Liquidity as of the end of each such calendar week) and (B) with respect to each 8-week period commencing with the 8-week period ending on the Friday of the eighth week after the Petition Date, the variance in dollar amounts and percentage terms of the actual aggregate disbursements (including, without limitation, professional fees (but excluding the First Lien Professional Fees and, if any, the Committee's professional fees permitted under the Pre-Sale Approved Budget and the amount budgeted therefor) and capital expenditures) from those reflected for the corresponding period in the Pre-Sale Approved Budget.

(ii)    From and including January 28, 2012 through and including June 30, 2012 (or, if the Wind-Down Approved Budget is extended in accordance with paragraph 3(a) above, July 31, 2012), for each period from January 28, 2012 through the end of each month thereafter set forth in the Wind-Down Approved Budget, tested at the end of each such month on a cumulative basis by reference to the Wind-Down Variance Report (as defined below) (it being understood that (I) the period from and including January 28, 2012 to and including January 31, 2012 shall be included in the period tested at the end of February 2012 and (II) an amount equal to the aggregate amount of all budgeted disbursements incurred but not paid during the 8-week period ending January 27, 2012 under the Pre-Sale Approved Budget (if any) shall be added to the "Corporate, Employee and Other Wind Down Expenses" line item in the Wind-Down

18

Approved Budget for the month of February 2012), the aggregate disbursements (including, without limitation, professional fees (but excluding the First Lien Professional Fees and, if any, the Committee's professional fees permitted under the Wind-Down Approved Budget and the amount budgeted therefor) and capital expenditures) by the Debtors shall not exceed one hundred ten percent (110%) of the aggregate amount of disbursements budgeted for each such cumulative period pursuant to the Wind-Down Approved Budget. The Debtors shall provide to the Postpetition Lender, the Canadian Representative, the First Lien Agent, the Second Lien Agent and the Committee, so as actually to be received on or prior to the fourth business day immediately following the end of each month, commencing with the fourth business day of March 2012, a variance report (a "*Wind-Down Variance Report*") certified by an Authorized Officer, in form acceptable to the Postpetition Lender, the First Lien Agent and the Approving Majority First Lien Lenders, each, in their respective sole discretion, setting forth (A) the actual cash receipts and aggregate disbursements (including, without limitation, professional fees (including, without limitation, the First Lien Professional Fees and, if any, the Committee's professional fees permitted under the Wind-Down Approved Budget) and capital expenditures) for such immediately preceding month and the Aggregate Liquidity as of the end of such immediately preceding month, and (B) with respect to each such cumulative period, the variance in dollar amounts and percentage terms of the actual aggregate disbursements (including, without limitation, professional fees (but excluding the First Lien Professional Fees and, if any, the Committee's professional fees permitted under the Wind-Down Approved Budget and the amount budgeted therefor) and capital expenditures) from those reflected for the corresponding period in the Wind-Down Approved Budget.

19

(iii)   The proceeds of the Intercompany Loan (subject to paragraph 5(a) below) and the Cash Collateral shall be used only as follows: (A) prior to the Cash Collateral Termination Date, solely for payment of the disbursements set forth in the Approved Budget subject to the terms and conditions of this Interim Order (including, without limitation, any variance permitted under this paragraph 3(b)) and (B) on or after the Cash Collateral Termination Date, solely (x) to fund (1) unpaid fees required to be paid in these Chapter 11 Cases to the clerk of this Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a), whether arising prior to or after the delivery of the Carve-Out Trigger Notice (as defined below), in an amount equal to $201,250, (2) any unpaid amounts incurred and earned prior to the occurrence of the Cash Collateral Termination Date under each of the Debtors' Professionals Carve-Out Cap (as defined below) and Committee Professionals Carve-Out Cap (as defined below) and (3) the Debtors' Professionals Post Carve-Out Cap (as defined below) and Committee Professionals Post Carve-Out Cap (as defined below) (the aggregate of such amounts in clauses (1), (2) and (3) above, the "*Maximum Carve-Out Amount*") (it being understood that such pre-funded unpaid fees required to be paid in these Chapter 11 Cases to the clerk of this Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a), the pre-funded amounts incurred and earned prior to the occurrence of the Cash Collateral Termination Date under each of the Debtors' Professionals Carve-Out Cap and Committee Professionals Carve-Out Cap and the pre-funded amounts in respect of the Debtors' Professionals Post Carve-Out Cap and Committee Professionals Post Carve-Out Cap shall be escrowed in accordance with paragraph 8(e) below and paid to the applicable retained professionals only if and when such amounts are incurred, earned and allowed by this Court under Sections 105(a), 330 and 331 of the Bankruptcy Code) and (y) to pay the First Lien Professional Fees.

20

The undertakings of the Debtors provided for in this paragraph 3(b) shall be collectively referred to herein as the "**_Budget Covenants_**."

(c)    Events of Default.  Subject to paragraph 14(b) below, upon the occurrence of any Event of Default (as defined below), the consensual Cash Collateral use arrangement contained in this Interim Order shall terminate automatically without any further notice or action (including, without limitation, further notice, motion or application to, order of or hearing before this Court) unless the occurrence of such Event of Default is waived in writing at any time by at least two First Lien Lenders holding in aggregate a majority of the then outstanding First Lien Obligations held by the Consenting First Lien Lenders (as defined in the Sale Support Agreement, dated as of September 28, 2011 (the "**_Sale Support Agreement_**"), entered by and among the Debtors, Graceway Canada and the First Lien Lenders from time to time party thereto) (the "**_Approving Majority First Lien Lenders_**").  Each of the following events shall constitute an event of default (collectively, the "**_Events of Default_**"):

(i)    the failure to obtain the entry by this Court of the Final Order on or within thirty-five (35) days after the Petition Date;

(ii)    on or prior to January 27, 2012, with respect to each of the following line items in the Pre-Sale Approved Budget, the payment by the Debtors of any disbursements in excess of the cumulative amount budgeted for each such line item in the Pre-Sale Approved Budget plus fifteen percent (15%) of the cumulative amount of disbursements with respect to such line item:  (i) "Payroll & Benefits", (ii) "R&D, Licensing & Regulatory", (iii) "Advertising & Promotions and Sales Expenses", (iv) "Corporate, Occupancy, Utilities & Other Expenses", (v) "Ropes & Gray", (vi) "Edwards Angell Palmer & Dodge", (vii) "Hogan Lovells US LLP", (viii) "Other Non-Restructuring Professionals" and (ix) "CapEx";

(iii)    after January 27, 2012, with respect to the "Total Corporate, Employee and Other Wind Down Expenses" line item in the Wind-Down Approved Budget, the payment by the Debtors of any disbursements in excess of the cumulative amount budgeted for such line item in the Wind-Down Approved Budget plus ten percent (10%) of the cumulative amount of disbursements with respect to such line item;

21

(iv)    any violation of the Budget Covenants;

(v)    (A) the entry of an order by any court invalidating, disallowing or limiting in any respect, as applicable, either (1) the enforceability, priority, or validity of the First Priority Liens or Adequate Protection Replacement Liens, in each case, securing the First Lien Obligations or (2) any of the First Lien Obligations or Adequate Protection Super-Priority Claims (as defined below) granted to the First Lien Claimholders or (B) with respect to any of the foregoing, any Debtor's application for, consent to, or acquiescence in, any such relief;

(vi)    the incurrence by any Debtor after the Petition Date of indebtedness that is (A) secured by a security interest, mortgage or other Lien on all or any portion of the Prepetition Collateral which is equal or senior to any security interest, mortgage or other Lien of the First Lien Agent and the First Lien Claimholders, as applicable, or (B) entitled to priority administrative expense status which is equal or senior to that granted to the First Lien Agent and First Lien Claimholders, as applicable, herein, except, in each case, (x) any such indebtedness used to refinance the First Lien Obligations in full and (y) the Intercompany Loan;

(vii)    the entry of a final order by this Court (other than the Final Order) granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a Lien on or security interest in any Prepetition Collateral with a value in excess of $250,000 or (B) with respect to any Lien on or the granting of any Lien on any Prepetition Collateral to any state or local environmental or regulatory agency (in each case with a value in excess of $250,000);

(viii)    reversal, vacatur, stay or modification (without the express prior written consent of the Postpetition Lender, the First Lien Agent and the Approving Majority First Lien Lenders, in their respective sole discretion) of this Interim Order;

(ix)    (A) the entry by this Court of an order, or the filing by the Debtors of a motion with this Court which seeks the entry of an order, accomplishing (x) the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or (y) the dismissal, termination, stay or modification of one or more of the Chapter 11 Cases or (B) with respect to any of the foregoing, any Debtor's application for, consent to, or acquiescence in, any such relief;

(x)    the entry by this Court of an order, or the filing by the Debtors of a motion with this Court, which seeks the entry of an order, accomplishing the appointment of an interim or permanent trustee, receiver or examiner with expanded powers to operate or manage the financial affairs, business or reorganization of any Debtor in one or more of the Chapter 11 Cases;

(xi)    any material breach by any Debtor of any of their obligations, representations, warranties or covenants set forth in this Interim Order (except as

22

covered by any other Event of Default under this paragraph 3(c)) or the Asset Purchase Agreement (as defined in the DIP Motion), as applicable, which material breach is not cured on or within five (5) Business Days after the giving of written notice of such breach to the Debtors;

(xii)   any material breach by Graceway Canada of any of its obligations, representations, warranties or covenants set forth in the Asset Purchase Agreement, as applicable, which material breach is not cured on or within five (5) Business Days after the giving of written notice of such breach to the Debtors;

(xiii)   the failure to make adequate protection payments or pay professional fees, costs and expenses of the First Lien Agent, in each case, when and as provided for under this Interim Order;

(xiv)   the Debtors fail to file the Sale Motion (as defined in the DIP Motion) on or within three (3) Business Days following the Petition Date seeking approval of the Bidding Procedures (as defined in the Asset Purchase Agreement) and Sale (as defined in the DIP Motion) in this Court;

(xv)   the Debtors fail to obtain entry by this Court of (a) the Bidding Procedures Order (as defined in the Asset Purchase Agreement) within forty-five (45) days after the Petition Date or (b) the Sale Order (as defined in the Asset Purchase Agreement) by January 2, 2012;

(xvi)   (a) the termination of the Asset Purchase Agreement other than in connection with acceptance of an Alternative Transaction (as defined in the Asset Purchase Agreement) that is acceptable to the Postpetition Lender and Approving Majority First Lien Lenders in their respective sole discretion, (b) the amendment or modification of, or filing of a pleading by any Debtor seeking to amend or modify, the Asset Purchase Agreement or any documents related thereto (including, without limitation, the Bidding Procedures, Bidding Procedures Order or Sale Order), in a manner not acceptable to the Postpetition Lender and Approving Majority First Lien Lenders in their respective sole discretion or (c) execution of definitive documents in respect of an Alternative Transaction that are not acceptable to the Postpetition Lender and Approving Majority First Lien Lenders in their respective sole discretion;

(xvii)   the failure to consummate the Sale on or before January 27, 2012;

(xviii)   the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Sale;

(xix)   the filing by any Debtor of any stand-alone plan of reorganization or liquidation (or the announcement of any Debtor's support of any such plan filed by any other party) prior to consummation of the Sale; and

CH\1291774.22

(xx)   the entry by this Court of an order, or the filing by the Debtors of a motion with this Court which seeks the entry of an order, authorizing the use of Cash Collateral for any purpose other than to pay the First Lien Obligations in full or as permitted in this Interim Order.

provided, however, that the consensual use arrangement of Prepetition Collateral, including, without limitation, Cash Collateral, described in this Interim Order shall, unless it shall have terminated earlier pursuant to the terms hereof, terminate on June 30, 2012 (unless extended automatically in accordance with paragraph 3(a) or by consent of the Approving Majority First Lien Lenders). The earliest date upon which the consensual Cash Collateral use arrangement described in this Interim Order is terminated pursuant to this paragraph 3(c) shall be referred to herein as the "*Cash Collateral Termination Date*." In the event this Interim Order terminates pursuant to this clause (c), the Adequate Protection Collateral will be used to fund the Maximum Carve-Out Amount pursuant to paragraph 8 below and to satisfy the Intercompany Loan pursuant to paragraph 5(d) before being used to satisfy any other obligation, including, without limitation, the First Lien Obligations.

(d)    Payments on Account of Prepetition Obligations.  Without limiting the foregoing, the Debtors shall not be permitted to make any payments on account of any prepetition debt or obligation prior to the effective date of a Chapter 11 plan or plans with respect to any of the Debtors, except (i) as set forth in this Interim Order; (ii) as provided in the first day orders, which first day orders shall be in form and substance reasonably acceptable to the Postpetition Lender, First Lien Agent and Majority First Lien Lenders; and (iii) as provided in the other motions, orders and requests for relief filed by the Debtors, each in form and substance reasonably acceptable to the Postpetition Lender, First Lien Agent and Approving Majority First Lien Lenders.

24

(e)    Enforceable Obligations.  No obligation, payment, transfer or grant of security under this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under Sections 502(d), 544, 547, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross-claim, defense or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.    **Adequate Protection for Prepetition Secured Parties**.  The Prepetition Secured Parties shall receive the following adequate protection (collectively referred to as the "*Prepetition Secured Parties' Adequate Protection*"):

(a)    Adequate Protection Replacement Liens.  To the extent of the diminution in value of the respective interests of the Prepetition Secured Parties in the respective Prepetition Collateral, including, without limitation, the Cash Collateral, from and after the Petition Date, calculated in accordance with Section 506(a) of the Bankruptcy Code, resulting from the use, sale or lease by the Debtors of the applicable Prepetition Collateral, including, without limitation, the Cash Collateral, the granting of the DIP Liens, the subordination of the Prepetition Liens thereto and to the Carve-Out and the imposition or enforcement of the automatic stay of Section 362(a) (collectively, "*Diminution in Value*") (in addition to (but without duplication of) any claim for Diminution in Value that may arise during the course of the Chapter 11 Cases, the First Lien Claimholders shall have (solely upon entry of the Final Order) a valid, binding and enforceable claim for Diminution in Value equal to the product of (x) 1 minus the quotient of the

25

U.S. Cash Consideration and the Cash Consideration (in each case, as defined in the Sale Support Agreement) and (y) the sum of the amounts set forth in Section 4(b) of the Sale Support Agreement that are authorized to be paid in accordance with the Sale Order), the First Lien Agent and Second Lien Agent, as applicable, for the benefit of the First Lien Claimholders and Second Lien Claimholders, as applicable, are hereby granted, subject to the terms and conditions set forth below, pursuant to Sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, replacement Liens upon all property of the Debtors, now existing or hereinafter acquired, including, without limitation, all cash and cash equivalents (whether maintained with the First Lien Agent or otherwise), and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock of subsidiaries, tax and other refunds, insurance proceeds, commercial tort claims, proceeds of the Debtors' claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law ("*Avoidance Actions*") (solely upon entry of the Final Order), rights under Section 506(c) of the Bankruptcy Code (solely upon entry of the Final Order), all other Prepetition Collateral and all other "property of the estate" (within the meaning of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits,

replacements and cash and non-cash proceeds of all of the foregoing (all of the foregoing collateral collectively referred to as the "*Adequate Protection Collateral*" and such adequate protection replacement liens, the "*Adequate Protection Replacement Liens*"). The Adequate Protection Replacement Liens on such Adequate Protection Collateral shall be subject and subordinate only to (i) the DIP Liens, (ii) the Prepetition Prior Liens, (iii) the payment of the Carve-Out and (iv) with respect to the Adequate Protection Replacement Liens granted to the Second Lien Agent for the benefit of the Second Lien Claimholders only, the Adequate Protection Replacement Liens granted to the First Lien Agent for the benefit of the First Lien Claimholders. For the avoidance of doubt, the Adequate Protection Replacement Liens granted to the Second Lien Agent for the benefit of the Second Lien Claimholders shall be subordinated to the Adequate Protection Replacement Liens granted to the First Lien Agent for the benefit of the First Lien Claimholders on the same basis as the Second Priority Liens are subordinated to the First Priority Liens under the Intercreditor Agreement.

   (b) <u>Adequate Protection Super-Priority Claims</u>. To the extent of Diminution in Value, the First Lien Claimholders and Second Lien Claimholders are hereby granted allowed super-priority administrative claims (such adequate protection super-priority claims, the "*Adequate Protection Super-Priority Claims*") against each of the Debtors pursuant to Sections 361, 363(e), 364(d)(1) and 507(b) of the Bankruptcy Code, which shall have priority, subject only to (i) the DIP Super-Priority Claims, (ii) the payment of the Carve-Out and (iii) with respect to the Adequate Protection Super-Priority Claims granted to the Second Lien Claimholders, the Adequate Protection Super-Priority Claims granted to the First Lien Claimholders, over all administrative expense claims, adequate protection and other diminution claims, unsecured claims and all other claims against the Debtors, now existing or hereafter arising, of any kind or

nature whatsoever, including, without limitation, administrative expenses or other claims of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 546, 726, 1113 and 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment. The Adequate Protection Super-Priority Claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof, provided, however, that (i) to the extent the Cash Collateral Termination Date shall have occurred, the Maximum Carve-Out Amount shall be funded and the Intercompany Loan shall be paid in full (including all accrued and previously capitalized interest thereon) in cash pursuant to paragraph 5(d) before any payments shall be made on account of the Adequate Protection Super-Priority Claims and (ii) to the extent the Cash Collateral Termination Date shall not have occurred, all amounts set forth in section 4(b) of the Sale Support Agreement shall be funded (provided, the Sale shall have been consummated) and the Intercompany Loan shall be paid in full (including all accrued and previously capitalized interest thereon) in cash pursuant to paragraph 5(d) before any payments shall be made on account of the Adequate Protection Super-Priority Claims, in each case, in accordance with the terms of this Interim Order. Other than as provided in this Interim Order with respect to the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be,

28

senior to, prior to or on a parity with the Adequate Protection Replacement Liens and the Adequate Protection Super-Priority Claims.

(c) Adequate Protection Payments, Professional Fees and Information. As further adequate protection, and in consideration, and as a requirement, for obtaining the consent of the First Lien Agent and Majority First Lien Lenders to the entry of this Interim Order and the Debtors' consensual use of the Prepetition Collateral, including, without limitation, the Cash Collateral, as provided herein, the Debtors shall (i) within three (3) Business Days of the date of entry of this Interim Order pay to the First Lien Agent a cash amount equal to $973,838.09, (ii) timely pay in cash all reasonable out of pocket fees, costs and expenses of the First Lien Agent (including, without limitation, payment in advance of the agency fee required to be paid pursuant to Section 2.11(c) of the First Lien Credit Agreement) and its professionals, including, without limitation, Morgan, Lewis & Bockius LLP, as financing counsel, Wachtell, Lipton, Rosen & Katz, as special restructuring and bankruptcy counsel, DLA Piper LLP, as local counsel, one foreign counsel and one financial advisor (collectively, the "*First Lien Professional Fees*"), in each case, on a regular monthly basis during the Chapter 11 Cases, without further notice, motion or application to, order of, or hearing before, this Court; provided that after consummation of the Sale, if the proceeds of the Sale are not sufficient to satisfy the claims of the First Lien Claimholders in full, the First Lien Agent shall pay such fees and expenses from proceeds of the Sale that would otherwise be distributed to the First Lien Agent for the benefit of the First Lien Claimholders withheld for such purpose, and (iii) deliver to the First Lien Agent, the Second Lien Agent and their respective advisors all information, reports, documents and other material that they may reasonably request, either directly or through their professionals (it being understood that the First Lien Agent, the Second Lien Agent and their respective advisors

29

shall be permitted in their sole discretion to distribute such information, reports, documents and other material to the First Lien Claimholders and Second Lien Claimholders, as applicable, upon request). Notwithstanding anything contained herein or otherwise, (A) all such professional fees (in each case, as described above) pursuant to this Interim Order shall be subject to recharacterization and reapplication pursuant to further order of this Court if and to the extent the First Lien Obligations are determined by this Court to be undersecured and (B) the Debtors shall not be obligated to reimburse any Prepetition Secured Party with respect to the defense of Claims and Defenses in the event such Claims and Defenses are asserted pursuant to paragraph 7 of this Interim Order.

(d) <u>Notice of Professional Fees</u>. None of the fees, costs and expenses incurred by professionals engaged by the First Lien Agent shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; <u>provided</u>, that such professionals shall submit copies of their respective professional fee invoices to the Debtors, the U.S. Trustee, counsel for the Postpetition Lender and counsel for the Committee (if appointed) (and any subsequent trustee of the Debtors' estates). Such invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential or privileged information, and the provision of such invoices shall not constitute any waiver of any privilege (including, without limitation, the attorney-client privilege) or of any benefits of the attorney work product doctrine. The Debtors, the U.S. Trustee, the Postpetition Lender and the Committee (if appointed) (and any subsequent trustee of the Debtors' estates) may object to the reasonableness or necessity of the particular items or categories of the fees, costs and expenses included in any professional fee

30

invoice submitted by such professionals; provided that, any such objection shall be forever waived and barred unless (i) it is filed with this Court and served on the applicable professional, the First Lien Agent and the Debtors no later than five (5) days after delivery of the applicable professional fee invoice to the objecting party and (ii) it describes with particularity the specific basis for the objection. Any hearing on an objection to payment of any fees, costs and expenses set forth in such professional fee invoice shall be limited to the reasonableness or necessity of the particular items or categories of the fees, costs and expenses which are the subject of such objection. All such unpaid fees, costs and expenses that have not been disallowed by this Court on the basis of an objection filed by the Debtors, the U.S. Trustee, the Postpetition Lender or the Committee (if appointed) (or any subsequent trustee of the Debtors' estates) in accordance with the terms hereof shall constitute First Lien Obligations and shall be secured by the Adequate Protection Collateral as specified in this Interim Order. The Debtors shall pay in accordance with the terms and conditions of this Interim Order the undisputed fees, costs and expenses reflected on any professional fee invoice no later than ten (10) Business Days after the submission thereof, or, in the case of any fees, cost and expenses timely objected to by the Debtors, the U.S. Trustee, the Postpetition Lender or the Committee (if appointed) (or any subsequent trustee of the Debtors' estates) in accordance with the terms hereof, no later than ten (10) Business Days after such objection has been resolved by this Court.

(e) <u>Right to Seek Additional Adequate Protection</u>. Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, this Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties. However, subject to the terms of the Intercreditor Agreement, any Prepetition Secured Party may request further or different adequate

protection, and the Debtors or any other party in interest may (subject to the Intercreditor Agreement) contest any such request; provided that any such further or different adequate protection shall at all times be subordinate and junior to the DIP Super-Priority Claims and DIP Liens of the Postpetition Lender granted under this Interim Order.

(f)    Consent to Priming and Adequate Protection.    The First Lien Agent and the Majority First Lien Lenders consent to the use of the Prepetition Collateral, including, without limitation, the Cash Collateral, the Prepetition Secured Parties' Adequate Protection and the priming provided for herein; provided, however, that such consent is expressly conditioned upon the entry of this Interim Order and shall not be deemed to extend to any other replacement financing or debtor-in-possession financing other than the Intercompany Loan or any other use of the Prepetition Collateral, including, without limitation, the Cash Collateral other than as specified herein; and provided, further, that (I) such consent shall be of no force and effect in the event this Interim Order is not entered or is entered and subsequently reversed, vacated, stayed or modified (unless such reversal, vacatur, stay or modification is acceptable to the First Lien Agent and the Approving Majority First Lien Lenders, in their sole discretion) and (II) in the event of the occurrence of the Cash Collateral Termination Date, nothing herein shall alter the burden of proof set forth in the applicable provisions of the Bankruptcy Code at any hearing concerning the continued use of the Prepetition Collateral, including, without limitation, the Cash Collateral, by the Debtors.

5.    **Intercompany Loan**.

(a)    Tranches.    The Intercompany Loan shall consist of a tranche A intercompany term loan in aggregate principal amount equal to $3,800,000 (the "*Tranche A Intercompany Loan*") and a tranche B intercompany term loan in aggregate principal amount

equal to $2,200,000 (the "*Tranche B Intercompany Loan*"). The Borrower shall borrow the Tranche A Intercompany Loan and Tranche B Intercompany Loan, in each case, no later than the third day after the entry by the Court of this Interim Order. The Borrower is hereby authorized, and agrees, to use the proceeds of (i) the Tranche A Intercompany Loan only in accordance with the terms and conditions of this Interim Order, including, without limitation, the Approved Budget and Budget Covenants and (ii) the Tranche B Intercompany Loan only in accordance with the terms and conditions of this Interim Order, including, without limitation, the Approved Budget and Budget Covenants, and with the prior written consent of the Approving Majority First Lien Lenders (it being understood that the Approving Majority First Lien Lenders shall be deemed to have consented to the Debtors' use of the proceeds of the Tranche B Intercompany Loan to pay the Expense Reimbursement Amount (as defined in the Asset Purchase Agreement) if approved by the Court pursuant to the Bidding Procedures Order and due and payable pursuant to the terms of the Asset Purchase Agreement).

(b)    <u>Interest and Fees</u>. Interest on the outstanding principal amount of the Intercompany Loan shall be capitalized and added thereto until the outstanding principal amount (including all previously capitalized interest) is paid in full on the Maturity Date (as defined below). Interest shall accrue at 4.75% per annum. Interest shall be capitalized quarterly, commencing with the Debtors' fiscal quarter ending December 31, 2011. No fees, costs, expenses or other charges shall accrue or be payable in connection with the Intercompany Loan.

(c)    <u>Maturity</u>. The Intercompany Loan shall mature and be paid in full (including all accrued and previously capitalized interest thereon) in cash on the earlier of one year from the date of entry of this Interim Order or closing of the Sale (the "*Maturity Date*").

(d)    Remedies. Failure to pay the entire principal amount of the Intercompany Loan to the Postpetition Lender on the Maturity Date shall constitute a default under the Intercompany Loan (an "*Intercompany Loan Default*"). The Debtors shall cure any Intercompany Loan Default within three (3) Business Days following receipt of notice of such default, provided, that, if the Debtors fail to cure the Intercompany Loan Default, the Postpetition Lender may seek an emergency hearing before this Court for the sole purpose of determining whether an Intercompany Loan Default has occurred and seeking relief from the automatic stay to exercise its rights and remedies with respect to the Adequate Protection Collateral in accordance with this Interim Order and applicable law.

(e)    DIP Liens. As security for the Intercompany Loan, pursuant to Section 364(d)(1) of the Bankruptcy Code the Debtors hereby grant to the Postpetition Lender a perfected first priority, senior priming Lien (the "*DIP Liens*") on all Adequate Protection Collateral (including, without limitation, Cash Collateral) that is senior and priming to (A) the Prepetition Liens, (B) the Adequate Protection Replacement Liens and (C) any Liens that are junior to the Prepetition Liens, after giving effect to any intercreditor or subordination agreements (the Liens referenced in clauses (A), (B) and (C), collectively, the "*Primed Liens*"). The DIP Liens shall immediately and without any further action by any Person, be valid, binding, permanent, perfected, continuing, enforceable and non-avoidable upon the date this Court enters this Interim Order.

(f)    DIP Lien Priority. Notwithstanding anything to the contrary contained in this Interim Order, for the avoidance of doubt, the DIP Liens granted to the Postpetition Lender shall in each and every case be first priority senior Liens that (i) are subject only to (A) valid, enforceable, non-avoidable and perfected Liens in existence on the Petition Date that (I) after

34

giving effect to any intercreditor or subordination agreement, are senior in priority to the Prepetition Liens and (II) are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code and after giving effect to any intercreditor or subordination agreement are senior in priority to the Prepetition Liens (collectively, the *"**Prepetition Prior Liens**"*) and (B) the Carve-Out (to the extent provided in the provisions of this Interim Order), and (ii) except as provided in sub-clause (i) of this clause (f), are senior to all prepetition and postpetition Liens of any other person or entity (including, without limitation, the Primed Liens). The DIP Liens and the DIP Super-Priority Claims (A) shall not be subject to Sections 510, 549, 550 or 551 of the Bankruptcy Code or, subject to entry of the Final Order, Section 506(c) of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under Section 551 of the Bankruptcy Code or (y) any other intercompany or affiliate Liens of the Debtors, and (C) shall be valid and enforceable in any Successor Case and/or upon the dismissal of any of the Chapter 11 Cases.

(g)　　Super-Priority Administrative Claim Status. In addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, except with respect to Avoidance Actions, the Intercompany Loan shall constitute an allowed super-priority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve-Out, over all administrative expense claims, adequate protection and other diminution claims (including the Adequate Protection Super-Priority Claims), unsecured claims and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses or other claims of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328,

35

330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 546, 726, 1113 and 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment (the "*DIP Super-Priority Claims*"). The DIP Super-Priority Claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof after funding of either (i) the Maximum Carve-Out Amount to the extent the Cash Collateral Termination Date shall have occurred or (ii) all amounts set forth in section 4(b) of the Sale Support Agreement to the extent the Cash Collateral Termination Date shall not have occurred and the Sale shall have been consummated, in each case, in accordance with the terms of this Interim Order. Other than as provided in this Interim Order with respect to the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the DIP Liens and the DIP Super-Priority Claims.

6. **Automatic Postpetition Lien Perfection**. This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection and priority of the Adequate Protection Replacement Liens and the DIP Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or (b) taking any other action to validate or perfect the Adequate Protection Replacement Liens and the DIP Liens or to entitle the

36

Adequate Protection Replacement Liens and the DIP Liens to the priorities granted herein. Notwithstanding the foregoing, each of the First Lien Agent, the Second Lien Agent and the Postpetition Lender, as applicable (in the case of the First Lien Agent and Second Lien Agent, solely with respect to the Adequate Protection Replacement Liens), may, in its sole discretion, file financing statements, mortgages, security agreements, notices of Liens and other similar documents, and is hereby granted relief from the automatic stay of Section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded on the Petition Date. The applicable Debtors shall execute and deliver to each of the First Lien Agent, the Second Lien Agent and the Postpetition Lender, as applicable, all such financing statements, mortgages, notices and other documents as such party may reasonably request to evidence and confirm the contemplated priority of the Adequate Protection Replacement Liens granted pursuant hereto. Without limiting the foregoing, each of the First Lien Agent, the Second Lien Agent and the Postpetition Lender, as applicable, in its sole discretion, may file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order. Subject to the entry of the Final Order, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof

37

or other Adequate Protection Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code and shall have no force or effect with respect to the Liens on such leasehold interests or other applicable Adequate Protection Collateral or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the Prepetition Secured Parties in accordance with the terms of this Interim Order. To the extent that the First Lien Agent or Second Lien Agent is the secured party under any account control agreements, listed as loss payee under any of the Debtors' insurance policies or is the secured party under any First Lien Document or Second Lien Document, the Postpetition Lender shall also be deemed to be the secured party under such account control agreements, loss payee under the Debtors' insurance policies and the secured party under each such First Lien Loan Document or Second Lien Loan Document, shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement) and shall act in that capacity and distribute any proceeds recovered or received first for its benefit and second, subsequent to payment in full of the Intercompany Loan, for the benefit of the Prepetition Secured Parties. The First Lien Agent or Second Lien Agent, as applicable, shall serve as agent for the Postpetition Lender for purposes of perfecting its Liens on all Adequate Protection Collateral that is of a type such that perfection of a Lien therein may be accomplished only by possession or control by a secured party.

7. **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**. The Debtors' Stipulations shall be binding upon the Debtors, Graceway Canada and any Chapter 11 trustee in all circumstances. The Debtors' Stipulations shall be binding upon each other party in interest, including any Committee, unless (i) such Committee or any other party in interest (other than the Debtors, Graceway Canada or any Chapter 11 trustee) obtains the authority to commence and actually commences, or if the Chapter 11 Cases are converted to

CH\1291774.22

cases under Chapter 7 prior to the expiration of the Challenge Period (as defined below), the Chapter 7 trustee in such Successor Cases actually commences, on or before sixty (60) days after the appointment of any Committee in the Chapter 11 Cases (or if no Committee has been so appointed, seventy-five (75) days from the Petition Date) (such time period shall be referred to as the "*Challenge Period*," and the date that is the last calendar day of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period, shall be referred to as the "*Challenge Period Termination Date*"), (x) a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings or releases included in the Debtors' Stipulations, or (y) a contested matter or adversary proceeding against any or all of the Prepetition Secured Parties in connection with or related to the Prepetition Obligations, or the actions or inactions of any or all of the Prepetition Secured Parties arising out of or related to the Prepetition Obligations, or otherwise, including, without limitation, any claim against any or all of the Prepetition Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim or defense to the Prepetition Obligations (including but not limited to those under Sections 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against any or all of the Prepetition Secured Parties) (the objections, challenges, actions and claims referenced in clauses (x) and (y), collectively, the "*Claims and Defenses*") and (ii) this Court rules in favor of the plaintiff in any such timely and properly commenced contested matter or adversary proceeding; provided, that as to the Debtors, for themselves and not their estates, Graceway Canada, for itself and its estate, and any Chapter 11 trustee, all such Claims and Defenses are irrevocably waived and relinquished as of the Petition Date. Until the Challenge Period Termination Date, any party in interest (other than the Debtors, Graceway Canada and any Chapter 11 trustee, but including the Committee (if appointed)) may assert any Claims and

39

Defenses. If no Claims and Defenses with respect to the First Lien Claimholders or First Lien Obligations have been timely asserted in any such adversary proceeding or contested matter in accordance with this paragraph 7, then, upon the Challenge Period Termination Date, and for all purposes in these Chapter 11 Cases and any Successor Case, (i) all payments made to the First Lien Claimholders pursuant to this Interim Order or otherwise shall not be subject to counterclaim, set-off, subordination, recharacterization, defense or avoidance, (ii) any and all such Claims and Defenses by any party in interest shall be deemed to be forever released, waived and barred with respect to the First Lien Claimholders, (iii) the First Lien Obligations shall be deemed to be an allowed claim, and (iv) the Debtors' Stipulations with respect to the First Lien Claimholders, including, without limitation, the release provisions therein, shall be binding on all parties in interest, including any Committee. If no Claims and Defenses with respect to the Second Lien Claimholders or Second Lien Obligations have been timely asserted in any such adversary proceeding or contested matter in accordance with this paragraph 7, then, upon the Challenge Period Termination Date, and for all purposes in these Chapter 11 Cases and any Successor Case, (i) any and all such Claims and Defenses by any party in interest shall be deemed to be forever released, waived and barred with respect to the Second Lien Claimholders and (ii) the Debtors' Stipulations with respect to the Second Lien Claimholders, including, without limitation, the release provisions therein, shall be binding on all parties in interest, including any Committee. Notwithstanding the foregoing, to the extent any Claims and Defenses are timely asserted in any such adversary proceeding or contested matter, (x) the Debtors' Stipulations and the other provisions in clauses (i) through (iv) or clauses (i) and (ii), as applicable, in the immediately preceding sentences shall nonetheless remain binding and preclusive on any Committee (and any subsequent Chapter 7 trustee of the Debtors' estates) and

40

on any other party in interest from and after the Challenge Period Termination Date, except solely with respect to the party in interest timely asserting such Claims and Defenses to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) or clauses (i) and (ii), as applicable, in the immediately preceding sentences were expressly challenged in such adversary proceeding or contested matter, and (y) any portion of the Debtors' Stipulations or other provisions in clauses (i) through (iv) or clauses (i) and (ii), as applicable, in the immediately preceding sentences that is the subject of a timely filed Claim and Defense shall become binding and preclusive on such party in interest timely asserting such Claims and Defenses to the extent set forth in any order of this Court resolving such Claim and Defense. The Challenge Period in respect of the First Lien Obligations may be extended by written agreement of the First Lien Agent and the Majority First Lien Lenders and in respect of the Second Lien Obligations may be extended by written agreement of the Second Lien Agent and the Required Lenders (as defined in the Second Lien Credit Agreement), as applicable, in their sole discretion. Nothing in this Interim Order vests or confers on any person or entity, including any Committee, standing or authority to pursue any cause of action belonging to any or all of the Debtors or their estates, including, without limitation, any Claim and Defense or other claim against any Prepetition Secured Parties.

8. **Carve-Out**. Subject to the terms and conditions contained in this paragraph 8, each of the DIP Liens, DIP Super-Priority Claims, Prepetition Liens, Prepetition Obligations. Adequate Protection Replacement Liens and Adequate Protection Super-Priority Claims shall be subject and subordinate to payment of the Carve-Out (as defined below):

(a) For purposes of this Interim Order, "*Carve-Out*" means (i) all unpaid fees required to be paid in these Chapter 11 Cases to the clerk of this Court and to the office of the

41

United States Trustee under 28 U.S.C. § 1930(a), whether arising prior to or after the delivery of the Carve-Out Trigger Notice (as defined below); (ii) all reasonable and documented unpaid fees and expenses, including, without limitation, success fees, of professionals retained by the Debtors in these Chapter 11 Cases (collectively, the *"Debtors' Professionals"*) that are incurred and earned prior to the delivery by the First Lien Agent of a Carve-Out Trigger Notice, have been or are subsequently allowed by this Court under Sections 105(a), 330 and 331 of the Bankruptcy Code, do not exceed the cumulative amount budgeted for each such Debtors' Professional in the applicable line item therefor in the Approved Budget and remain unpaid after application of any retainers (each such budgeted amount, a *"Debtors' Professionals Carve-Out Cap"*); (iii) all reasonable and documented unpaid fees and expenses of professionals retained by the Committee in these Chapter 11 Cases (collectively, the *"Committee's Professionals"*) and all reasonable and documented unpaid expenses of the members of such Committee (*"Committee Members"*) that are, in each case, incurred and earned prior to the delivery by the First Lien Agent of a Carve-Out Trigger Notice and have been or are subsequently allowed by this Court under Sections 105(a), 330 and 331 of the Bankruptcy Code, in an aggregate amount (for both Committee Members and the Committee's Professionals) not to exceed $600,000 (the *"Committee Professionals Carve-Out Cap"*); (iv) all reasonable and documented unpaid fees and expenses, including, without limitation, success fees, of the Debtors' Professionals that are incurred and/or earned on or after the delivery by the First Lien Agent of a Carve-Out Trigger Notice, that are allowed by this Court under Sections 105(a), 330 and 331 of the Bankruptcy Code and remain unpaid after application of any retainers, in an aggregate amount not to exceed the sum of (A) if not paid prior to delivery by the First Lien Agent of a Carve-Out Trigger Notice, the Sale Transaction Fee due and owing to Lazard Frères & Co. LLC (*"Lazard"*) as

42

defined in and pursuant to the terms of that certain engagement letter, dated March 12, 2010, between Lazard and the Borrower (the "*Lazard Success Fee*") and (B) $1,250,000 (the "*Debtors' Professionals Post Carve-Out Cap*"); and (v) all reasonable and documented unpaid fees and expenses of the Committee Professionals that are incurred and/or earned on or after the delivery by the First Lien Agent of a Carve-Out Trigger Notice and are allowed by this Court under Sections 105(a), 330 and 331 of the Bankruptcy Code, in an aggregate amount not to exceed $50,000 (the "*Committee Professionals Post Carve-Out Cap* and together with the Debtors' Professionals Carve-Out Cap, the Debtors' Professionals Post Carve-Out Cap and Committee Professionals Carve-Out Cap, the "*Carve-Out Cap*") (clauses (i) through (v), collectively, the "*Carve-Out*"). The term "*Carve-Out Trigger Notice*" shall mean a written notice delivered by the First Lien Agent to the Debtors' lead counsel, counsel for the Postpetition Lender, the U.S. Trustee, counsel for the Second Lien Agent, and counsel to any Committee appointed in these Chapter 11 Cases, which notice may be delivered at any time following the occurrence and during the continuation of any Event of Default, expressly stating that the Carve-Out is invoked.

(b)     Any payments actually made pursuant to Bankruptcy Code Sections 327, 328, 330, 331, 363, 503, 1103 or otherwise to Debtors' Professionals or Committee's Professionals shall in the case of any payments made on account of any fees and expenses described in clauses (iii), (iv) and (v) of the definition of Carve-Out, reduce the applicable Carve-Out Cap on a dollar-for-dollar basis.

(c)     Notwithstanding any provision in this paragraph 8 to the contrary or otherwise, no portion of the Carve-Out, Cash Collateral, Prepetition Collateral, Adequate

Protection Collateral or proceeds of the Intercompany Loan shall be utilized for the payment of professional fees and disbursements to the extent restricted under paragraph 15 hereof.

(d)     Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Chapter 11 Cases, or of any other person or entity, or shall affect the right of any Prepetition Secured Party to object to the allowance and payment of such fees and expenses.

(e)     On the Cash Collateral Termination Date, if any, the Debtors shall use the proceeds of the Intercompany Loan (subject to paragraph 5(a) above) and Cash Collateral (including, for the avoidance of doubt, proceeds of any liquidated Adequate Protection Collateral) to fund an amount equal to the unused portion of the Maximum Carve-Out Amount into an interest-bearing reserve escrow at a financial institution reasonably acceptable to the First Lien Agent (the "*Carve-Out Escrow Account*") in full and complete satisfaction of the Postpetition Lender's, First Lien Agent's, Second Lien Agent's, First Lien Claimholders' and Second Lien Claimholders' obligations in respect of the Carve-Out; provided, however, that any unused amounts held in the Carve-Out Escrow Account shall continue to be subject to the DIP Liens, Adequate Protection Replacement Liens and Prepetition Liens in accordance with the terms hereof.  The funds held in the Carve-Out Escrow Account shall only be used by the Debtors to pay such amounts if and when incurred, earned and allowed by this Court under Sections 105(a), 330 and 331 of the Bankruptcy Code.  For the avoidance of doubt, (i) the portion of the Carve-Out Escrow Account pertaining to the period prior to the delivery of the Carve-Out Trigger Notice allocated to each applicable retained professional shall be limited to the amount set forth in the Approved Budget for such professional, (ii) (except for the Lazard

44

Success Fee, which shall be allocated to Lazard) the portion of the Carve-Out Escrow Account pertaining to the Debtors' Professionals Post Carve-Out Cap shall be allocated to each applicable retained Debtors' professional based upon the amount set forth in the Approved Budget for such professional for the period prior to the delivery of a Carve-Out Trigger Notice divided by the total amount set forth in the Approved Budget for all of the Debtors' professionals during the period prior to the delivery of a Carve-Out Trigger Notice and (iii) the portion of the Carve-Out Escrow Account pertaining to the Committee Professionals Post Carve-Out Cap shall be allocated to each applicable retained Committee professional based upon the amount set forth in the Approved Budget for such professional for the period prior to the delivery of a Carve-Out Trigger Notice divided by the total amount set forth in the Approved Budget for all of the Committee professionals during the period prior to the delivery of a Carve-Out Trigger Notice.

9.     **Waiver of Section 506(c) Claims**.  Subject to the entry of the Final Order, as a further condition to the Debtors' use of the Prepetition Collateral, including, without limitation, the Cash Collateral, and to the payment of the Carve-Out to the extent provided herein, no costs or expenses of administration of the Chapter 11 Cases or any Successor Case (including, without limitation, any costs and expenses of preserving or disposing of property securing the Prepetition Obligations) shall be charged against or recovered from or against any or all of the Prepetition Secured Parties, the Adequate Protection Collateral, the Prepetition Collateral, and the Cash Collateral, in each case, pursuant to Section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the First Lien Agent and the Majority First Lien Lenders and no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the First Lien Claimholders.

CH\1291774.22

10. **After-Acquired Property**. Subject to the entry of the Final Order, the "equities of the case" exception of Section 552 of the Bankruptcy Code shall not apply.

11. **Protection of First Lien Secured Parties' Rights**.

(a)  Unless the First Lien Agent and Approving Majority First Lien Lenders shall have provided their prior written consent, there shall not be entered in these proceedings, or in any Successor Case, any order (other than this Interim Order and the Final Order) which authorizes the obtaining of credit or the incurrence of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the Adequate Protection Collateral and/or that is entitled to administrative priority status, in each case which is superior to or *pari passu* with the Adequate Protection Replacement Liens granted to the First Lien Agent for the benefit of the First Lien Claimholders and the Adequate Protection Super-Priority Claims granted to the First Lien Claimholders (except the Intercompany Loan and any such indebtedness used to refinance the First Lien Obligations in full).

(b)  The Debtors (and/or their legal and financial advisors) will (i) maintain books, records and accounts to the extent and as required by the First Lien Documents, (ii) cooperate with, consult with, and provide to the First Lien Agent and the Majority First Lien Lenders all such information as required or allowed under the First Lien Documents or the provisions of this Interim Order, (iii) permit representatives of the First Lien Agent and Majority First Lien Lenders such rights to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and consult with respect to, the Debtors' respective affairs, finances, properties, business operations and accounts with the Debtors'

46

respective officers, employees and independent public accountants and (iv) permit the First Lien Agent, the Majority First Lien Lenders and their respective representatives, to consult with the Debtors' management and advisors on matters concerning the general status of the Debtors' businesses, financial condition and operations.

12. **Cash Collection**. From and after the date of the entry of this Interim Order, all collections and proceeds of any Adequate Protection Collateral or Prepetition Collateral or services provided by any Debtor and all Cash Collateral which shall at any time come into the possession, custody or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same bank accounts into which the collections and proceeds of the Prepetition Collateral were deposited under the First Lien Documents (or in such other accounts as are designated by First Lien Agent from time to time).

13. **Disposition of Collateral**. Except for the Sale and as otherwise permitted under this Interim Order, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Prepetition Collateral or Adequate Protection Collateral outside of the ordinary course of business without the prior written consent of the First Lien Agent and the Majority First Lien Lenders (and no such consent shall be implied from any other action, inaction or acquiescence by the First Lien Agent or any First Lien Lender or any order of this Court). Upon any sale or disposition of substantially all of the Adequate Protection Collateral, (i) to the extent the Cash Collateral Termination Date shall have occurred, the Maximum Carve-Out Amount shall be funded and the Intercompany Loan shall be paid in full pursuant to paragraph 5(d) before any payments shall be made on account of the First Lien Obligations and (ii) to the extent the Cash Collateral Termination Date shall not have occurred, all amounts set forth in section 4(b) of the Sale Support Agreement shall be funded and the Intercompany Loan

shall be paid in full pursuant to paragraph 5(d) before any payments shall be made on account of the First Lien Obligations.

14. **Relief from Automatic Stay**.

(a)     Any automatic stay otherwise applicable to the First Lien Claimholders is hereby modified, without requiring prior notice to or authorization of this Court, to the extent necessary to permit the Approving Majority First Lien Lenders to exercise the following remedies immediately upon the occurrence and during the continuance of an Event of Default (subject to the limitations set forth in this Paragraph 14): (i) declare a termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral, including Cash Collateral derived solely from the proceeds of Adequate Protection Collateral, and to use Prepetition Collateral other than in the ordinary course (any such declaration to be made to the Debtors, the Postpetition Lender, counsel to the Committee (if appointed) and the United States Trustee and to be referred to herein as a *"Termination Declaration"* and the date on which the earliest of any such Termination Declaration occurs being herein referred to as the *"Termination Declaration Date"*) and/or (ii) the First Lien Claimholders shall be permitted to reduce any claim to judgment.

(b)     During the five (5) Business Day period after the Termination Declaration Date, the Debtors and any Committee shall be entitled to an emergency hearing before the Court for the sole purpose of contesting whether an Event of Default has occurred and Section 105 of the Bankruptcy Code may not be invoked by the Debtors in an effort to restrict or preclude any First Lien Lender from exercising any rights or remedies set forth in this Interim Order. Unless during such period the Court determines that an Event of Default has not occurred and/or is not continuing, this Interim Order shall automatically terminate (or, if the Approving Majority First

Lien Lenders shall have specified, in their sole discretion, in the Termination Declaration that the Prepetition Collateral, including, without limitation, Cash Collateral, use arrangement set forth herein shall instead be reduced or restricted, such use arrangement shall be so reduced or restricted) at the end of such 3 Business Day period in accordance with paragraph 3(c), without further notice or order. During such five (5) Business Day period, the Debtors may not use Cash Collateral except to pay payroll and other expenses critical to keep the business of the Debtors operating, in each case, in accordance with the Approved Budget.

(c)     The automatic stay imposed under Bankruptcy Code Section 362(a) is hereby modified pursuant to the terms of this Interim Order as necessary to (i) permit the Debtors to grant the Adequate Protection Replacement Liens and the DIP Liens and to incur all liabilities and obligations to the Prepetition Secured Parties and the Postpetition Lender under this Interim Order, (ii) authorize the Postpetition Lender to retain and apply payments hereunder in connection with an Intercompany Loan Default and (iii) otherwise implement and effectuate the provisions of this Interim Order.

15.     **Restriction on Use of Proceeds**.     Notwithstanding anything herein to the contrary, no proceeds from the Intercompany Loan, Adequate Protection Collateral, Cash Collateral (including any prepetition retainers funded by any or all of the Prepetition Secured Parties), Prepetition Collateral, or any portion of the Carve-Out may be used by any of the Debtors, any Committee, any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, or any other person, party or entity to (or to pay any professional fees and disbursements incurred in connection therewith) (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to Bankruptcy Code Section 364(c) or (d), or otherwise, other than the Intercompany Loan or loans used to refinance the First

49

Lien Obligations in full; or (b) investigate (except as set forth below), assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, any or all of the Prepetition Secured Parties and their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any Claims and Defenses or any Avoidance Actions, in each case, with respect to the Prepetition Secured Parties; (ii) any so-called "lender liability" claims and causes of action with respect to the Prepetition Secured Parties; (iii) any action with respect to the validity, enforceability, priority and extent of the Prepetition Obligations, or the validity, extent, perfection and priority of the Prepetition Liens or the Adequate Protection Replacement Liens (or the value of any of the Prepetition Collateral or Adequate Protection Collateral); (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the Prepetition Liens, the Adequate Protection Replacement Liens or the other Prepetition Secured Parties' Adequate Protection; and/or (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to any or all of the Prepetition Secured Parties hereunder or the Prepetition Documents; provided, however, up to $25,000 in the aggregate of the Committee Professionals Carve-Out Cap and Committee Professionals Post Carve-Out Cap, any Adequate Protection Collateral, any Prepetition Collateral and any Cash Collateral may be used by the Committee (to the extent such committee is appointed) to investigate (but not prosecute) the extent, validity and priority of the Prepetition Obligations, the

50

Prepetition Liens or any other claims against the Prepetition Secured Parties so long as such investigation occurs within fifty (50) days after entry of the Final Order.

16. **Proofs of Claim**. Upon entry of the Final Order, the First Lien Agent, the First Lien Claimholders, the Second Lien Agent and the Second Lien Claimholders will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim allowed herein. The Debtors' Stipulations in paragraph D herein shall be deemed to constitute a timely filed proof of claim for the First Lien Agent, the First Lien Claimholders, the Second Lien Agent and the Second Lien Claimholders, as applicable. Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases to the contrary, the First Lien Agent for the benefit of itself and the other First Lien Claimholders and the Second Lien Agent for the benefit of itself and the other Second Lien Claimholders is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or Successor Cases for any claim allowed herein or otherwise.

17. **Preservation of Rights Granted under the Interim Order**.

(a) <u>No Non-Consensual Modification or Extension of Interim Order</u>. The Debtors shall not seek, and it shall constitute an Event of Default (resulting, among other things, in the termination of the Debtors' right to use the Prepetition Collateral, including, without limitation, the Cash Collateral and the immediate maturity of the Intercompany Loan) if there is entered (except as otherwise provided herein) an order amending, supplementing, extending or otherwise modifying this Interim Order without the prior written consent of the First Lien Agent and the Majority First Lien Lenders, and no such consent shall be implied by any other action, inaction or acquiescence.

CH\1291774.22

(b)    <u>Dismissal</u>.    If any order dismissing any of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code), to the fullest extent permitted by law, that (i) the Prepetition Secured Parties' Adequate Protection and DIP Protections shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Prepetition Secured Parties' Adequate Protection or the Intercompany Loan, as applicable, have been paid in full in cash or are otherwise satisfied in full (and that the Prepetition Secured Parties' Adequate Protection and DIP Protections shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Prepetition Secured Parties' Adequate Protection and DIP Protections.

(c)    <u>Modification of Interim Order</u>.    Based on the findings set forth in this Interim Order and in accordance with Section 364(e) of the Bankruptcy Code, which is applicable to the Intercompany Loan contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed by a subsequent order of this Court or any other court, the Postpetition Lender shall be entitled to the protections provided in Section 364(e) of the Bankruptcy Code.

(d)    <u>Survival of Interim Order</u>.    The provisions of this Interim Order, any actions taken pursuant hereto, the Prepetition Secured Parties' Adequate Protection, the DIP Protections and all other rights, remedies, Liens, priorities, privileges, protections and benefits granted to any of the Prepetition Secured Parties or the Postpetition Lender shall survive, and shall not be modified, impaired or discharged by, the entry of any order confirming any plan of reorganization or liquidation in any Chapter 11 Case, converting any Chapter 11 Case to a case

52

under Chapter 7, dismissing any of the Chapter 11 Cases, withdrawing of the reference of any of the Chapter 11 Cases or any Successor Case or providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases in this Court, or terminating the joint administration of these Chapter 11 Cases or by any other act or omission. The terms and provisions of this Interim Order, including the Prepetition Secured Parties' Adequate Protection, the DIP Protections and all other rights, remedies, Liens, priorities, privileges, protections and benefits granted to any of the Prepetition Secured Parties or Postpetition Lender, shall continue in full force and effect notwithstanding the entry of any such order, and the Prepetition Secured Parties' Adequate Protection and DIP Protections shall continue in these proceedings and in any Successor Case, and shall maintain their respective priorities as provided by this Interim Order.

18. **Other Rights and Obligations**.

(a) <u>Binding Effect</u>. Subject to paragraph 7 above, the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, (i) the Prepetition Secured Parties, any Committee, the Debtors and the Postpetition Lender and their respective successors and assigns, (ii) any Chapter 7 or Chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, (iii) an examiner appointed pursuant to Section 1104 of the Bankruptcy Code and (iv) any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors, in each case, whether in any of the Chapter 11 Cases, in any Successor Cases, or upon dismissal of any such Chapter 11 Case or Successor Case; <u>provided</u>, <u>however</u>, that the Prepetition Secured Parties shall have no obligation to permit the use of Prepetition Collateral, including, without limitation, the Cash Collateral, by any Chapter 7 or Chapter 11 trustee or other responsible person appointed for the

estates of the Debtors in any Chapter 11 Case or Successor Case, other than the Debtors in accordance with the terms hereof.

(b)     No Waiver.  The failure of the First Lien Claimholders to seek relief or otherwise exercise their rights and remedies under this Interim Order, the First Lien Documents or otherwise (or any delay in seeking or exercising same) shall not constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise.  Except as expressly provided herein, nothing contained in this Interim Order (including, without limitation, the authorization of the use of any Prepetition Collateral, including, without limitation, Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to any First Lien Claimholder, including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion).  Except as prohibited by this Interim Order and the First Lien Documents, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, the ability of the First Lien Claimholders under the Bankruptcy Code or under non-bankruptcy law to (i) request conversion of the Chapter 11 Cases to cases under Chapter 7, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases, (ii) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, any Chapter 11 plan or plans with respect to any of the Debtors, or (iii) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) of the First Lien Claimholders. Except to the extent otherwise expressly provided in this Interim Order, neither the commencement of the Chapter 11 Cases nor the entry of this Interim Order shall limit or otherwise modify the rights and remedies of the First Lien Claimholders with respect to non-

54

Debtor entities or their respective assets, whether such rights and remedies arise under the First Lien Documents, applicable law, or equity.

(c) <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary. In determining to permit the use of Prepetition Collateral, including, without limitation, the Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, the First Lien Claimholders shall not (i) be deemed to be in control of the operations of the Debtors or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates.

(d) <u>No Marshaling</u>. Neither the First Lien Claimholders nor the Postpetition Lender shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Adequate Protection Collateral or the Prepetition Collateral, as applicable.

(e) <u>Amendments</u>. Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by on behalf of all the Debtors and the First Lien Agent (after having obtained the approval of the Majority First Lien Lenders) and, except as provided herein, approved by this Court; <u>provided</u>, <u>however</u>, that any waiver, modification or amendment of any of the provisions hereof relating to the Intercompany Loan shall also be signed by or on behalf of the Postpetition Lender.

(f) <u>Inconsistency</u>. In the event of any inconsistency between the terms and conditions of the Prepetition Documents and the terms and conditions of this Interim Order, the provisions of this Interim Order shall govern and control.

55

(g)     _Enforceability_.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable _nunc pro tunc_ to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, Local Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

(h)     _Headings_.  Paragraph headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

19.     **Final Hearing**.

(a)     The Final Hearing to consider entry of the Final Order is scheduled for _____ ____, 2011, at _____ (prevailing Eastern time) at this Court.  The proposed Final Order shall be substantially the same as the Interim Order except that those provisions in the Interim Order that are subject to the entry of the Final Order shall be included in the Final Order without such qualification.  If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

(b)     _Final Hearing Notice_.  On or before October 3, 2011 the Debtors shall serve, by United States mail, first-class postage prepaid, (such service constituting adequate notice of the Final Hearing) (i) notice of the entry of this Interim Order and of the Final Hearing (the "_**Final Hearing Notice**_") and (ii) a copy of this Interim Order, on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with

56

this Court and to any Committee, if the same shall have been appointed, or Committee counsel. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of this Court no later than October ___, 2011, which objections shall be served upon: (a) the Debtors, Graceway Pharmaceuticals, LLC, 340 Martin Luther King Jr. Blvd., Suite 500, Bristol, TN 37620, Attn: John A. Bellamy, john.bellamy@gracewaypharma.com, (b) counsel for the Debtors, Latham & Watkins LLP, 233 South Wacker Drive, Chicago, Illinois 60606, Attn: Josef Athanas and Caroline Reckler, josef.athanas@lw.com and caroline.reckler@lw.com; (c) financing counsel to the First Lien Agent, Morgan, Lewis & Bockius LLP, 225 Franklin Street, 16th Floor, Boston, Massachusetts 02110, Attn: Jonathan K. Bernstein, jbernstein@morganlewis.com; (d) special restructuring and bankruptcy counsel to the First Lien Agent, Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York 10019, Attn: Scott K. Charles and Michael S. Benn, SKCharles@wlrk.com and MSBenn@wlrk.com; (e) counsel to any Committee; (f) counsel to the Second Lien Agent, Sidley Austin LLP, One South Dearborn, Chicago, Illinois 60603, Attn: Larry J. Nyhan, lnyhan@sidley.com ; and (g) the Office of the United States Trustee for the District of Delaware, in each case to allow actual receipt of the foregoing no later than October ____, 2011, at 4:00 p.m. (prevailing Eastern time).

20.    **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.


Dated: September ___, 2011
        Wilmington, Delaware


_____

UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

## Approved Budget

# EXHIBIT B

## Intercompany Notes

## Exhibit C

## Form of Joinder Agreement

Reference is hereby made to that certain Sale Support Agreement, dated September ___, 2011 (as such agreement may be amended, modified or supplemented from time to time, the "*Sale Support Agreement*") by and among Graceway Pharmaceuticals, LLC, Graceway Pharma Holding Corp., Graceway Holdings, LLC, Chester Valley Holdings, LLC, Chester Valley Pharmaceuticals, LLC, Graceway Canada Holdings, Inc., Graceway Canada Company and Graceway International, Inc. and each of the first lien lenders party thereto. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Support Agreement.

As a condition precedent to becoming the beneficial holder or owner of [_____] dollars ($_____) of First Lien Loan Claims, the undersigned transferee (the "*Transferee*") hereby agrees to become bound by all of the terms, conditions and obligations of the undersigned transferor (the "*Transferor*") set forth in or contemplated by the Sale Support Agreement with respect to not only the above referenced First Lien Loan Claims to be transferred by the Transferor but also any other First Lien Loan Claims owned by such Transferee prior to the date hereof. The Transferee acknowledges and agrees that (i) it has reviewed, or has had the opportunity to review, with the assistance of professional and legal advisors of its choosing, the Sale Support Agreement and (ii) all representations and warranties set forth in section 9 of the Sale Support Agreement are true and correct in all material respects as of the date hereof with respect to such Transferee.

This Joinder Agreement shall take effect and shall become an integral part of the Sale Support Agreement immediately upon its execution and the Transferee shall be deemed to be bound by all of the terms, conditions and obligations of the Sale Support Agreement as of the date hereof with respect to not only the above referenced First Lien Loan Claims to be transferred by the Transferor, but also any other First Lien Loan Claims owned by such Transferee prior to the date hereof.

IN WITNESS WHEREOF, this Joinder Agreement has been duly executed by the undersigned Transferee as of the date specified below.

Date: _____, 201_

|  |  |
|---|---|
|  | _____<br>Name of Transferee<br><br>_____<br>Authorized Signatory of Transferee<br><br><br>_____<br>(Type or Print Name and Title of Authorized Signatory)<br><br>Address:<br><br>_____<br>_____<br>_____<br>Attn:_____<br>Tel:_____<br>Fax:_____<br>Email:_____ |

*[Signature Page to Joinder Agreement]*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>GRACEWAY PHARMACEUTICALS, LLC,<br>*et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 11-_____ (____)<br><br>Joint Administration Pending |

## CONSOLIDATED LIST OF CREDITORS HOLDING
## 30 LARGEST UNSECURED CLAIMS

The following is a list of creditors holding the 30 largest unsecured claims against the above-captioned debtor and certain affiliated entities that have simultaneously commenced chapter 11 cases in this Court (collectively, the "**Debtors**"). This list has been prepared on a consolidated basis from the unaudited books and records as of September 28, 2011.

This list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in the Debtors' chapter 11 cases. This list does not include (1) persons who come within the definitions of "insider" set forth in 11 U.S.C. Section 101 or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the largest unsecured claims.

The information herein shall not constitute an admission of liability by, nor is it binding on, any Debtor. Moreover, nothing herein shall affect any Debtor's right to challenge the amount or characterization of any claim at a later date.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Graceway Pharma Holding Corp., a Delaware corporation (9175); Graceway Holdings, LLC, a Delaware limited liability company (2502); Graceway Pharmaceuticals, LLC, a Delaware limited liability company (5385); Chester Valley Holdings, LLC, a Delaware limited liability company (9457); Chester Valley Pharmaceuticals, LLC, a Delaware limited liability company (3713); Graceway Canada Holdings, Inc., a Delaware corporation (6663); and Graceway International, Inc., a Delaware corporation (2399). The mailing address for Graceway Pharmaceuticals, LLC is 340 Martin Luther King Jr. Blvd., Suite 500, Bristol, TN 37620 (Attn: John Bellamy).

# Top 30 Unsecured Creditors as of 9/28/2011

| Count | Name of Creditor | Name, telephone number and complete mailing address including, zip code of employee, agent or department of creditor familiar with claims who may be connected. | Nature of claim. (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff. | Amount of claim. (if secured, also state value of security) |
|---|---|---|---|---|---|
| 1 | Goldman Sachs Credit Partners, L.P. | 30 Hudson Street, 17th Floor<br>Jersey City, NJ 07302<br>Attn: Muhammad Khan<br>(T) 212-902-1000<br>(F) 212-357-4597 | Mezzanine Credit Agreement | | $81,396,389.39 |
| 2 | 3M | 3M Corporate Headquarters<br>3M Center<br>St. Paul, MN 55144-1000<br>Attn: George W. Buckley, Chairman, President and CEO<br>(T) 888-364-3577<br>(F) 651-733-9973 | Contract Claim | | $10,066,570.60 |
| 3 | Tricare | Skyline 5<br>Suite 810<br>5111 Leesburg Pike<br>Falls Church, VA 22041-3206<br>Attn: Rear Admiral Thomas McGinnis, Chief, Pharmacy Operations Directorate<br>(T) 303-676-3705 (Denver, CO) or 703-681-6012 (Falls Church, VA)<br>(F) 303-676-3616 (Denver, CO) | Government Contract Claim | | $3,039,104.00 |
| 4 | McKesson Patient Relationship Solutions | One Post Street<br>San Francisco, CA 94104<br>Attn: John H. Hammergren, Chairman, President & CEO<br>(T) 415-983-8300<br>(F) 415-983-8464 | Trade debt | | $1,640,395.15 |
| 5 | DPT Laboratories, LTD | 318 McCullough<br>San Antonio, TX 78215<br>Attn: Paul Johnson, President<br>(T) 210-476-8150<br>(F) 210-476-0794 | Trade debt | | $440,560.64 |
| 6 | Metaphor Inc. | 119 Cherry Hill Road Suite 145<br>Parsippany, NJ 07054<br>Attn: Dwayne Hann, President<br>(T) 973-334-1009<br>(F) 973-334-1667 | Trade debt | | $398,890.70 |
| 7 | NYS Dept. of Health | New York State Department of Health<br>Corning Tower<br>Empire State Plaza,<br>Albany, NY 12237<br>Attn: Nirav R. Shah, M.D., M.P.H, Commissioner<br>(T) 518-474-2011<br>(F) 518-474-0572 | Trade debt | | $337,195.52 |
| 8 | Source Healthcare Analytics | 2934 East Camelback Road<br>Phoenix, AZ 85016-3429<br>Attn: President or General Counsel<br>(T) 866-467-4644<br>(F) 866-467-4648 | Trade debt | | $300,000.00 |
| 9 | Chamberlain Communications, LLC | 111 Broadway, 19th Floor<br>New York, NY 10006<br>Attn: Deborah Cohen COO<br>(T) 212-884-0650<br>(F) 212-884-0628 | Trade debt | | $205,500.00 |
| 10 | Tennessee Dept. of Health | Cordell Hull Building<br>425 5th Avenue North<br>Nashville, TN 37243<br>Attn: John J. Dreyzehner, MD, MPH, Commissioner<br>(T) 615-741-3111<br>(F) 615-253-2100 | Trade debt | | $164,685.36 |
| 11 | California Dept. of Health Care Services | 500 W. Temple St., Room 383<br>Los Angeles, CA 90012<br>Attn: Violet Varona-Lukens, Executive Officer<br>(T) 213-974-1411<br>(F) 213-620-0636 | Trade debt | | $163,633.51 |

| Count | Name of Creditor | Name, telephone number and complete mailing address including, zip code of employee, agent or department of creditor familiar with claims who may be connected. | Nature of claim. (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff. | Amount of claim. (If secured, also state value of security) |
|---|---|---|---|---|---|
| 12 | Evince Communications, LLC | One Selleck Street<br>Norwalk, CT 06855<br>Attn: Dennis Kaiser, Director of Operations<br>(T) 800-207-6144<br>(F) 203-604-1858 | Trade debt | | $163,140.00 |
| 13 | ETHOS Health Communications, Inc. | 790 Newtown Yardley Road<br>Suite 425<br>Newtown, PA 18940-1748<br>Attn: David A. Sadock, President & CEO<br>(T) 215-867-1900<br>(F) 215-867-1906 | Trade debt | | $146,055.36 |
| 14 | Express Scripts/DPS, Inc. | One Express Way<br>St. Louis, MO 63121<br>Attn: George Paz, Chairman & CEO<br>(T) 314-996-0900<br>(F) 888-853-5408 | Trade debt | | $141,916.51 |
| 15 | Laboratorios Vargas, S.A. | Las Piedras A Puente Restaurador, Apartado 2461<br>Caracas 1010-A, Venezuela<br>Attn: Aitor Gonzalo<br>(T) +58 (212) 409.05.50<br>(F) +58 (212) 541.78 | Trade debt | Disputed | $82,390.26 |
| 16 | Quadrant HealthCom, Inc. | 7 Century Drive, Suite 302<br>Parsippany, NJ 07054-4609<br>Attn: Marcy Holeton, President & CEO<br>(T) 973-206-8022<br>(F) 973-206-9378 | Trade debt | | $71,795.43 |
| 17 | Agency for Healthcare Admin | 2727 Mahan Drive<br>Tallahassee, FL 32308<br>Attn: Karen Zeiler, Chief of Staff<br>(T) 850-412-3606<br>(F) 850-922-2897 | Trade debt | | $70,929.09 |
| 18 | Commonwealth of PA/DRP | Fourth and Walnuts Sts<br>Harrisburg, PA 17128-0101<br>Attn: Tony Rovito, Office Manager<br>(T) 717-783-1405<br>(F) 717-783-4447 | Trade debt | | $67,925.86 |
| 19 | Poretta & Orr Inc. | 450 East Street<br>Doylestown, PA 18901<br>Attn: Rick Counihan, Account Supervisor<br>(T) 215-345-1515<br>(F) 215-345-6459 | Trade debt | | $65,851.60 |
| 20 | PPD Medical Communication | 929 North Front Street<br>Wilmington, NC 28401-3331<br>Attn: David L. Grange, CEO<br>(T) 910-251-0081<br>(F) 910-762-5820 | Trade debt | | $64,058.21 |
| 21 | GSW | 500 Olde Worthington Road<br>Westerville, OH 43082<br>Attn: Dan Smith, COO<br>(T) 614-848-4848<br>(F) 614-839-7374 | Trade debt | | $60,030.00 |
| 22 | Humana Inc. | 500 West Main Street<br>Louisville, KY 40202<br>Attn: Michael B. McCallister, Chairman of the Board and CEO<br>(T) 800-486-2620<br>(F) 502-508-1210 | Trade debt | | $58,162.82 |

**Top 30 Unsecured Creditors as of 9/28/2011**

| Count | Name of Creditor | Name, telephone number and complete mailing address including, zip code of employee, agent or department of creditor familiar with claims who may be connected. | Nature of claim. (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff. | Amount of claim. (if secured, also state value of security) |
|---|---|---|---|---|---|
| 23 | Maine Medicaid Agency | 11 State House Station<br>Augusta, Maine 04333-0011<br>Attn: Stefanie Nadeau, Acting Director<br>(T) 207-287-9202<br>(F) 207-287-8540 | Trade debt | | $58,060.32 |
| 24 | SDI Health LLC | 1 SDI Drive<br>Plymouth Meeting, PA 19462<br>Attn: Andrew Kress, Chief Executive Officer<br>(T) 610-834-0800<br>(F) 610-834-8817 | Trade debt | | $55,125.00 |
| 25 | Wright Express | 97 Darling Avenue<br>South Portland, Maine 04106<br>Attn: Michael E. Dubyak, Chairman, President and CEO<br>(T) 207-773-8171<br>(F) 207-828-5181 | Trade debt | | $52,300.00 |
| 26 | WV Dept of Health and Human Resources | One Davis Square, Suite 100 East<br>Charleston, WV 25301<br>Attn: Michael J. Lewis, M.D., Ph.D., Cabinet Secretary<br>(T) 304-558-0684<br>(F) 304-558-1130 | Trade debt | | $50,266.58 |
| 27 | CVS Caremark Part D Services | One CVS Drive<br>Woonsocket, RI 02895<br>Attn: Larry J. Merlo, President & Chief Executive Officer<br>(T) 401-765-1500<br>(F) 401-652-1593 | Trade debt | | $47,723.66 |
| 28 | Caremark PCS Health LLC State | 750 West John Carpenter Freeway<br>Suite 1200<br>Irving, TX 75039<br>Attn: Mr. Edwin M. Crawford, Chairman<br>(T) 469-524-4700<br>(F) 972-830-6195 | Trade debt | | $44,478.91 |
| 29 | Innovation Printing & Communication | 11601 Caroline Road<br>Philadelphia, PA 19154<br>Attn: Estelle Bollendorf, Accounts Receivable<br>(T) 215-969-4600<br>(F) 215-464-7664 | Trade debt | | $40,450.50 |
| 30 | AT&T Mobility | 208 South Akard Street<br>Dallas, TX 75202-4206<br>Attn: Ralph de la Vega, President and CEO<br>(T) 210-821-4105<br>(F) 214-761-4239 | Trade debt | | $33,000.00 |
| | Grand Total | | | | $99,526,584.98 |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>GRACEWAY PHARMACEUTICALS, LLC,<br>*et al.,*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 11-____ (____)<br><br>Joint Administration Pending |

## DECLARATION CONCERNING DEBTORS' CONSOLIDATED LIST OF CREDITORS HOLDING 30 LARGEST UNSECURED CLAIMS

I, Brian G. Shrader, on behalf of Graceway Pharmaceuticals, LLC, a Delaware limited liability company, declare under penalty of perjury that I have reviewed the consolidated list of creditors holding the 30 largest unsecured claims submitted herewith, and that the list is true and correct to the best of my information and belief.

Dated: September 29, 2011
Wilmington, Delaware

_____
Brian G. Shrader
Chief Financial Officer

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Graceway Pharma Holding Corp., a Delaware corporation (9175); Graceway Holdings, LLC, a Delaware limited liability company (2502); Graceway Pharmaceuticals, LLC, a Delaware limited liability company (5385); Chester Valley Holdings, LLC, a Delaware limited liability company (9457); Chester Valley Pharmaceuticals, LLC, a Delaware limited liability company (3713); Graceway Canada Holdings, Inc., a Delaware corporation (6663); and Graceway International, Inc., a Delaware corporation (2399). The mailing address for Graceway Pharmaceuticals, LLC is 340 Martin Luther King Jr. Blvd., Suite 500, Bristol, TN 37620 (Attn: John Bellamy).

CH\1301111.1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GRACEWAY PHARMACEUTICALS, LLC, *et al.*,[1] | Case No. 11-_____ (____) |
| | Joint Administration Pending |
| Debtors. | |

## LIST OF EQUITY SECURITY HOLDERS
## AND STATEMENT OF CORPORATE OWNERSHIP

In accordance with Rule 1007(a)(1) and 1007(a)(3) of the Federal Rules of Bankruptcy Procedure, the Debtor submits the List of Equity Security Holders and Statement of Corporate Ownership attached hereto, representing the record holders as of September 29, 2011.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Graceway Pharma Holding Corp., a Delaware corporation (9175); Graceway Holdings, LLC, a Delaware limited liability company (2502); Graceway Pharmaceuticals, LLC, a Delaware limited liability company (5385); Chester Valley Holdings, LLC, a Delaware limited liability company (9457); Chester Valley Pharmaceuticals, LLC, a Delaware limited liability company (3713); Graceway Canada Holdings, Inc., a Delaware corporation (6663); and Graceway International, Inc., a Delaware corporation (2399). The mailing address for Graceway Pharmaceuticals, LLC is 340 Martin Luther King Jr. Blvd., Suite 500, Bristol, TN 37620 (Attn: John Bellamy).

## List of Equity Security Holders of Record and Statement of Corporate Ownership

| NAME | ADDRESS | EQUITY HOLDINGS |
|------|---------|-----------------|
| Graceway Holdings, LLC | 340 Martin Luther King Jr. Blvd.<br>Suite 500<br>Bristol, TN 37620 | 100% |

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

In re:

GRACEWAY PHARMACEUTICALS, LLC, et al.,[1]

Debtors.

Chapter 11

Case No. 11-_____ (_____)

Joint Administration Pending

## DECLARATION REGARDING LIST OF EQUITY SECURITY HOLDERS
## AND STATEMENT OF CORPORATE OWNERSHIP

I, Brian G. Shrader, on behalf of Graceway Pharmaceuticals, LLC, a Delaware limited liability company, declare under penalty of perjury that I have reviewed the List of Equity Security Holders and Statement of Corporate Ownership submitted herewith, and that the list is true and correct to the best of my information and belief.

Dated: September 29, 2011
Wilmington, Delaware

Respectfully Submitted,

GRACEWAY PHARMACEUTICALS, LLC

Brian G. Shrader
Chief Financial Officer

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Graceway Pharma Holding Corp., a Delaware corporation (9175); Graceway Holdings, LLC, a Delaware limited liability company (2502); Graceway Pharmaceuticals, LLC, a Delaware limited liability company (5385); Chester Valley Holdings, LLC, a Delaware limited liability company (9457); Chester Valley Pharmaceuticals, LLC, a Delaware limited liability company (3713); Graceway Canada Holdings, Inc., a Delaware corporation (6663); and Graceway International, Inc., a Delaware corporation (2399). The mailing address for Graceway Pharmaceuticals, LLC is 340 Martin Luther King Jr. Blvd., Suite 500, Bristol, TN 37620 (Attn: John Bellamy).