## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GRACEWAY PHARMACEUTICALS, LLC, *et al.*,[1] | Case No. 11-13036 (_____) |
| Debtors. | Joint Administration Pending |

## DECLARATION OF GREGORY C. JONES IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Gregory C. Jones, being duly sworn, depose and say:

1.     I am the Executive Vice President of Strategic Development of Graceway Pharmaceuticals, LLC, a limited liability company organized under the laws of the State of Delaware and the primary operating company of the debtors and debtors-in-possession (collectively, the "**Debtors**" or the "**Company**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"). I submit this declaration (the "**First Day Declaration**") on behalf of the Debtors.

2.     As Executive Vice President of Strategic Development, I am responsible for various internal and external strategic projects and operational initiatives. As a result of my tenure with the Debtors, my review of public and non-public documents, and my discussions with other members of the Debtors' management team and the Debtors' professionals, I am familiar with the Company's business, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Graceway Pharma Holding Corp., a Delaware corporation (9175); Graceway Holdings, LLC, a Delaware limited liability company (2502); Graceway Pharmaceuticals, LLC, a Delaware limited liability company (5385); Chester Valley Holdings, LLC, a Delaware limited liability company (9457); Chester Valley Pharmaceuticals, LLC, a Delaware limited liability company (3713); Graceway Canada Holdings, Inc., a Delaware corporation (6663); and Graceway International, Inc., a Delaware corporation (2399). The mailing address for Graceway Pharmaceuticals, LLC is 340 Martin Luther King Jr. Blvd., Suite 500, Bristol, TN 37620 (Attn: John Bellamy).

matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisers that report to me in the ordinary course of my responsibilities. References to the Bankruptcy Code (as defined below), the chapter 11 process and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.     On September 28, 2011 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief in the Bankruptcy Court for the District of Delaware (the "**Court**"). The Debtors will continue to operate their businesses and manage their properties as debtors-in-possession.

4.     I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**") and (b) "first day" motions, which are being filed concurrently herewith (collectively, the "**First Day Motions**").[2] The Debtors seek the relief set forth in the First Day Motions with the goal of minimizing the adverse effects of the commencement of the Chapter 11 Cases on their business. I have reviewed the Debtors' petitions and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and the success of these Chapter 11 Cases.

5.     Part I of this First Day Declaration provides an overview of the Debtors' businesses, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the Debtors'

---

[2]     Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the applicable First Day Motion.

chapter 11 filings. Part II sets forth the relevant facts in support of the Debtors' First Day Motions.

**PART I**

**I.     BUSINESS OVERVIEW**

6.     The Debtors are a specialty pharmaceutical company focused on generating sales growth and developing, in-licensing and acquiring branded prescription products primarily in the areas of dermatology, respiratory, and women's health. The Debtors were founded with a culture of commitment to physicians and patients, and a dedication to enhancing the quality of health care. The Debtors are committed to providing innovative new therapies in the form of unique products and drug delivery technologies.

7.     As of the Petition Date, the Debtors' products sold in the United States include, among others: Zyclara® (imiquimod) Cream 3.75% ("**Zyclara**"), Aldara® (imiquimod) Cream 5% ("**Aldara**"), Maxair® Autohaler® (pirbuterol acetate inhalation aerosol) ("**Maxair**"), Atopiclair® Nonsteroidal Cream ("**Atopiclair**"), and Estrasorb® (estradiol topical emulsion) ("**Estrasorb**"). Zyclara is a second generation imiquimod product developed by the Debtors, and is the core product of the Debtors' business. Zyclara received approval from the United States Food and Drug Administration ("**FDA**") for treatment of actinic keratoses ("**AK**") and external genital warts ("**EGW**") in March 2010 and March 2011, respectively. The Debtors have been granted regulatory exclusivity to market Zyclara in the United States through March 2013 for AK and March 2014 for EGW. Additionally, various patents are pending, and the Debtors expect near term approval of certain patents.

**A.     Company History**

8.     The Debtors were founded in 2006 through a partnership of industry veteran Jefferson J. Gregory and GTCR Golder Rauner, LLC ("**GTCR**"), a leader in the private equity

3

070649.1001

industry for more than 25 years. On January 2, 2007, the Debtors announced that they had completed the acquisition of the North and South America pharmaceuticals business of 3M Company (together with its subsidiaries and affiliates, "**3M**") for approximately $875 million. This acquisition positioned the Debtors as a leader in the market of specialty pharmaceutical products. As part of the purchase, the Debtors acquired several products from 3M, including Aldara. Also, on January 2, 2007, the Debtors announced that Chester Valley Pharmaceuticals, LLC, a dermatology-focused specialty pharmaceutical company and another company partially owned by GTCR would merge into Graceway Pharmaceuticals, LLC ("**Graceway Pharma**").

9. On January 1, 2008, the Debtors acquired a centralized distribution facility in Tennessee, including a Free Trade Zone for the export of its products. On February 19, 2008, the Debtors acquired the rights to Estrasorb, a topical estrogen therapy, in the United States. On December 12, 2008 the Debtors filed with the FDA a next generation imiquimod product, and on December 31, 2008 the Debtors acquired complete marketing rights in the United States to Atopiclair, a non-steroidal therapy for eczema. On July 2, 2009 the Debtors acquired the worldwide rights to three of Pfizer's dermatology projects, and on November 6, 2009 the Debtors acquired worldwide rights to a product being developed by Gilead Sciences.

10. On May 12, 2010, the Debtors entered into a licensing agreement with Meda AB ("**Meda**") for commercialization and developmental rights in and to the patents covering Zyclara in the European market. In exchange for permitting Meda to market and sell Zyclara throughout Europe, the Debtors received a cash payment of $19 million and an ongoing royalty payment of 5% after commercialization and approval of Zyclara in Europe. Additionally, the agreement provides Meda with an option to purchase certain future product developments from the Debtors.

YCST01: 11470164.2

070649.1001

The Debtors also obtained royalty free rights in and to developments made by Meda under the licensed patents.

11.     On June 28, 2010, the Debtors entered into a series of transactions with International Pharma Labs, S.A.R.L., a company formed under the laws of Luxemburg that operates in Mexico and Latin America, and certain of its subsidiaries and affiliates[3] (collectively "**IPL**"),. Pursuant to a Purchase and Sale Agreement, IPL acquired the right to sell substantially all of the products which the Debtors had marketing and other rights in and to, other than Zyclara, throughout Mexico and certain parts of South America and Latin America.[4] Under the Purchase and Sale Agreement, the Debtors received a cash payment of $15.1 million from IPL. Of the $15.1 million purchase price, $1.1 million was attributed to inventory on hand at close, which amount was subsequently paid in four installments.

12.     Additionally, as part of the June 28, 2010 transactions the Debtors entered into an exclusive Licensing Agreement with IPL whereby IPL is permitted to market and sell Zyclara, and certain future indications approved for Zyclara and developments the Debtors make to Zyclara, in Mexico and certain parts of South America and Latin America. Under the Licensing Agreement, the Debtors received a $10 million cash payment, and will receive ongoing royalties after approval and commercialization of the product. The Debtors also obtained royalty-free rights in and to developments made by IPL under the licensed patents.

---

[3]     The subsidiaries and affiliates include: More Pharma Corporation, S. se R.L. de C.V.; International Pharma Labs, S.A.R.L.; Pharma Investment Holding 3 LLC; Pharma Investment Holding 4 LLC; Cabinet Procurement, LLC.

[4]     Specifically, the territories covered by the agreement are: Argentina, Belize, Bolivia, Brazil, Chile, Colombia, Costa Rica, Ecuador, El Salvador, French Guiana, Guatemala, Guyana, Honduras, the Islands of the Caribbean (including Antigua, Aruba, Bahamas, Barbados, Barbuda, Caicos Islands, Cayman Islands, Cuba, Dominican Republic, Dominica, Grenada, Grenadines, Guadeloupe, Haiti, Jamaica, Martinique, Nevis, St. Kitts, St. Lucia, St. Vincent, Trinidad, Tobago, Turks, the Virgin Islands), Mexico, Nicaragua, Panama, Paraguay, Peru, Suriname, Uruguay and Venezuela.

070649.1001

13.     The Debtors also entered into two separate product supply agreements with IPL ("**Product Supply Agreements**"). Under the first Product Supply Agreement, the Debtors are supplying certain currently marketed pharmaceuticals sold by IPL. These pharmaceuticals are manufactured by 3M and are part of a supply agreement between the Debtors and 3M. Under the second Product Supply Agreement, the Debtors will supply IPL with Zyclara, also manufactured by 3M, and any future developments to Zyclara that are part of the Licensing Agreement. The Debtors receive credits against the Debtors' minimum purchase requirements under their supply agreement with 3M for the product amounts supplied to IPL.

14.     Graceway Pharma is the direct and indirect parent of Chester Valley Holdings, LLC, Chester Valley Pharmaceuticals, LLC , Graceway Canada Holdings, Inc. and Graceway International, Inc. Graceway Pharma is wholly owned by Graceway Holdings, LLC ("**Holdings**"), which is wholly owned by Graceway Pharma Holding Corp ("**Parent**"). A corporate organization chart is attached hereto as **Exhibit A**.

**B.     Business Operations and Sales**

15.     The Debtors are headquartered in Bristol, Tennessee, and the Debtors' sales and marketing efforts are directed from the Debtors' offices in Exton, Pennsylvania. The Debtors' sales and marketing infrastructure is designed to efficiently reach critical points in the pharmaceutical product distribution chain, and includes a highly trained sales force capable of providing sales coverage across the United States. In total, the Debtors employ approximately 165 full-time employees, 89 of which are sales related employees.

16.     In 2007, the year the Debtors were formed, the Debtors had total net sales of approximately $313.58 million. Of the total 2007 net sales, the sales of Aldara accounted for 77.02% of all sales, Maxair accounted for 10.39%, and the Debtors' other products accounted for

the remaining 12.59%. The Debtors' EBITDA for 2007 was approximately $189.80 million. In 2008, the Debtors had total net sales of approximately $340.26 million. Of the total 2008 net sales, the sales of Aldara accounted for 80.96% of all sales, Maxair accounted for 8.91%, and the Debtors' other products accounted for the remaining 13%. The Debtors' EBITDA for 2008 was approximately $187.29 million. In 2009, the Debtors had total net sales of approximately $354.61 million. Of the total 2009 net sales, the sales of Aldara accounted for 84.95% of all sales, Maxair accounted for 8.04%, and the Debtors' other products accounted for the remaining 7.01%. The Debtors' EBITDA for 2009 was approximately $214.57 million.

17.     Since 2010 the Debtors have faced substantial declines in their net sales and a corresponding drop in EBITDA. These declines result primarily from the combination of the global recession and negative litigation results with respect to generic competition against Aldara, described in more detail below. In 2010, the Debtors had total net sales of approximately $219.53 million, consisting of product sales of $150.89 million and royalty and licensing revenues of $68.64 million. Of the total net sales, net sales from Aldara accounted for 23.9%, royalty revenues of Aldara (Authorized Generic) accounted for 17.7%, net sales from Maxair accounted for 12.0%, net sales from Zyclara accounted for 17.8%, licensing revenues for Zyclara accounted for 13.2%, and the Debtors' other products accounted for the remaining 15.4%. The Debtors' EBITDA for 2010 was $83.33 million.

18.     During the first two quarters of 2011, the Debtors' net sales were $67.54 million consisting of $58.12 million of product sales and $9.42 million of royalty revenues. Net sales from Aldara accounted for 15.7%, royalty revenues of Aldara (Authorized Generic) accounted for 10.9%, Maxair accounted for 15.7%, Zyclara accounted for 33.8%, and the Debtors' other products accounted for the remaining 23.9%. The Debtors had no licensing revenues for the first

YCST01: 11470164.2                    070649.1001

two quarters of 2011. The Debtors' EBITDA for the period from January 1, 2011 through June 30, 2011 was approximately $14.93 million.

19.     Graceway Canada Company ("**Graceway Canada**")[5] is a non-debtor subsidiary of the Debtors that is located in Toronto, Ontario and operates exclusively in Canada. Graceway Canada operates largely independently from the Debtors, although the Debtors provide certain operational and overhead support as well as a sublicense of the Debtors' rights to various products. Approximately 47 individuals are employed by Graceway Canada. Graceway Canada is a wholly owned subsidiary of debtor Graceway Canada Holdings, Inc.

**C.     The Debtors' Financial Results Deteriorate Following Unfavorable Litigation Results**

20.     Aldara has been one of the Debtors' core products since it was acquired as a mature product from 3M.

21.     Aldara is (or has been) protected by three US patents, each of which is owned or licensed by the Debtors. US Patent No. 4,698,338 (the "**338 Patent**") covers imiquimod, the active pharmacological ingredient in Aldara. The '338 Patent expired on August 25, 2009, with a period of exclusivity that ran to February 25, 2010. US Patent No. 5,238,944 (the "**944 Patent**") covers a formulation of imiquimod with isoteric acid. The '944 Patent expired on August 24, 2010, with a period of exclusivity running to February 24, 2011. US Patent No. 7,655,672 (the "**672 Patent**") protects a formulation of imiquimod with oleic acid and was issued on February 2, 2010.

22.     On January 10, 2007, Nycomed U.S. Inc., ("**Nycomed**") informed the Debtors that it had filed an Abbreviated New Drug Application ("**ANDA**") to produce a bioequivalent

---

[5] As discussed below, Graceway Canada will provide the Debtors with a post-petition intercompany debtor-in-possession loan.

generic version of Aldara. On February 25, 2010, the FDA approved Nycomed's ANDA seeking to produce a generic version of Aldara. Once approved, Nycomed immediately began advertising, selling, and distributing its product domestically.

23. The Debtors filed a lawsuit on February 23, 2010, alleging that Nycomed's generic Aldara drug infringes the '672 Patent. The Debtors' complaint sought damages and injunctive relief for injuries relating to lost sales and profits of Aldara, including lost reputation and market share, and lost business opportunities associated with an inability to fund research ventures, including meeting payroll, and debt service. The complaint also named Perrigo Company and Perrigo Israel Pharmaceuticals Ltd. (collectively "**Perrigo**") as defendants.

24. On March 8, 2010, the District of New Jersey denied the Debtors' motion for a temporary restraining order against Nycomed. Graceway Pharm., LLC. v. Perrigo Co., Case No. 2:10-cv-00937 (WJM) (D.N.J. March 8, 2010).

25. In April of 2010, Perrigo settled with the Debtors and became the authorized generic distributor for Aldara. The litigation against Nycomed has not been resolved and is still pending in the District of New Jersey.

26. The unfortunate outcome of this lawsuit has resulted in the Debtors no longer possessing an exclusive right to manufacture and distribute what was previously their main product; the market is now occupied by several other entities. As a result, the Debtors' net revenues for Aldara decreased from roughly $320.83 million in 2009 to $52.2 million in 2010. The loss of exclusivity with respect to Aldara, and the resulting decrease in net sales, is the primary factor that has led the Debtors to commence these Chapter 11 Cases.

**D.     Development of Zyclara**

27. As noted above, the Debtors recently developed and launched a second generation imiquimod product, Zyclara, for the treatment of AK and EGW. Zyclara was designed as an

improvement of Aldara, the first generation imiquimod product. With respect to the treatment of AK, Zyclara treats a larger surface area than Aldara and both visible and non-visible AK lesions. Zyclara's AK dosing regimen is also shorter than Aldara's (once daily treatment for eight weeks versus two times a week for 16 weeks). With respect to the EGW indication, Zyclara offers patients a short daily-dosing cycle with sustained efficiency. Many of the other approved topical treatments for EGW are not ideal due to lengthy and confusing dosing regimens.

28.     As Zyclara was being developed for EGW, it was intended to improve patient experience by offering a more intuitive dosing regimen. Namely, it provides for once daily treatment for up to eight weeks (versus three times a week for up to 16 weeks with Aldara), with the goal of improving patient compliance. As of March 2011, Zyclara had captured 14% and 16% of the total and new prescriptions, respectively, written for imiquimod products, which implies approximately 60% conversion of Aldara's AK market.

## II.     OVERVIEW OF THE PREPETITION CAPITAL STRUCTURE

29.     On May 3, 2007, the Debtors entered into a first lien secured credit facility agreement, a second lien secured credit facility agreement, and an unsecured mezzanine credit facility agreement. Each of the credit facilities and the amounts owed thereunder is described below.

YCST01: 11470164.2

070649.1001

| Type of Prepetition Indebtedness | Approximate Amount of Outstanding Debt as of September 28, 2011[6] |
|---|---|
| First Lien Debt<br>         Revolver<br>         Term B | $430,698,397.58 (in the aggregate)<br>     $22,054,563.23<br>     $408,643,834.35 |
| Second Lien Debt | $330,000,000 |
| Mezzanine Debt | $81,396,389.39 |
| Trade Debt (unsecured) | $30,000,000 |

### A.     First Lien Debt

30.     Prior to the Petition Date, certain of the Debtors entered into that certain First Lien Credit Agreement dated as of May 3, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "**First Lien Credit Agreement**"), among, inter alia, Holdings, Graceway Pharma, the lenders party thereto (collectively, "**First Lien Lenders**"), and Bank of America, N.A. ("**BofA**"), as administrative agent for the First Lien Lenders and collateral agent for the First Lien Claimholders (as defined in the Intercreditor Agreement (as defined below), without giving effect to any cap provided for therein) (BofA, in such capacity, the "**First Lien Agent**"), Swing Line Lender (as defined in the First Lien Credit Agreement) and L/C Issuer (as defined in the First Lien Credit Agreement). Pursuant to the First Lien Credit Agreement, the First Lien Agent, the First Lien Lenders, the Swing Line Lender and the L/C Issuer agreed to extend certain loans to, and issue letters of credit for the account of, Graceway Pharma, including (a) a Term B loan of $650 million, with the balance payable on May 3, 2012, (b) a revolving credit facility in an aggregate principal amount of up to $30 million, (c) a swing line loan in an aggregate principal amount of up to $10 million and (d) the issuance of up to $10 million of letters of credit.

---

[6]     These amounts exclude interest, fees, and expenses.

31. The obligations (the "**First Lien Obligations**") of Graceway Pharma, Holdings and the Debtors other than Parent as guarantor (the "**Guarantor**") under the Collateral Documents (as defined in the First Lien Credit Agreement) (as such documents are amended, restated, supplemented or otherwise modified from time to time, the "**First Lien Collateral Documents**") were secured by, among other things, a first priority continuing security interest in substantially all of the Debtors' (other than Parent's) assets and property (the "**First Priority Liens**")

32. <u>Amendments to the First Lien Credit Agreement</u>. The Debtors have from time to time addressed issues arising under the First Lien Credit Agreement with the First Lien Lenders, beginning in 2009. At that time, the Debtors and the First Lien Lenders desired to clarify the First Lien Credit Agreement with respect to the effect of certain payments on Excess Cash Flow (as defined in the First Lien Credit Agreement) and to recalculate Excess Cash Flow accordingly. Graceway Pharma, Holdings and certain of the First Lien Lenders therefore entered into the Clarification and Amendment to Credit Agreement (the "**First Amendment**") dated August 7, 2009.

33. In early 2010, the Debtors were considering the purchase of loans from existing lenders. Accordingly, Graceway Pharma, Holdings and certain of the First Lien Lenders entered into the Second Amendment to First Lien Credit Agreement (the "**Second Amendment**"), dated January 22, 2010. The loan purchase authorized by the Second Amendment did not occur.

34. Later in 2010, the Debtors faced certain events of default under the First Lien Credit Agreement. Graceway Pharma, Holdings and certain of the First Lien Lenders entered into the Third Amendment to First Lien Credit Agreement (the "**Third Amendment**") on October 15, 2010. The Third Amendment waived the then-currently existing events of default,

YCST01: 11470164.2 070649.1001

subject to an increase in the interest rate margins payable to the First Lien Lenders, a pay-down of First Lien Obligations by the Debtors, and increased communications between the Debtors and the First Lien Lenders with respect to the Debtors' financial condition.

### B. Second Lien Debt

35. Also prior to the Petition Date, Graceway Pharma entered into that certain Second Lien Credit Agreement dated as of May 3, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "**Second Lien Credit Agreement**"), among, inter alia, Graceway Pharma, Holdings, the lenders party thereto (collectively, "**Second Lien Lenders**") and Deutsche Bank Trust Company Americas ("**DB**"), as administrative agent for the Second Lien Lenders and collateral agent for the Second Lien Claimholders (as defined in the Intercreditor Agreement) (the Second Lien Claimholders and First Lien Claimholders collectively, the "**Prepetition Secured Parties**") (DB, in such capacity, the "**Second Lien Agent**"). Pursuant to the Second Lien Credit Agreement, the Second Lien Agent and the Second Lien Lenders agreed to extend certain loans to Graceway Pharma totaling $330 million in the aggregate.

36. The obligations (the "**Second Lien Obligations**" and, together with the First Lien Obligations, the "**Prepetition Obligations**") of Graceway Pharma, Holdings and the Guarantors under the Collateral Documents (as defined in the Second Lien Credit Agreement) (as such documents are amended, restated, supplemented or otherwise modified from time to time, the "**Second Lien Collateral Documents**") were secured by, among other things, a second priority continuing security interest in substantially all of the Debtors' (other than Parent's) assets and property (the "**Second Priority Liens**" and, together with the First Priority Liens, the "**Prepetition Liens**").

37.     Second Lien Credit Agreement Forbearance.   On March 8, 2011, Graceway Pharma, Holdings and the Second Lien Agent entered into a forbearance agreement (the "**Forbearance Agreement**"), pursuant to which certain of the Second Lien Lenders agreed to forbear on exercising remedies and to continue providing credit to Debtors under the Second Lien Credit Agreement.   Under its original terms, the Forbearance Agreement was set to expire on March 25, 2011.   By means of four subsequent amendments to the Forbearance Agreement, dated March 23, 2011, April 7, 2011, April 21, 2011 and May 13, 2011, the Forbearance Agreement was extended through September 15, 2011.

### C.     Intercreditor Agreement

38.     Pursuant to the Intercreditor Agreement, dated as of May 3, 2007 (the "**Intercreditor Agreement**," attached hereto as **Exhibit B**, and together with the First Lien Documents and the Second Lien Documents, the "**Prepetition Documents**"), among Holdings, Graceway Pharma, the First Lien Agent, the Second Lien Agent and BofA as Collateral Agent, the Second Priority Liens are subject and subordinate to the First Priority Liens on the terms contained in the Intercreditor Agreement.   Pursuant to Section 6.01 of the Intercreditor Agreement, because the First Lien Agent consents to the use of Cash Collateral during the pendency of the Chapter 11 Cases, the Second Lien Agent may not object to the use of Cash Collateral.   Intercreditor Agreement at § 6.01.   In addition, the Second Lien Agent may not request any form of adequate protection other than the Adequate Protection Replacement Liens and Adequate Protection Super-Priority Claims provided in the Interim Order on the DIP Financing/Cash Collateral Motion.   Id. at §§ 6.04(a), (b).

### D.     Unsecured Debt

39.     Also prior to the Petition Date, Graceway Pharma entered into that certain Mezzanine Credit Agreement dated as of May 3, 2007 (as amended, restated, supplemented or

otherwise modified from time to time, the "**Mezzanine Credit Agreement**"), among, inter alia, Holdings, Graceway Pharma, the lenders party thereto (collectively, "**Mezzanine Lenders**") and Goldman Sachs Credit Partners L.P. ("**Goldman**"), as administrative agent for the Mezzanine Lenders (Goldman, in such capacity, the "**Mezzanine Agent**"). Pursuant to the Mezzanine Credit Agreement, the Mezzanine Agent and the Mezzanine Lenders agreed to extend certain unsecured loans to Graceway Pharma totaling $70 million in the aggregate.

### E. Trade and Other Unsecured Debt

40.     The Company has been paying obligations due and owing to its vendors, suppliers and other prepetition creditors as they come due in the ordinary course of business. As of the Petition Date, the total outstanding obligations due and owing to vendors, suppliers and other general unsecured creditors (other than the lenders under the Mezzanine Credit Agreement) are approximately $30,000,000.

## III.     EVENTS LEADING TO THE CHAPTER 11 FILINGS

41.     As noted above, as a result of litigation relating to Aldara, the Debtors no longer possess the exclusive right to manufacture and distribute what had been a very profitable product. Due to this development, as well as the impact of the global recession, the Debtors' revenues have decreased substantially over the past year.

42.     As a result of the foregoing, the Debtors began to explore operational modifications to save operating costs, as well as sales of certain non-core assets. As described above, the Debtors entered into the transactions with Meda and IPL, pursuant to which the Debtors divested substantially all of their operations other than operations within the United States and Canada and licensed the rights to sell many of their products outside of the United States and Canada.

YCST01: 11470164.2
070649.1001

43.     In March 2010, the Debtors retained Lazard Frères & Co. LLC ("**Lazard**") as an investment banker to assist the Debtors in addressing their financial situation and exploring potential financing and restructuring alternatives. Additionally, in March 2010, the Debtors retained Alvarez and Marsal North America, LLC ("**Alvarez**") to perform a variety of restructuring related services. The Debtors and their advisors continued to evaluate operational changes that could result in decreased cost, while also negotiating with the lenders under their prepetition credit facilities. In May, 2010, the Debtors terminated approximately 40% of the Debtors' workforce in order to cut costs.

44.     Despite the Debtors' efforts, the Debtors were unable to avoid potential defaults under their credit agreements. As discussed above, such potential defaults caused the Debtors to enter into the Third Amendment and Forbearance Agreement during 2010 and 2011.

## IV.     OBJECTIVES OF THE CHAPTER 11 CASES

45.     Notwithstanding the global economic circumstances and litigation results that contributed to the Debtors' current challenges, the Debtors are a strong specialty pharmaceutical company with a solid product base going forward. These cases have been initiated to enable the Debtors to stabilize their operations and maximize the value of the Debtors' assets through a sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code (the "**Sale**").

### A.     The Prepetition Marketing Process

46.     As noted above, in March 2010, the Debtors retained Lazard and Alvarez to assist the Debtors in addressing their financial situation, explore potential financing and restructuring alternatives and to perform a variety of restructuring related services. Prior to filing these Chapter 11 Cases, the Debtors, with the assistance of Lazard and Alvarez, and in consultation with certain of the First Lien Lenders and their advisors, pursued a range of options to address

16

the Debtors' concerns about their ability to service their debt going forward, including new financing, refinancing and the sale of certain or all of the Debtors' assets or business. After exploring the strategic alternatives available to them, the Debtors determined that the best way to maximize the value of their assets for the benefit of their creditors was to seek a sale of substantially all of their assets pursuant to Section 363 of the Bankruptcy Code.

47.     As set forth in the *Declaration of Daniel Aronson in Support of Debtors' Motion for Entry of (I) an Order Approving and Authorizing (A) Bidding Procedures in Connection with the Sale of Certain Assets of the Debtors, (B) Stalking Horse Bid Protections, (C) the Form and Manner of Notice of the Sale Hearing and (D) Other Related Relief* (the "**Aronson Declaration**") attached as Exhibit C to the *Debtors' Motion for Entry of (I) an Order Approving and Authorizing (A) Bidding Procedures in Connection with the Sale of Certain Assets of the Debtors, (B) Stalking Horse Bid Protections, (C) the Form and Manner of Notice of the Sale Hearing and (D) Other Related Relief; and (II) An Order Authorizing (A) the Sale of Certain Assets of the Debtors Free and Clear of All Claims, Liens, Liabilities, Rights, Interests and Encumbrances, (B) the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement, (C) the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief* (the "**Sale Motion**") filed concurrently herewith, the Debtors implemented an extensive marketing and sale process for the Debtors' assets that was directed by Lazard. As a result of this prepetition marketing and sales process, the Debtors received two bids for substantially all of the Debtors' assets and engaged in parallel, but individual, arm's-length negotiations with each bidder and such bidder's counsel and advisors regarding the terms and conditions of an acquisition.

YCST01: 11470164.2

070649.1001

**B.      Selection of the Stalking Horse Bidder**

48.      Following these extensive negotiations on the terms and conditions of each offer, the Debtors, with the assistance of Lazard and their other advisors, conducted a final side-by-side analysis of the proposals and, ultimately, made the considered determination that the offer of Galderma S.A., a Switzerland corporation, was the highest and/or best offer presented and was an acceptable offer to serve as the stalking horse bidder.  On September 23, 2011, the special committee of the Board of Managers of Graceway Holdings, LLC and the full Board of Managers of Graceway Holdings, LLC (conducted concurrently with meetings of the boards of managers and directors of various subsidiaries and affiliates) held meetings to consider the bids received.  The special committee of the Board of Managers of Graceway Holdings, LLC recommended and ultimately the full Board of Managers (and the boards of managers and directors of various subsidiaries and affiliates) voted to select Galderma S.A. as the stalking horse bidder (the "**Stalking Horse Bidder**").  Thereafter, the Debtors and the Stalking Horse Bidder entered into the Asset Purchase Agreement dated September 27, 2011, between the Debtors, as sellers, and the Stalking Horse Bidder, as buyer (the "**APA**") pursuant to which Galderma S.A. agreed to pay $275,000,000 and to assume certain assumed liabilities to acquire the Acquired Assets (as defined in the APA), subject to the outcome of the auction and Court approval.

**C.      The Sale is Supported by the Consenting First Lien Lenders**

49.      Throughout the pre-petition marketing process, the Debtors and their advisors have kept those First Lien Lenders who were willing to become restricted and special restructuring and bankruptcy counsel to the First Lien Agent fully apprised of the implementation and effectuation of the marketing process.  The Debtors shared the bids with special restructuring and bankruptcy counsel to the First Lien Agent.  Prior to the board of

18

directors' ultimate selection of the Stalking Horse Bidder, special restructuring and bankruptcy counsel to the First Lien Agent represented to the Debtors' counsel that certain of the First Lien Lenders preferred the Stalking Horse Bidder's bid over the final bid submitted by the other bidder.

50.     To that end, on September 28, 2011, certain first lien lenders (the "**Consenting First Lien Lenders**"), who hold at least 40% of the outstanding First Lien Obligations under the First Lien Credit Agreement, executed a sale support agreement attached hereto as **Exhibit C** (the "**Sale Support Agreement**") evidencing their support of the Sale to the Stalking Horse Bidder or Successful Bidder.

51.     In the Sale Support Agreement and subject to the terms and conditions set forth therein, the Consenting First Lien Lenders have agreed to both support the Sale and allow the Debtors to use cash collateral ("**Cash Collateral**") and the proceeds of the Sale to, among other things, permit the Debtors to operate in the ordinary course of business through the consummation of the Sale and upon the consummation of the Sale, repay the Intercompany Loan (as defined below), pay accrued administrative expenses, fund the orderly wind-down of the Debtors' estates and confirm a plan of liquidation.

52.     Under the Sale Support Agreement and subject to the terms and conditions set forth therein, the Debtors have agreed to seek prompt approval of the Sale pursuant to various deadlines set forth in the Sale Support Agreement and which are consistent with the various deadlines set forth in the APA. The Sale Support Agreement recognizes the Debtors' fiduciary obligations to maximize value for all creditors, and, as such, does not impair the Debtors' ability to consider Alternative Transactions (as defined in the Sale Support Agreement), regardless of whether such Alternative Transaction results from the bid and auction procedures provided for in

YCST01: 11470164.2                                    070649.1001

the APA or otherwise. Similarly, the Sale Support Agreement allows the Debtors to withdraw from the Sale Support Agreement in the event that the board of directors reasonably determines that proceeding with or consummating the Sale would be inconsistent with the exercise of their respective fiduciary duties.

**D.    These Chapter 11 Cases Will Be Funded by Debtor-in-Possession Financing and Cash Collateral Use, Each of Which is Consented to by the Consenting First Lien Lenders**

53.    To continue to fund their operations while seeking to maximize the value of their assets for the benefit of all creditors through the continued sale process and administer these Chapter 11 Cases, the Debtors have negotiated the consensual use of cash collateral with the Consenting First Lien Lenders and are seeking approval of an aggregate of $6,000,000 in postpetition intercompany term loans from non-debtor Graceway Canada to Graceway Pharma (the "**Intercompany Loan**"). The Consenting First Lien Lenders have consented to the Intercompany Loan priming all prepetition First Lien Obligations (as defined in the DIP Motion) and to the use of Cash Collateral.

54.    Upon closing the Sale, the Debtors intend to use certain proceeds of the Sale and/or Cash Collateral to repay the Intercompany Loan and implement an orderly distribution of the sale proceeds and the liquidation of their remaining assets for the benefit of their creditors pursuant to a liquidating plan. After the consummation of the Sale, the Debtors will be able to determine which constituents other than the holders of the First Lien Obligations, if any, will be entitled to receive a distribution pursuant to a plan of liquidation.

55.    With sufficient financing to fund these Chapter 11 Cases and a stalking horse APA in place (the key terms of which have already been subject to a fulsome market test), and with the support of the majority of their First Lien Lenders for both the Intercompany Loan and

the Sale, the Debtors now seek to promptly effectuate the sale transaction to the Stalking Horse Bidder, subject to a competitive bidding process that is consistent with the Debtors' fiduciary duties to maximize value for their estates, stakeholders and parties in interest.

## PART II

56.    In furtherance of the objective of successfully administering these Chapter 11 Cases and maximizing value for all creditors, the Debtors have sought approval of the First Day Motions and related orders (the "**Proposed Orders**"), and respectfully request that the Court consider entering orders granting such First Day Motions.  For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Motions.

57.    I have reviewed each of the First Day Motions and Proposed Orders (including the exhibits thereto), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with a minimum of interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in achieving the maximization of the Debtors' value.

## I.    ADMINISTRATIVE AND PROCEDURAL MOTIONS

### A.    Joint Administration Motion

58.    The Debtors seek the joint administration of their Chapter 11 Cases, seven (7) in total, for procedural purposes only.  Many of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect all of the Debtors.  Thus, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

21

### B.     Retention Applications

59.     I believe that the retention of chapter 11 professionals is essential to these Chapter 11 Cases.  Accordingly, during the filing of these Chapter 11 Cases, the Debtors anticipate that they will request permission to retain, among others, the following professionals:  (a) Latham & Watkins LLP, as co-counsel;  (b) Young Conaway Stargatt & Taylor, LLP, as co-counsel;  (c) Alvarez, as restructuring advisor;  (d) Lazard, as investment banker;  (e) PricewaterhouseCoopers LLP, as tax consultant;  and (f) BMC Group, Inc., as claims, noticing, soliciting and balloting agent.   I believe that the above professionals are well qualified to perform the services contemplated by their various retention applications, the services are necessary for the success of these Chapter 11 Cases, and the professionals will coordinate their services to avoid duplication of efforts.  I understand that the Debtors may find it necessary to seek retention of additional professionals as these Chapter 11 Cases progress.

### C.     DIP Financing / Cash Collateral Motion (the "__DIP Motion__")

60.     As discussed above, prior to the Petition Date, the Debtors engaged in lengthy discussions with the Consenting First Lien Lenders about financing these Chapter 11 Cases. Those discussions culminated with the Consenting First Lien Lenders (i) agreeing to the use of Cash Collateral pursuant to the terms and conditions of the DIP Orders (as defined below) and the Approved Budget and (ii) permitting the Intercompany Loan to prime all prepetition first lien obligations.  The Intercompany Loan will not prime valid and properly perfected Prepetition Prior Liens (as defined in the DIP Motion).

61.     It is my understanding that the Debtors intend to support the ongoing operations of their business during these Chapter 11 Cases through the use of Cash Collateral and the Intercompany Loan.  The Intercompany Loan negotiated by the Debtors consists of a tranche A

term loan in the aggregate principal amount of $3,800,000 (the "**Tranche A Intercompany Loan**") and a tranche B term loan in the aggregate principal amount of $2,200,000 (the "**Tranche B Intercompany Loan**"). Graceway Pharma agrees to use the proceeds of (i) the Tranche A Intercompany Loan only in accordance with the terms and conditions of the Interim Order, including the Approved Budget and Budget Covenants (as defined in the DIP Motion) and (ii) the Tranche B Intercompany Loan only in accordance with the terms and conditions of the Interim Order, including the Approved Budget and Budget Covenants, and with the prior written consent of the Approving Majority First Lien Lenders (as defined in the DIP Motion).

62.    The Intercompany Loan will be evidenced by the Term Loan Notes by and among Graceway Pharma, as borrower, and non-debtor Graceway Canada, as lender (the "**Intercompany Notes**"). The Debtors will provide a secured guarantee of the Intercompany Loan in favor of Graceway Canada, which will be evidenced by the Intercompany Guarantee. Graceway Pharma will seek permission to borrow all amounts available under the Intercompany Notes upon entry of the Interim Order, subject to the terms and conditions contained in the Interim Order and the Approved Budget.

63.    I believe that the Debtors have compelling, yet simple reasons for requesting authority to use Cash Collateral and obtain postpetition financing. The Debtors intend to use both the Intercompany Loan and Cash Collateral to provide liquidity for working capital and for other general corporate purposes of the Debtors up to the date upon which the proposed Sale of substantially all of the Debtors' assets is consummated.

64.    Pursuant to the DIP Motion, the Debtors request entry of interim and final orders (the "**DIP Orders**") (a) authorizing the Debtors to use Prepetition Collateral (as defined in the DIP Motion), including, without limitation, Cash Collateral; (b) authorizing Graceway Pharma to

obtain, and authorizing each of the other Debtors unconditionally to guarantee, jointly and severally, the obligations in respect of the senior secured postpetition financing consisting of an aggregate of $6,000,000 of Intercompany Loans; (c) granting certain adequate protection to the Prepetition Secured Parties (defined in the DIP Motion); (d) authorizing the Debtors to grant to Graceway Canada the DIP Protections (as defined below); (e) modifying the automatic stay imposed by Section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Orders and subject in all respects to the Debtors' rights under paragraph 14 of the DIP Orders; (f) scheduling a final hearing on the DIP Motion to be held within thirty-five (35) days after the Petition Date to consider entry of a final order acceptable in form and substance to the Prepetition First Lien Agent and Majority First Lien Lenders, which grants all of the relief requested in the DIP Motion on a final basis; and (g) waiving any applicable stay and providing for immediate effectiveness of the DIP Orders.

65.     I believe that the Debtors have an immediate need to use the Prepetition Collateral, including, without limitation, the Cash Collateral, and obtain the Intercompany Loan to, among other things, permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs. I believe that the Debtors' access to sufficient working capital and liquidity through the use of the Cash Collateral and borrowing the Intercompany Loan is of vital importance and in the best interest of the Debtors' estates.

66.     I further believe that the Debtors are unable to obtain financing on more favorable terms from a source other than Graceway Canada. It is my understanding that the Debtors are unable to obtain adequate unsecured credit allowable under Section 503(b)(1) of the Bankruptcy

Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under Sections 364(c) and (d) of the Bankruptcy Code without (i) granting to Graceway Canada the rights, remedies, privileges, benefits and protections provided in the DIP Orders, including, without limitation, the DIP Liens and the DIP Super-Priority Claims (each as defined in the DIP Motion, and together the "**DIP Protections**") and (ii) providing the Prepetition Secured Parties certain adequate protection more fully described in the Interim Order.

67. For the foregoing reasons, I believe that the interests of the Debtors, their estates and their creditors are best served by entry of the DIP Orders authorizing the relief requested in the DIP Motion.

## II. BUSINESS OPERATION MOTIONS

### A. Cash Management Motion

68. Pursuant to the Cash Management Motion, the Debtors seek an order (I) authorizing the continued and regular use of existing (a) bank accounts, (b) cash management system, and (c) business forms and checks; and (II) waiving the investment and deposit requirements of Section 345(b) of the Bankruptcy Code. The Debtors also request that the Court (a) authorize and direct all banks with which the Debtors maintain the Existing Bank Accounts (as defined below) to continue to maintain, service, and administer such accounts; (b) waive any applicable requirement to establish separate accounts for cash collateral and/or tax payments; and (c) authorize third-party payroll and benefits administrators and providers to prepare and issue checks on behalf of the Debtors. As of the Petition Date the Debtors estimate that they have approximately $4.5 million in available cash on hand.

69. The Office of the United States Trustee (the "**U.S. Trustee**") has established certain operating guidelines for debtors-in-possession in order to supervise the administration of chapter 11 cases (the "**Operating Guidelines**"). The Operating Guidelines require chapter 11

debtors to, among other things: (i) close all existing bank accounts and open new debtor-in-possession bank accounts; (ii) establish one debtor-in-possession account for all estate monies required for the payment of taxes, including payroll taxes; (iii) maintain a separate debtor-in-possession account for cash collateral; and (iv) obtain checks for all debtor-in-possession accounts which bear the designation "Debtor-In-Possession," the bankruptcy case number and the type of accounts. The Debtors believe that enforcing certain of these requirements would disrupt the Debtors' operations and impose a financial burden on the estate, and thus seek the authority requested under the Cash Management Motion.

      **1.**       **The Debtors Should Be Granted Authority to Maintain Their Existing Bank Accounts.**

70.       On the Petition Date, in the ordinary course of business, the Debtors maintained an aggregate of six active bank accounts and three inactive bank accounts (the "**Existing Bank Accounts**") held at Wells Fargo Bank, N.A. ("**Wells Fargo**").[7] The Existing Bank Accounts are maintained, among other things, as general depository accounts, zero-balance controlled disbursement and payroll accounts, commercial and business checking accounts, and short-term deposit accounts. All of these accounts are denominated in U.S. currency, and the Debtors hold no accounts outside of the United States.

71.       The Debtors routinely deposit, withdraw, and otherwise transfer funds to, from, and between the Existing Bank Accounts by various methods including checks, automated clearing house ("**ACH**") transactions, electronic funds transfers ("**EFT**") and direct deposits. Each month the Debtors pay, on average, hundreds of invoices by check, wire and ACH transfers from the Existing Bank Accounts. I believe that Wells Fargo is a financially stable banking

---

[7]     A list of the Existing Bank Accounts is attached as Exhibit B to the Cash Management Motion. Five of the bank accounts are linked and four are stand-alone accounts, as I will further elaborate below.

                                                    

institution. Wells Fargo is a member of the Federal Deposit Insurance Corporation ("**FDIC**") which provides government-guaranteed deposit protection insurance.

72.     The Existing Bank Accounts are part of a carefully constructed and complex, automated cash management system (described more fully below) that ensures the Debtors' ability to efficiently monitor and control all of their cash receipts and disbursements. I believe that closing the Existing Bank Accounts and opening new accounts would inevitably disrupt the Debtors' business and result in delays impeding the Debtors' ability to transition smoothly into chapter 11, and would likewise jeopardize the Debtors' efforts to successfully maximize value for their estates and creditors.

73.     I believe it is essential that the Debtors be permitted to continue to maintain their Existing Bank Accounts and, if necessary, open new accounts (together with the Existing Bank Accounts, the "**Bank Accounts**"), wherever they are needed, irrespective of whether such banks are designated depositories in the District of Delaware; provided however, that any new bank account opened by the Debtors shall be with a bank that is insured by the FDIC and organized under the laws of the United States of America or any state therein (such banks, together with Wells Fargo, the "**Banks**") and shall be designated a "debtor-in-possession" or "DIP" account by the respective bank. Such Bank Accounts will be renamed "debtor-in-possession" accounts with the Petition Date included in the account title. I am informed that the Debtors will provide notice to the U.S. Trustee, the First Lien Agent and any committee prior to opening any new bank accounts.

74.     The Debtors thus request in the Cash Management Motion that the Bank Accounts be deemed to be debtor-in-possession accounts, and that their maintenance and continued use, in the same manner and with the same account numbers, styles, and document

forms as those employed during the prepetition period, be authorized. In addition, the Debtors request in the Cash Management Motion that the existing deposit agreements currently in effect between the Debtors and Wells Fargo continue to remain in effect, that the Banks be authorized to deduct from the appropriate Bank Accounts the Banks' fees and expenses (the "**Bank Fees and Expenses**"), that no liens on any Bank Accounts take priority over the Bank Fees and Expenses except as set forth in the deposit agreements between the Debtors and the Banks, and that the Debtors be required to maintain sufficient balances in the Bank Accounts to cover such fees and expenses.

> **2.    The Debtors Should be Authorized to Continue to Use Their Existing Cash Management System.**

75.    In order to ensure an orderly transition into chapter 11, the Debtors also request in the Cash Management Motion authority to continue to use their existing cash management system as required by the Debtors in the ordinary course of business. Prior to the commencement of these cases, the Debtors used a complex, automated and integrated, centralized cash management system to collect, transfer, and disburse funds generated by their operations and to accurately record all such transactions as they are made (such system, as existing, the "**Cash Management System**").[8]

76.    The Cash Management System is managed primarily by the Debtors' financial and treasury personnel at their headquarters in Bristol, Tennessee. The Cash Management System consists of the Existing Bank Accounts that are specifically tailored to meet the Debtors' operating needs, enabling the Debtors to centrally control and monitor corporate funds, invest excess cash, track their cash availability, comply with the requirements of their financing

---

[8]    A flowchart generally outlining the Debtors' cash management system is attached to the Cash Management Motion as Exhibit C.

agreements, reduce administrative expenses and obtain accurate account balances and presentment information.

77. **Existing Bank Accounts:** In the ordinary course of business, the Debtors maintain an aggregate of five linked accounts at Wells Fargo, including one general depository account, one payroll zero balance account, one controlled disbursement zero-balance account, one lockbox account and one inactive zero-balance account. A description of these accounts is as follows:

a. The Debtors' primary operating account is held at Wells Fargo in the name of Graceway Pharmaceuticals, LLC (Account No. xxxxxxxxx6558) (the "**General Depository Account**"). The General Depository Account is the sole concentration account for the Debtors' Cash Management System and handles both the concentration of deposits as well as directing the majority of cash disbursements. The General Depository Account collects all customer lockbox receipts, wires, bank deposits, miscellaneous wires, rebates and reimbursements as well as certain wire transfers made to the Debtors by their non-debtor affiliated entities (the "**Non-Debtor Affiliated Entities**").[9] The Debtors' disbursements automatically flow from the General Depository Account to the Accounts Payable Account and Payroll Account (each as defined below) to cover transactions processed. Such settlements occur on a daily basis. Wire transfers are also made directly from the General Depository Account for outgoing payments on behalf of the Debtors, including interest payments, EFT's to certain suppliers and manufacturers as well as payments to international vendors. Funds from the General Depository Account may also be used to fund one currently inactive zero-balance account. The General Depository Account also accumulates excess cash deposits.

b. The Debtors maintain a zero-balance payroll account at Wells Fargo in the name of Graceway Pharmaceuticals,

---

[9]    Non-debtor affiliated entities include all of Debtors' foreign entities and shell entities, including Graceway Canada; Graceway Costa Rica SA, a shell company (Costa Rica); Graceway Honduras SA, a shell company (Honduras); Graceway Guatemala SA, a shell company (Guatemala). The Debtors will not make any outgoing payments to these Non-Debtor Affiliated Entities during the administration of these cases aside from any payments to Graceway Canada that may be contemplated under a DIP order.

LLC (Account No. xxxxxxxxx3816) (the "**Payroll Account**"). The Payroll Account is used as the source for all wage disbursements to employees, payment of payroll taxes, and payment of employee contributions to 401k, health and other benefit plans. The Payroll Account is funded directly from the General Depository Account through planned deposits based on payroll obligations.

c. The Debtors maintain one zero-balance controlled disbursement account at Wells Fargo in the name Graceway Pharmaceuticals, LLC (Account No. xxxxxxxxx9153) (the "**Accounts Payable Account**"). The Accounts Payable Account is funded from the General Depository Account and is used to make payments to vendors, tax remittances and other check disbursements.

d. The Debtors maintain a lockbox account at Wells Fargo, held in the name of Graceway Pharmaceuticals, LLC (Account No., xx3799) (the "**Lockbox Account**"). The Lockbox Account receives funds directly from customers and other parties who hold accounts payable to the Debtors. All funds in the Lockbox Account are swept on a daily basis directly into the General Depository Account.

e. The Debtors maintain one inactive zero-balance account at Wells Fargo in the name of Graceway Canada Holdings, Inc. (Account No. xxxxxxxxx3926) (the "**GW Canada Holdings Account**"). The GW Canada Holdings Account is maintained by the Debtors to receive payments or distributions from Graceway Canada. When in use, the GW Canada Holdings Account may also receive funding from the General Depository Account. The GW Canada Holdings Account is not currently in use.

78. **Stand-alone accounts:** In the ordinary course of business, the Debtors maintain four additional stand-alone accounts, including one commercial checking account, one time deposit account and two inactive zero-balance accounts:

a. The Debtors operate a stand-alone commercial checking account at Wells Fargo in the name of Graceway International, Inc. (Account No. xxxxxxxxx9537) (the "**International Checking Account**"). The International Checking Account receives wires from customers in Latin America and South America and is used to make wire payments to vendors and intercompany transfers. Checks

drawn on this account are also used to make certain payments for international freight and other charges.

b. The Debtors hold a time deposit account at Wells Fargo in the name of Chester Valley Pharmaceuticals, LLC (Account No. xxxxxxxx4878) (the "**Time Deposit Account**"). The Time Deposit Account is primarily used to hold a certificate of deposit required by Enterprise Fleet Leasing to support the large fleet of leased vehicles for the Debtors' national sales team.

c. The Debtors hold an account at Wells Fargo in the name of Graceway Holdings, LLC (Account No. xxxxxxxx3939) (the "**GW Holdings Account**") that is currently inactive and has a zero balance.

d. The Debtors also hold an additional account at Wells Fargo in the name of Chester Valley Pharmaceuticals, LLC (Account No. xxxxxxxx3984) (the "**Chester Valley Account**") that is also inactive and also has a zero balance.

79. The Cash Management System is complex, automated and computerized, and includes accounting controls needed to enable the Debtors, as well as creditors and the Court, if necessary, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. When manual transactions are made in the system, the Debtors closely monitor the accounts to ensure the transactions are appropriately documented.

80. I believe that the cash management procedures utilized by the Debtors are ordinary, usual and essential business practices, and are similar to those used by other major corporate enterprises. The Cash Management System provides significant benefits to the Debtors, including the ability to control corporate funds centrally, ensure availability of funds when necessary, and reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

81. The operation of the Debtors' business requires that the Cash Management System continue during the pendency of these Chapter 11 Cases. I believe that requiring the

Debtors to adopt new cash management systems at this critical stage of these Chapter 11 Cases would be expensive, would create unnecessary administrative burdens and problems (including the possibility that transactions might not be adequately documented), and would likely disrupt and adversely impact the Debtors' ability to maximize value. Indeed, requiring Cash Management System changes could irreparably harm the Debtors, their estates and their creditors by creating cash flow interruptions while systems were changed. I believe therefore that maintenance of the existing Cash Management System is in the best interests of all creditors and other parties-in-interest.

82. The only modification to their Cash Management System that the Debtors request in the Cash Management Motion is the permission to close the inactive Chester Valley Account. Pursuant to the Second Lien Credit Agreement, the Chester Valley Account cannot be closed due to restrictions under a deposit account control agreement with the Second Lien Lenders. However, the Chester Valley Account is inactive and has a zero balance and the Debtors do not anticipate any further use for this account or any need to maintain this account on behalf of the Second Lien Lenders. In order to streamline the Cash Management System postpetition, and to reduce the ongoing monthly costs incurred to maintain this inactive account, the Debtors request in the Cash Management Motion authority to modify their Cash Management System and deposit control agreement with the Second Lien Lenders solely to the extent that the Debtors are permitted to close the Chester Valley Account.

YCST01: 11470164.2

070649.1001

### 3. The Debtors Should be Granted Authority to Continue to Use Existing Business Forms and Checks.

83.     In order to minimize expenses to their estates, the Debtors also seek authorization in the Cash Management Motion to continue using all correspondence and business forms (including, without limitation, letterhead, purchase orders, and invoices), without reference to the Debtors' status as debtors-in-possession. Most parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession as a result of the notoriety of these cases, the press releases issued by the Debtors, and any additional press coverage. Moreover, each of the Debtors' vendors will receive direct notice of the commencement of these cases.

84.     I believe that changing correspondence and business forms would be expensive, unnecessary, and burdensome to the Debtors' estates and disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors. For these reasons, the Debtors request in the Cash Management Motion that they be authorized to use existing checks and business forms without being required to place the label "Debtor-in-Possession" on each. I am informed that if at any point after the Petition Date the Debtors need to order new business forms or checks, the Debtors will ensure such forms or checks comply with Local Rule 2015-2(a) and will include the title "Debtor-in-Possession" as well as the corresponding bankruptcy number.

### 4. The Debtors Do Not Expect to Incur Any Claims on Account of Intercompany Transactions or Shared Services After the Petition Date.

85.     The Debtors currently conduct, in the ordinary course of business, intercompany transactions with their non-debtor Canadian affiliate, Graceway Canada. The Debtors manage all of their cash and conduct all receipts and disbursements for all operations on a separate

33

company basis, with virtually all customers, suppliers and employees dealing directly with Graceway Pharma for operations and transactions based in the United States, with Graceway International for transactions based in Latin and South America, and with Graceway Canada for transactions based in Canada. Graceway Canada's operations are entirely separate from the Debtors' operations, although certain services are provided by the Debtors to Graceway Canada, including certain technology support, legal, regulatory and intellectual property advisory services, human resource functions, and other central functions (the "**Shared Services**").

86.     Before the commencement of these proceedings, the Debtors engaged in intercompany transactions including, but not limited to, the following (collectively, the "**Intercompany Transactions**"):

> Intercompany Transactions Among Debtors:
>
> a.     Payment of Expenses: Expenses paid by a Debtor on behalf of other Debtors (for example, certain centrally-billed expenses, including payment of certain insurance premiums, professional fees, shipping and transportation and other costs).
>
> b.     Inventory Transfers: Ordinary course transactions involving goods paid by a Debtor for the account of another Debtor.

87.     As of the Petition Date, the Debtors believe in good faith that there were no outstanding amounts owing by them under any prepetition Intercompany Transactions and, as such, are not seeking authority in the Cash Management Motion to pay any such amounts. The Debtors have also put into place steps to ensure that no Intercompany Transactions will occur after the Petition Date and that very limited, if any, Shared Services will be provided or extended.[10]     As a result, the Debtors do not anticipate that any claims on account of

---

[10]     Note that the definition of Intercompany Transactions is not intended to include or apply to any postpetition debtor-in-possession financing provided by Graceway Canada.

Intercompany Transactions or Shared Services will arise after the Petition Date. In the event that such claims do arise, the Debtors anticipate that they will be *de minimis* and limited in accordance with the requirements imposed on the Debtors under any approved debtor-in-possession financing facility or any order regarding the use of cash collateral.

**5.      The Debtors Should Be Authorized to Continue to Allow Third-Party Benefit Administrators to Prepare and Issue Checks on Their Behalf.**

88.      Prior to the Petition Date and in the ordinary course of business, the Debtors employ third-party benefits administrators to prepare and issue payroll and benefits checks on their behalf. Because these practices are carried out in the ordinary course of business, the Debtors do not believe their continuance requires court approval. However, out of an abundance of caution, the Debtors seek authority in the Cash Management Motion to continue these practices in order to avoid interference with the Debtors' ability to pay employee wages and benefits.[11]

89.      By reason of the foregoing, I believe that the interests of the Debtors, their estates and their stake holders would be best served by an order granting the Cash Management Motion.

**B.      Customer Programs Motion**

90.      In the Customer Programs Motion, the Debtors seek authority to pay prepetition amounts related to the Debtors' Customer, Marketing, and Medical Affairs Programs (as defined below) and to continue such Customer, Marketing, and Medical Affairs Programs on a postpetition basis. The Debtors estimate that as of the Petition Date, the current accrued prepetition expense liability for wholesale chargebacks, wholesale channel management agreement obligations, product returns, and wholesale co-pay coupons is $15.4 million. The Debtors further estimate that as of the Petition Date the anticipated monthly postpetition cost for

---

[11]      See Employee Obligations Motion.

continuing all other Customer, Marketing, and Medical Affairs Programs is approximately $1.0 million.

91.    The Debtors believe that a significant portion of the amounts to be paid with regard to the Customer, Marketing, and Medical Affairs Programs discussed herein will arise postpetition and, therefore, will be entitled to administrative expense priority under Section 503 of the Bankruptcy Code and may be paid in the ordinary course. The Debtors are also seeking authority, but not direction, to pay, consistent with the terms of this Motion, the prepetition obligations described herein in the ordinary course. Additionally, the Debtors request that all applicable banks and other financial institutions be authorized to receive, process, honor and pay any and all checks drawn on the Debtors' accounts on account of the Customer, Marketing, and Medical Affairs Programs, whether such checks were presented prior to or after the Petition Date.

92.    If the Debtors are not granted the relief requested in the Customer Programs Motion, the Debtors would be unable to effectively maintain their customer relationships, which I believe would cause significant harm to the Debtors, their estates, creditors, and all parties in interest at a time when customer support is critical to the Debtors' operations and sale effort.

93.    It is my belief that the uninterrupted maintenance of the Customer, Marketing, and Medical Affairs Programs is essential to maintaining customer satisfaction, attracting new customers, and continuing the Debtors' obligations to advance awareness of disease states and the range of therapies and drug treatments available. The markets the Debtors operate within are highly competitive, and the Debtors' Customer, Marketing, and Medical Affairs Programs and ongoing relationships with physicians, clinicians, healthcare providers, academicians and their various wholesale, managed care companies and other institutional and government customers

are integral to maintaining product awareness and ensuring that the Debtors' products remain competitive in the marketplace of drug treatments. I believe discontinuation of the Debtors' Customer, Marketing, and Medical Affairs Programs would thus disrupt their business operations, generate adverse publicity and undermine the Debtors' relationship with all of their customer groups.

94. Additionally, I believe that the Debtors' failure to honor their Customer, Marketing, and Medical Affairs Programs in the ordinary course of business and consistent with the terms of the Customer Programs Motion will hinder the Debtors' ability to continue operating during these Chapter 11 Cases. Indeed, the Debtors' continued relationships with their commercial, institutional and retail customers, as well as with the physicians and healthcare providers who prescribe their products and with the clinicians and academicians who advocate and research their products, are some of the key elements required for the Debtors to achieve a successful sale of their business. The value of the Debtors' operations as a going concern – a value that the Debtors are maintaining and maximizing for the benefit of all creditors in furtherance of their fiduciary duty to these estates – vastly exceeds the value of the relief requested by the Customer Programs Motion. The Debtors generated approximately $185.2 million in net sales for the fiscal year 2010. I believe that potential future sales, even those conducted outside the Customer, Marketing, and Medical Affairs Programs, will be jeopardized, and may be severely impacted, if the prepetition obligations described in the Customer Programs Motion and owed to customers under the Customer, Marketing, and Medical Affairs Programs are not honored in the ordinary course and consistent with the terms of Customer Programs Motion.

YCST01: 11470164.2

070649.1001

95.    Accordingly, the Debtors request authority, but not direction, to honor those obligations related to the Customer, Marketing, and Medical Affairs Programs described below.

### 1.    Summary of Customer, Marketing, and Medical Affairs Programs

96.    Prior to the Petition Date, in the ordinary course of business, the Debtors offered certain incentive programs to their wholesale and retail customers, and certain medical education and medical affairs programs for the physicians, clinicians, academicians and healthcare professionals who advocate for Debtors' products or conduct research related to the Debtors' products (the "**Customer, Marketing, and Medical Affairs Programs**"). Under the Customer, Marketing, and Medical Affairs Programs, the Debtors provide (a) wholesale customers with certain chargeback benefits, volume discounts and product return privileges, (b) retail customers with certain co-pay coupons, incentive programs and purchase assistance plans and (c) physicians, clinicians, academicians and healthcare professionals with certain medical education programs and information sessions related to the Debtors' products. Virtually all of the Customer, Marketing, and Medical Affairs Programs offered by the Debtors are standard practice in the pharmaceutical industry.

### 2.    Wholesaler Chargeback Program And Channel Management Agreements

97.    Pharmaceutical companies such as the Debtors sell products through a network of large wholesale drug distributors (such distributors, as set forth on Schedule 1 to the Customer Programs Motion, collectively, the "**Wholesalers**"). The Wholesalers distribute the Debtors' products to various retailers, mail-order pharmacies, managed care organizations, and other institutions (the "**Dispensers**") who sell the products directly to patients. The Debtors negotiate certain channel management agreements ("**Channel Management Agreements**") and chargeback agreements (the "**Wholesale Chargeback Agreements**") with the Wholesalers.

YCST01: 11470164.2

070649.1001

Channel Management Agreements govern the terms of certain sales incentives that the Wholesalers receive for the sale of Debtors' products (the "**Channel Management Commissions**"). The Wholesale Chargeback Agreements govern the terms of sale of the Debtors' products by the Wholesalers to the Dispensers. Certain Dispensers may also negotiate a separate pricing and purchase agreement directly with the Debtors (the "**Purchase Agreements**").

98. Based on the existence of certain Purchase Agreements, Wholesale Chargeback Agreements, or statutory rights, certain Wholesalers may be entitled to sell the Debtors' products to certain eligible Dispensers at a special discounted rate (the "**Wholesale Chargeback Program**"). The special discounted rate is less than the wholesale acquisition cost ("**WAC**") that the Wholesaler pays the Debtors. Thus, when the Wholesaler sells the Debtors' products to eligible Dispensers at a rate lower than WAC, a chargeback obligation arises to compensate the Wholesaler for the deficiency (a "**Wholesale Chargeback**"). The sale is communicated to the Wholesaler, who generates an invoice for the Wholesale Chargeback obligation, which is then submitted to the Debtors. Most Wholesale Chargeback invoices are submitted to the Debtors within six weeks of the initial sale. The Debtors reimburse the Wholesalers for qualified Wholesale Chargeback invoices by issuing the Wholesaler a credit memo for the total amount owed. Since all Wholesale Chargebacks are settled by credit memo, no additional cash outlay is required under the Wholesale Chargeback Program.

99. Under the terms of the Channel Management Agreements, the Wholesalers provide the Debtors with regularly scheduled, confidential electronic reports regarding detail of the inventory of the Debtors' products at their storage and distribution facilities, including information related to sales and shipments of Debtors' products. Such reports help the Debtors

manage their operations and ensure that the supply and distribution of their products meet fluctuating demands. The reports, in addition to other sales data, are used by the Debtors to calculate the Channel Management Commissions owed to each Wholesaler. The Channel Management Commissions are settled by credit memos issued to the Wholesalers at either the end of each month or the end of each quarter. The credit memos are deducted by the Wholesaler from future sales revenues and thus no additional cash outlay is required.

100. The Debtors estimate that the aggregate amount of (A) Wholesale Chargebacks accrued and owing as of the Petition Date under the Wholesale Chargeback Program is $1.2 million (the "**Prepetition Chargeback Amount**") and (B) Channel Management Commissions accrued and owing as of the Petition Date under the Channel Management Agreements is $1.3 million (the "**Prepetition CMA Amount**"). However, since no additional cash outlay is required under the Wholesale Chargeback Program or the Channel Management Agreements, the Debtors do not have any outstanding cash payments to make under the programs as of the Petition Date.

101. In order to remain competitive with other pharmaceutical companies, the Debtors request in the Customer Programs Motion authority to settle by credit memo issued in the ordinary course of business and consistent with past practice (A) prepetition Wholesale Chargebacks owed to the Wholesalers in an aggregate amount not to exceed the Prepetition Chargeback Amount and (B) prepetition Channel Management Commissions owed to the Wholesalers in an aggregate amount not to exceed the Prepetition CMA Amount, provided, in each case, that the Wholesaler to whom any such prepetition Wholesale Chargeback or Channel Management Commission is due shall have executed a Wholesaler Support Agreement substantially in the form attached to the Customer Programs Motion as Exhibit C. Additionally,

the Debtors request in the Customer Programs Motion authority to continue to perform under the Wholesale Chargeback Program and Channel Management Agreements on a postpetition basis in the ordinary course of business and consistent with past practice.

### 3. Wholesaler Product Returns

102. In the ordinary course of business the Debtors permit the Wholesalers to return certain unsold or expired products. Such wholesale customers therefore hold contingent claims against the Debtors for these product returns (the "**Product Returns**"). The Wholesalers also rely on the existence of such return policies to maintain products with acceptable dating. I believe these policies are standard practice in the pharmaceutical industry. I further believe that continuing such programs are important to maintaining the Debtors' relationships with the Wholesalers and maximizing the value of the Debtors' estates.

103. The Debtors estimate that the total accrued expense liabilities for Product Returns as of the Petition Date is $10.0 million (the "**Prepetition Product Returns Amount**"). The rate by which this liability will be reduced, however, is determined by the actual monthly rate of Product Returns. Such returns vary dramatically from month to month and are driven by batch expiration dates of the Debtors' products. For instance, product return rates increase dramatically following the expiration dates of certain batch production lots but may be low during other months of the year. While difficult to predict precisely, the Debtors anticipate that due to recent batch expiration dates, the Product Returns on account of prepetition sales may reach $1.4 million for October, 2011. The Debtors estimate, however, that after this initial period, Product Returns on account of prepetition sales will taper off to between $300,000 and $800,000 per month for the remainder of Q4 and throughout Q1 and Q2 of 2012.

104. In order to remain competitive with other pharmaceutical companies, the Debtors request in the Customer Programs Motion authority to pay in the ordinary course of business and

consistent with past practice prepetition accrued expense liabilities for Product Returns owed to the Wholesalers in an aggregate amount not to exceed the Prepetition Product Returns Amount, provided that the Wholesaler to whom any such prepetition accrued expense liability for Product Returns is or becomes due shall have executed a Wholesaler Support Agreement substantially in the form attached to the Customer Programs Motion as Exhibit C. Additionally, the Debtors request in the Customer Programs Motion authority to continue to pay liabilities for Product Returns on a postpetition basis in the ordinary course of business and consistent with past practice.

### 4.    McKesson Co-Pay Coupons

105.    Prior to the Petition Date, and in the ordinary course of business, the Debtors offered certain "co-pay coupons" administered by a division of McKesson Corporation ("**McKesson**"). The co-pay coupons provide discounts off the prescription price of certain of the Debtors' products ("**McKesson Co-Pay Coupons**"). The McKesson Co-Pay Coupons were provided by field sales representatives to doctors for distribution to their patients and were also available to customers online at the Debtors' product websites. For instance, the McKesson Co-Pay Coupons for Zyclara permit the holder to reduce their prescription cost. The McKesson Co-Pay Coupons may only be used by those retail customers who are members of a commercial insurance plan, and are not available to individuals receiving any Federal or state-subsidized health insurance. The McKesson Co-Pay Coupons have been a popular program and have generated significant additional sales revenue for the Debtors.

106.    McKesson Co-Pay Coupons do not have expiration dates, and as of the Petition Date certain customers had not yet redeemed all of the outstanding prepetition McKesson Co-Pay Coupons. At the time that these McKesson Co-Pay Coupons were made available to customers, the Debtors had every expectation that they would be redeemable. The Debtors

YCST01: 11470164.2

estimate that the aggregate amount of prepetition McKesson Co-Pay Coupons that are outstanding as of the Petition Date is $2.9 million (the "**Prepetition McKesson Co-Pay Coupons Amount**"). The Debtors' average monthly postpetition cost for the McKesson Co-Pay Coupons is expected to be $704,000.

5. **Product Samples, Product Donations, and the Patient Assistance Program**

107. Prior to the Petition Date, in the ordinary course of business and as part of their ongoing sales and marketing efforts, the Debtors provide free product samples to doctors to offer to their patients (the "**Sampling Program**") and donate certain amounts of products with reduced shelf-life to certain charitable and non-governmental organizations ("**Product Donations**"). The Sampling Program encourages both doctors and patients to sample and test Debtors' products, which encourages doctors to learn about the Debtors' drug treatment options and also encourages patient usage and loyalty. Product Donations also serve certain public relations goals and provide tax advantages to the Debtors.

108. Prior to the Petition Date, and in the ordinary course of business, the Debtors offered a program for indigent patients (the "**Patient Assistance Program**"). The Patient Assistance Program provides qualified patients with up to 3-months' supply of certain of the Debtors' products, administered through the patient's healthcare provider. Qualified patients include those at or near the nationally established poverty level. The Debtors incur certain monthly costs for services associated with identifying and verifying the eligibility of such patients. I believe that such customer programs engender loyalty and goodwill among the doctors who prescribe the Debtors' products to their patients and encourage brand and company loyalty amongst patients. The Debtors estimate that the total monthly postpetition cost for administering the Sampling Program, Product Donations and Patient Assistance Program is

YCST01: 11470164.2                                                        070649.1001

approximately $205,000. The majority of these expenses take the form of net sales deductions and require no additional cash outlay. However, the Debtors estimate that out-of-pocket cash costs associated with maintaining these programs are approximately $8,000 per month.

### 6. Medical Education Programs

109. Prior to the Petition Date, and in the ordinary course of business, the Debtors maintained various programs which provided certain not-for-profit entities with grants and sponsorship for research conferences, symposiums and regional seminars (collectively, the "**Medical Education Programs**"). The attendees of the conferences and symposiums including doctors, health care providers and researchers, attend such events to learn about the most recent updates on disease states relevant to the company. In some instances they may receive continuing medical education credit ("**CME**") from the American Medical Association for attending such events. I believe these events provide an important educational service to doctors and healthcare professionals and other individuals who diagnose and treat diseases relevant to the company.

110. In addition to the conferences and symposiums, the Debtors also invite leading medical experts and opinion leaders (the "**Key Opinion Leaders**") to host regional dinners and seminars for local physicians, clinicians, academicians and healthcare professionals. Such dinners and seminars serve as information sessions for the attendees to learn about the Debtors' products and to share information about treatment options. The Debtors sponsor the costs of these events and provide the Key Opinion Leaders with certain expense stipends and reasonable speaking fees. I believe such regional dinners and seminars form an important medical function by disseminating important medical information to physicians, clinicians, academic professionals and other healthcare providers, encouraging such people to learn about the Debtors' products and to better understand the disease states covered by Debtors' products.

111.     The Debtors' ability to continue their Medical Education Programs is essential to maintaining physician knowledge and product awareness, and thus to supporting the Debtors' educational and sales efforts.  I believe supporting Medical Education Programs is standard practice by pharmaceutical companies.  I further believe that the Debtors' failure to continue such programs would impact physician awareness and treatment behavior in medical conditions relevant to the Debtors.  This would lead to significant erosion of the Debtors' revenues and customer base and significant impairment of the Debtors' ability to maximize the value of their assets.  The Debtors estimate that the average monthly postpetition cost for the Medical Education Programs is approximately $85,000.

112.     By reason of the foregoing, I believe that the interests of the Debtors, their estates and their stake holders would be best served by an order granting the Customer Programs Motion.

C.     **Employee Obligations Motion**

113.     As noted above, the Debtors employ approximately 165 full-time employees and approximately one part-time employee (the "**Employees**") in the United States.[12]  Of the full-time Employees, approximately 155 are active salaried Employees and approximately 10 are active hourly Employees.  There are approximately 27 Employees who are eligible for overtime pay.  Two Employees are currently on leave of absence.  The 10 active hourly Employees are temporary employees who do not participate in the Employee Benefits Plans (as defined below) and work on specific projects of limited duration.  I believe that the continued and uninterrupted

---

[12]     Approximately 43 individuals are employed by Graceway Canada (the "**Canadian Employees**"). Although certain administrative tasks performed by the Debtors may relate to the Canadian Employees, the Debtors do not pay the Canadian Employees and the Employee Obligations Motion does not seek any relief relating to the Canadian Employees.

service of the Employees is essential to the Debtors' continuing operations, their ability to maximize the value of the Debtors' estates, and the success of these Chapter 11 Cases.

114.   To minimize the personal hardship the Employees will suffer if prepetition Employee Obligations are not paid when due, and to maintain the Employees' morale during this critical time, the Debtors seek authority, pursuant to the Employee Obligations Motion and in their sole discretion, to (a) pay certain Employee claims for wages, salaries, contractual compensation, commissions, sick leave, vacation time, holiday vacation time, severance, and other accrued compensation (as set forth below), (b) reimburse all prepetition Employee business expenses, and (c) make prepetition contributions and pay benefits under certain Employee Benefits Plans, including without limitation, certain medical, insurance and retirement benefits (as set forth below).  In addition, the Debtors seek authority in the Employee Obligations Motion to continue the Employee benefits and programs described in the Employee Obligations Motion and in effect immediately prior to the filing of these Chapter 11 Cases during the postpetition period, as well as pay the Employment and Withholding Taxes.

### 1.    Compensation and Related Obligations

115.   <u>Wage Obligations</u>.  The Debtors' average bi-weekly gross payroll (<u>i.e.</u>, gross salaries and wages paid to Employees before Employee taxes or other deductions are withheld) for all Employees is approximately $675,000 (the "**<u>Wage Obligations</u>**").  The Debtors conduct a single bi-weekly payroll for all Employees.  On the Tuesday or Wednesday before week end on a payroll week, the Debtors fund the payroll to Automatic Data Processing, Inc. ("**ADP**") and ADP handles payments to Employees at week end.  As of September 27, 2011, the Debtors had transferred the payroll amounts to ADP for the payroll disbursement scheduled for the week ended September 30, 2011.

116.    The Debtors estimate that as of the Petition Date, accrued and unpaid prepetition Wage Obligations (i.e., gross salaries and wages to be paid to Employees before Employee taxes or other deductions, including Miscellaneous Payroll Deductions (as defined below) are withheld) total approximately $2,000 on account of those Wage Obligations owed to the 10 temporary Employees and amounts earned by Employees for overtime work during the period from September 16, 2011 through September 30, 2011, all of which will likely be due and payable during the period between the Petition Date and the entry of the Final Order (the "**Interim Period**"). The prepetition Wage Obligations, as well as the amounts under the Sales Incentive Plan (as defined below), the Debtors seek authority to pay do not exceed the $11,725 cap under Section 507(a)(4) of the Bankruptcy Code with respect to any Employee.[13]

117.    Pursuant to the Employee Obligations Motion, the Debtors seek authority, but not direction, to pay the outstanding amounts owed as of the Petition Date for accrued and unpaid Wage Obligations (exclusive of Reimbursable Business Expenses, PTO Obligations, Employee Benefits Obligations and amounts that may be owed under the Sales Programs, which are addressed elsewhere in the Employee Obligations Motion) owed to Employees.[14]

118.    <u>Sales Employees and Sales Programs</u>.  Approximately 89 of the Employees are sales-related Employees (the "**Sales Employees**") who, in the ordinary course of business, participate in two sales-incentive programs (the "**Sales Programs**") pursuant to which quarterly payments may be made in amounts that depend on the level of sales and whether defined sales

---

[13]      This analysis excludes Reimbursable Business Expenses. This analysis also excludes PTO Obligations (as defined below) and Employee Benefits Obligations (as defined below). If these additional obligations were accounted for, in addition to the Wage Obligations, as of the Petition Date, such obligations may exceed the $11,725 cap for certain Employees.

[14]      Two of the Debtors' Employees who are also directors are paid directors' fees in connection with their service on the Debtors' board of directors. For the avoidance of doubt, the Debtors request authority in the Employee Obligations Motion to pay these two Employees their base compensation in the ordinary course of business. As of the Petition Date, there are no accrued and unpaid prepetition amounts owed to the Debtors' directors and postpetition the Debtors will continue to pay directors' fees in the ordinary course of business.

goals were met for that quarter. The first program, a sales incentive plan (the "**Sales Incentive Plan**"), is maintained by the Debtors for the benefit of their Sales Employees, including managers and regional directors related to sales. Pursuant to the Sales Incentive Plan, each quarter the Debtors determine various targets and incentives and communicate these goals to the Sales Employees. Additionally, the Debtors may create sales contests that are used to stimulate specific goal achievement, and successful participants in such contests will be paid pursuant to the Sales Incentive Plan. The Debtors have established various contests for market share improvement for each of the remaining months in 2011. The second program, an institutional sales plan (the "**Institutional Sales Plan**"), is maintained by the Debtors for the benefit of those Sales Employees who do not participate in the Sales Incentive Plan. Pursuant to the Institutional Sales Plan, quarterly goals are established and payment is made the following quarter to those Sales Employees who achieved their sales goals.

119. The payments made under the Sales Programs are a key component of the Sales Employees' compensation structure. The Sales Programs allow the Debtors to retain their best sales talent, as well as to incentivize the sale of particularly profitable products. The constantly changing market for the Debtors' products motivates the quarterly nature of the Sales Programs and motivates the various goals, levels, and contests that the Debtors create each quarter under the Sales Programs. The amounts due under the Sales Programs are typically paid six to eight weeks following the end of the quarter. Under the terms of the Sales Programs, Sales Employees must be employed in good standing on the date that the payments under the Sales Program are made.

120. On average, the Debtors' gross quarterly payments under the Sales Programs are approximately $733,000 and goals are designed with this figure as a typical projection. As of the

070649.1001

Petition Date, the Debtors estimate that approximately $302,500 will be due for the current quarter, of which substantially all could be construed as having accrued prior to the Petition Date. Pursuant to the Employee Obligations Motion, the Debtors request the authority to pay all amounts specified therein due under the Sales Programs to the Sales Employees without regard to whether such amounts were earned during the prepetition or postpetition period. With respect to the current quarter, the Debtors request the authority to make such payment on or about November 15, 2011. For each quarter thereafter, the Debtors request the authority to pay such amounts as they become due in the ordinary course of business or, at the Debtors' discretion, upon the closing of a sale of substantially all of the Debtors' assets. The Debtors do not believe that any insiders (as such term is defined in the Bankruptcy Code) participate in the Sales Programs; however, for the avoidance of doubt, the Debtors do not seek the authority to pay any amounts due under the Sales Programs to any insiders. I am informed that the Debtors will not make such payments without further order of the Court.

121.   Independent Contractors.   In addition to the Employees described above, the Debtors employ approximately 13 independent contractors (the "**Independent Contractors**") to provide various services including, but not limited to, sales back-up coverage when the Debtors' Sales Employees are on leave of absence or extended vacancies, and other services similar to those performed by the Employees. Ensuring that the Independent Contractors are paid in the ordinary course like the Employees is essential to the Debtors' continuing operations. All of the Independent Contractors are paid by the Debtors on an hourly basis. Approximately four (4) of the Independent Contractors are paid directly by the Debtors, while the remaining Independent Contractors are paid by agencies that the Debtors pay directly. I believe that the Independent Contractors are critical to the Debtors' operations and the success of these Chapter 11 Cases. As

of the Petition Date, the total accrued but unpaid wages for the Independent Contractors are approximately $75,859 in the aggregate. The Debtors are seeking authorization, but not direction, to pay the prepetition amounts owed to the Independent Contractors and their agencies to ensure the uninterrupted employment of the Independent Contractors with the Debtors.

122. <u>Employment and Withholding Taxes</u>. In connection with the salaries and wages paid to Employees and those Independent Contractors paid directly by the Debtors, the Debtors are required by law to withhold from their Employees' wages amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "**Employee Withholding Taxes**") and to remit the same to the applicable taxing authorities. In addition, the Debtors are required to make matching payments from their own funds for, among other things, Social Security and Medicare taxes and to pay, based on a percentage of gross payroll, state and federal unemployment insurance, employment training taxes, and state disability insurance contributions (the "**Employer Payroll Tax Obligations**" and together with the Employee Withholding Taxes, the "**Payroll Tax Obligations**"). As of the Petition Date, the accrued and unpaid prepetition Employer Payroll Tax Obligations are approximately $16,300.[15] Pursuant to the Employee Obligations Motion, the Debtors request that they be authorized, but not directed, to pay the outstanding amounts owed as of the Petition Date for accrued and unpaid Payroll Tax Obligations.

123. <u>Administration of Employment and Withholding Taxes</u>. As is customary in the case of most large companies, the Debtors pay a third party, ADP, to maintain or provide record keeping and other administrative services with respect to their payroll and various Employee Benefits Plans (as defined below). ADP's services cost the Debtors approximately $3,000 per

---

[15] This amount does not include Employer Payroll Tax Obligations that may be owed on account of payments under the Severance Plan or the PTO Plans.

month. The Debtors request that they be authorized, but not directed, to pay ADP to maintain and provide record keeping relating to their payroll and various Employee benefit programs identified in the Employee Obligations Motion that may be outstanding as of the Petition Date. As of the Petition Date, the Debtors believe that accrued but unpaid administrative processing costs owed to ADP are *de minimis*.

124. <u>Miscellaneous Payroll Deductions</u>. In addition to the deductions discussed herein, the Debtors deduct certain amounts from their Employees' paychecks to make payments on behalf of Employees for, among other things, state disability, auto allowances, garnishments and charitable contributions (collectively, the "**<u>Miscellaneous Payroll Deductions</u>**"). The Debtors subsequently forward these deductions to the appropriate third-party recipients. On average, the Debtors have historically deducted from Employees' paychecks approximately $15,000 per month in Miscellaneous Payroll Deductions. As of Petition Date, approximately $7,500 was previously deducted from Employees' paychecks but has not yet been remitted to the appropriate third-party recipients. By the Employee Obligations Motion, the Debtors seek authority, but not direction, (a) to continue to deduct the Miscellaneous Payroll Deductions, and (b) to remit and forward all of the Miscellaneous Payroll Deductions to the appropriate parties.

125. <u>Reimbursable Business Expenses</u>. In the ordinary course of the Debtors' businesses, the Debtors reimburse Employees who incur travel, business related, and/or entertainment expenses in the performance of their job duties for reasonable expenses for which the Employee has a clearly documented business purpose, are supported by receipts, are permitted by the Debtors' Travel and Entertainment Policy, and are reported on a properly approved expense report (collectively, the "**<u>Reimbursable Business Expenses</u>**"). Nearly all of

YCST01: 11470164.2

070649.1001

the Employees have been reimbursed for some Reimbursable Business Expenses; however, the Sales Employees tend to be reimbursed most often.

126. Historically, Employees incur most of the Reimbursable Business Expenses by charging the expenses to a credit card issued by the Debtors, and then entering the expenses into the Debtors' system for reimbursement. Payment for Reimbursable Business Expenses is remitted directly to the credit card company for such charges on a weekly basis. However, Employees may also, particularly for lower cost expenses, pay such expenses directly and submit receipts for reimbursement under the Travel and Entertainment Policy. On average, approximately $320,000 per month in Reimbursable Business Expenses is incurred and submitted for reimbursement. As of the Petition Date, the Debtors estimate that approximately $263,000 in Reimbursable Business Expenses has been incurred by Employees and has not yet been reimbursed to Employees or remitted to the credit card company. By the Employee Obligations Motion, the Debtors seek authority, but not direction, to pay all Reimbursable Business Expenses in the ordinary course of business, including those incurred prior to the Petition Date.[16]

### 2. Employee Programs

127. In the ordinary course of business, the Debtors have established various benefit plans and policies for their Employees which can be divided into the following categories: (i) medical insurance, dental insurance, vision care and prescription drug coverage (collectively, the "**Health Plans**"); (ii) basic life and accidental death and dismemberment insurance, and short- and long-term disability insurance (collectively, the "**Welfare Plans**" and together with the Health Plans, the "**Health and Welfare Plans**"); (iii) paid time off plans, including vacation

---

[16] For the avoidance of doubt, the Debtors request authority to reimburse directors for any reimbursable business expenses due and owing to the directors as of the Petition Date.

and sick days (collectively, the "**PTO Plans**"); (iv) a 401(k) plan (the "**401(k) Plan**"); (v) the Severance Plan (as defined below); and (vi) certain other benefits programs including an education reimbursement policy, an adoption assistance plan, an automobile program, and an employee assistance plan (the "**Other Benefits Programs**" and together with the Health and Welfare Plans, PTO Plans, the 401(k) Plan, and the Severance Plan, the "**Employee Benefits Plans**"). In certain instances, the Debtors deduct specified amounts from the Employees' wages in connection with the Employee Benefits Plans, such as, among others, the Health Plans and the 401(k) Plan.

128. Most of the Employee Benefits Plans operate on a plan year that begins on May 1 of each year and concludes on April 30 of the following year. For plan year 2009 (which ran from May 1, 2009 through April 30, 2010), the Debtors' expenditures under all Employee Benefits Plans, including Employee contributions and administration costs, totaled approximately $10,586,438, of which approximately $3,384,123, or 32 percent, was funded by Employee contributions. For plan year 2010 (which ran from May 1, 2010 through April 30, 2011), the Debtors' expenditures under all Employee Benefits Plans, including Employee contributions and administration costs, totaled approximately $5,937,532, of which approximately $1,980,403, or 33 percent, was funded by Employee contributions. For plan year 2011, the Debtors anticipate that the average monthly expenditures under all Employee Benefits Plans, including Employee contributions and administration costs, will be approximately $430,365, of which approximately $129,299, or 30 percent, will be funded by Employee contributions. All obligations with respect to the Employee Benefits Plans (including insurance policies and coverage) are hereinafter referred to as the "**Employee Benefits Obligations**," which include the obligations arising under the various plans described below. The majority of

the Employee Benefits Obligations are paid in advance each month. As of the Petition Date, the Debtors believe that the accrued and unpaid prepetition Employee Benefits Obligations, excluding Employee contributions, total approximately $2,600.[17] Employee contributions that have already been deducted from Employee wages with respect to Employee Benefits Obligations, but have not yet been transmitted to the appropriate third party, are approximately $1,800.

129.     Pursuant to the Employee Obligations Motion, the Debtors seek authority, but not direction, to pay any outstanding prepetition obligations under the Employee Benefits Plans and to continue the Employee Benefits Plans postpetition; provided, however, that the sum of any amounts paid by the Debtors (i) in respect of PTO Obligations (as defined below), (ii) on account of liabilities under the provisions of the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**") or any other similar state law and (iii) in respect of the Severance Plan (as defined below), in each case on or after the Petition Date, shall not exceed $2,616,007.

130.     Health and Welfare Plans. The Debtors provide their Employees with a standard range of Health and Welfare Plans. Participants in the Health and Welfare Plans include the Debtors' Employees and their eligible dependents. The Health and Welfare Plans are administered by several different vendors, including Blue Cross and Blue Shield of Tennessee, Metropolitan Life Insurance Company, VSP, Caremark, and Prudential Insurance Company of America. Approximately $48,900 is deducted from Employees' wages each month on account of the Health and Welfare Plans. During plan year 2009, the Debtors paid approximately $3,545,665 to provide the Health and Welfare Plans to their Employees, of which approximately $631,390, or 18 percent, was funded by Employee contributions. During plan year 2010, the

---

[17]     This calculation does not include PTO Obligations, as any such accrued PTO Obligations do not represent a current cash pay obligation.

Debtors paid approximately $2,159,965 to provide the Health and Welfare Plans to their Employees, of which approximately $609,104, or 28 percent, was funded by Employee contributions.

131. Each of the Health and Welfare Plans is described below:

a. Medical Plan Coverage.[18] The Debtors offer all Employees a choice of two medical plan options, a traditional PPO plan (the "**PPO**") and the Debtors' high deductible health plan (the "**HDHP**"), both of which are administered by Blue Cross and Blue Shield of Tennessee (the "**Healthcare Plans**"). Under the PPO there is a $20 co-pay for primary care physicians and most services and a $40 co-pay for specialists, assuming the Employee uses in-network service providers. Under the HDHP, which is accompanied by a Health Savings Account administered by OptumHealth Bank (the "**HSA**"), Employee deductibles are $2,000 for single coverage and $4,000 for family coverage. For participants in the HDHP, the Debtors make an annual contribution of $1,000 for single employee coverage and $2,000 for family coverage, a pro-rated portion of which is made in each payroll, to each Employee's HSA. The Employees may then use the funds from the HSA to pay their medical expenses under the HDHP. Additionally, the Employees may use the funds from the HSA to pay expenses associated with the Prescription Drug Plan (as defined below). Employees may contribute additional funds to the HSA through pre-tax contributions, which the Debtors deduct from the Employee's check and remit to OptumHealth Bank. On average, the Debtors pay approximately $116,900 per month to maintain the Healthcare Plans,[19] and withhold approximately $38,400 per month from Employees' wages in respect of the Healthcare Plans. As of the Petition Date, the Debtors do not believe there are any accrued and unpaid prepetition amounts on account of the Health Care Plans because all amounts due for each month are typically paid prior to the start of such month. The Debtors also do not believe that any amounts have been deducted from the Employees' wages in respect of the Healthcare Plans but not yet transferred to the appropriate provider.

b. Dental Plan Coverage. The Debtors offer dental coverage for the Debtors' Employees through the Metropolitan Life Insurance Company (the "**Dental Plan**"). All Employees, along with their spouses and eligible dependants, may participate in the Dental Plan. The Dental Plan is a PPO plan where, for services rendered by in-network providers, 100% of

---

[18]    Employees have the opportunity to continue their health insurance at the full health insurance premium for a period of approximately 18 months through COBRA if their employment is terminated.

[19]    This figure includes amounts pad on account of COBRA.

expenses are paid for preventative treatment, 80% after a deductible amount is paid for minor restoration and 50% after a deductible amount is paid for major restoration. Employees with an HSA account may use funds from the HSA toward these deductibles and co-pays. The Debtors pay approximately $20,000 per month to maintain the Dental Plan,[20] and withhold approximately $5,500 per month from Employees' wages in respect of the Dental Plan. As of the Petition Date, the Debtors do not believe there are any accrued and unpaid prepetition amounts on account of the Dental Plan because all amounts due for each month are typically paid prior to the start of such month. The Debtors also do not believe that any amounts have been deducted from the Employees' wages in respect of the Dental Plan but not yet transferred to the appropriate provider. .

c.    Vision Plan Coverage.    The Debtors offer vision coverage to the Employees under a VSP Vision Care Plan provided by VSP (the "**Vision Plan**"). All Employees, along with their spouses and eligible dependants, may participate in the Vision Plan. Under the Vision Plan, Employees have a co-pay relating to the various expenses, and Employees with an HSA may use available funds from the HSA to pay this co-pay. The Debtors pay approximately $2,600 per month to maintain the Vision Plan and withhold approximately $1,800 per month from Employees' wages in respect of the Vision Plan. As of the Petition Date, the Debtors estimate that approximately $2,600 is owed on account of the Vision Plan.[21] Approximately $1,986 has already been deducted from the Employees' wages in respect of the Vision Plan but has not yet been transferred to the appropriate provider.

d.    Prescription Drug Plan. The Debtors maintain a self-insured prescription drug plan (the "**Prescription Drug Plan**") that is designed to be used with an Employee's HSA. The Prescription Drug Plan is administered by Caremark. All Employees, along with their spouses and eligible dependants, may participate in the Prescription Drug Plan. Costs of the Prescription Drug Plan are shared between the Debtors and the Employees, and Employees typically have a co-pay amount for the prescription drugs purchased which can be paid from the Employee's HSA. Amounts due by the Debtors under the Prescription Drug Plan are submitted by invoices to the Debtors from Caremark. For the 12 months prior to the Petition Date the Debtors paid approximately $383,000 on account of the Prescription Drug Plan. As of the Petition Date, the Debtors estimate that, based on historical invoices, approximately $15,300 may have accrued on account of the Prescription Drug Plan. By the Employee Obligations Motion, the Debtors request the authority to pay

---

[20]    This figure includes amounts pad on account of COBRA.

[21]    This figure includes amounts pad on account of COBRA.

any amounts under the Prescription Drug Plan regardless of whether such amounts accrued prior to or after the Petition Date.

e.     Long-Term Disability Coverage. The Debtors maintain a fully insured long-term disability plan (the "**LTD Plan**") with Prudential Insurance Company of America for the benefit of the Employees. Under the LTD Plan, in the event of a long-term disability, Employees receive 60 percent of their prior salary, up to a maximum of $10,000 per month, until age 65, subject to certain limitations. As of the Petition Date, the Debtors do not believe there are any accrued and unpaid prepetition amounts on account of the LTD Plan.

f.     Short-Term Disability Coverage. The Debtors maintain a fully insured short-term disability plan (the "**STD Plan**") with Prudential Insurance Company of America for the benefit of the Employees. Under the STD Plan, in the event of a short-term disability, Employees are paid 67 percent of their prior salaries up to a maximum of $2,500 per week for 12 weeks after a 7 day elimination period. As of the Petition Date, the Debtors do not believe there are any accrued and unpaid prepetition amounts on account of the STD Plan.

g.     Life and AD&D Coverage. The Debtors maintain basic life and accidental death and dismemberment insurance for the Employees through Prudential Insurance Company of America for the benefit of the Employees (the "**Life and AD&D Insurance Policies**" and, together with the LTD Plan and STD Plan, the "**Prudential Plans**"). Under the Life and AD&D Insurance Policies an Employee's beneficiaries may receive two times the Employee's salary up to a maximum of $625,000 in the event that the Employee dies or is accidentally dismembered. The cost of the Life and AD&D Insurance Policies is paid by the Debtors, although Employees may choose to buy supplemental policies for which the Employees will be responsible. As of the Petition Date, the Debtors do not believe there are any accrued and unpaid prepetition amounts on account of the Life and AD&D Insurance Policies. The Debtors pay approximately $20,000 per month to maintain coverage under all of the Prudential Plans.

132.    Paid Time Off Benefits. The Employees are eligible, in certain circumstances, to receive their full wages for, among other things, vacation, personal days, and holidays (the "**PTO Obligations**") pursuant to the PTO Plans established and maintained by the Debtors. Specifically, Employees are permitted two (2) personal days and five (5) sick days per year. Employees are permitted to take off the typical holidays, totaling 12 days, and an additional "floating" holiday for the 2011 year. Employees are permitted three (3) additional days of

bereavement leave in the event of a death in the immediate family. Employees are permitted time off, and certain expenses paid, for service on a jury or service in the military. Vacation leave is granted in accordance with a vacation policy established by the Debtors whereby vacation leave is accrued on a monthly basis. Employees may "borrow" vacation leave prior to the actual accrual up to the total amount of vacation leave that is anticipated to be accrued in a calendar year. If an Employee's employment ends before used vacation is fully accrued, the Employee's final paycheck is docked for this amount. Generally, Employees with less than five years of service may accrue ten days of vacation; Employees with more than five but less than 15 years of service may accrue 15 days of vacation; Employees with more than 15 years of service but less than 20 may accrue up to 20 days of vacation; and Employees with more than 20 years of service may accrue up to 25 days of vacation. Additionally, when certain Employees are hired the Debtors may grant a credit for vacation time that the Employee had earned at the Employee's prior place of employment.

133. Vacation time must be taken in the year that it is granted as there is no provision in the Debtors' vacation policy for the payment of cash in lieu of vacation leave. The Debtors typically do not permit vacation to be carried over into succeeding years; however, if vacation is cancelled at the request of the Debtors' management to address the business needs of the Debtors, then an Employee's manager may request in writing that the Employee be permitted to carry over a maximum of five (5) days of vacation leave to the next calendar year. Such a request is subject to the approval of the Employee's departmental Executive Vice President, the Debtors' Head of Human Resources, and the Debtors' Chief Executive Officer. Upon termination of employment, Employees are paid for unused vacation only if two weeks' notice is provided and the separation results from causes other than misconduct.

YCST01: 11470164.2
070649.1001

134.     As of the Petition Date, the Debtors estimate that they have approximately $790,000 of earned but unpaid PTO Obligations under the PTO Plans.  This amount is not a current cash pay obligation, as Employees are entitled to be paid for accrued and unused vacation time, personal days and holidays (if payable by law) only in the event they are terminated. Because the PTO Plans are essential features of the employment package provided to the Debtors' Employees, and failure to provide these benefits would harm Employee morale and encourage the premature departure of valuable Employees, the Debtors request in the Employee Obligations Motion authority to honor all of their PTO Obligations as and when they come due in the ordinary course of business; provided, however, that the sum of any amounts paid (i) in respect of PTO Obligations, (ii) on account of liabilities under the provisions of COBRA or any other similar state law and (iii) in respect of the Severance Plan (as defined below), in each case on or after the Petition Date, shall not exceed $2,616,007.

135.     401(k) Plan.  The 401(k) Plan, formerly titled the Graceway Pharmaceuticals, LLC 401(k) Savings and Retirement Plan, is maintained by the Debtors for the benefit of the Employees pursuant to Section 401 of the Internal Revenue Code.   The 401(k) Plan is administered by Wells Fargo.  The Debtors pay approximately $9,200 per year for administrative costs associated with the 401(k) Plan ("**Administrative Fees**").  As of the Petition Date, the Debtors do not believe that any amounts are due and owing on account of the 401(k) Plan.  The Debtors estimate approximately $40,000 has been deducted from Employees' wages on account of the 401(k) but has not yet been transmitted to Wells Fargo.  By the Employee Obligations Motion, the Debtors request the authority to (a) transmit deducted amounts to Wells Fargo, and (b) continue to pay the Administrative Fees in the ordinary course of business

YCST01: 11470164.2                                                                                     070649.1001

136.    _Severance Plan_.  Prior to the Petition Date, the Debtors maintained a severance

plan (the "**Severance Plan**") pursuant to which Employees typically received between two and

five months' salary upon termination.[22]  Payments under the Severance Plan are typically made

approximately one to two weeks after a terminated Employee signs a severance agreement in

connection with the termination.  Although the plan is not evidenced in writing, the Severance

Plan is a critical component of the Employees' compensation, and I believe that Employee good

will and morale would be severely impacted if the Debtors were not permitted to continue the

Severance Plan in the ordinary course of business.  Employees terminated for "cause" are not

eligible for severance benefits.  As of the Petition Date, there are no Employees receiving

severance payments under the Severance Plan and the Debtors do not owe severance payments to

any Employee.  By the Employee Obligations Motion, the Debtors request authority, in their sole

discretion and pursuant to the Final Order, to continue the Severance Plan and to provide any

eligible Employee, including any insider (as that term is defined in the Bankruptcy Code),

severance benefits in the event such Employee is terminated postpetition; _provided_, however,

that the sum of any amounts paid (i) in respect of PTO Obligations, (ii) on account of liabilities

under the provisions of COBRA or any other similar state law and (iii) in respect of the

Severance Plan, in each case on or after the Petition Date, shall not exceed $2,616,007.  The

Debtors do not believe that any payments under the Severance Plan will be due during the

Interim Period and do not seek authority to make any payments under the Severance Plan during

the Interim Period.

137.    The Employees rely on the expectation that the Severance Plan will provide them

with income protection in the event they are terminated without cause, and, as such, the

---

[22]       In some instances, Employees receive more than five months' salary based on the Employees' seniority.

070649.1001

Severance Plan represents a key component of the Debtors' retention effort that is critical to maintaining staffing essential to the ongoing operation of the Debtors' business. The Debtors' business relies heavily on their Employees, and a failure to continue the Severance Plan would, in my opinion, inevitably result in decreased Employee morale and confidence, consequences that would thwart the Debtors' efforts to maximize value during these Chapter 11 Cases.

138. The Severance Plan has historically applied to insiders (as that term is defined in the Bankruptcy Code) as well as rank and file employees. The Debtors seek to continue the Severance Plan with respect to insiders as well as rank and file employees, but, in addition to the limitation on payments under the Severance Plan discussed above, also seek to limit any Severance Plan payments to insiders to the amounts permitted in Section 503(c)(2) of the Bankruptcy Code. With that limitation, the Severance Plan satisfies the requirements set forth in Section 503(c)(2) of the Bankruptcy Code for payments of severance to insiders. First, the Severance Plan is generally applicable to all of the Employees, and has been applied as such. All of the 19 Employees terminated in the 12 months prior to the Petition Date received offers of severance payments pursuant to the Severance Plan.[23] Second, the Debtors do not seek authority in the Employee Obligations Motion to make any payment to any insider (as that term is defined in the Bankruptcy Code) that is in an amount greater than ten (10) times the amount of the mean severance pay given to nonmanagement Employees during the calendar year in which the payment is made.

139. <u>Other Benefits Programs</u>. The Debtors provide a number of miscellaneous benefits to Employees. The Debtors believe that the amounts owing on the Petition Date on account of the Other Benefits Programs are *de minimis*. By the Employee Obligations Motion,

---

[23] One Employee rejected the offered severance payments and is pursuing litigation against the Debtors.

the Debtors seek authority, but not direction, to pay any outstanding prepetition obligations under the Other Benefits Programs and to continue these benefits postpetition. The Other Benefits Programs include, but are not limited to, the following:

a.     <u>Adoption Assistance</u>. The Debtors maintain an adoption assistance policy (the "**Adoption Assistance Policy**"). Pursuant to the Adoption Assistance Policy, Employees may be reimbursed for 100% of covered charges up to a maximum of $5,000 per child each calendar year. International adoptions are reimbursed at $7,500 per child each calendar year. Special needs children adoptions are reimbursed up to $10,000 per year. The Debtors have not paid any amounts under the Adoption Assistance Policy during 2011, and expect that a maximum of $5,000 will be paid during the nine months following the Petition Date.

b.     <u>Automobile Program</u>. The Debtors currently lease approximately 98 automobiles for Employees who require transportation as part of their employment (the "**Automobile Costs**").[24] A nominal amount is deducted from employee payroll, in accordance with applicable United States Department of the Treasury regulations, on account of the Employees' personal use of the leased automobiles. On average, the Debtors pay approximately $136,000 per month, and deduct approximately $13,000 per month from Employee payroll, on account of the Automobile Costs. As of the Petition Date, the Debtors do not believe there are any accrued and unpaid prepetition amounts on account of the Automobile Costs.

c.     <u>Other Policies</u>. The Debtors maintain additional policies and programs, consisting of a military leave policy, an education reimbursement policy, and an employee assistance plan. The Debtors believe that a *de minimis* amount is accrued and unpaid under these other policies as of the Petition Date.

140.     Pursuant to the Employee Obligations Motion, the Debtors seek authority, but not direction, to continue postpetition and to pay all amounts due and owing as of the Petition Date for the Employee Benefits Plans, subject to the limitations set forth above.

141.     Finally, pursuant to the Employee Obligations Motion, the Debtors seek an order authorizing and directing all banks to receive, process, honor and pay any and all checks, drafts, and other forms of payment drawn on the Debtors' bank accounts related to Employee

---

[24]     The Automobile Costs include lease payments, title and license fees, maintenance fees, repair costs, excess mileage charges, fuel costs, insurance premiums and related costs.

     070649.1001

Obligations, whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable bank accounts to cover such payments.

142.    I believe that the payment of the Employee Obligations as set forth herein serves the sound business purpose of maximizing the value of the Debtors' estates.  I further believe that the Debtors' success in these cases hinges in large part on the morale and continued efforts of the Debtors' Employees.  Indeed, because the pharmaceutical industry, by its nature, places a premium on continuity and continued presence, the continued employment of the Employees is particularly critical to the success of these Chapter 11 Cases.  Through the payment of the Employee Obligations as set forth in the Employee Obligations Motion, the Debtors seek to motivate and encourage the Employees to continue to support the Debtors' efforts to maximize value during these Chapter 11 Cases.

143.    Any failure by the Debtors to pay the Employee Obligations as set forth herein would negatively impact the morale of the Debtors' Employees at a critical time for the Debtors and their businesses when the Employees are most needed.  Indeed, the Debtors' Employees are familiar with the Debtors' pharmaceutical operations; hiring and training new workers would seriously impair the Debtors' efficiency as well as their ability to deliver their products in a timely and safe fashion.  Moreover, many of the Employees have built key relationships with those parties in the medical and pharmaceutical community who are most able to influence the value of the Debtors' products.  Such parties value the consistency and reliability of working with the same individuals and, as a result, such relationships are irreplaceable.  The proposed purchaser of the Debtors' assets has required that the Debtors use commercially reasonable efforts to maintain their operations in the ordinary course of business consistent with past practices pending the closing of the sale, which would be impossible without the continued

efforts of the Debtors' Employees. The damage to the value of the Debtors' assets and, hence, the costs to creditors as a whole, would be immediate and irreparable. In short, the potential harm and economic disadvantage that would stem from the failure to pay the Employee Obligations as set forth herein is grossly disproportionate to the amount of any prepetition claims that may be paid.

144.    With respect to the Employees, the Debtors have determined that to avoid significant disruption of the Debtors' business operations there exists no practical or legal alternative to payment of the Employee Obligations as set forth herein.

145.    By reason of the foregoing, I believe that the interests of the Debtors, their estates and their stake holders would be best served by an order granting the Employee Obligations Motion.

### D.    Tax Motion

146.    In the ordinary course of the Debtors' business, the Debtors (a) incur taxes, including, but not limited to, sales, use, income, franchise, personal property, real property, excise, business and other taxes in operating their business (collectively, the "**Taxes**")[25] and (b) are charged fees including, but not limited to, permitting fees, license fees, regulatory fees, user fees and other similar charges and assessments (collectively, the "**Fees**").[26] The Taxes and Fees are owed to various government taxing, licensing and regulatory authorities (collectively, the "**Authorities**," a listing of which is annexed as Exhibit B to the Tax Motion).[27] The Debtors'

---

[25]    The Debtors have a taxable presence in all 50 states and the District of Columbia.

[26]    The Debtors collect certain Fees from their customers on behalf of governmental entities. For such Fees, the Debtors are required to remit the collected amounts to the appropriate governmental entity. The Debtors hereby request authority to pay Fees regardless of whether they constitute "trust fund" obligations.

[27]    The Debtors do not seek authority to collect and pay state and federal withholding taxes under the Tax Motion but rather request such authority as part of the Employee Obligations Motion filed concurrently herewith.

64

have historically paid all Taxes and Fees to the respective Authorities in accordance with all applicable laws and regulations and in a timely manner.

147.     For tax year 2009, the Debtors paid approximately $1,200 in sale and use taxes (the "**Sale and Use Taxes**"), primarily relating to samples of the Debtors' products. The Sale and Use Taxes typically arise if a supplier does not have business operations in the state in which it is supplying goods and does not charge state taxes. For tax year 2010, the Debtors paid approximately $1,150 in Sale and Use Taxes. As of the Petition Date, the Debtors have paid a *de minimis* amount in Sale and Use Taxes for tax year 2011, and estimate that approximately $200 will be owed in Sale and Use Taxes for 2011. The Debtors request the authority to pay all such amounts without regard to whether the amounts accrued prior to or following the Petition Date.

148.     For 2009, the Debtors also paid approximately $469,000 in franchise/gross receipts taxes (the "**Franchise/Gross Receipts Taxes**") and approximately $4.98 million in income taxes (the "**Income Taxes**"). Franchise/Gross Receipts Taxes are imposed by certain states for the privilege of allowing companies to do business in a state or to maintain a company's good standing in a state, and may be based on a flat fee, net operating income or capital employed. Certain jurisdictions assess both Franchise/Gross Receipts Taxes and Income Taxes, while others assess either Franchise/Gross Receipts Taxes or Income Taxes depending on which results in a higher tax assessed. In addition, some jurisdictions require estimated Franchise/Gross Receipts Taxes payments to be remitted on a quarterly basis if the estimated Franchise/Gross Receipts Taxes exceed a certain threshold. For 2010, Debtors paid approximately $132,000 in Franchise/Gross Receipts Taxes and approximately $250,000 in Income Taxes. As of the Petition Date, the Debtors have paid approximately $23,100 in Franchise/Gross Receipts Taxes for 2011 and have not paid any amounts for Income Taxes for

YCST01: 11470164.2

070649.1001

2011. The Debtors estimate that they will owe an additional $163,025 in Franchise/Gross Receipts Taxes and $10,000 in Income Taxes for 2011. The Debtors request the authority to pay all such amounts without regard to whether the amounts accrued prior to or following the Petition Date.

149. State and local laws in jurisdictions where the Debtors operate generally grant Authorities the ability to levy property taxes against the Debtors' real and personal property (the "**Property Taxes**"). The Debtors typically pay Property Taxes on their real and personal property in the ordinary course of business as such taxes are invoiced to avoid the imposition of statutory liens on their real and personal property. The Debtors, for tax year 2009, remitted approximately $12,500 on account of real Property Taxes and $11,000 on account of personal Property Taxes. For tax year 2010, the Debtors paid approximately $13,000 on account of real Property Taxes and $13,000 on account of personal Property Taxes. The Debtors estimate that for tax year 2011 they will owe approximately $13,000 on account of real Property Taxes and approximately $14,000 on account of personal Property Taxes. The Debtors request the authority to pay all such amounts without regard to whether the amounts accrued prior to or following the Petition Date.

150. Certain states require the Debtors to pay various business taxes. These taxes may be based on various conditions determined by the applicable taxing jurisdiction. Further, certain states require the Debtors to pay business license fees to remain in good standing for purposes of introducing their prescription goods into the state (collectively the "**Business Taxes**"). It is my understanding that certain of these Business Taxes may, under applicable law, be entitled to priority as a secured claim. For 2009, the Debtors paid approximately $83,000 in Business Taxes. For 2010, the Debtors paid approximately $79,200 in Business Taxes. The Debtors have

paid approximately $13,200 on account of Business Taxes for 2011 and do not believe any additional Business Taxes will be due for 2011. In the Tax Motion, the Debtors request authority to pay all such amounts without regard to whether amounts accrued prior to or following the Petition Date.

151.     Various federal, state and local laws require the Debtors to obtain and pay Fees for a wide range of licenses and permits from a number of local, state and federal regulatory agencies. Indeed, because the Debtors operate in a highly regulated industry, the Debtors are subject to many license requirements and annual Fees from (i) the Food and Drug Administration, (ii) the states in which the Debtors operate and (iii) the federal government. During the 12 months prior to the Petition Date, the Debtors expended approximately $3.3 million for Fees owed to the federal government and approximately $25,000 for Fees owed to various state and local agencies. The majority of such amounts are paid in advance or upon submission of an application for the related licenses. The Debtors estimate that for tax year 2011 they will owe an additional $390,000 on account of such fees and licenses. In the Tax Motion, the Debtors request authority to pay all such amounts without regard to whether amounts accrued prior to or following the Petition Date.

152.     The Debtors request the authority, but not direction, to pay all amounts owed on account of Taxes and Fees regardless of whether such amounts accrued prior to or after the Petition Date. Some, if not all, of the applicable governmental authorities may cause the Debtors to be audited if the Taxes and Fees are not paid immediately. Such audits will unnecessarily divert the Debtors' attention away from these Chapter 11 Cases. Further, if the Debtors do not pay such amounts in a timely manner, the governmental authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that will

harm the estates. Finally, it is my understanding that some of these outstanding tax liabilities are for "trust fund" taxes that the Debtors have collected and hold in trust for the benefit of the applicable governmental authority. Therefore, such funds do not constitute property of the estates and could not otherwise be used by the estates.

153.    In all cases, the Debtors' failure to pay the Taxes and Fees could have a material adverse impact on their ability to operate in the ordinary course of business. Any disputes that could impact their ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole. As a result, I believe that granting the relief requested in the Tax Motion will enhance the likelihood of the Debtors' successfully maximizing the value of the estates' assets, and thus benefit the estates' creditors.

### E.    Utilities Motion

154.    In the operation of their business, the Debtors incur utility expenses for, among other things, electric service, gas service, water, cell phone service, data service, telephone service, internet services, and waste services  (collectively, the "**Utility Services**") in the ordinary course of business. These Utility Services are provided by approximately twelve (12) providers (collectively, the "**Utility Providers**"), a listing of which is found in Utilities Motion Exhibit C). On average, the Debtors spend approximately $70,307 each month on Utility Services. The Debtors have historically paid the Utility Providers promptly and in full. In light of this, I believe that the Adequate Assurance Deposit proposed in the Utilities Motion is more than sufficient to provide the Utility Providers with adequate assurance of payment.

155.    Uninterrupted Utility Services are essential to the Debtors' ongoing business operations. Should the Utility Providers refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted. In particular, such discontinuation

YCST01: 11470164.2

070649.1001

would irreparably disrupt the Debtors' ability to operate their businesses, which would negatively affect customers, cash flow and, ultimately, value and creditor recoveries. Simply put, without Utility Services, the Debtors' operations will shut down. Therefore, I believe it is critical that Utility Services continue uninterrupted.

156.    By reason of the foregoing, I believe that the interests of the Debtors, their estates and their stake holders would be best served by an order granting the Utilities Motion.

**F.    Shipping Motion**

157.    Pursuant to the Shipping Motion, the Debtors seek authority to pay prepetition shipping and importing expenses, including customs duties, general order penalties, ocean freight, air freight, trucking charges, brokerage fees, detention and demurrage fees, surety bond premiums, consolidation and deconsolidation charges, and the like (collectively, the "**Importing and Shipping Claims**"). I believe that payment of such Importing and Shipping Claims may be necessary or appropriate, as the Debtors may determine in the exercise of their business judgment, to obtain goods in transit or to satisfy the liens, if any, in respect thereof. On a monthly basis, the Debtors pay approximately $72,000 in charges related to shipping and importing. The Debtors are current on their payments and estimate, to the best of their ability, that their current liability as of the Petition Date for Importing and Shipping Claims is $35,000. However, out of an abundance of caution, and mindful of the need to continue in the ordinary course to maximize the value of the Debtors' estates, the Debtors request in the Shipping Motion authority to honor, continue, and/or renew their Import Obligations and Shipping Obligations (each as defined below) on a postpetition basis in the ordinary course of business.

158.    An integral component of the Debtors' retail operations is the efficient flow of finished goods from domestic and foreign manufacturers and suppliers to the Debtors' U.S.

YCST01: 11470164.2                                    070649.1001

distribution centers. In the ordinary course of their businesses, the Debtors arrange for the development, production and testing of their unique pharmaceutical products, in finished form, bulk form or clinical trial configurations, with certain sole source suppliers located outside the United States (the "**Imported Goods**"). There the Debtors pursue such arrangements due to the highly specialized nature of such goods and the unique manufacturing processes available by these suppliers. Such products are then shipped to the Debtors' distribution center in the United States and Canada where the products are then picked up by the Wholesalers, U.S. distributors, and overnight courier services, for final delivery to retail pharmacies, clinics, health care centers, hospitals, research institutions, laboratories and certain retail locations. Certain products housed at the Debtors' Distribution Centers are also shipped for repackaging, disposal, or further testing by certain labs and research institutions. Accordingly, the Debtors rely heavily on their foreign and domestic commercial common carriers, couriers, shippers, warehousemen and certain third party vendors and logistics service providers to ship, transport, store, and move through customs and deliver goods through established distribution networks.

### 1. Shipping Obligations

159.     In the normal course of their business, the Debtors incur certain freight bills and other charges owed to certain commercial common carriers and overnight courier services (the "**Shippers**") to ship, transport, store and deliver bulk and finished goods, samples, materials, products, promotional items, supplies and related items as well as to manage the return shipping and disposal of expired products and other product returns (the foregoing, collectively, the "**Shipping Obligations**"). On average, the Debtors pay, in the aggregate, approximately $43,000[28] on a monthly basis on account of the Shipping Obligations.

---

[28]     Note, the Shipping Obligations exclude amounts included in the Import Obligations (as defined below).

160.    The Debtors seek to pay the prepetition Shipping Obligations for several reasons. First, if they are not paid, the Shippers may refuse to perform additional services for the Debtors. In such event, the Debtors will incur additional expenses (such as premium shipping costs) to replace these Shippers, which amounts will likely exceed the amount of unpaid prepetition Shipping Obligations that the Debtors request permission to pay hereunder.

161.    Second, any delays in delivery with respect to goods that may be in the possession of Shippers or customs brokers as of the commencement of these cases will likely result in the assertion, under applicable law, of possessory liens upon the Debtors' property in the possession of such Shippers or customs brokers and could disrupt the Debtors' inventory distribution network to the detriment of their operations.[29]

162.    The Debtors estimate that as of the Petition Date they owe $19,000 on account of prepetition Shipping Obligations.

### 2.    Import Obligations

163.    In connection with the Imported Goods, the Debtors have certain import expenses, including customs duties, general order penalties, ocean freight, air freight, trucking charges, brokerage fees, detention and demurrage fees, surety bond premiums, consolidation and deconsolidation charges, and the like, including a $100,000 customs bond outstanding to the United States Department of Homeland Security to secure the payment of certain custom obligations (the foregoing, collectively, the "**Import Obligations**"). The Debtors typically incur approximately $29,000 per month in Import Obligations. Payment of the Import Obligations is managed through third-party logistics providers, including Panalpina World Transport LTD and its associated companies ("**Panalpina**") and Schenker LTD and its associated companies

---

[29]    At any given time, Shippers utilized by the Debtors are in possession of property of the Debtors in an amount of approximately $915,000. Such property generally consists of the Debtors' finished product as well as certain packaging and marketing materials.

("**Schenker**"), and is necessary to obtain possession of the Imported Goods. Absent payment, the Debtors' customs brokers (the "**Customs Brokers**" and collectively with Panalpina and Schenker, the "**Importers**") may assert shipper's liens against the goods, and the United States Customs Service may assert a lien against such goods under 19 C.F.R. 141.1 (2010). Graceway Canada currently manages and pays for its own Import Obligations.

164. If the Import Obligations are not timely paid the U.S. Customs Service may demand, pursuant to U.S. Customs Regulations, liquidated damages far in excess of the Import Obligations, in addition to other sanctions. Therefore, I believe it is in the best interests of the Debtors' estates that the Debtors be authorized to pay all Import Obligations when they become due, including prepetition Import Obligations, in order to ensure continuous operations and product distribution and to avoid paying significant amounts in damages and sanctions and the assertion of various liens against the Debtors' goods.

165. I believe that payment of the Debtors' Import Obligations will benefit the Debtors' estates because (a) the Debtors' operations might otherwise be interrupted, (b) the eventual sale of the products so imported will generate substantial gross income, (c) forfeiture of goods or the imposition of damages and sanctions on goods which the Debtors have already become indirectly obligated to deliver will be avoided, (d) the shelf-life of the Debtors' products is limited, thereby necessitating that any delay to the Debtors' operations be limited to avoid product wastage; (e) important relationships with doctors, based upon the availability of products, will be protected, and (f) customer loyalty will not be jeopardized.

166. As of the Petition Date, the Debtors have already become indirectly obligated to pay for certain Imported Goods which they have not yet received, because such goods were either in transit overseas; in transit to or within the United States or Canada or awaiting U.S.

YCST01: 11470164.2 070649.1001

Customs or Canada Border Services Agency clearance; or awaiting clearance by the customs authorities of a foreign country. The Debtors estimate that as of the Petition Date, the amount of such Import Obligations will not exceed $16,000. Thus, in the aggregate, the Debtors believe they owe $35,000 in prepetition Shipping Obligations and Import Obligations.

167. I believe that the relief requested in the Shipping Motion will ensure the continuous supply of goods that are vital to the Debtors' continuous operations and integral to a successful sale. Absent such relief, the Debtors would be required to expend substantial time and resources convincing Shippers, Importers, and other parties holding goods that they should not assert a lien on or hold goods in transit. The attendant disruption to the continuous flow of goods (including Imported Goods held by Shippers and Importers) to the Debtors would likely result in a shortage of goods used by the Debtors in their operations. Without the goods, the Debtors' business would rapidly deteriorate and their opportunity to achieve a successful sale would be seriously jeopardized.

168. In return for payment of the prepetition Importing and Shipping Claims, the Debtors propose that the Shippers and Importers continue to provide goods and services to the Debtors on the most favorable terms in effect between such Shippers or Importers and the Debtors in the twelve months prior to the Petition Date or on such other terms more favorable to the Debtors as the Debtors and the Shippers or Importers may otherwise agree ("**Customary Trade Terms**"). The Debtors propose that the Customary Trade Terms apply for the remaining term of the Shippers' or Importers' relationship with the Debtors, as long as the Debtors agree to pay for such goods and services in accordance with such terms. If any Shipper or Importer accepts payment on account of a prepetition obligation of the Debtors and thereafter does not continue to provide goods or services to the Debtors on Customary Trade Terms, any payments

made will be deemed an avoidable postpetition transfer under Section 549 of the Bankruptcy Code and, therefore, will be recoverable by the Debtors in cash upon written request. Upon recovery by the Debtors, the Shipper's or Importer's claim will be reinstated as a prepetition claim in the amount so recovered. Upon recovery by the Debtors, any such prepetition shipping or importing claim will be reinstated as if the payment had not been made. In essence, the Debtors seek to return the parties to their respective positions immediately prior to the Petition Date in the event a Shipper or Importer refuses to continue to provide goods or services to the Debtors on Customary Trade Terms or such other trade terms as the Debtors find acceptable, following payment of its Importing and Shipping Claim.

169. By reason of the foregoing, I believe that the interests of the Debtors, their estates and their stake holders would be best served by an order granting the Shipping Motion.

### G. Insurance Motion

170. In connection with the operation of their businesses and management of their properties, the Debtors maintain various insurance policies (the "**Insurance Policies**"). The Insurance Policies include, but are not limited to, general liability, automobile, workers' compensation, umbrella liability, directors and officers liability, products liability, fidelity, and property insurance. The Insurance Policies maintained by the Debtors are set forth on Exhibit B to the Insurance Motion. Of these policies, the following require the Debtors to pay a deductible: property insurance (20 UUN TA9885) – $25,000 to $50,000, depending on the claim; fiduciary, crime, kidnapping and ransom (8207-8184) – $10,000 for fiduciary, $50,000 for crime; and ocean cargo (OC7300011) – $5,000. Additionally, the following policies require the Debtors to pay a self-insured retention: the Debtors' primary products liability self-insured retention (N/A)

– $500,000; umbrella liability (policy no. 20 RHU TA9564) – $10,000; and D&O (01-686-03-49) – $100,000.

171.    The Debtors estimate that, for policies currently in place, they paid approximately $1,194,151 in premiums and related charges in 2010.  The Debtors' estimate that the amount due on account of the Insurance Policies for the remainder of the current policy period is approximately $159,516.  Such amount includes the monthly installment payments due under the Finance Agreement (as defined below), totaling approximately $135,359, as well as monthly installment payments for the Insurance Policies that are provided by The Hartford ("**Hartford**"), totaling approximately $24,157.  The Debtors do not believe they owe any prepetition amounts on account of these policies.

172.    The Debtors have been represented in their negotiations with their various insurance underwriters by Marsh USA Inc. ("**Marsh**").  The employment of Marsh as the Debtors' insurance broker has allowed the Debtors to obtain the insurance coverage necessary to operate their businesses in a reasonable and prudent manner and to realize considerable savings in the procurement of such policies.  Marsh is compensated for its services through commissions paid by the insurance carriers, and is not paid for such services by the Debtors.  Therefore, the Debtors do not believe they owe Marsh any amounts for prepetition services.  I believe that it is in the best interests of the Debtors' creditors and estates to continue their business relationship with Marsh, which results in considerable savings to the Debtors at no out-of-pocket cost to the Debtors.

173.    Additionally, the Debtors are required, under the laws of nine states in which they operate, to provide surety bonds to the applicable state boards of pharmacy.  These surety bonds are typically required to ensure compliance of non-resident distributors with the laws and

070649.1001

regulations relating to the wholesale distribution of pharmaceuticals. The surety bonds required to be posted by the Debtors total $825,000. Historically, the Debtors have satisfied their surety bond obligations through a letter of credit, which was posted as collateral to secure the Debtors' obligations to provide surety bonds. As of the Petition Date, there is no amount outstanding under the letter of credit posted by the Debtors in support of their surety bond obligations. The Debtors anticipate that postpetition, such surety bond obligations may be satisfied either through cash deposits provided to the state boards of pharmacy or by entering into new letters of credit, which would be posted as collateral.

174.    Under the laws of the various jurisdictions in which they operate, the Debtors are required to maintain workers' compensation policies and programs and to provide employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors. Accordingly, the Debtors maintain workers' compensation programs in all states in which they operate pursuant to the applicable requirements of local law. The Debtors fully insure their workers' compensation liabilities through a workers' compensation policy issued by Hartford on March 9, 2011, which runs through March 9, 2012. The Debtors' typical aggregate payments per annum to Hartford for workers' compensation insurance are approximately $71,500. Payments to Hartford are made in monthly installments. The Debtors' remaining obligations under the workers' compensation policy for the current policy period total approximately $6,645.

175.    The Debtors maintain an insurance premium finance agreement (the "**Finance Agreement**") with AFCO Premium Credit LLC (including any affiliates or subsidiaries, "**AFCO**"). Pursuant to the Finance Agreement, AFCO agreed to pay the insurance premiums due under certain Insurance Policies, set forth on Exhibit C to the Insurance Motion, in exchange

for a down payment of $70,891.00 and nine (9) monthly installment payments of $45,119.60, for a total of $406,076.40 in payments from the Debtors. As of the Petition Date, the Debtors' remaining obligations under the Finance Agreement total approximately $135,359. The Debtors' obligation to pay AFCO under the Finance Agreement is secured by the grant to AFCO of a security interest in any and all unearned premiums and dividends that may become payable under the covered Insurance Policies, as well as loss payments that reduce the unearned premiums.

176. I believe that the Insurance Policies subject to the Finance Agreement are essential to the preservation of the Debtors' businesses, properties, and assets. In the Debtors' business judgment, the terms of the Finance Agreement represent the best possible terms for financing the premiums of the Insurance Policies. The Debtors' estates will benefit by maintaining this low-cost financing from the Insurance Premium Finance Company. Moreover, any interruption of payments might adversely affect the Debtors' ability to obtain financing for future policies on favorable terms. In some cases, the coverage is required by regulations, laws, and/or contracts that govern the Debtors' business obligations.

177. I have been advised that maintenance of insurance coverage under the various Insurance Policies is required under the Operating Guidelines, the laws of the various states in which the Debtors operate and the Debtors' various debt agreements. Thus, I believe it is essential to the Debtors' ongoing business to honor all the obligations described in the Insurance Motion. By reason of the foregoing, I believe that the interests of the Debtors, their estates and their stake holders would be best served by an order granting the Insurance Motion.

## III. CONCLUSION

178. The Debtors' ultimate goal in these Chapter 11 Cases is to achieve a sale of their businesses that maximizes the value of the Debtors' estates for the benefit of all the Debtors' creditors and subsequently confirm a chapter 11 plan or, alternatively, to reorganize their

YCST01: 11470164.2

070649.1001

financial affairs pursuant to the terms of a confirmed chapter 11 plan. In the near term, however, to minimize any loss of value of their businesses during these Chapter 11 Cases, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful reorganization or sale of the Debtors' businesses will be substantially enhanced.

179. I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just.

YCST01: 11470164.2

070649.1001

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of September, 2011.

Respectfully Submitted,

GRACEWAY PHARMACEUTICALS, LLC

Gregory C. Jones
Executive Vice President of Strategic Development