# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
|  |  |
| GRACEWAY PHARMACEUTICALS, LLC, *et al.*,[1] | Case No. 11-13036 (MFW) |
|  | Joint Administration Pending |
| Debtors. |  |
|  | **Proposed Bidding Procedures Objection Deadline:**[2] |
|  | [October 11] at [12:00] p.m. |
|  | **Proposed Bidding Procedures Hearing:** |
|  | [October 14, 2011] at [____] .m. |
|  | **Proposed Sale Objection Deadline:** |
|  | [November 1] at [4:00] p.m. |
|  | **Proposed Sale Hearing:** |
|  | [November 7, 2011] at [____] .m. |

**DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER APPROVING AND AUTHORIZING (A) BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF CERTAIN ASSETS OF THE DEBTORS, (B) STALKING HORSE BID PROTECTIONS, (C) THE FORM AND MANNER OF NOTICE OF THE SALE HEARING AND (D) RELATED RELIEF; AND (II) AN ORDER AUTHORIZING (A) THE SALE OF CERTAIN ASSETS OF THE DEBTORS FREE AND CLEAR OF ALL CLAIMS, LIENS, LIABILITIES, RIGHTS, INTERESTS AND ENCUMBRANCES; (B) THE DEBTORS TO ENTER INTO AND PERFORM THEIR OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT; (C) THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) GRANTING RELATED RELIEF**

("Sale Motion")

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Graceway Pharma Holding Corp., a Delaware corporation (9175); Graceway Holdings, LLC, a Delaware limited liability company (2502); Graceway Pharmaceuticals, LLC, a Delaware limited liability company (5385); Chester Valley Holdings, LLC, a Delaware limited liability company (9457); Chester Valley Pharmaceuticals, LLC, a Delaware limited liability company (3713); Graceway Canada Holdings, Inc., a Delaware corporation (6663); and Graceway International, Inc., a Delaware corporation (2399). The mailing address for Graceway Pharmaceuticals, LLC is 340 Martin Luther King Jr. Blvd., Suite 500, Bristol, TN 37620 (Attn: John Bellamy).

[2] All hearing dates and objections deadlines are subject to the Court's availability. A notice with the confirmed dates and times for such hearings and objection deadlines will be separately filed.

## Motion Contents

**Jurisdiction** ........................................................................................................ **3**

**Introduction** ........................................................................................................ **3**

**Relief Requested** ................................................................................................. **4**

**Factual Background** ............................................................................................ **5**

    I.      The Debtors' Business and Operations .......................................... 5

    II.    Decision to Sell the Debtors' Assets ............................................ 6

**Overview of the Proposed Sale** ........................................................................ **10**

    I.      Material Terms of the APA ......................................................... 10

    II.    Provisions to Be Highlighted under the Local Rules ................... 14

**Bidding Procedures Order** .............................................................................. **16**

    I.      Outline of the Bidding Procedures ............................................. 16

    II.    Provisions to Be Highlighted Under the Local Rules .................. 17

    III.   Summary of the Assumption Procedures .................................... 21

**Basis for Relief** ................................................................................................ **22**

    I.      The Bidding Procedures Order Should be Entered on the Terms Proposed ................. 22

          A.    The Bidding Procedures Are Fair, Appropriate and Should be Approved ........... 22

          B.    The Bid Protections Have Sound Business Purpose and Should be Approved. .. 24

          C.    The Assumption Procedures Are Appropriate and Should be Approved ............. 28

          D.    The Form and Manner of the Sale Notice Should be Approved. ......................... 28

    II.    The Sale Order Should be Entered on the Terms Proposed. ........................................ 30

          A.    The Sale Should be Approved as an Exercise of the Debtors' Sound Business Judgment. ................. 30

          B.    The Sale Should be Approved "Free and Clear" Under § 363(f). ........................ 36

          C.    Assumption and Assignment of Contracts and Leases Should be Approved. ..... 36

**Notice** .............................................................................................................. **39**

Graceway Pharmaceuticals, LLC and the other above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**" or the "**Company**"), submit this motion for entry of the Bidding Procedures Order attached hereto as **Exhibit A** and the Sale Order attached hereto as **Exhibit B** (as such terms are each defined herein). In support of this motion, the Debtors submit the *Declaration of Daniel Aronson in Support of the Debtors' Motion for Entry of an Order Approving and Authorizing (A) Bidding Procedures in Connection with the Sale of Certain Assets of the Debtors, (B) Stalking Horse Bid Protections, (C) the Form and Manner of Notice of the Sale Hearing and (D) Other Related Relief* (the "**Aronson Declaration**") attached hereto as **Exhibit C** and also respectfully state as follows in support of this motion (the "**Motion**"):

## Jurisdiction

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases (as defined below).

2. The statutory bases for the relief requested herein are Sections 105(a), 363, 365, 503, 507 and, if applicable, 1146(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

## Introduction

3. On September 29, 2011 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").

CH\1293030.10

The Debtors are operating their business and managing their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committees have been appointed or designated. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these Chapter 11 Cases.

### Relief Requested

4.   *First*, by this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"):

    a.   authorizing and approving bidding procedures in connection with the receipt and analysis of competing bids for certain assets of the Debtors, substantially in the form attached as **Exhibit 1** to the Bidding Procedures Order (the "**Bidding Procedures**"), including customary bid protections for the Stalking Horse Bidder (defined herein) pursuant to the Asset Purchase Agreement, dated September 27, 2011, by and among the Debtors, as sellers, and Galderma, S.A., as buyer (the "**APA**"), attached hereto as **Exhibit D**;[3]

    b.   authorizing and approving procedures for the assumption and assignment of the Assigned Agreements (defined below) in connection with the sale of certain assets of the Debtors (the "**Sale**");

    c.   approving the form and manner of notice of the Sale and hearing thereon, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "**Sale Notice**");

---

[3]   The schedules to the APA have not been attached due to the confidential, competitive and/or proprietary nature of certain information contained therein. However, a non-redacted version of such schedules or, as applicable, such confidential, competitive and/or proprietary information, will be provided to: (a) potential bidders party to an appropriate confidentiality agreement with the Debtors in accordance with the Bidding Procedures; (b) the Court, *in camera*; (c) the U.S. Trustee; (d) counsel to the any official statutory committees appointed by the U.S. Trustee, subject to the prior execution of a confidentiality agreement reasonably satisfactory to the Debtors; and (e) financing counsel to the agent (the "**First Lien Agent**") to the lenders party to the Debtors' prepetition first lien credit agreement (the "**First Lien Lenders**"); (f) special bankruptcy and restructuring counsel to the First Lien Agent; and (g) counsel to the agent (the "**Second Lien Agent**") to the lenders party to the Debtors' prepetition second lien credit agreement (the "**Second Lien Lenders**").

d.    establishing the following dates and deadlines, subject to modification as needed, relating to competitive bidding and approval of the Sale:[4]

- Sale Objection Deadline:    November 1, 2011 at 4:00 p.m. prevailing Eastern Time, as the deadline to object to the Sale transactions and/or the assumption and assignment of Assigned Agreements or cure amounts related thereto (the "**Sale Objection Deadline**");

- Bid Deadline:  November 1, 2011 at 4:00 p.m. prevailing Eastern Time, as the deadline by which all binding bids must be actually received pursuant to the Bidding Procedures (the "**Bid Deadline**");

- Auction:  November 3, 2011 at 9:00 a.m. prevailing Eastern Time, as the date and time the auction, if one is needed (the "**Auction**"), which will be held at the offices of Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022; and

- Sale Hearing:  November 7, 2011, as the date of the sale hearing (the "**Sale Hearing**") which will be held before the Honorable Judge Mary F. Walrath, United States Bankruptcy Judge for the United States Bankruptcy Court for the District of Delaware, at: 824 North Market Street, Courtroom 4, Wilmington, Delaware 19801.

5.    *Second*, by this Motion, the Debtors also seek entry of an order, substantially in the form attached hereto as **Exhibit B** (the "**Sale Order**"), authorizing (a) the sale of certain assets of the Debtors free and clear of all claims, liens, liabilities, rights, interests and encumbrances, (b) the Debtors to enter into and perform their obligations under the APA, (c) the Debtors to assume and assign certain executory contracts and unexpired leases; and (d) granting related relief.

**Factual Background**

**I.    The Debtors' Business and Operations**

6.    A description of the Debtors' business, the reasons for commencing these Chapter 11 Cases, and the relief sought from this Court to allow for a smooth transition into chapter 11

---

[4]    All hearing dates and objections deadlines set forth in this section are subject to the Court's availability. A notice with the confirmed dates and times for such hearings and objection deadlines will be separately filed.

(including the facts and circumstances supporting this motion) are set forth in the *Declaration of Gregory C. Jones in Support of Chapter 11 Petitions and First Day Motions* filed contemporaneously herewith (the "**First Day Declaration**").

## II. Decision to Sell the Debtors' Assets; Selection of Stalking Horse Bidder

7.      In March 2010, the Debtors retained Lazard Frères & Co. LLC ("**Lazard**") as an investment banker to assist the Debtors in addressing their financial situation and exploring potential financing and restructuring alternatives. Additionally, in March 2010, the Debtors retained Alvarez and Marsal North America, LLC ("**Alvarez**") to perform a variety of restructuring related services. Prior to filing these Chapter 11 Cases, the Debtors, with the assistance of Lazard and Alvarez, and in consultation with certain of the First Lien Lenders, pursued a range of options to address the Debtors' concerns about their ability to service their debt going forward, including new financing, refinancing and the sale of certain or all of the Debtors' assets or business. After exploring the strategic alternatives available to them, the Debtors determined that the best way to maximize the value of their assets for the benefit of their creditors was to seek a sale of substantially all of their assets pursuant to Section 363 of the Bankruptcy Code.

## III. Prepetition Marketing Process

8.      In April 2011, Lazard began an extensive marketing and sale process for the Debtors' assets, aggressively canvassing the marketplace to locate potential financial purchasers, including both strategic and financial buyers. Lazard contacted 60 potential investors in the first round of outreach, all of whom reviewed preliminary, non-confidential solicitation materials. Of those initially contacted, 21 executed confidentiality agreements with the Debtors and received access to an electronic data room to review confidential information and to serve as the basis for discussions towards potential bids (the "**Data Room Participants**"). Approximately 11 Data

Room Participants responded with preliminary letters of interest (the "**Potential Purchasers**"). Of the 11 Potential Purchasers, seven (7) responded with preliminary letters of interest in which they expressed an interest in purchasing the entire Company, and the remaining four (4) responded with preliminary letters of interest in which they expressed an interest in purchasing specific assets of the Company.

9.      The preliminary letters of interest came from a variety of Potential Purchasers with wide-ranging bids. After evaluating these preliminary letters of interest, as well as the seriousness of the Potential Purchasers' interest and their ability to move expeditiously to consummate the transaction, the Debtors, in consultation with Lazard, opted to pursue further discussions with four of the Potential Purchasers. Each of these four Potential Purchasers received access to additional information in an electronic data room and also received a management presentation beginning on or about June 29, 2011. Following those presentations and initial diligence conducted by the Potential Purchasers, on August 5, 2011, the Debtors received one binding bid to purchase certain assets of the Company (the "**First Bid**"). Subsequently, on September 5, 2011, the Debtors received another binding bid to purchase certain assets of the Company (the "**Second Bid**").

**IV.     Negotiation of Stalking Horse Bid and Selection of Stalking Horse Bidder**

10.     From August 5, 2011 until September 5, 2011, the Debtors negotiated extensively with the bidder that submitted the First Bid regarding the terms and conditions of the proposed acquisition. Beginning on September 5, 2011, when the Second Bid was received, the Debtors, in consultation with their advisors, engaged in parallel arm's-length negotiations with each bidder and such bidder's respective counsel and advisors. For three weeks following the receipt of the Second Bid, the Debtors and Lazard, along with the Debtors' other advisors and counsel,

continued extensive negotiations regarding the terms and conditions of both the First Bid and Second Bid, which ultimately resulted in materially improved contract terms for the Debtors.

11.     Following these extensive negotiations regarding the terms and conditions of each offer, the Debtors, with the assistance of Lazard and their other advisors, conducted a final side-by-side analysis of the proposals and, ultimately, made the considered determination that the offer of the bidder that submitted the Second Bid, Galderma S.A., a Switzerland corporation, was the highest and/or best offer presented and was an acceptable offer to serve as the stalking horse bid. On September 23, 2011, the special committee of the Board of Managers of Graceway Holdings, LLC (the "**Special Committee**") held a meeting and voted to recommend that the Board of Managers of Graceway Holdings, LLC approve Galderma S.A. as the stalking horse bidder pursuant to the terms of the Second Bid. Following the meeting of the Special Committee, the full Board of Managers of Graceway Holdings, LLC (conducted concurrently with meetings of the boards of managers and directors of the various other Seller entities) held a meeting to consider the recommendation of the Special Committee, and voted to select Galderma S.A. as the stalking horse bidder (the "**Stalking Horse Bidder**").

12.     Thereafter, the Debtors and the Stalking Horse Bidder entered into the APA, among the Debtors, as sellers, and the Stalking Horse Bidder, as buyer. Pursuant to the APA: (i) the Stalking Horse Bidder agreed to pay $275,000,000 (the "**Cash Purchase Price**"), and to assume certain liabilities (together with the Cash Purchase Price, the "**Stalking Horse Bid**") to acquire the Acquired Assets (as defined in the APA), subject to the outcome of the Auction, if one is needed, and Court approval; and (ii) the Debtors agreed to provide the Bid Protections (as described herein).

**V.    Sale Supported By Majority Of First Lien Lenders**

13.    Throughout the pre-petition marketing process, the Debtors and their advisors have kept special restructuring and bankruptcy counsel to the First Lien Agent, as well as the First Lien Lenders who were willing to become restricted, fully apprised of the implementation and effectuation of the marketing process. The Debtors shared the First Bid and the Second Bid with special restructuring and bankruptcy counsel to the First Lien Agent. Prior to the ultimate selection by the Board of Managers of Graceway Holdings, LLC of the Stalking Horse Bidder, special restructuring and bankruptcy counsel to the First Lien Agent represented to the Debtors' counsel that certain of the First Lien Lenders preferred the Stalking Horse Bid over the final bid submitted by the other bidder.

14.    To that end, on September 28, 2011, certain first lien lenders (the "**Consenting First Lien Lenders**"), who hold at least 40% of the outstanding first lien obligations under the first lien credit agreement, executed a sale support agreement attached hereto as **Exhibit E** (the "**Sale Support Agreement**") evidencing their support of the Sale to the Stalking Horse Bidder or Successful Bidder (as defined in the APA).

15.    In the Sale Support Agreement and subject to the terms and conditions set forth therein, the Consenting First Lien Lenders have agreed to both support the Sale and allow the Debtors to use cash collateral and the proceeds of the Sale to, among other things, permit the Debtors to operate in the ordinary course of business through the consummation of the Sale and upon the consummation of the Sale, repay the intercompany debtor-in-possession loan, pay accrued administrative expenses, fund the orderly wind-down of the Debtors' estates and confirm a plan of liquidation.

16.    Under the Sale Support Agreement and subject to the terms and conditions set forth therein, the Debtors have agreed to seek prompt approval of the Sale pursuant to various

deadlines set forth in the Sale Support Agreement, which are consistent with the various deadlines set forth in the APA. The Sale Support Agreement recognizes the Debtors' fiduciary obligations to maximize value for all creditors, and, as such, does not impair the Debtors' ability to consider Alternative Transactions (as defined in the Sale Support Agreement), regardless of whether such Alternative Transaction results from the bid and auction procedures provided for in the APA or otherwise. Similarly, the Sale Support Agreement allows the Debtors to withdraw from the Sale Support Agreement in the event that the Board of Managers of Graceway Holdings, LLC reasonably determines that proceeding with or consummating the Sale would be inconsistent with the exercise of their respective fiduciary duties.

17.     Accordingly, with a stalking horse bidding floor and APA in place (the key terms of which have already been subject to a comprehensive market test) and with the support of the majority of their First Lien Lenders, the Debtors now seek to promptly effectuate the Sale to the Stalking Horse Bidder, subject to a competitive bidding process that is consistent with the Debtors' fiduciary duties to maximize value for their estates, stakeholders and parties in interest.

## Overview of the Proposed Sale

### I.     Material Terms of the APA

18.     The principal terms of the APA are summarized in the following chart:[5]

| APA Provision | Summary Description |
| --- | --- |
| APA Parties | Sellers: Graceway Pharmaceuticals, LLC; Chester Valley Holdings, LLC; Chester Valley Pharmaceuticals, LLC; Graceway Canada Holdings, Inc.; Graceway International, Inc.; Graceway Canada Company[6] |

---

[5]     This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the APA, the latter governs in all respects. Capitalized terms used but not defined in this chart have the meaning ascribed in the APA.

[6]     Graceway Canada Company is a non-Debtor affiliate of the other Sellers, all of whom are Debtors in these Chapter 11 Cases. The Debtors will file a separate motion to value the assets of Graceway Canada Company and to establish the procedures for other parties in interest to object to the Debtors' valuation, if appropriate, so that at the closing of the Sale the portion of the sale proceeds attributed to the assets of Graceway Canada Company can be remitted directly by the Buyer to Graceway Canada Company.

| APA Provision | Summary Description |
|---|---|
| | Buyer: Galderma S.A. |
| **Consideration** | Cash in the amount of $275,000,000.00 plus the assumption of the Assumed Liabilities. See APA, §§ 1.1; 3.1 |
| **Acquired Assets** | The APA sets forth the assets to be purchased by the Stalking Horse Bidder (the "**Acquired Assets**"), including, without limitation, (a) all Inventory; (b) the Assigned Agreements; (c) all Permits and pending applications therefor; (d) all Business Intellectual Property; (e) all Pre-Paid Expenses; (f) all goodwill associated with the Acquired Assets; (g) all Documents (other than those described in Section 2.2(c) of the APA) to the extent available and permitted by applicable Laws, *provided* that Sellers may retain copies of such Documents; (h) all Claims and Proceedings (including, for the avoidance of doubt, the Nycomed Litigation and all claims for past infringement or misappropriation of Business Intellectual Property) of Sellers as of the Closing other than Claims and Proceedings (i) primarily related to or constituting any Excluded Asset or Excluded Liability or (ii) against Sellers (regardless of whether or not such claims and causes of action have been asserted by Sellers) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds (other than Tax refunds), rights of reimbursement and other rights of recovery, including insurance proceeds, possessed by Sellers as of the Closing (regardless of whether such rights are currently exercisable) to the extent related to any Product or other Acquired Asset or any of the Assumed Liabilities; and (i) all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements relating to any Product or Acquired Asset (or any portion thereof). See APA, § 2.1. |
| **Excluded Assets** | The APA sets forth the assets that will be not be purchased by the Stalking Horse Bidder, including, without limitation,, (a) each Seller's rights under the APA (including the right to receive the Purchase Price delivered to Sellers pursuant to the APA); (b) all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits, securities, securities entitlements, instruments and other investments of Sellers and all bank accounts and securities accounts, including any cash collateral that is collateralizing any letters of credit; (c) all Documents prepared in connection with the APA or the transactions contemplated by the APA or relating to the Bankruptcy Case or the Canadian Proceedings, all minute books, corporate records (such as stock registers) and organizational documents of Sellers and the Retained Subsidiaries, Tax Returns, other Tax work papers, and all other Documents not related to the Products or the Acquired Assets; (d) any Contract that is not an Assigned Agreement, including the Contracts listed or described on Schedule 2.2(d) of the APA, which Schedule may be modified from the Effective Date through one (1) Business Day prior to the Sale Hearing in accordance with Section 7.9 of the APA; (e) any Tax refunds, rebates or credits of Sellers; (f) all Claims and Proceedings of Sellers (other than those described in Section 2.1(h) of the APA; (g) all Seller Employees and all of the funding vehicles and assets of any Benefit Plan; (h) the Avoidance Actions or similar Proceedings, including but not limited to Proceedings under Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code; (i) any security deposits or pre-paid expenses not associated with the Acquired Assets; (j) all insurance policies and binders, all claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders and all rights to proceeds thereof (other than as described in Section 2.1(h) of the APA); (k) all shares of capital stock or other equity interests of any Seller or Retained Subsidiary or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller or Retained Subsidiary; (l) the Equipment; (m) all Accounts |

| APA Provision | Summary Description |
|---|---|
| | Receivable; (n) all Real Property; (o) any assets, properties and rights of any Sellers other than the Acquired Assets, including those set forth on Schedule 2.2(o) of the APA; (p) the Excluded Intellectual Property; (q) any Inventory that is part of a split lot of and in the possession of Sellers as of the Filing; and (r) the Intercompany Loan and all interest thereon See APA, § 2.2. |
| Assumed Liabilities | The APA sets forth the liabilities that will be assumed by the Stalking Horse Bidder (the "**Assumed Liabilities**"), including, without limitation, (a) all Liabilities arising from the ownership of the Acquired Assets or the sale of Products by Buyer, in each case after the Closing Date, it being understood that Liabilities arising from the ownership of the Acquired Assets or the operation of the Business prior to the Closing Date (including the sale of Products by Sellers and their Affiliates prior to the Closing Date) will not constitute Assumed Liabilities regardless of when the obligation to pay such Liabilities arises, other than as set forth in Section 2.3(e) of the APA and Section 8.1 of the APA; (b) all Liabilities under the Assigned Agreements arising after the Closing; (c) the Cure Costs associated with any Contracts (i) added by Buyer to Schedule 1.1(a) of the APA after the Effective Date, *provided* that such Contract (A) is listed on Schedule 2.2(d) of the APA as of the Effective Date or (B) arose in the Ordinary Course of Business after the Effective Date and was approved by Buyer in writing as an "Assigned Agreement" or (ii) added by Buyer to Schedule 1.1(a) of the APA after the Auction; (d) all Liabilities of Sellers for any claims entitled to administrative expense priority in the Bankruptcy Case in accordance with the applicable provisions of the Bankruptcy Code arising out of any Contract removed by Buyer from Schedule 1.1(a) of the APA in accordance with Section 7.9 that is listed on Schedule 2.3(d) of the APA; and (e) all Liabilities for Transfer Taxes, as provided in Section 8.1 of the APA. See APA, § 2.3. |
| Excluded Liabilities | The APA sets forth the liabilities that will be not be assumed by the Stalking Horse Bidder, including the Liabilities of Sellers that are not an Assumed Liability, including, without limitation, any Liability incurred by Sellers for returns, government Rebates, commercial Rebates and obligations arising under any patient coupon program, in each case, with respect to Product sold by Sellers prior to Closing and whether such Liabilities arise prior to, on or after the Closing Date. See APA, § 2.4. |
| Assumption of Executory Contracts and Assignment to the Stalking Horse Bidder | All Assigned Agreements and Permits owned by the Sellers that are proposed to be assigned by Buyer pursuant to Section 365 of the Bankruptcy Code in connection with the Sale transactions set forth in the APA are listed on Schedule 1.1(a) to the APA (as the same may be revised, amended and supplemented from time to time by Buyer from the Effective Date through one (1) Business Day prior to the Sale Hearing pursuant to § 7.9 of the APA, collectively, the "**Assigned Agreements**"). See APA, §§ 2.1; 2.5. |
| Payment of Cure Amounts | The APA provides that the Sellers are responsible for payment of all Cure Costs other than those with respect to a Contract that is (i) added by Buyer to Schedule 1.1(a) of the APA after the Effective Date, *provided* that such Contract (A) is listed on Schedule 2.2(d) to the APA as of the Effective Date or (B) arose in the Ordinary Course of Business after the Effective Date and was approved by Buyer in writing as an "Assigned Agreement" or (ii) added by Buyer to Schedule 1.1(a) after the Auction. See APA, §§ 2.3(c); 2.5. |
| Employment Provisions | All Seller Employees and related Benefit Plans are Excluded Assets. See APA, § 2.2(g). |
| Closing Conditions | The APA includes closing conditions typical and customary for transactions of this kind, including, without limitation: |

| APA Provision | Summary Description |
|---|---|
| | • **Buyer:** (i) the representations and warranties of the Sellers in Article V of the APA must be true and correct as of the Closing Date or, if not true, would not reasonably be expected to have a Material Adverse Effect, (ii) Sellers must perform and comply in all material respects with the covenants and agreements required by the APA prior to Closing, (iii) no Closing Legal Impediment may be in effect, (iv) any applicable waiting period under the HSR Act and any other material waiting period under any applicable antitrust or competition Law must have expired or been terminated and any other material approval under any applicable antitrust or competition Law must have been received, (v) each of the deliveries required to be made to Buyer pursuant to Section 4.3 of the APA must have been so delivered, (vi) the Bankruptcy Court must have entered the Sale Order and the Sale Order must be a Final Order, and (vii) the Canadian Court must have entered the Canadian Sale and Vesting Order and the Canadian Sale and Vesting Order must be a Final Order.<br><br>• **Sellers:** (i) the representations and warranties of Buyer contained in the APA must be true and correct as of the Closing Date or, if not true, would not reasonably be expected to prevent or materially impair the ability of Buyer to consummate the transactions contemplated by this Agreement, (ii) the Bankruptcy Court must have entered the Sale Order and the Sale Order must be a Final Order, (iii) the Canadian Court must have entered the Canadian Sale and Vesting Order and the Canadian Sale and Vesting Order must be a Final Order, (iv) Buyer must have performed and complied with in all material respects the material covenants and agreements that Buyer is required to perform or comply with pursuant to the APA at or prior to the Closing, (v) no Closing Legal Impediment may be in effect, (vi) any applicable waiting period under the HSR Act and any other material waiting period under any applicable antitrust or competition Law must have expired or been terminated and any other material approval under any applicable antitrust or competition Law must have been received, and (vii) each of the deliveries required to be made to Sellers pursuant to Section 4.2 of the APA must have been so delivered.<br><br>See APA, §§ 9.1-9.7; 10.1-10.7. |
| **Representations, Warranties and Covenants** | The APA includes representations, warranties and covenants made or agreed to by the parties typical and customary for transactions of this kind, including, without limitation, representations, warranties and covenants relating to (i) organization/good standing, (ii) authorization of transaction, (iii) non-contravention, (iv) environmental and health and safety matters, (v) title to and condition of Acquired Assets, (vi) taxes, (vii) legal proceedings, (viii) compliance with laws and permits, (ix) intellectual property, (x) the Assigned Agreements, (xi) regulatory matters, (xii) brokers or finders fees, (xiii) affiliate transactions, (xiv) insurance, (xv) certain issues with respect to 3M, (xvi) inventory and products, (xvii) the Canadian Competition Act, (xviii) financial statements, and (xix) availability of funds and solvency of Buyer, and (xx) Sellers' operations prior to the Closing Date. See APA, §§ 5.1-5.19; 6.1-6.6; 7.2. |
| **Bid Protections** | The APA provides for a Break-Up Fee equal to $8,250,000. See APA, § 7.6(a). The APA further provides a cap for reimbursable expenses of $1,500,00 which, if the Break-Up Fee is determined payable, reduces the Break-Up Fee to the extent paid. See APA, § 7.6(b) The Bidding Procedures also provide that any Overbid after the Opening Bid must be made in increments of at least $2,500,000 (or such other amount the Debtors determine to facilitate the Auction). |

| APA Provision | Summary Description |
| --- | --- |
| Deposit | $27,500,000 to be held in escrow. <u>See</u> APA, § 3.2. |

## II.  Provisions to Be Highlighted under the Local Rules

19.  The APA contains the following terms, conditions and provisions that are to be highlighted pursuant to Local Rule 6004-1(b):

a.  **Sale to Insider**.  Not applicable.

b.  **Management Agreements**.  None.

c.  **Releases**.  The APA contains provisions releasing all past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any Seller from liability for any claim based on, in respect of, or by reason of the transactions contemplated by the APA and a covenant by the Buyer, on behalf of itself and its affiliates, not to sue with respect to any such claim.  <u>See</u> APA, § 12.11.  The Debtors believe these provisions are typical and customary for transactions of this kind.  In any event, the marketing process and Sale negotiations were conducted in consultation with the Debtors' advisors in an appropriate manner and the Sale was approved by the board members as a sound discharge of their fiduciary duties to these estates and creditors.

d.  **Private Sale/No Competitive Bidding**.  Not applicable.

e.  **Closing and Other Deadlines**.  The APA contains provisions allowing for its termination by the Buyer or Sellers if the Closing has not occurred by January 27, 2012.  <u>See</u> APA, § 11.1(a)(iii).  In addition, the APA contains provisions allowing for its termination by the Buyer if (a) the Bidding Procedures Order has not been entered on or before forty-five days after the date of execution of the APA (or is vacated or stayed as of such date) or (b) the Sale Order has not been entered on or before January 2, 2012 (or is vacated or stayed as of such date).  <u>See</u> APA, § 11.1(b)(iv) and (v).  The Debtors believe these provisions are typical and customary for transactions of this kind.  In any event, the marketing process and Sale negotiations were conducted in consultation with the Debtors' advisors in an appropriate manner and the Sale was approved by the board members as a sound discharge of their fiduciary duties to these estates and creditors.

f.  **Good Faith Deposit**.  The APA contains provisions requiring a good faith deposit by the Buyer in the amount of $27,500,000 to be placed in escrow.  <u>See</u> APA, § 3.2.  The Debtors believe these provisions are typical and customary for transactions of this kind.  In any event, the marketing process and Sale negotiations were conducted in consultation with the Debtors' advisors in an appropriate manner and the Sale was approved by

the board members as a sound discharge of their fiduciary duties to these estates and creditors.

g. **Interim Arrangements with Proposed Buyer**. The APA provides that after the Effective Date and prior to the Closing Date the Buyer, at the Buyer's sole cost and expense and in accordance with reasonable procedures to be established in good faith by mutual agreement of Sellers' Interim Access Manager and Buyer's Interim Access Manager, will be afforded certain access to the Sellers' facilities, employees and books and records and will be furnished certain information by the Sellers. See APA, § 7.1.

h. **Use of Proceeds**. The proposed Sale Order provides that the Cash Consideration from the Sale, less the Break-Up Fee (if any) paid pursuant to the terms of the APA, shall be paid directly by the Successful Bidder to the First Lien Agent (as defined below) on the Closing Date for distribution to the First Lien Claimholders (as defined in the DIP Order), except for certain exceptions and holdbacks. Sale Order, ¶ 27. Any contingent payments under the APA not yet due and payable on the Closing Date, in each case, will be paid by the Successful Bidder directly to the First Lien Agent for distribution to the First Lien Claimholders. See Sale Order, ¶ 27.

i. **Tax Exemption**. Not applicable.

j. **Record Retention**. The Debtors will have access to their books and records sufficient to administer the bankruptcy estate. See APA, § 8.8.

k. **Sale of Avoidance Actions**. Not applicable.

l. **Requested Findings as to Successor Liability**. The proposed Sale Order provides that the Buyer shall not be deemed, as a result of any action taken in connection with the APA, the consummation of the Transactions (as defined in the Sale Order) contemplated by the APA, or the transfer or operation of the Acquired Assets to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for Buyer, with respect to any obligations as an assignee under the Assigned Agreements arising after the Closing); (b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors. See Sale Order, ¶¶ T, U, W, 8, 15, 16, 18.

m. **Sale Free and Clear of Unexpired Leases**. The APA requires that the Sale Order provide, and the proposed Sale Order provides, that the Acquired Assets, are being sold free and clear of all Encumbrances, with certain exceptions. See APA, § 5.5; Sale Order, ¶¶ T, U, V, 8-14.

n. **Credit Bid**. Not applicable. The Bidding Procedures permit the Debtors' secured lenders to credit bid, subject to certain requirements.

o.    **Relief from Bankruptcy Rule 6004(h).** The proposed Sale Order provides that, notwithstanding Bankruptcy Rule 6004(h), there is no just reason for delay in the implementation of the Sale Order and expressly directs entry of the Sale Order and authorizes implementation thereof immediately after entry. See Sale Order, ¶¶ B, 29, 36.

## Bidding Procedures Order

### III.   Outline of the Bidding Procedures

20.    The Bidding Procedures are intended to permit a fair and efficient competitive sale process, consistent with the timeline of these cases, to confirm that the Stalking Horse Bid is, indeed, the highest or otherwise best offer, or promptly identify the alternative bid that is higher or otherwise better. Because the Bidding Procedures are attached as **Exhibit 1** to the Bidding Procedures Order, they are not restated in their entirety herein. The Bidding Procedures establish, among other things:[7]

- the requirements a Potential Bidder must satisfy to be entitled to participate in the bidding process and become a Qualified Bidder (See Bid. Proc., at 3-4);

- the availability of, access to, and conduct during due diligence by Potential Bidders (See Bid. Proc., at 4);

- the deadlines and requirements for submitting a competing bid and the method and criteria (including minimum consideration and other required elements) by which such a competing bid is to become entitled to be a Qualified Bid sufficient to trigger an Auction (See Bid. Proc., at 5-6);

- the procedures for conducting the Auction, if any (See Bid. Proc., at 6-9);

- the criteria by which the Successful Bidder will be selected by the Debtors (See Bid. Proc., at 8-9); and

- various other matters relating to the Sale process generally, including regarding the Sale Hearing, requirements for credit bids, designation of a Back-Up Bidder, payment of the Bid Protections, return of any Good Faith Deposits and certain reservations of rights (See Bid. Proc., at 9-12).

---

[7]    Capitalized terms used but not defined in this Paragraph 20 shall have the meanings set forth in the Bidding Procedures.

21. Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals, and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for their estates in consultation with key parties set forth therein.

## IV. Provisions to Be Highlighted Under the Local Rules

22. The Bidding Procedures contain the following provisions that are to be highlighted pursuant to Local Rule 6004-1(c), which are more fully described in the Bidding Procedures and the proposed Bidding Procedures Order:[8]

a. **Provisions Governing Qualification of Bidders**. "Potential Bidders" must, on or before November 1, 2011, satisfy the "Participant Requirements" by submitting to the Debtors certain documents, including an executed confidentiality agreement and preliminary proof of the Potential Bidder's financial capacity to close the proposed transaction. See Bid. Proc., at 2-3.

b. **Provisions Governing Qualified Bids**. To participate in the Auction, each Bidder must deliver to the Debtors in writing by 4:00 p.m. (prevailing Eastern Time) on November 1, 2011 an irrevocable, good faith and bona fide offer to purchase all or a substantial portion of the Assets and payment or assumption of all or a substantial portion of the liabilities to be paid or assumed under the APA, for an aggregate amount of at least the sum of the cash "Purchase Price" and assumed liabilities provided for under the APA, in the aggregate, plus the "Initial Minimum Overbid Increment" and include with such offer (i) a marked copy of the APA reflecting the proposed amendments and modifications from the APA executed with the Stalking Horse Bidder, which may not be materially more burdensome to the Debtors; (ii) identification of the executory contracts and unexpired leases for which assumption and assignment is required and the corresponding cure amounts associated with the assumption and assignment of such leases and contracts; (iii) no contingencies, including among other things, obtaining financing; shareholder, board or other approval; regulatory contingencies (other than that any applicable waiting period under The Hart-Scott-Rodino Antitrust Improvements Act of 1976 (Public Law 94-435)) or the outcome or review of diligence; (iv) a commitment to close within the time specified

---

[8] All hearing dates and objections deadlines set forth in this section are subject to the Court's availability. A notice with the confirmed dates and times for such hearings and objection deadlines will be separately filed.

in the APA; (v) written evidence of a firm commitment for financing or other evidence of the Bidder's financial wherewithal and ability to consummate the proposed purchase and which the Debtors reasonably believe to be sufficient to satisfy the standards to provide adequate assurance of future performance of any contracts or leases to be assumed and assigned under Section 365 of the Bankruptcy Code; (vi) no request or entitlement that the Bidder receive any transaction or break-up fee, expense reimbursement, termination or similar type of fee or payment, and (vi) a cash deposit equal to $27,500,000. See Bid. Proc., at 4-5. Such offer must remain irrevocable until five (5) business days after the Assets have been sold pursuant to the closing of the sale or sales approved by the Bankruptcy Court in a final, non-appealable order. See Bid. Proc., at 5. The Stalking Horse Bidder and each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely on its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid, and that it did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidding Procedures or, (a) as to the Stalking Horse Bidder, the terms of the sale of the Assets shall be set forth in the APA, or (b) as to another Successful Bidder, the terms of the sale of the Assets shall be set forth in the applicable purchase agreement. See Bid. Proc., at 10. Furthermore, the Bidding Procedures include additional provisions allowing credit bidding by the First Lien Lenders and the Second Lien Lenders subject to the requirements that, among other things, any credit bid (i) provide for payment in cash at closing and/or the assumption of the unpaid administrative expense claims of the Debtors owning such collateral incurred from the Petition Date through and including the date on which the closing of the sale occurs, (ii) provide for payment in cash at closing of the Break-Up Fee, (iii) with respect to the First Lien Lenders, provide for payment in cash at closing of all claims that are senior to the claims of the First Lien Lenders pursuant to the DIP Financing Order or otherwise, (iv) include a description of all assets to be purchased that are not subject to a valid and perfected security interest held by the agent for the First Lien Lenders or the Second Lien Lenders, as the case may be, (v) provide for payment in cash in an amount equal to the fair value of such unencumbered assets, (vi) provide for payment in cash of the Lazard Success Fee, and (vii) with respect to the Second Lien Lenders, provide for payment in cash at closing of all obligations owed to the First Lien Lenders and to other the holders of claims with claims senior to those of the Second Lien Lenders pursuant to the Interim Cash Collateral Order or otherwise. See Bid. Proc., at 9-10.

c. **Provisions Providing Bid Protections to the Stalking Horse Bidder**. The Bidding Procedures provide that if the APA terminates because the Debtors have accepted or selected, and the Bankruptcy Court has approved, the Bid or Bids (including a credit bid) of any Qualified Bidder(s) other than Stalking Horse Bidder to purchase all or a substantial portion of the Debtors' Assets, and such transaction or transactions contemplated by any such Bid or Bids has been consummated, the Debtors shall pay the Stalking Horse Bidder out of the proceeds of such transaction or transactions the Break-Up Fee of $8,250,000. See Bid. Proc., at 9; Bid Proc. Order, ¶¶ B, 9. In addition, the Stalking Horse Bidder will be reimbursed for its reasonable out-of-pocket costs and expenses incurred in connection with the Sale up to a $1,500,000 cap if certain conditions are satisfied, provided that if the Break-Up Fee (defined below) is subsequently determined to be payable, the Break-Up Fee will be reduced by the amount of the expense reimbursement. See Bid Proc. Order, ¶¶ B, 9. Furthermore, to be a Qualified Bid, bids must offer the Initial Minimum Bid Increment of at least the aggregate of (i) the cash Purchase Price; (ii) the Assumed Liabilities; (iii) the Break-Up Fee; and (iv) a cash amount of $2,500,000. See Bid. Proc., at 6. In the event of an Auction, subsequent bids shall be made in minimum increments of $2,500,000, and the Stalking Horse Bidder shall receive a credit equal to the sum of the Break-Up Fee in each round of bidding when bidding at the Auction. See Bid. Proc., at 7-8; Bid Proc. Order, ¶ B.

d. **Modification of Bidding and Auction Procedures.** The Debtors, in their reasonable discretion, may adopt rules for the Auction at or prior to the Auction that will better promote the goals of the Auction and that are not inconsistent with the Bidding Procedures, the Bidding Procedures Order or the Bankruptcy Code. The Bidding Procedures may be materially modified only upon the express written consent of the Debtors and the Stalking Horse Bidder (such consent not to be unreasonably withheld), or by order of the Bankruptcy Court. See Bid. Proc., at 12. The Debtors may (a) determine which Qualified Bid, if any, is the highest, best, and/or otherwise financially superior offer; and (b) reject at any time before entry of orders of the Bankruptcy Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors, their estates and creditors. See Bid. Proc., at 11-12. At or before the Sale Hearing, the Debtors may impose such other terms and conditions as the Debtors may determine to be in the best interests of their estate and creditors and other parties in interest thereof that are not inconsistent with the Bidding Procedures Order, the Bidding Procedures or the Bankruptcy Code. See Bid. Proc., at 12. The Debtors reserve the right as they may determine to be in the best interests of their estates to: (a) determine which Potential Bidders are Qualified Bidders; (b) determine which Bids are

Qualified Bids; (c) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures Order or the requirements of the Bankruptcy Code or any other orders entered by the Bankruptcy Court, or (iii) contrary to the best interests of the Debtors and their estates or stakeholders, as applicable; (e) impose additional terms and conditions with respect to any or all Potential Bidders other than the Stalking Horse Bidder; (f) adjourn the Auction and/or Sale Hearing in open court without further notice; and (h) with the consent of the Stalking Horse Bidder, remove a portion of the Assets from the Auction. See Bid. Proc., at 12. Without limiting the foregoing, the Debtors may determine to distribute or not distribute copies of other Qualified Bids to other Qualified Bidders prior to or during the Auction other than with respect to the distribution of the Opening Bid as set forth in the Bidding Procedures. See Bid. Proc., at 12.

e.  **Closing with Alternative Back-Up Bidders.** The Bidding Procedures provide that following the approval of the Sale of the Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved Sale within fourteen (14) days after the entry of the Sale Order (except where the sole cause of any delay in closing is as a result of default by the Debtor), the Debtors shall be authorized, but not required, to deem the Back-Up Bid, as disclosed at the Sale Hearing, the Successful Bid and the Debtors shall be authorized, but not required, to consummate the Sale with the Back-Up Bidder submitting such Back-Up Bid without further notice or orders of the Court. If the Stalking Horse Bidder is not the Successful Bidder at the Auction but is designated as the bidder that has submitted the Back-Up Bid, then such Back-Up Bid must remain open until the earlier of the consummation of the transaction with the Successful Bidder and 30 days after the conclusion of the Sale Hearing. If any other bidder submits the Back-Up Bid, such Back-Up Bid must remain open until the consummation of the Sale to the Successful Bidder. See Bid. Proc., at 11.

f.  **Provisions Governing the Auction.** The Bidding Procedures provide that if one or more Qualified Bids are received by the Bid Deadline, then the Debtors shall conduct the Auction, and the Auction shall commence on November 3, 2011 at the offices of Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022-4834 at 9:00 a.m. (prevailing Eastern Time). See Bid. Proc. Order, at 6.

**V.    Summary of the Assumption Procedures**

23.    The Debtors are also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Assigned Agreements in connection with the Sale (the "**Assumption Procedures**").  The Assumption Procedures are as set forth below:

      i.    **Designation Deadline.**  On or before one day prior to the Sale Hearing, the Stalking Horse Bidder or other Successful Bidder shall have the right to (a) designate any Contract to be an Assigned Agreement by amending Schedule 1.1(a) to the APA (Assigned Agreements) to add such Contract and (b) designate any Contract to not be an Assigned Agreement by amending Schedule 1.1(a) to the APA (Assigned Agreements) to remove such Contract; provided that, following the conclusion of the Auction, the Stalking Horse Bidder or such other Successful Bidder (i) may designate any Contract to be an Assigned Agreement by amending Schedule 1.1(a) to add such Contract to Schedule 1.1(a) and (ii) may not remove any Contract that was on Schedule 1.1(a) as of the conclusion of the Auction from Schedule 1.1(a).

      ii.    **Notices for Assigned Agreements.**  As soon as practicable, the Debtors shall serve on all non-Debtor counterparties to any Contract (the "**Contract Notice Parties**") that may be assumed by the Debtors and assigned to the Successful Bidder, a "**Contract Notice**" in the form attached to the Bidding Procedures Order as **Exhibit 3** that identifies, to the extent applicable (a) the Contract that may be an Assigned Agreement, (b) the name of the counterparty to such Contract, (c) any applicable cure amount for such Contract if it becomes an Assigned Agreement, and (d) the deadline by which any such Contract counterparty must file a "**Contract Objection**" to the proposed assumption and assignment; provided, however, that the presence of a Contract on a Contract Notice does not constitute an admission that such Contract is an executory contract.  As soon as practicable after the conclusion of the Auction, the Debtors shall file with the Court and serve on the Contract Notice Parties party to an Assigned Agreement identified by the Successful Bidder a further notice in the form attached to the Bidding Procedures Order as **Exhibit 4** (the "**Assumption Notice**") identifying the Successful Bidder and stating which Contracts will be Assigned Agreements, and no other or further notice will be required with respect to the Assigned Agreements. If the Successful Bidder designates any additional Contracts during the period between the Auction and the day prior to the Sale Hearing pursuant to subsection (i) above, the Debtors shall file with the Court and serve on such additionally affected Contract Notice Parties a revised Assumption Notice.

iii. **Objections to Assumption and Assignment of Contracts**. For all non-Debtor counterparties to an Assigned Agreement served a Contract Notice in accordance with this Order more than 14 days prior to the Sale Hearing, to which no Contract Objection was timely filed within 14 days after mailing of the Contract Notice, the counterparty to such Assigned Agreement shall be deemed to have waived and released any right to assert an objection to the assignment and assumption of such Assigned Agreement and to have otherwise consented to such assumption and assignment and cure amount, and the assignment will be deemed effective in accordance with the Sale Order. For all non-Debtor counterparties to an Assigned Agreement served with a Contract Notice 14 days or less prior to the Sale Hearing, if a timely filed Contract Objection is not received at or prior to the Sale Hearing, the counterparty to such Assigned Agreement shall be deemed to have waived and released any right to assert an objection to the assignment and assumption of such Assigned Agreement and to have otherwise consented to such assumption and assignment and cure amount, and the assignment will be deemed effective in accordance with the Sale Order. If any counterparty timely files a Contract Objection that cannot be resolved by the Debtors and the counterparty, the Court shall resolve such Contract Objection prior to assumption and assignment of such designated Contract, and upon entry of an order by the Court resolving such Contract Objection, the assignment shall be deemed effective in accordance with the Sale Order.

24. Any party failing to timely file an objection to the assumption and assignment of any contract or lease or related cure amount specified on a Contract Notice will be barred from objecting thereto, including asserting any additional cure or other default amounts against the Debtors or any of the Debtors' estates, the Stalking Horse Bidder or other Successful Bidder with respect to such executory contract(s) or unexpired lease(s) and shall be deemed to consent to the Sale and the assumption and assignment of such executory contract(s) or unexpired lease(s) effectuated in connection therewith.

## Basis for Relief

## VI. The Bidding Procedures Order Should be Entered on the Terms Proposed.

### A. The Bidding Procedures Are Fair, Appropriate and Should be Approved.

25. "When conducting an asset sale, the ultimate responsibility of the debtor, and the primary focus of the bankruptcy court, is the maximization of the value of the assets sold." John

J. Jerome & Robert D. Drain, <u>Bankruptcy Court Is Newest Arena for M&A Action</u>, N.Y.L.J., June 3, 1991. "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" <u>Continuing Creditors' Committee of Star Telecomms., Inc. v. Edgecomb</u>, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting <u>Grobow v. Perot</u>, 539 A.2d 180, 187 (Del. 1988)); <u>see also</u> <u>Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford</u>, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008). Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefor. <u>See</u> <u>In re Delaware Hudson Ry. Co.</u>, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

26.     Here, the Debtors submit that the Bidding Procedures are fair and appropriate under the circumstances, consistent with procedures routinely approved by courts in this district and in the best interest of the Debtors' estates, and that the Debtors have sound business justifications for selling the Acquired Assets at this time. The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the net value realized from the Sale by the Debtors' estates. In particular, the Bidding Procedures contemplate an open and fair auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

27.     The Bidding Procedures provide the Debtors with an adequate opportunity to consider competing bids and select the highest and best offer for the Acquired Assets. Entering into the APA with the Stalking Horse Bidder ensures that the Debtors obtain the highest and best consideration for the Acquired Assets by setting the minimum purchase price which will be

tested a second time in the marketplace. As such, the Debtors and their creditors can be assured that, taking into account the financial condition of the business and the economy, the consideration obtained will be fair and reasonable and at or above market.

**B.**     **The Bid Protections Have Sound Business Purpose and Should be Approved.**

28.      The Debtors are also requesting approval of (a) a break-up fee equal to three percent (3%) of the Cash Purchase Price (the "**Break-Up Fee**") which is equal to $8,250,000 and (b) an expense reimbursement to reimburse the Stalking Horse Bidder for its reasonable out-of-pocket costs and expenses incurred in connection with the Sale up to a $1,500,000 cap, if certain conditions are satisfied (the "**Expense Reimbursement Amount**" and together with the Break-Up Fee, the "**Bid Protections**"); provided that, if the Break-Up Fee is subsequently determined to be payable, the Break-Up Fee shall be reduced by the Expense Reimbursement Amount to be paid to the Stalking Horse Bidder upon the occurrence of certain "triggering events" typical and customary for transactions of this kind, including, among other things, consummation of a competing transaction or an uncured breach of the APA. The Bidding Procedures also provide that any Overbid (as defined in the Bidding Procedures) after the Opening Bid (as defined in the Bidding Procedures) must be made in increments of at least $2,500,000 (or such other amount the Debtors determine to facilitate the Auction).

29.      Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private sale or by public auction. The Debtors believe that having the ability to offer the Bid Protections (as outlined in the Bidding Procedures) to the Stalking Horse Bidder will likely maximize the realizable value of the Acquired Assets for the benefit of the Debtors' estates, creditors and other parties-in-interest.

30.      Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. Courts have identified at least two

instances in which bid protections may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999) (hereinafter, "O'Brien"). Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Id.; see also In re Reliant Energy Channel View LP, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

31.  In O'Brien, the court reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee. Such factors are as follows:

> a.  the presence of self-dealing or manipulation in negotiating the break-up fee;
>
> b.  whether the fee harms, rather than encourages, bidding;
>
> c.  the reasonableness of the break-up fee relative to the purchase price;
>
> d.  whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;
>
> e.  the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;
>
> f.  the correlation of the fee to a maximization of value of the debtor's estate;

g. the support of the principal secured creditors and creditors committees of the break-up fee;

h. the benefits of the safeguards to the debtor's estate; and

i. the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

32. **Stalking Horse Bidder Bid Protections.** The Bid Protections set forth in the Bidding Procedures will enable the Debtors to secure an adequate floor for the Acquired Assets and, thus, insist that competing bids be materially higher or otherwise better than the APA and attracts other potential buyers to bid for all of the Acquired Assets subject to the APA – a clear benefit to the Debtors' estates. Moreover, the Stalking Horse Bidder would not agree to act as a stalking horse without the Bid Protections, and there has been no showing of any self-dealing or manipulation in the negotiation of the Bid Protections. Without the Bid Protections, the Debtors might lose the opportunity to obtain the highest or best offer for the Acquired Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder. Furthermore, without the benefit of the Stalking Horse Bidder, the bids received at the Auction for the Acquired Assets could be substantially lower than the Stalking Horse Bid.

33. Moreover, payment of the Break-Up Fee will not diminish the Debtors' estates. The Break-Up Fee is only payable if a Sale to a bidder other than the Stalking Horse Bidder is consummated, and the Initial Minimum Overbid Increment under the Bidding Procedures includes the addition of the Break-Up Fee, among other things, to the Cash Purchase Price under the APA.

34.     The Debtors further believe, and are advised, that, relative to the total purchase price under the APA, the amount of each of the Bid Protections is comparable to bid protections approved by courts in this and other districts. See, e.g., In re NEC Holdings Corp., No. 10-11890 (PJW) (Bankr. D. Del. July 30, 2010) (breakup fee and expense reimbursement of approximately 3.5% of stalking horse purchase price); In re Global Motorsport Group, Inc., No. 08-10192 (KJC) (Bankr. D. Del. Feb. 14, 2008) (breakup fee of approximately 4% of sale price); In re Dura Auto. Sys., Inc., No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007); In re New Century TRS Holdings, Inc., No. 07-10416 (KJC) (Bankr. D. Del. Apr. 20, 2007); In re Three A's Holdings, L.L.C., No. 06-10886 (BLS) (Bankr. D. Del. Sept. 7, 2006); In re Radnor Holdings, No. 06-10894 (Bankr. D. Del. Sept. 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); In re Riverstone Networks, No. 06-10110 (Bankr. D. Del. Feb. 24, 2006) (expense reimbursement up to $1 million where the stalking horse purchase price was $170 million); In re Great Kansas City Paper, Inc., No. 03-10048 (Bankr. D. Me. Feb. 18, 2003) (expense reimbursement up to $750,000 in addition to a break-up fee of 5.4%, the aggregate value of which was $5 million); In re FSC Corp., No. 00-04659 (Bankr. N.D. Ill. Feb. 28, 2000) (expense reimbursement up to $500,000 in addition to a break-up fee of 3.4%, valued at $1,500,000).[9]

35.     Accordingly, the Debtors submit that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances and, because the standard used by courts in this district in approving similar protections has been satisfied here, the Debtors respectfully submit that the Bid Protections should be approved.

---

[9]     Because of the voluminous nature of the orders cited herein, they are not attached to the Motion. Copies of these orders are available on request of the Debtors' counsel.

### C. The Assumption Procedures Are Appropriate and Should be Approved.

36. In connection with the assumption and assignment of the Assigned Agreements, the Debtors believe it is necessary to establish a process by which (i) the Debtors and counterparties to Assigned Agreements can reconcile cure obligations, if any, in accordance with Section 365 of the Bankruptcy Code, and (ii) such counterparties can object to the assumption and assignment of Assigned Agreements and/or related cure amounts.

37. As set forth in the Bidding Procedures Order, the Debtors are also requesting that any party that fails to object to the proposed assumption and assignment of any Assigned Agreement be deemed to consent to the assumption and assignment of the applicable Assigned Agreement pursuant to Section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, notwithstanding any anti-alienation provision or other restriction on assignment. See, e.g., Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

38. The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to parties to the Assigned Agreements and provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, the Debtors request that the Court approve the Assumption Procedures set forth in the Bidding Procedures Order.

### D. The Form and Manner of the Sale Notice Should be Approved.

39. Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

40.     Within three (3) business days after entry of the Bidding Procedures Order or as soon thereafter as practicable, the Debtors will serve the Sale Notice upon the following parties: (a) the United States Trustee for the District of Delaware; (b) the members of and counsel to the Unsecured Creditors Committee; (c) financing counsel to the administrative agent for the lenders under the Debtors' prepetition first lien credit facility; (d) special restructuring and bankruptcy counsel to the administrative agent for the lenders under the Debtors' prepetition first lien credit facility; (e) local counsel to the administrative agent for the lenders under the Debtors' prepetition first lien credit facility; (f) counsel to the administrative agent for the lenders under the Debtors' prepetition second lien credit facility; (g) counsel to the administrative agent for the lenders under the Debtors' prepetition unsecured mezzanine credit facility; (h) the Food and Drug Administration; (i) the attorneys general for each of the States in which the Debtors conduct operations; (i) all taxing authorities having jurisdiction over any of the Acquired Assets, including the Internal Revenue Service; (j) the Environmental Protection Agency; (k) the Tennessee Environmental Protection Agency; (l) the Pension Benefit Guaranty Corporation; (m) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002; (n) any parties who have expressed an interest in acquiring all or a substantial portion of the Acquired Assets; (o) parties who are known or reasonably believed to have asserted any lien, encumbrance, claim or other interest in the Acquired Assets, (p) all governmental agencies that is an interested party with respect to the Sale and transactions proposed thereunder; (q) the U.S. Public Health Service; (r) all non-Debtor parties to the Assigned Agreements; (s) the Centers for Medicare and Medicaid Services; and (t) all other known creditors of the Debtors.

41.     Additionally, within five (5) business days after entry of the Bidding Procedures Order or as soon thereafter as practicable, the Debtors will publish the Sale Notice once in the *Wall Street Journal*.

42.     The Debtors submit that notice of this motion and the related hearing to consider entry of the Bidding Procedures Order coupled with service of the Sale Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice proposed herein.

## VII.     The Sale Order Should be Entered on the Terms Proposed.

### A.     The Sale Should be Approved as an Exercise of the Debtors' Sound Business Judgment.

43.     Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing.   Although Bankruptcy Code section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts in this district and elsewhere have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction.  See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986); In re Eagle Picher Holdings, Inc., 2005 Bankr. LEXIS 2894, at *3 (Bankr. S.D. Ohio 2005); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re Boston Generating, LLC, 440 B.R. 302, 321 (Bankr. S.D.N.Y. 2010).  Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Ill. 1995); see also In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

44.     The sale of a debtor's assets is appropriate where there are sound business reasons behind such a determination. See Myers, 91 F.3d at 395; see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991); Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action"). The Debtors have a sound business justification for selling the Acquired Assets pursuant to the Bidding Procedures at this time. Based on the results of their analysis of the Debtors' ongoing and future business prospects, the Debtors' management and team of financial advisors have concluded that a sale of all of the Acquired Assets in accordance with the Bidding Procedures is the best method to maximize recoveries to the estates. Maximization of the Acquired Assets' value is a sound business purpose warranting authorization of any proposed sale.

45.     The Debtors have proposed a fair and open process for achieving the objective of obtaining the highest or best offer and sale of the Acquired Assets for the benefit of the Debtors' estates and their creditors. The sale of the Acquired Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Acquired Assets. Consequently, the fairness and reasonableness of the consideration to be received by the

Debtors will ultimately be demonstrated by a second "market check" through the Auction, which is the best means for establishing whether a fair and reasonable price is being paid.[10]

46. In addition, all creditors and parties-in-interest will receive adequate notice of the Bidding Procedures and Sale Hearing as set forth above. Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these Chapter 11 Cases, those parties potentially interested in bidding on the Acquired Assets who have not already been contacted and others whose interests are potentially implicated by a proposed Sale. Accordingly, consummating the Sale as soon as possible is in the best interests of the Debtors and its creditors and parties-in-interest.

(i)     A Sound Business Purpose Exists for the Sale.

47. The Debtors have a sound business justification for entering into this transaction, including converting underperforming assets into cash that can be used to pay creditors or fund the estates through confirmation a chapter 11 plan of liquidation that effectuates a discharge of the remaining claims, interests, liens and other "Excluded Liabilities" not assumed as part of the sale pursuant to Sections 541 and 1141 of the Bankruptcy Code.

48. Notably, it was not without extensive consideration that the APA was executed. Indeed, it was only after (a) potential alternatives were evaluated, (b) the transaction was aggressively marketed, (c) multiple rounds of competing proposals were evaluated and analyzed and (d) all of the foregoing was presented to the Special Committee and the members of the Board of Managers of Graceway Holdings, LLC (who, in conjunction with advice from experienced professionals, discharged their fiduciary duties, exercised sound and appropriate business judgment and determined to pursue the Sale on the terms of the APA, subject to

---

10      The Debtors reserve all rights to not submit any bid which is not acceptable to the Debtors for approval to the Bankruptcy Court.

competitive bidding sanctioned by the Court), that the Debtors and the Stalking Horse Bidder entered into, and agreed to be bound by, the APA.

49.    Thus, for the reasons set forth herein, as will be further shown at the Sale Hearing, because the APA (or any marked APA, as the case may be) constitutes (or will constitute) the highest or otherwise best offer for the Acquired Assets and provides greater recovery for these estates than any known or practicably available alternative, the Debtors submit that the execution thereof represents sound reasonable business judgment.

(ii)    Adequate and Reasonable Notice of the Sale Will be Provided.

50.    As described above, the Sale Notice (a) will be served in a manner that provides at least 21-days notice of the date, time and location of the Sale Hearing, (b) informs interested parties of the deadlines for objecting to the Sale and (c) otherwise includes all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest, and, as such, the Debtors are confident the Sale Notice will be properly vetted by the time of service thereof.

(iii)    The Sale and Purchase Price Reflects a Fair Value Transaction.

51.    It is a well-settled that, where there is a court-approved auction process, a full and fair price is presumed obtained for the assets sold, as the best way to determine value is exposure to the market. See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship, 526 U.S. 434, 457 (1999); see also In Re Trans World Airlines, Inc., No. 01-00056, 2001 Bankr. Lexis 980, at *13 (Bankr. D. Del. April 2, 2001) (while a "§ 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction"). This is especially true here, where the proposed sale of the Acquired Assets has been subjected to an extensive prepetition marketing

process, reviewed by outside professionals firms and intensively scrutinized by the Debtors and their retained advisors.

52.     Moreover, even as the Debtors move forward with the Sale, after entry of the Bidding Procedures Order, Lazard will continue to market the transaction and solicit other offers for the Acquired Assets consistent with the Bidding Procedures and subject to the APA, including, for example, by contacting previously solicited parties, providing acceptable bidders with data room access and requested information and otherwise assisting the Debtors with all efforts to increase transaction value.  In this way, the number of bidders that are eligible to participate in a competitive auction process will be maximized, or, if no Auction is held because no Auction is necessary, the APA purchase price will, conclusively, be fair value.

(iv)     The Sale Has Been Proposed in Good Faith and Without Collusion and the Stalking Horse Bidder or Successful Bidder Is a "Good Faith Purchaser

53.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" In re Abbotts Dairies, 788 F.2d at 147 (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders); see also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995).

54.     In other words, a party would have to show fraud or collusion between the buyer and the debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith.  See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders

or the trustee, or an attempt to take grossly unfair advantage of other bidders"); see also In re Angelika Films, 57th, Inc., 1997 WL 283412, *7 (S.D.N.Y. 1997); In re Balcalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct in the course of the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

55.     The Debtors submit the Stalking Horse Bidder, or other successful bidder arising from the Auction, is or would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and the APA, or any marked version thereof, is or would be a good faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[11] First, the consideration to be received by the Debtors pursuant to the APA is substantial, fair and reasonable. Second, the parties entered into the APA in good faith, and after extensive, arm's-length negotiations, during which both parties were represented by competent counsel. Third, there is no indication of any "fraud, collusion between the purchaser and other bidders or the Debtors, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale or APA to be avoided under section 363(n) of the Bankruptcy Code. Finally, the Stalking Horse Bidder's offer was evaluated and approved by the Board of Managers of Graceway Holdings, LLC in consultation with the Debtors' professionals. Accordingly, the Debtors believe that the Stalking Horse Bidder (or other successful bidder) and

---

[11]   Section 363(m) of the Bankruptcy Code provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

See 11 U.S.C. § 363(m).

the APA (or marked APA) should be entitled to the full protections of Section 363(m) of the Bankruptcy Code.

**B.     The Sale Should be Approved "Free and Clear" Under § 363(f).**

56.     Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets). As Bankruptcy Code section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet one of the five conditions of section 363(f). Citicorp Homeowners Servs., Inc. v. Elliot, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988); (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that if any of the five conditions of § 363(f) are met, the trustee has the authority to conduct the sale free and clear of all liens). The Debtors believe that they will be able to demonstrate at the Sale Hearing that they have satisfied one or more of these conditions.

57.     As noted above, in excess of 50% of the First Lien Lenders have executed the Sale Support Agreement evidencing their support for the Sale.

**C.     Assumption and Assignment of Contracts Should be Approved.**

      (i)      The Assumption of the Contacts Reflects Business Judgment.

58.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of

an unexpired lease or executory contract. See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3d. Cir. 1989). The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estates, increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to control a case impartially. See Richmond Leasing Co. v. Capital Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

59.     Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. See In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors fee assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Doge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

60.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given

"practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc., 103 B. R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when a prospective assignee of a lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

61. Upon Closing (as defined in the APA), the Stalking Horse Bidder will have financial resources that are more than sufficient to perform under any executory contracts it seeks to have assumed by the Debtors under the APA. Moreover, if necessary, the Debtors will adduce facts at the hearing on any objection demonstrating the financial wherewithal of the Stalking Horse Bidder or any Successful Bidder, and their willingness and ability to perform under the contracts to be assumed and assigned to them. The Sale Hearing therefore will provide this Court and other interested parties ample opportunity to evaluate and, if necessary, challenge, the ability of any Successful Bidder to provide adequate assurance of future performance under the Assigned Agreements that it seeks to assume.

62. The Debtors respectfully submit that the proposed Assumption Procedures are appropriate and reasonably tailored to provide Contract Notice Parties with adequate notice in the form of the Assumption Notice or Cure Notice, as applicable, of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable. Such Contract Notice Parties will then be given an opportunity to object to such notice. If an

objection is filed, such objection will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors.

63. Furthermore, to the extent that any defaults exist under any executory contract or unexpired lease that is to be assumed and assigned in connection with the Sale of the Acquired Assets, the Debtors (or, in certain cases, the Stalking Horse Bidder, as applicable under the APA) will cure any such default prior to such assumption and assignment. Moreover, the Debtors will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Successful Bidder, its experience in the industry, and its willingness and ability to perform under the contracts to be assumed and assigned to it.

64. Accordingly, the Debtors submit that implementation of the proposed Assumption Procedures is appropriate in these cases. This Court therefore should have a sufficient basis to authorize the Debtors to assume and assign contracts as may be set forth in the APA or any Successful Bidder's asset purchase agreement.

## Notice

65. The Debtors, through the Debtors' proposed claims, noticing, soliciting and balloting agent, BMC Group, Inc., have provided notice of this Motion to: (a) the United States Trustee for the District of Delaware; (b) financing counsel to the First Lien Agent; (c) special restructuring and bankruptcy counsel to the First Lien Agent; (d) counsel to the Second Lien Agent; (e) the administrative agent for the lenders under the Debtors' prepetition unsecured mezzanine credit facility; (f) the creditors listed on the Debtors' consolidated list of 30 largest unsecured creditors, as filed with the Debtors' chapter 11 petitions; (g) the Food and Drug Administration; (h) the Internal Revenue Service; (i) the U.S. Public Health Service; (j) the Centers for Medicare and Medicaid Services; (k) all parties requesting notice pursuant to Bankruptcy Rule 2002; (l) all parties who are known or reasonably believed to have asserted any

lien, encumbrance, claim or other interest in the Acquired Assets; and (m) counsel to the Stalking Horse Bidder. In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

66.     A copy of the Motion is available on the Court's website: www.deb.uscourts.gov. Additional copies of the Motion are available for free on the website of the Debtors' proposed claims, noticing, soliciting and balloting agent, BMC Group, Inc., at www.bmcgroup.com/graceway, or can be requested by calling (888) 909-0100 from within the United States or +1 310 321 5555 if calling from outside the United States.

WHEREFORE, the Debtors respectfully request that this Court enter the Bidding Procedures Order and the Sale Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the applicable relief requested herein, and granting such other and further relief as is just and proper.

Dated: September 29, 2011
Wilmington, Delaware

Respectfully Submitted,

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

David S. Heller
Josef S. Athanas
Matthew L. Warren
LATHAM & WATKINS LLP
Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS-IN-POSSESSION