## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GRACEWAY PHARMACEUTICALS, LLC, *et al.*,[1] | Case No. 11-13036 (_____) |
| Debtors. | Joint Administration Pending |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I)
AUTHORIZING DEBTORS TO UTILIZE CASH COLLATERAL PURSUANT
TO 11 U.S.C. § 363; (II) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363
AND 364; (III) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION
FINANCING PURSUANT TO 11 U.S.C. § 364 AND (IV) SCHEDULING A
FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

("DIP Financing/Cash Collateral Motion")

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"),

hereby move this Court (the "**Motion**") for entry of an interim order (the "**Interim Order**"),[2] in

substantially the form attached hereto as Exhibit A, and a final order (the "**Final Order**"),

(A) authorizing the Debtors to (i) use cash collateral pursuant to Section 363 of title 11 of the

United States Code (as amended, the "**Bankruptcy Code**"), (ii) grant adequate protection to the

Prepetition Secured Parties (defined below) pursuant to Sections 361, 362, 363 and 364 of the

Bankruptcy Code, (iii) obtain postpetition financing pursuant to Section 364 of the Bankruptcy

Code and (B) scheduling interim and final hearings pursuant to Rule 4001(b) and (c) of the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Graceway Pharma Holding Corp., a Delaware corporation (9175); Graceway Holdings, LLC, a Delaware limited liability company (2502); Graceway Pharmaceuticals, LLC, a Delaware limited liability company (5385); Chester Valley Holdings, LLC, a Delaware limited liability company (9457); Chester Valley Pharmaceuticals, LLC, a Delaware limited liability company (3713); Graceway Canada Holdings, Inc., a Delaware corporation (6663); and Graceway International, Inc., a Delaware corporation (2399). The mailing address for Graceway Pharmaceuticals, LLC is 340 Martin Luther King Jr. Blvd., Suite 500, Bristol, TN 37620 (Attn: John Bellamy).

[2] Unless indicated otherwise, capitalized terms used but not immediately defined herein shall have the meanings ascribed to them in the Interim Order.

Federal Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy Rules**"), all as more fully described herein. In support of this Motion, the Debtors respectfully state:[3]

## Preliminary Statement

1.    Prior to the Petition Date (defined below), the Debtors engaged in lengthy discussions with certain First Lien Lenders (defined below) about financing these Chapter 11 Cases (defined below). Those discussions culminated with certain First Lien Lenders holding over 40% of the First Lien Obligations (the "**Majority First Lien Lenders**") (i) agreeing to the use of Cash Collateral (defined below) pursuant to the terms and conditions of the Interim Order and an agreed upon budget (the "**Approved Budget**") and (ii) permitting the Intercompany Loan (defined below) to prime all prepetition First Lien Obligations. The Intercompany Loan will not prime valid and properly perfected Prepetition Prior Liens (defined below).

2.    The Debtors intend to support the ongoing operations of their business during these cases through the use of Cash Collateral and the Intercompany Loan. The Intercompany Loan will consist of $6,000,000 in aggregate principal amount of intercompany term loans to be made by a non-Debtor affiliate of the Debtors, Graceway Canada Company ("**Graceway Canada**" or the "**Postpetition Lender**"), to Graceway Pharmaceuticals, LLC ("**Graceway Pharma**" or the "**Borrower**") for the benefit of all of the Debtors. The Intercompany Loan will be evidenced by the Term Loan Notes by and among Debtor Graceway Pharma, as borrower, and non-Debtor Graceway Canada, as lender (the "**Intercompany Notes**"). The Debtors will provide a secured guarantee of the Intercompany Loan in favor of Graceway Canada, which will be evidenced by the Guaranty Agreement (the "**Intercompany Guarantee**"). Upon the entry the

---

[3]    The facts and circumstances supporting this Motion are set forth in the Declaration of Gregory C. Jones in Support of Chapter 11 Petitions and First Day Motions (the "**First Day Declaration**"), filed on the Petition Date (defined below).

Interim Order, the Borrower seeks to be permitted to borrow all amounts available under the Intercompany Notes, subject to the terms and conditions contained in the Interim Order and the Approved Budget.[4]

3.     The reasons supporting the Debtors' request for authority to use Cash Collateral and obtain postpetition financing are compelling, yet simple. As explained in greater detail below, the Debtors will use both the Intercompany Loan and Cash Collateral to provide liquidity for working capital and for other general corporate purposes of the Debtors up to the date upon which the proposed sale of substantially all of the Debtors' assets (the "**Sale**") is consummated, as set forth in more detail in the *Debtors' Motion for Entry of (I) an Order Approving and Authorizing (A) Bidding Procedures in Connection with the Sale of Certain Assets of the Debtors, (B) Stalking Horse Bid Protections, (C) the Form and Manner of Notice of the Sale Hearing and (D) Other Related Relief; and (II) An Order Authorizing (A) the Sale of Certain Assets of the Debtors Free and Clear of All Claims, Liens, Liabilities, Rights, Interests and Encumbrances, (B) the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement, (C) the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief* (the "**Sale Motion**") filed contemporaneously herewith.

4.     Upon closing the Sale, the Debtors intend to use certain proceeds of the Sale and/or Cash Collateral to repay the Intercompany Loan and implement an orderly distribution of the sale proceeds and the liquidation of their remaining assets for the benefit of their creditors pursuant to a liquidating plan. At this time, the Debtors anticipate that they will be able to

_____

[4]     A copy of the Intercompany Notes in substantially final form is annexed to the Interim Order as <u>Exhibit B</u>. The Intercompany Guaranty is attached as Exhibit A to the Intercompany Notes.

3

confirm a plan of liquidation because the Approved Budget provides the Debtors with sufficient liquidity to pay all currently anticipated administrative expenses. After the consummation of the Sale, the Debtors will be able to determine which constituents in addition to the holders of the First Lien Obligations, if any, will be entitled to receive a distribution pursuant to a plan of liquidation.

5.     By this Motion and pursuant to Sections 105(a), 361, 362, 363, and 364 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, and 9014, the Debtors hereby seek entry of two orders - an Interim Order in the form annexed hereto as <u>Exhibit A</u> and a Final Order,[5] following notice of the Motion and the Interim Order and a hearing (the "**Final Hearing**") on the relief requested - approving such relief on a final basis (together, the "**DIP Orders**"), which in each case:

(a)     authorize the Debtors to use Prepetition Collateral, including, without limitation, "cash collateral," as such term is defined in Section 363 of the Bankruptcy Code (the "**Cash Collateral**"), in which the Prepetition Secured Parties have a Lien or other interest, whether existing on the Petition Date, arising pursuant to the DIP Orders or otherwise;

(b)     authorize the Borrower to obtain, and authorizes each of the other Debtors unconditionally to guarantee, jointly and severally, the Borrower's obligations in respect of, senior secured postpetition financing, which would consist of a $6,000,000 Intercompany Loan from the Postpetition Lender to the Borrower;

(c)     grants, as of the Petition Date and in accordance with the relative priorities set forth in the DIP Orders, certain adequate protection to the Prepetition Secured Parties;

(d)     authorizes the Borrower and each of the other Debtors to grant to the Postpetition Lender the DIP Protections (as defined below);

(e)     modifies the automatic stay imposed by Section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Orders and subject in all respects to the Debtors' rights under paragraph 14 of the DIP Orders;

---

[5]     A copy of the proposed Final Order shall be filed under separate cover prior to the Final Hearing and shall be in form and substance substantially similar to the Interim Order.

(f) schedules the Final Hearing on the DIP Motion to be held within thirty-five (35) days after the Petition Date to consider entry of the Final Order acceptable in form and substance to the First Lien Agent and Majority First Lien Lenders, which grants all of the relief requested in the DIP Motion on a final basis; and

(g) waives any applicable stay (including under Bankruptcy Rule 6004 and any applicable Local Rules) and provides for immediate effectiveness of the DIP Orders.

## Jurisdiction

6.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

7.      The statutory bases for the relief requested herein are Sections 105(a), 361, 362, 363, 364, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Local Rules 2002-1 and 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

## Background

8.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a petition with this Court under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors are operating their business and managing their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committees have been appointed or designated. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these Chapter 11 Cases.

YCST01: 11460918.4                                                      070649.1001

9. The Debtors are a specialty pharmaceutical company focused on generating sales growth and developing, in-licensing and acquiring branded prescription products primarily in the areas of dermatology, respiratory, and women's health. The Debtors were founded with a culture of commitment to physicians and patients, and a dedication to enhancing the quality of health care. The Debtors are committed to providing innovative new therapies in the form of unique products and drug delivery technologies.

10. As of the Petition Date, the Debtors' products sold in the United States include, among others: Zyclara® (imiquimod) Cream 3.75% ("**Zyclara**"), Aldara® (imiquimod) Cream 5% ("**Aldara**"), Maxair® Autohaler® (pirbuterol acetate inhalation aerosol) ("**Maxair**"), Atopiclair® Nonsteroidal Cream ("**Atopiclair**"), and Estrasorb® (estradiol topical emulsion) ("**Estrasorb**"). Zyclara is a second generation imiquimod product developed by the Debtors, and is the core product of the Debtors' business. Zyclara received approval from the United States Food and Drug Administration ("**FDA**") for treatment of actinic keratoses ("**AK**") and external genital warts ("**EGW**") in March 2010 and March 2011, respectively. The Debtors have been granted regulatory exclusivity to market Zyclara in the United States through March 2013 for AK and March 2014 for EGW. Additionally, various patents are pending, and the Debtors expect near term approval of certain patents.

11. The Debtors were founded in 2006 through a partnership of industry veteran Jefferson J. Gregory and GTCR Golder Rauner, LLC ("**GTCR**"), a leader in the private equity industry for more than 25 years. On January 2, 2007, the Debtors announced that the Debtors had completed the acquisition of the North and South America pharmaceuticals business of 3M Company (together with its subsidiaries and affiliates, "**3M**") for approximately $875 million. This acquisition positioned the Debtors as a leader in the market of specialty pharmaceutical

6

products. As part of the purchase, the Debtors acquired several products from 3M, including Aldara. Also, on January 2, 2007, the Debtors announced that Chester Valley Pharmaceuticals, LLC, a dermatology-focused specialty pharmaceutical company and another company partially owned by GTCR would merge into Graceway Pharma.

12. The Debtors are headquartered in Bristol, Tennessee, and the Debtors' sales and marketing efforts are directed from the Debtors' offices in Exton, Pennsylvania. The Debtors' sales and marketing infrastructure is designed to efficiently reach critical points in the pharmaceutical product distribution chain, and includes a highly trained sales force capable of providing sales coverage across the United States. In total, the Debtors employ approximately 165 full-time employees, 82 of which are sales related employees.

13. Since 2010 the Debtors have faced substantial declines in their net sales and a corresponding drop in EBITDA. These declines result primarily from the combination of the global recession and unfortunate and devastating litigation results with respect to generic competition against Aldara. In 2010, the Debtors had total net sales of approximately $219.53 million, consisting of product sales of $150.89 million and royalty and licensing revenues of $68.64 million. Of the total net sales, net sales from Aldara accounted for 23.9%, royalty revenues of Aldara (Authorized Generic) accounted for 17.7%, net sales from Maxair accounted for 12.0%, net sales from Zyclara accounted for 17.8%, licensing revenues for Zyclara accounted for 13.2%, and the Debtors' other products accounted for the remaining 15.4%. The Debtors EBITDA for 2010 was $83.33 million.

A. **Capital Structure**

14. Graceway Pharma is the direct and indirect parent of Chester Valley Holdings, LLC, Chester Valley Pharmaceuticals, LLC , Graceway Canada Holdings, Inc. and Graceway

7

International, Inc. Graceway Pharma is wholly owned by Graceway Holdings, LLC ("**Holdings**"), which is wholly owned by Graceway Pharma Holding Corp ("**Parent**").

**B.**     **Prepetition Indebtedness**

15.     First Lien Credit Facility. Prior to the Petition Date, the Borrower entered into that certain First Lien Credit Agreement dated as of May 3, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "**First Lien Credit Agreement**"), among, inter alia, Holdings, the Borrower, the lenders party thereto (collectively, "**First Lien Lenders**"), and Bank of America, N.A. ("**BofA**"), as administrative agent for the First Lien Lenders and collateral agent for the First Lien Claimholders (as defined in the Intercreditor Agreement (defined below), without giving effect to any cap provided for therein) (BofA, in such capacity, the "**First Lien Agent**"), Swing Line Lender (as defined in the First Lien Credit Agreement) and L/C Issuer (as defined in the First Lien Credit Agreement). Pursuant to the First Lien Credit Agreement, the First Lien Agent, the First Lien Lenders, the Swing Line Lender and the L/C Issuer agreed to extend certain loans to, and issue letters of credit for the account of, the Borrower, including (a) a Term B loan of $650 million, with the balance payable on May 3, 2012, (b) a revolving credit facility in an aggregate principal amount of up to $30 million, (c) a swing line loan in an aggregate principal amount of up to $10 million and (d) the issuance of up to $10 million of letters of credit.

16.     The obligations (the "**First Lien Obligations**") of the Borrower, Holdings and the Debtors other than Parent as guarantors (the "**Guarantors**") under the Collateral Documents (as defined in the First Lien Credit Agreement) (as such documents are amended, restated, supplemented or otherwise modified from time to time, the "**First Lien Collateral Documents**")

8

were secured by, among other things, a first priority continuing security interest in substantially all of the Debtor's (other than Parent's) assets and property (the "**First Priority Liens**").

17. <u>Amendments to the First Lien Credit Agreement</u>. The Debtors have from time to time addressed issues arising under the First Lien Credit Agreement with the First Lien Lenders, beginning in 2009. At that time, the Debtors and the First Lien Lenders desired to clarify the First Lien Credit Agreement with respect to the effect of certain payments on Excess Cash Flow (as defined in the First Lien Credit Agreement) and to recalculate Excess Cash Flow accordingly. Borrower, Holdings and certain of the First Lien Lenders therefore entered into the Clarification and Amendment to Credit Agreement (the "**First Amendment**") dated August 7, 2009.

18. In early 2010, the Debtors were considering the purchase of loans from existing lenders. Accordingly, Borrower, Holdings and certain of the First Lien Lenders entered into the Second Amendment to First Lien Credit Agreement (the "**Second Amendment**"), dated January 22, 2010. The loan purchase authorized by the Second Amendment did not occur.

19. Later in 2010, the Debtors faced certain events of default under the First Lien Credit Agreement. Borrower, Holdings and certain of the First Lien Lenders entered into the Third Amendment to First Lien Credit Agreement (the "**Third Amendment**") on October 15, 2010. The Third Amendment waived the then-currently existing events of default, subject to an increase in the interest rate margins payable to the First Lien Lenders, a pay-down of First Lien Obligations by the Debtors, and increased communications between the Debtors and the First Lien Lenders with respect to the Debtors' financial condition.

20. <u>Second Lien Credit Agreement</u>. Also prior to the Petition Date, the Borrower entered into that certain Second Lien Credit Agreement dated as of May 3, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "**Second Lien Credit**

9

**Agreement**"), among, _inter alia_, Holdings, the Borrower, the lenders party thereto (collectively, "**Second Lien Lenders**") and Deutsche Bank Trust Company Americas ("**DB**"), as administrative agent for the Second Lien Lenders and collateral agent for the Second Lien Claimholders (as defined in the Intercreditor Agreement) (the Second Lien Claimholders and First Lien Claimholders collectively, the "**Prepetition Secured Parties**") (DB, in such capacity, the "**Second Lien Agent**"). Pursuant to the Second Lien Credit Agreement, the Second Lien Agent and the Second Lien Lenders agreed to extend certain loans to the Borrower totaling $330 million in the aggregate.

21. The obligations (the "**Second Lien Obligations**" and, together with the First Lien Obligations, the "**Prepetition Obligations**") of Borrower, Holdings and the Guarantors under the Collateral Documents (as defined in the Second Lien Credit Agreement) (as such documents are amended, restated, supplemented or otherwise modified from time to time, the "**Second Lien Collateral Documents**") were secured by, among other things, a second priority continuing security interest in substantially all of the Debtor's (other than Parent's) assets and property (the "**Second Priority Liens**" and, together with the First Priority Liens, the "**Prepetition Liens**").

22. <u>Second Lien Credit Agreement Forbearance</u>. On March 8, 2011, the Borrower, Holdings and the Second Lien Agent entered into a forbearance agreement (the "**Forbearance Agreement**"), pursuant to which certain of the Second Lien Lenders agreed to forbear on exercising remedies and to continue providing credit to Debtors under the Second Lien Credit Agreement. Under its original terms, the Forbearance Agreement was set to expire on March 25, 2011. By means of four subsequent amendments to the Forbearance Agreement, dated March 23, 2011, April 7, 2011, April 21, 2011 and May 13, 2011, the Forbearance Agreement was extended through September 15, 2011.

23.     _Intercreditor Agreement_.  Pursuant to the Intercreditor Agreement, dated as of May 3, 2007 (the "**Intercreditor Agreement**," attached hereto as Exhibit B, and together with the First Lien Documents and the Second Lien Documents, the "**Prepetition Documents**"), among Holdings, the Borrower, the First Lien Agent, the Second Lien Agent and BofA as Collateral Agent, the Second Priority Liens are subject and subordinate to the First Priority Liens on the terms contained in the Intercreditor Agreement.  Pursuant to Section 6.01 of the Intercreditor Agreement, because the First Lien Agent consents to the use of Cash Collateral during the pendency of the Chapter 11 Cases, the Second Lien Agent may not object to the use of Cash Collateral.  Intercreditor Agreement at § 6.01.  In addition, the Second Lien Agent may not request any form of adequate protection other than the Adequate Protection Replacement Liens and Adequate Protection Super-Priority Claims provided in the Interim Order.  Id. at §§ 6.04(a), (b).

24.     _Mezzanine Credit Agreement_.  Also prior to the Petition Date, the Borrower entered into that certain Mezzanine Credit Agreement dated as of May 3, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "**Mezzanine Credit Agreement**"), among, inter alia, Holdings, the Borrower, the lenders party thereto (collectively, "**Mezzanine Lenders**") and Goldman Sachs Credit Partners L.P. ("**Goldman**"), as administrative agent for the Mezzanine Lenders (Goldman, in such capacity, the "**Mezzanine Agent**").  Pursuant to the Mezzanine Credit Agreement, the Mezzanine Agent and the Mezzanine Lenders agreed to extend certain unsecured loans to the Borrower totaling $70 million in the aggregate.

25.     _Amounts Owed under Prepetition Documents_.  Each of the credit facilities and the amounts owed thereunder is set forth in the chart below.

YCST01: 11460918.4

070649.1001

| Type of Prepetition Indebtedness | Approximate Amount of Outstanding Debt as of the Petition Date |
|---|---|
| First Lien Debt<br>    Revolver<br>    Term B | $430,698,397.58 (in the aggregate)<br>    $22,054,563.23<br>    $408,643,834.35 |
| Second Lien Debt | $330,000,000 |
| Mezzanine Debt | $80,106,753.34 |
| Trade Debt (unsecured) | $30,000,000 |

## Terms and Conditions of the Intercompany Loan and Use of Cash Collateral

### A.    Highlighted Provisions under Bankruptcy Rule 4001[6] and Local Rule 4001-2[7]

26.    The following sets forth the sections of the Intercompany Loan and the Interim Order that are required to be identified in accordance with Rule 4001(c)(i)(B) and Local Rule 4001-2(a)(i):

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| N/A | Borrower | Graceway Pharmaceuticals, LLC | Interim Order: Introductory paragraph (ii) |
| N/A | Lender | Graceway Canada Company | Interim Order: Introductory paragraph (ii) |
| N/A | Size of facility | $6,000,000, available upon entry of the Interim Order. | Interim Order: Introductory paragraph (ii) |
| N/A | Use of proceeds | The proceeds of the Intercompany Loan shall be used to enable the Debtors to continue to operate their | Interim Order: ¶¶ 2 |

---

[6]    Certain provisions referenced in Bankruptcy Rule 4001 are not applicable here: (i) the establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation or entry of a confirmation order, Rule 4001(c)(i)(B)(vi); (ii) indemnification of any entity, Rule 4001(c)(i)(B)(ix); (iii) prepayment premiums, Rule 4001(c)(i)(B)(xii); and (iv) waiver or modification of authority to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, Bankruptcy Rule 4001(c)(i)(B)(v).

[7]    Certain provisions referenced in Local Rule 4001-2 are not applicable here:  (i) roll-up provisions, Local Rule 4001-2(a)(i)(E); (ii) grant of cross-collateralization protection, Local Rule 4001-2(a)(i)(A).

YCST01: 11460918.4                                            070649.1001

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | business, subject to the terms and conditions in the Interim Order, the Approved Budget[8] and Budget Covenants. | |
| N/A | Application of proceeds | Prior to the Cash Collateral Termination Date, proceeds of the Intercompany Loan and the use of Cash Collateral will be used solely for payment of the disbursements set forth in the Approved Budget subject to the terms and conditions of the Interim Order. On or after the Cash Collateral Termination Date, such proceeds will be applied solely (x) to fund (1) unpaid fees required to be paid to the clerk of the Court and to the office of the United States Trustee, whether arising prior to or after the delivery of the Carve-Out Trigger Notice, in an amount equal to $201,250, (2) any unpaid amounts incurred and earned prior to the occurrence of the Cash Collateral Termination Date under each of the Debtors' Professionals Carve-Out Cap and Committee Professionals Carve-Out Cap and (3) the Debtors' Professionals Post Carve-Out Cap and Committee Professionals Post Carve-Out Cap (the aggregate of such amounts in clauses (1), (2) and (3) above, the "**Maximum Carve-Out Amount**") pursuant to the terms of the Interim Order and (y) to pay the First Lien Professional Fees.

Upon any sale or disposition of substantially all of the Adequate Protection Collateral, (i) after the Cash Collateral Termination Date, the Maximum Carve-Out Amount will be funded and the Intercompany Loan will be paid in full pursuant to the Interim Order before any payments will be made on account of the First Lien Obligations and (ii) prior to the Cash Collateral Termination Date, all amounts set forth in section 4(b) of the Sale Support Agreement will be funded and the Intercompany Loan shall be paid in full pursuant to the Interim Order before any payments will be made on account of the First Lien Obligations. | Interim Order: ¶¶ 3, 13 |
| N/A | Amount of loan | The Intercompany Loan consists of a Tranche A Intercompany Loan in aggregate principal amount equal to $3,800,000 and a Tranche B Intercompany Loan in aggregate principal amount equal to | Interim Order: ¶ 5(a) |

---

[8]     A copy of the Approved Budget is attached to the Interim Order as Exhibit 1.

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | $2,200,000. The Borrower has requested authority to borrow the Tranche A Intercompany Loan and Tranche B Intercompany Loan no later than the third day after the entry of the Interim Order. The Borrower seeks authorization to use the proceeds of (i) the Tranche A Intercompany Loan only in accordance with the terms and conditions of the Interim Order, including, without limitation, the Approved Budget and Budget Covenants and (ii) the Tranche B Intercompany Loan only in accordance with the terms and conditions of the Interim Order, including, without limitation, the Approved Budget and Budget Covenants, and with the prior written consent of the Approving Majority First Lien Lenders.[9] At this time, the Approving Majority First Lien Lenders have consented to the use of the proceeds of the Tranche B Intercompany Loan solely to pay the Expense Reimbursement Amount if approved by the Court pursuant to the Bidding Procedures Order (defined below) and due and payable pursuant to the terms of the Asset Purchase Agreement (defined below). | |
| N/A | Interest rate | Interest on the outstanding principal amount of the Intercompany Loan will be capitalized and added to the principal until the outstanding principal amount (including all previously capitalized interest) is paid in full on the Maturity Date. Interest will accrue at 4.75% per annum. Interest will be capitalized quarterly, commencing with the Debtors' fiscal quarter ending December 31, 2011. | Interim Order: ¶ 5(b) |
| N/A | Term/ Maturity date | The Intercompany Loan matures and must be paid in full (including all accrued and previously capitalized interest) on the earlier of one year from the date of entry of the Interim Order or closing of the Sale. | Interim Order: ¶ 5(c) |
| N/A | Fees | Other than payment of reasonable fees, costs and expenses of the First Lien Agent's professionals, no fees, costs, expenses or other charges will accrue or be payable in connection with the Intercompany Loan. | Interim Order: ¶ 5(b) |

---

[9] Approving Majority First Lien Lenders is defined as at least two First Lien Lenders holding in aggregate a majority of the then outstanding First Lien Obligations held by the Consenting First Lien Lenders (as defined in the Sale Support Agreement, dated as of September 28, 2011 (the "**Sale Support Agreement**"), entered by and among the Debtors, Graceway Canada and the First Lien Lenders from time to time party thereto).

14

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| Bankruptcy Rule 4001 (c)(i)(B)(i)<br><br>Local Rule 4001-2(a)(i)(G) | Liens/ security for Postpetition Lender | As security for the Intercompany Loan, the Postpetition Lender will be granted a perfected, first priority, senior priming Lien (the "**DIP Lien**") on all Adequate Protection Collateral (including, without limitation, Cash Collateral) that is senior to (A) the Prepetition Liens, (B) the Adequate Protection Replacement Liens and (C) any Liens that are junior to the Prepetition Liens, after giving effect to any intercreditor or subordination agreements (the Liens referenced in clauses (A), (B) and (C), collectively, the "**Primed Liens**"). | Interim Order: ¶ 5(e) |
| Bankruptcy Rule 4001 (c)(i)(B)(ii) | Adequate protection | The Prepetition Secured Parties will receive, subject in each case to the Intercreditor Agreement: (1) Adequate Protection Replacement Liens to the extent of any Diminution in Value, (2) Adequate Protection Super-Priority Claims to the extent of any Diminution in Value, (3) an adequate protection payment of $973,838.09 from the Debtors to the First Lien Agent within three Business Days of the date of entry of the Interim Order, (4) timely payment of the fees, costs and expenses of the First Lien Agent and its professionals and (5) all information, reports, documents and other material that the First Lien Agent, the Second Lien Agent and their respective advisors may reasonably request (it being understood that the First Lien Agent, the Second Lien Agent and their respective advisors may distribute such information, reports, documents and other material to the First Lien Claimholders and Second Lien Claimholders, as applicable, upon request). | Interim Order: ¶ 4 |
| Local Rule 4001-2(a)(i)(F) | Carve-out<br><br>Disparate treatment of professionals | "**Carve-Out**" means: (i) all unpaid fees required to be paid to the clerk of the Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a), whether arising prior to or after the delivery of the Carve-Out Trigger Notice (defined below); (ii) all reasonable and documented unpaid fees and expenses, including, without limitation, success fees, of professionals retained by the Debtors in these Chapter 11 Cases (the "**Debtors' Professionals**") that are incurred and earned prior to the delivery by the First Lien Agent of a Carve-Out Trigger Notice, have been or are subsequently allowed by the Court, do not exceed the cumulative amount budgeted for each such Debtors' Professional in the applicable line item in the Approved Budget and remain unpaid after application | Interim Order: ¶ 8 |

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | of any retainers (each such budgeted amount, a "**Debtors' Professionals Carve-Out Cap**"); (iii) all reasonable and documented unpaid fees and expenses of professionals retained by the Committee in these Chapter 11 Cases (the "**Committee's Professionals**") and all reasonable and documented unpaid expenses of the members of such Committee ("**Committee Members**") that are, in each case, incurred and earned prior to the delivery by the First Lien Agent of a Carve-Out Trigger Notice and have been or are subsequently allowed by the Court, in an aggregate amount (for both Committee Members and the Committee's Professionals) not to exceed $600,000 (the "**Committee Professionals Carve-Out Cap**"); (iv) all reasonable and documented unpaid fees and expenses, including, without limitation, success fees, of the Debtors' Professionals that are incurred and/or earned on or after the delivery by the First Lien Agent of a Carve-Out Trigger Notice, that are allowed by the Court and remain unpaid after application of any retainers, in an aggregate amount not to exceed the sum of (A) if not paid prior to delivery by the First Lien Agent of a Carve-Out Trigger Notice, the Sale Transaction Fee due and owing to Lazard Frères & Co. LLC ("**Lazard**") as defined in and pursuant to the terms of that certain engagement letter, dated March 12, 2010, between Lazard and the Borrower (the "**Lazard Success Fee**") and (B) $1,250,000 (the "**Debtors' Professionals Post Carve-Out Cap**"); and (v) all reasonable and documented unpaid fees and expenses of the Committee Professionals that are incurred and/or earned on or after the delivery by the First Lien Agent of a Carve-Out Trigger Notice and are allowed by the Court, in an aggregate amount not to exceed $50,000 (the "**Committee Professionals Post Carve-Out Cap**" and together with the Debtors' Professionals Carve-Out Cap, the Debtors' Professionals Post Carve-Out Cap and Committee Professionals Carve-Out Cap, the "**Carve-Out Cap**"). The term "**Carve-Out Trigger Notice**" means a written notice delivered by the First Lien Agent to the Debtors' lead counsel, counsel for the Postpetition Lender, the U.S. Trustee, counsel for the Second Lien Agent, and counsel to any Committee appointed in these Chapter 11 Cases, which notice may be delivered at any time following the occurrence and during the | |

YCST01: 11460918.4

070649.1001

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | continuation of any Event of Default, expressly stating that the Carve-Out is invoked. | |
| Bankruptcy Rule 4001 (c)(i)(B)(x)<br><br>Local Rule 4001-2(a)(i) | 506(c) waiver | Subject to the entry of the Final Order, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases (including, without limitation, any costs and expenses of preserving or disposing of property securing the Prepetition Obligations) will be charged against or recovered from or against any or all of the Prepetition Secured Parties, the Adequate Protection Collateral, the Prepetition Collateral, and the Cash Collateral, in each case, pursuant to Section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the First Lien Agent and the Approving Majority First Lien Lenders and no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the First Lien Claimholders. | Interim Order: ¶ 9 |
| Bankruptcy Rule 4001 (c)(i)(B)(viii) | Release, waiver, or limitation on claims or other causes of action belonging to the estate or the trustee | The Debtors' Stipulations are binding upon the Debtors, Graceway Canada and any Chapter 11 trustee in all circumstances. The Debtors' Stipulations are binding on each other party in interest, including any Committee, unless (i) such Committee or any other party in interest (other than the Debtors, Graceway Canada or any Chapter 11 trustee) obtains the authority to commence and actually commences, or if the Chapter 11 Cases are converted to cases under Chapter 7 prior to the expiration of the Challenge Period (defined below), the Chapter 7 trustee in such Successor Cases actually commences, on or before on or before sixty (60) days after the appointment of any Committee (or if no Committee has been so appointed, seventy-five (75) days from the Petition Date) (such time period shall be referred to as the "**Challenge Period**," and the date that is the last calendar day of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period, shall be referred to as the "**Challenge Period Termination Date**"), (x) a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings or releases included in the Debtors' Stipulations, or (y) a contested matter or adversary proceeding against any or all of the Prepetition Secured Parties in connection with or related to the Prepetition Obligations, or the actions or inactions of any or all of the Prepetition Secured | Interim Order: ¶ 7 |

YCST01: 11460918.4

070649.1001

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | Parties arising out of or related to the Prepetition Obligations, or otherwise, including, without limitation, any claim against any or all of the Prepetition Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim or defense to the Prepetition Obligations (including but not limited to those under Sections 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against any or all of the Prepetition Secured Parties) (the objections, challenges, actions and claims referenced in clauses (x) and (y), collectively, the "**Claims and Defenses**") and (ii) the Court rules in favor of the plaintiff in any such timely and properly commenced contested matter or adversary proceeding. | |
| Bankruptcy Rule 4001 (c)(i)(B)(ii) Local Rule 4001-2(a)(i)(B) | Determination of validity, enforceability, or amount of a prepetition claim | The Debtors' Stipulations are binding on the Debtors, Graceway Canada and any Chapter 11 trustee in all circumstances. As to the Debtors, for themselves and not their estates, Graceway Canada, for itself and its estate, and any Chapter 11 trustee, all Claims and Defenses against the Prepetition Secured Parties are irrevocably waived and relinquished as of the Petition Date. | Interim Order: ¶ 7 |
| Bankruptcy Rule 4001 (c)(i)(B)(iv) | Waiver or modification of the automatic stay | The automatic stay is waived to permit the First Lien Agent, the Second Lien Agent and the Postpetition Lender, as applicable (in the case of the First Lien Agent and Second Lien Agent, solely with respect to the Adequate Protection Replacement Liens) to file financing statements, mortgages, security agreements, notices of Liens and other similar documents.<br><br>The automatic stay otherwise applicable to the First Lien Claimholders is modified, without requiring prior notice to or authorization of the Court, to the extent necessary to permit the Approving Majority First Lien Lenders to exercise the following remedies immediately upon the occurrence of an Event of Default: (i) declare a termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral, including Cash Collateral derived solely from the proceeds of Adequate Protection Collateral, and to use Prepetition Collateral other than in the ordinary course (any such declaration to be made to the Debtors, the Postpetition Lender, counsel to the Committee (if appointed) and the United States Trustee and to be referred to herein as a "**Termination** | Interim Order ¶¶ 6; 14(a), (c) |

YCST01: 11460918.4

070649.1001

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | **Declaration**" and the date which is the earliest to occur of any such Termination Declaration being herein referred to as the "**Termination Declaration Date**") and/or (ii) the First Lien Claimholders shall be permitted to reduce any claim to judgment. The automatic stay is modified to (i) permit the Debtors to grant the Adequate Protection Replacement Liens and the DIP Liens and to incur all liabilities and obligations to the Prepetition Secured Parties and the Postpetition Lender under the Interim Order, (ii) authorize the Postpetition Lender to retain and apply payments hereunder in connection with an Intercompany Loan Default and (iii) otherwise implement and effectuate the provisions of the Interim Order. | |
| Bankruptcy Rule 4001 (c)(i)(B)(v) | Waiver or modification of authority to request use of cash collateral or request authority to obtain credit | No proceeds from the Intercompany Loan, Adequate Protection Collateral, Cash Collateral, Prepetition Collateral, or any portion of the Carve-Out may be used by any of the Debtors, any Committee, any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, or any other person, party or entity to (or to pay any professional fees and disbursements incurred in connection therewith) request authorization to obtain postpetition loans or other financial accommodations pursuant to Bankruptcy Code Section 364(c) or (d), or otherwise, other than the Intercompany Loan or loans used to refinance the First Lien Obligations in full. | Interim Order ¶ 15 |
| Bankruptcy Rule 4001 (c)(i)(B)(vii) | Waiver or modification of applicability of non-bankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | To the extent of any Diminution in Value, the First Lien Agent and Second Lien Agent, for the benefit of the First Lien Claimholders and Second Lien Claimholders, as applicable, are granted, pursuant to Sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, Adequate Protection Replacement Liens upon all Adequate Protection Collateral. The DIP Liens granted to the Postpetition Lender are first priority senior Liens that (i) are subject only to (A) valid, enforceable, non-avoidable and perfected Liens in existence on the Petition Date that (I) after giving effect to any intercreditor or subordination agreement, are senior in priority to the Prepetition Liens and (II) are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code and after giving effect to any intercreditor or | Interim Order ¶¶ 4(a); 5(f). |

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | subordination agreement are senior in priority to the Prepetition Liens (collectively, the "**Prepetition Prior Liens**") and (B) the Carve-Out (to the extent provided in the provisions of the Interim Order), and (ii) are senior to all prepetition and postpetition Liens of any other person or entity (including, without limitation, the Primed Liens). The DIP Liens and the DIP Super-Priority Claims (A) are not subject to Sections 510, 549, 550 or 551 of the Bankruptcy Code or, subject to entry of the Final Order, Section 506(c) of the Bankruptcy Code, (B) are not be subordinate to, or pari passu with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under Section 551 of the Bankruptcy Code or (y) any other intercompany or affiliate Liens of the Debtors, and (C) are valid and enforceable in any Successor Case and/or upon the dismissal of any of the Chapter 11 Cases.<br><br>The Interim Order is sufficient and conclusive evidence of the validity, enforceability, perfection and priority of the Adequate Protection Replacement Liens and the DIP Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or (b) taking any other action to validate or perfect the Adequate Protection Replacement Liens and the DIP Liens or to entitle the Adequate Protection Replacement Liens and the DIP Liens to the priorities granted in the Interim Order. | |
| Bankruptcy Rule 4001 (c)(i)(B)(xi)<br><br>Local Rule 4001-2(a)(i)(D) | Liens granted on claims arising under chapters 5 or 7 | Subject to entry of a Final Order, Adequate Protection Collateral includes proceeds of Avoidance Actions, and is subject to the DIP Liens and the Adequate Protection Replacement Liens. | Interim Order ¶¶ 4(a), 5(e) |

## B.     Summary of Principal Terms of the Intercompany Loan

27.     The terms and conditions of the Intercompany Notes, the Intercompany Guarantee and the Interim Order were negotiated by the parties in good faith and at arm's length, and are

20

fair and reasonable under the circumstances. Accordingly, the Postpetition Lender should be accorded the benefits of Section 364(e) of the Bankruptcy Code in respect of such agreement.

28. The Intercompany Loan consists of a tranche A intercompany term loan in aggregate principal amount equal to $3,800,000 (the "**Tranche A Intercompany Loan**") and a tranche B intercompany term loan in aggregate principal amount equal to $2,200,000 (the "**Tranche B Intercompany Loan**"). The Debtors agree to use the proceeds of the Tranche A Intercompany Loan and Tranche B Intercompany Loan only in accordance with the terms and conditions of the Interim Order, including, without limitation, the Approved Budget and Budget Covenants. The Debtors further agree to use the proceeds of the Tranche B Intercompany Loan only with the prior written consent of the Approving Majority First Lien Lenders (defined below); provided, however, that the Approving Majority First Lien Lenders have consented to the use of the proceeds of the Tranche B Intercompany Loan to pay the Expense Reimbursement Amount (as defined in the Asset Purchase Agreement, defined below) if approved by the Court pursuant to the Bidding Procedures Order and due and payable pursuant to the terms of the Asset Purchase Agreement).

29. Interest on the outstanding principal amount of the Intercompany Loan will be capitalized and added to the principal amount until the outstanding principal amount (including all previously capitalized interest) is paid in full on the Maturity Date (defined below). Interest will accrue at 4.75% per annum. Interest will be capitalized quarterly, commencing with the Debtors' fiscal quarter ending December 31, 2011. No fees, costs, expenses or other charges will accrue or be payable in connection with the Intercompany Loan.

30. The Intercompany Loan matures and must be paid in full (including all accrued and previously capitalized interest) on the earlier of one year from the date of entry of the

21

Interim Order or the effective date of the Debtors' chapter 11 plan (the "**Maturity Date**"). The Intercompany Loan is also due and payable upon consummation of the Sale and the Majority First Lien Lenders have agreed, and the DIP Orders provide, that the proceeds of the Sale will be used to repay the Intercompany Loan prior to the payment of the First Lien Obligations.

31.     The provisions above were negotiated and are necessary for the Borrower to procure the financing made available under the Intercompany Loan in a sufficient amount and on a timely basis. The Debtors believe that the Postpetition Lender is acting in good faith and is providing to the Debtors' estates with reasonably equivalent value and fair consideration in exchange for the treatment of the Postpetition Lender pursuant to the Interim Order.

**C.      Use of Cash Collateral**

32.     During the ordinary course of operations, the Debtors generate cash from the use of the assets pledged under the Prepetition Documents. The Debtors use Cash Collateral in the normal course of their business in order to finance their operations and make essential payments, such as employee payroll, taxes and inventory. As of the Petition Date, the Debtors' books reflect a cash balance of approximately $4.5 million. It is imperative that the Debtors obtain authority to use Cash Collateral. Without the use of Cash Collateral, the Debtors will be unable to meet their working capital needs. The Debtors therefore request authorization to use the proceeds of the Prepetition Secured Parties' collateral and Cash Collateral in accordance with the terms of the Intercompany Loan and the DIP Orders to fund the Debtors' operation of their businesses.

33.     The consensual Cash Collateral use arrangement is predicated upon specific sale milestones that, unless otherwise waived by the Approving Majority First Lien Lenders, the Debtors must take all action reasonably necessary to achieve. The sale milestones include: (a)

22

filing the Sale Motion on or within three (3) business days following the Petition Date; (b) entry of a Court order (the "**Bidding Procedures Order**") approving the procedures for bidding on the Debtors' assets (the "**Bidding Procedures**") on or within forty-five (45) days after the Petition Date; (c) entry of a Court order (the "**Sale Order**") approving the Sale by January 2, 2012; and (d) the consummation of the Sale by January 27, 2012. In addition, the consensual Cash Collateral use arrangement requires the Debtors to enter into the asset purchase agreement dated September 27, 2011 (the "**Asset Purchase Agreement**") or another transaction (the "**Alternative Transaction**") that is acceptable to the Postpetition Lender and the Approving Majority First Lien Lenders.

      D.     **Adequate Protection**

      34.     As adequate protection for the interests of the Prepetition Secured Parties in the Prepetition Collateral (including Cash Collateral) the Debtors have agreed to provide to the Prepetition Secured Parties the following (collectively, the "**Prepetition Secured Parties' Adequate Protection Obligations**"):

| | | |
|---|---|---|
| **Adequate Protection:** | (a) | <u>Adequate Protection Replacement Liens</u>. To the extent of the diminution in value of the respective interests of the Prepetition Secured Parties in the respective Prepetition Collateral, including, without limitation, the Cash Collateral, from and after the Petition Date, calculated in accordance with Section 506(a) of the Bankruptcy Code, resulting from the use, sale or lease by the Debtors of the applicable Prepetition Collateral, including, without limitation, the Cash Collateral, the granting of the DIP Liens, the subordination of the Prepetition Liens thereto and to the Carve-Out and the imposition or enforcement of the automatic stay of Section 362(a) (collectively, "**Diminution in Value**") (in addition to (but without duplication of) any claim for Diminution in Value that may arise during the course of the Chapter 11 Cases, the First Lien Claimholders shall have (solely upon entry of the Final Order) a valid, binding and enforceable claim for Diminution in Value equal to the product of (x) 1 minus the quotient of the U.S. Cash Consideration and the |

23

Cash Consideration (in each case, as defined in the Sale Support Agreement) and (y) the sum of the amounts set forth in Section 4(b) of the Sale Support Agreement that are authorized to be paid in accordance with the Sale Order), the First Lien Agent and Second Lien Agent, as applicable, for the benefit of the First Lien Claimholders and Second Lien Claimholders, as applicable, are hereby granted, subject to the terms and conditions set forth below, pursuant to Sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, replacement Liens upon all property of the Debtors, now existing or hereinafter acquired, as more fully described in the Interim Order (collectively, the "**Adequate Protection Collateral**" and such adequate protection replacement liens, the "**Adequate Protection Replacement Liens**"), which shall be subject and subordinate only to (i) the DIP Liens, (ii) the Prepetition Prior Liens, (iii) the payment of the Carve-Out and (iv) with respect to the Adequate Protection Replacement Liens granted to the Second Lien Agent for the benefit of the Second Lien Claimholders only, the Adequate Protection Replacement Liens granted to the First Lien Agent for the benefit of the First Lien Claimholders. For the avoidance of doubt, the Adequate Protection Replacement Liens granted to the Second Lien Agent for the benefit of the Second Lien Claimholders shall be subordinated to the Adequate Protection Replacement Liens granted to the First Lien Agent for the benefit of the First Lien Claimholders on the same basis as the Second Priority Liens are subordinated to the First Priority Liens under the Intercreditor Agreement

(b)     Super-Priority Administrative Claim.  To the extent of Diminution in Value, the First Lien Claimholders and Second Lien Claimholders are granted allowed super-priority administrative Adequate Protection Super-Priority Claims, against each of the Debtors pursuant to Sections 361, 363(e), 364(d)(1) and 507(b) of the Bankruptcy Code which shall have priority, subject only to (i) the DIP Super-Priority Claims, (ii) the payment of the Carve-Out and (iii) with respect to the Adequate Protection Super-Priority Claims granted to the Second Lien Claimholders, the Adequate Protection Super-Priority Claims granted to the First Lien Claimholders, over all administrative expense claims, adequate protection and other diminution claims, unsecured claims and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or

24

attachment. The Adequate Protection Super-Priority Claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof, provided, however, that (i) to the extent the Cash Collateral Termination Date shall have occurred, the Maximum Carve-Out Amount shall be funded and the Intercompany Loan shall be paid in full (including all accrued and previously capitalized interest thereon) in cash before any payments shall be made on account of the Adequate Protection Super-Priority Claims and (ii) to the extent the Cash Collateral Termination Date shall not have occurred, all amounts set forth in section 4(b) of the Sale Support Agreement shall be funded (provided, the Sale shall have been consummated) and the Intercompany Loan shall be paid in full (including all accrued and previously capitalized interest thereon) in cash before any payments shall be made on account of the Adequate Protection Super-Priority Claims, in each case, in accordance with the terms of the Interim Order. Other than as provided in the Interim Order with respect to the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the Adequate Protection Replacement Liens and the Adequate Protection Super-Priority Claims.

(c)     Adequate Protection Payments, Professional Fees and Information. The Debtors will (i) within 3 Business Days of the date of entry of the Interim Order pay to the First Lien Agent a cash amount equal to $973,838.09, (ii) timely pay in cash all reasonable out of pocket fees, costs and expenses of the First Lien Agent (including, without limitation, payment in advance of the agency fee required to be paid pursuant to Section 2.11(c) of the First Lien Credit Agreement) and its professionals, including, without limitation, Morgan, Lewis & Bockius LLP, as financing counsel, Wachtell, Lipton, Rosen & Katz, as special restructuring and bankruptcy counsel, DLA Piper LLP, as local counsel, one foreign counsel and one financial advisor (collectively, the "**First Lien Professional Fees**"), in each case, on a regular monthly basis during the

25

Chapter 11 Cases, without further notice, motion or application to, order of, or hearing before, the Court provided that after consummation of the Sale, if the proceeds of the Sale are not sufficient to satisfy the claims of the First Lien Lenders in full, the First Lien Agent shall pay such fees and expenses from proceeds of the Sale that would otherwise be distributed to the First Lien Agent for the benefit of the First Lien Lenders withheld for such purpose and (iii) deliver to the First Lien Agent, the Second Lien Agent and their respective advisors all information, reports, documents and other material that they may reasonably request, either directly or through their professionals (it being understood that the First Lien Agent, the Second Lien Agent and their respective advisors shall be permitted in their sole discretion to distribute such information, reports, documents and other material to the First Lien Claimholders and Second Lien Claimholders, as applicable, upon request).

(d)     Right to Seek Additional Adequate Protection. Subject to the terms of the Intercreditor Agreement, any Prepetition Secured Party may request further or different adequate protection, and the Debtors or any other party in interest may (subject to the Intercreditor Agreement) contest any such request. Any such further or different adequate protection shall at all times be subordinate and junior to the DIP Super-Priority Claims and DIP Liens of the Postpetition Lender.

35.     The First Lien Agent and the Majority First Lien Lenders have consented to the foregoing arrangements to provide the Prepetition Secured Parties' Adequate Protection. Moreover, the Majority First Lien Lenders have agreed that, except for the one-time $973,838.09 adequate protection payment, payments servicing the First Lien Obligations, including payment of currently accruing interest and fees (except as set forth above), will not be part of the Adequate Protection received by the Prepetition Secured Parties.

**E.     Approved Budget**

36.     The consensual use arrangement of Prepetition Collateral described in the Interim Order is governed by the Approved Budget attached to the Interim Order as Exhibit A, which is

26

divided into two parts. From the Petition Date through and including January 27, 2012, the budget consists of a rolling weekly cash flow budget (the "**Pre-Sale Approved Budget**"). From and including January 28, 2012 through and including June 30, 2012, the budget consists of a rolling monthly cash flow budget (the "**Wind-Down Approved Budget**"). In each case, the Approved Budget reflects on a line-item basis the Debtors' projected (1) aggregate cash receipts, (2) disbursements (including professional fees and capital expenditures) and (3) cash on hand (collectively, "**Aggregate Liquidity**"), on a weekly or monthly basis as applicable. If the Debtors have filed a plan of reorganization or liquidation that is reasonably acceptable to the First Lien Agent and Approving Majority First Lien Lenders and the Court has entered an order approving the Debtors' related disclosure statement on or before June 30, 2012, and the Debtors are using reasonable best efforts to confirm such plan, then the Wind-Down Approved Budget will automatically be extended from June 30, 2012 through July 31, 2012. Furthermore, in the event the Wind-Down Approved Budget is extended through July 31, 2012, the Debtors are prohibited from using Prepetition Collateral during the extension in excess of the amounts provided under the Wind-Down Approved Budget through June 30, 2012. The Approved Budget may be amended with the consent of the First Lien Agent and the Approving Majority First Lien Lenders.

## Basis for Relief

### F.    Approval Pursuant to Section 364(c) of the Bankruptcy Code

37.    The Debtors propose to obtain financing under the Intercompany Loan by providing security interests and liens as set forth above pursuant to Sections 364(c) and (d) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under Section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured

27

credit allowable under Section 503(b)(1) of the [the Bankruptcy Code] . . . " 11 U.S.C. § 364(c).

Financing pursuant to Section 364(d) of the Bankruptcy Code is appropriate when the trustee or

debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative

claim. See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor

must show that it has made reasonable effort to seek other sources of financing under Sections

364(a) and (b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D.

Pa. 1987) (secured credit under Section 364(c)(2) of the Bankruptcy Code is authorized, after

notice and hearing, upon showing that unsecured credit cannot be obtained).

     38.    Courts have articulated a three-part test to determine whether a debtor is entitled

to financing under Section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> (a)     the debtor is unable to obtain unsecured credit under Section 364(b), i.e., by allowing a lender only an administrative claim;

> (b)     the credit transaction is necessary to preserve the assets of the estate; and

> (c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39; see also In re St. Mary Hospital, 86 B.R. 393,

401-02 (Bankr. E.D. Pa. 1988); In re Crouse Group, Inc., 71 B.R. at 549.

     39.    Prior to negotiating the Intercompany Loan, the Debtors considered other sources

of postpetition financing to determine whether they could obtain debtor in possession financing

on better terms. The First Lien Lenders were unwilling to subordinate their First Priority Lien to

financing from any other source than the Postpetition Lender. Based on current capital markets

conditions, after consultation with their investment bankers, the Debtors determined that

postpetition financing on an unsecured basis or on a junior priority basis to the Prepetition

28

Secured Parties would be unobtainable. Without the postpetition financing, the Debtors would not be able to ensure that they would be able to continue operations without interruption. The failure to continue to operate pending the Sale would significantly impair the value of the Debtors' assets and the Debtors' ability to maximize value through the proposed Sale or any other restructuring. Given the Debtors' circumstances and the volatile conditions and lack of liquidity in the capital markets, the Debtors believe that the terms of the Intercompany Loan are fair, reasonable and adequate, all as more fully set forth below.

### G. Approval of Priming Liens and Adequate Protection Pursuant to Section 364(d) of the Bankruptcy Code

40. If a debtor is unable to obtain credit under the provisions of Section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d). The DIP Liens are valid, binding, enforceable and fully perfected as of the date the Interim Order is entered, and will prime and be senior in all respects to the Prepetition Liens and the Adequate Protection Replacement Liens (each as defined in the Interim Order) pursuant to Section 364(d) of the Bankruptcy Code, and are subject only to the Carve-Out and the Prepetition Prior Liens. The DIP Liens do not prime any Prepetition Prior Liens.

41. Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

      (a)    the trustee is unable to obtain credit otherwise; and

      (b)    there is adequate protection of the interest of the holder of the lien on the property of the estate on

29

which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

42. The Bankruptcy Code does not explicitly define "adequate protection." Section 361 of the Bankruptcy Code does, however, provide three nonexclusive examples of what may constitute "adequate protection" of an interest of an entity in property under Sections 362, 363 or 364 of the Bankruptcy Code:

> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the...use...under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

> (2) providing to such entity an additional or replacement lien to the extent that such...use...or grant results in a decrease in the value of such entity's interest in such property; or

> (3) granting such other relief...as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

43. Similarly, the Bankruptcy Code does not expressly define the nature and extent of the "interest in property" of which a secured creditor is entitled to adequate protection under Section 361, 363, and 364. However, the Bankruptcy Code plainly contemplates that a qualifying interest demands protection only to the extent that the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property." See 11 U.S.C. § 361. Indeed, courts have repeatedly held that the purpose of adequate protection "is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization." In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); see also In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (same); Bank of New England v. BWL, Inc., 121 B.R. 413, 418 (D. Me. 1990) (same); In re Beker Indus. Corp., 58 B.R. 725,

30

736 (Bankr. S.D.N.Y. 1986) (focus of adequate protection "is protection of the secured creditor from diminution in the value of its collateral during the reorganization process").

44.     The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  See In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."  Id. (quoting In re Beker Indus. Corp., 58 B.R. at 736).  The Debtors have concluded that financing comparable to that provided by the Postpetition Lender under the Intercompany Loan is currently unobtainable.

45.     In accordance with Section 364(d) of the Bankruptcy Code, and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides the Prepetition Lenders with the Adequate Protection as described above, including: (a) adequate protection liens, (b) adequate protection superpriority claims, and (c) payment of certain professional fees incurred by the First Lien Agent.  Moreover, the Debtors anticipate a Sale of all or substantially all of the their assets, subject to a marketing and auction process to determine the highest or otherwise best offer.  Subject to the terms and conditions of the Sale Support Agreement, the net proceeds of Sale will be used to, among other things, pay the Prepetition Obligations on the Sale consummation date.  This process further provides adequate protection to the Prepetition Secured Parties since the Debtors are simply seeking to utilize the Prepetition Secured Parties' cash collateral to monetize their non-cash collateral.

46.     The First Lien Agent and the Majority First Lien Lenders have consented to the foregoing Adequate Protection arrangements and the priming of their respective liens.

YCST01: 11460918.4                                                                   070649.1001

### C.   Use of Cash Collateral

47.   Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.[10] Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

48.   Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course set forth in Section 363 of the Bankruptcy Code. Specifically, a trustee or debtor in possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

> (A)   each entity that has an interest in such collateral consents; or
>
> (B)   the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of [Section 363 of the Bankruptcy Code].

11 U.S.C. § 363(c)(2).

49.   The Debtors submit that, under the circumstances here, their request to use Cash Collateral should be approved. The First Lien Agent and the Majority First Lien Lenders have consented to the use of Cash Collateral provided that the relief requested herein is granted.

---

[10]   Pursuant to Section 1107 of the Bankruptcy Code, a debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363 of the Bankruptcy Code. See 11 U.S.C. § 1107(a).

**D.** **No Comparable Alternative to the Intercompany Loan is Currently Available**

50. A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Sections 364(c) and (d) of the Bankruptcy Code. See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). The Debtors determined, after consultation with their investment bankers, that no alternative postpetition financing could be obtained on terms equal to or more favorable than the Intercompany Loan. The Debtors believe that the Majority First Lien Lenders would not consent to their liens being primed by any postpetition credit facility other than the Intercompany Loan, and that a non-consensual priming fight would be required in order to obtain a different postpetition credit facility. Accordingly, the Debtors determined that the financing provided under the terms of the Intercompany Loan was the only financing available on comparable terms. Thus, in addition to evidence to be introduced at the Interim Hearing if necessary, the Debtors submit that the requirements of Sections 364(c) and (d) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors is satisfied.

**E.** **The Intercompany Loan Terms are Fair, Reasonable and Adequate**

51. The proposed terms of the Intercompany Loan are fair, reasonable and adequate given today's market and the facts of these cases. The purpose of the Intercompany Loan is to provide the Debtors with sufficient working capital and liquidity to bridge the Debtors to consummation of a going-concern sale of their assets pursuant to Section 363 of the Bankruptcy Code.

52. The proposed Intercompany Loan provides that the security interests and administrative expense claims granted to the Postpetition Lender and Prepetition Secured Parties

33

are subject to the Carve-Out.  In re Ames Dep't Stores, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. Id. at 40.

**F.**     **The Section 506(c) Waiver in the Final Order Should Be Approved**

53.     The Court should approve the Debtors' waiver, in the Final Order, of any right to surcharge any or all of the Prepetition Secured Parties or the Postpetition Lender, their respective claims, or their respective collateral.  Such waivers and provisions are standard and customary under financings between sophisticated parties.  As one court noted in discussing the later enforceability of such waivers, "the Trustee and Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estates (including a substantial carve-out for the benefit of administrative creditors)." In re Molten Metal Technology, Inc., 244 B.R. 515, 527 (Bankr. D. Mass. 2000).  See also In re Nutri/System of Florida Assocs., 178 B.R. 645, 650 (E.D. Pa. 1995) (noting that debtor had waived § 506(c) rights in obtaining debtor in possession financing); In re Telesphere Communications, Inc., 179 B.R. 544, 549 (Bank. N.D. Ill. 1994) (approving settlement between debtor and certain lenders wherein debtor waived certain rights (including 506(c) rights) against the lenders in exchange for valuable consideration).

54.     The waiver of surcharge rights is particularly appropriate where, as here, it is tied to the benefit to be received from the Prepetition Secured Parties and the Postpetition Lender by allowing the Debtors to continue to use Cash Collateral and the proceeds of the Collateral to fund the administration of the Debtors' estates in accordance with the Approved Budget.  See In re Lunan Family Restaurants Ltd. P'ship, 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof

34

is on any proponent of § 506(c) treatment, who must show by a preponderance of evidence that (1) the expenditure was necessary, (2) the amounts were reasonable, and (3) the secured creditor was the party primarily benefited by the expenditure].") (citing In re Flagstaff, 739 F.2d 73, 77 (2d Cir. 1984) and New Orleans Public Service Inc. v. Delta Towers, Ltd. (In re Delta Towers), 112 B.R. 811, 815 (E.D. La. 1990), rev'd on other grounds sub nom., In re Delta Towers, 924 F.2d 74 (5th Cir. 1991).

### G.    Modification of Automatic Stay

55.    The Intercompany Loan contemplates a modification of the automatic stay to the extent applicable and necessary, to permit the parties to implement the terms of the DIP Orders. In addition, the consensual Cash Collateral use arrangement requires a modification of the automatic stay so that, upon the occurrence and during the continuance of an Event of Default, the Postpetition Lender and Prepetition Secured Parties may exercise all rights and remedies as set forth in the Interim Order. Provisions of this kind are standard in debtor-in-possession financing and are reasonable under the circumstances.

### H.    Interim Approval Should Be Granted

56.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to Section 364 of the Bankruptcy Code or to use cash collateral pursuant to Section 363 may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

57.    The Debtors request that the Court hold and conduct the Interim Hearing to consider entry of the Interim Order authorizing the Debtors from and after entry of the Interim

Order until the Final Hearing to receive the loan contemplated by the Intercompany Loan and to use Cash Collateral. This relief will enable the Debtors to operate their business in a manner that will permit them to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### I.     <u>Notice Procedures and the Final Hearing</u>

58.     Pursuant to Local Rule 4001-2(c), the Final Order may only be entered after notice and a hearing, and a hearing to consider the Final Order is ordinarily not held until at least ten (10) days after the organizational meeting of the creditors' committee. The Debtors shall, within three business days of the entry of the Interim Order by the Court, serve by overnight mail, a copy of the Interim Order and a notice of the Final Hearing (the "**<u>Final Hearing Notice</u>**") to consider entry of the Final Order on the date established by the Court.

59.     The Debtors respectfully request that the Court schedule the Final Hearing on this Motion no later than thirty-five (35) days after the Petition Date. Such relief is necessary in order to maintain ongoing operations and avoid immediate and irreparable harm and prejudice to the Debtors' respective estates.

### <u>Notice</u>

60.     No trustee, examiner or creditors' committee has been appointed in the Chapter 11 Cases. The Debtors, through the Debtors' proposed claims, noticing, soliciting and balloting agent, BMC Group, Inc., have provided notice of this Motion to: (a) the United States Trustee for the District of Delaware; (b) financing counsel to the First Lien Agent; (c) special restructuring and bankruptcy counsel to the First Lien Agent; (d) counsel to the Second Lien Agent; (e) the administrative agent for the lenders under the Debtors' prepetition unsecured mezzanine credit facility; (f) the creditors listed on the Debtors' consolidated list of 30 largest unsecured creditors,

        

as filed with the Debtors' chapter 11 petitions; (g) the Food and Drug Administration; (h) the Internal Revenue Service; (i) the U.S. Public Health Service; (j) the Centers for Medicare and Medicaid Services; (k) all parties requesting notice pursuant to Bankruptcy Rule 2002; and (l) each entity with an interest in the Prepetition Collateral. In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

61.     A copy of the Motion is available on the Court's website: www.deb.uscourts.gov. Additional copies of the Motion are available for free on the website of the Debtors' proposed claims, noticing, soliciting and balloting agent, BMC Group, Inc., at www.bmcgroup.com/graceway, or can be requested by calling (800) 655-1129 from within the United States or +1 310 321 5555 if calling from outside the United States.

YCST01: 11460918.4

070649.1001

WHEREFORE, the Debtors respectfully request that this Court (i) enter the Interim Order, substantially in the form attached hereto as Exhibit A; (ii) after the Final Hearing, enter the Final Order substantially in the form that shall be filed with the Court; and (iii) grant such other and further relief as this Court deems appropriate.

Dated: September 29, 2011
Wilmington, Delaware

Respectfully Submitted,

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

David S. Heller
Josef S. Athanas
Matthew L. Warren
LATHAM & WATKINS LLP
Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS-IN-POSSESSION